No. 17-2400

---

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

---

**In re FEDEX GROUND PACKAGE SYSTEM, INC.,
EMPLOYMENT PRACTICES LITIGATION**

**THIS DOCUMENT RELATES TO:
Michael Tofaute, et al. v. FedEx Ground
Package System, Inc.**

---

On Appeal from the United States District Court for
the Northern District of Indiana
Civil No. 3:05-cv-00595-RLM-CAN (NJ)
The Honorable Judge Robert L. Miller Jr.

---

**APPENDIX**

---

**DiSABATO & BOUCKENOOGHE LLC**
David J. DiSabato, Esq.
Lisa R. Bouckenooghe, Esq.
4 Hilltop Road
Mendham, New Jersey 07945
Tel.: 973-813-2525
Fax: 973-900-8445
ddisabato@disabatolaw.com
lbouckenooghe@disabatolaw.com

**NAGEL RICE LLP**
Greg M. Kohn, Esq.
103 Eisenhower Parkway
Roseland, New Jersey 07068
Tel.: 973-618-0400
Fax: 973-618-9194
gkohn@nagelrice.com

*Attorneys for Appellants – Objectors/New Jersey Class Representatives*

## **INDEX TO APPENDIX**

Transcript of Oral Argument held on March 14, 2017.....A-0073-172

# <u>APPENDIX</u>

# INDEX TO APPENDIX

Transcript of Oral Argument held on March 14, 2017.....A-0073-172

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS

1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF INDIANA
2                              SOUTH BEND DIVISION

3    IN RE:   FEDEX GROUND PACKAGE
     SYSTEM, INC., EMPLOYMENT PRACTICES    CAUSE NUMBER
4    LITIGATION                            3:05MD00527 (MDL 1700)

5
                     excerpt TRANSCRIPT OF PROCEEDINGS
6                            MARCH 14, 2017
              BEFORE THE HONORABLE ROBERT L. MILLER, JR.
7

8    APPEARANCES:

9    For Plaintiffs:        MR. ROBERT HARWOOD
                            MR. MATTHEW HOUSTON
10                          MS. SUSAN ELLINGSTAD
                            MS. BETH ROSS
11                          MR. GORDON RUDD
     For NJ Plaintiffs:     MR. GREG M. KOHN
12                          MS. LISA R. BOUCKENOOGHE
                            (See docket for addresses)
13

14   For the Defendant:     MS. ALISON FOX
                            MR. BENJAMIN FERRON
15                          MR. JIM ENGLISH
                            MR. JASON NORRIS
16                          MR. JOSEPH MILCOFF
                            MR. SCOTT VOELZ
17                          (See docket for address)

18

19                         *DEBRA J. BONK*
        *Federal Certified Realtime and Registered Merit Reporter*
20                  *United States District Court*
                 *204 South Main Street - Room 323*
21                  *South Bend, Indiana 46601*
                 *debra_bonk@innd.uscourts.gov*
22                      *574-246-8039*

23

24   *Proceedings reported in machine shorthand.  Transcript*
     *produced by Computer-Aided Transcription - ECLIPSE*
25

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1                          ***

2

3

4

5

6        **THE COURT:**  Well, we're about 40 minutes early for

7  New Jersey.

8        Do you have people who are going to be on the phone

9  listening in or are you folks all ready to roll?

10       **MR. KOHN:**  We're ready to roll, Your Honor.

11       **THE COURT:**  Okay.  Are you folks ready to roll?

12       **MR. KOHN:**  Your Honor, we've got to plug in a

13  computer there.

14        Should we do that now before we get started?

15       **THE COURT:**  Yeah, why don't we take a break and let

16  you do that.

17       **MR. KOHN:**  I think FedEx will be nice enough to let

18  us use a spot over there.

19       **THE COURT:**  Okay.  We'll take a break to let you set

20  up your presentation.

21       **MS. ROSS:**  Do we have time for the restroom?

22       **THE COURT:**  I'm sorry?

23       **MS. ROSS:**  Time for the restroom?

24       **THE COURT:**  Oh, yes.

25       We'll plan to start, say, at five after 10:00.  Let

1    us know if you need more time than that to set up the

2    equipment.

3              **MR. KOHN:**  Thank you, Your Honor.

4              **(Short recess taken.)**

5         **MS. ROSS:**  Your Honor.

6         **THE COURT:**  Yes.

7         **MS. ROSS:**  Just whenever you're ready.

8         **THE COURT:**  Okay.  This is the final one of these

9    hearings.  This is the New Jersey case, **Tofaute**, I'm told, or

10   **Tofaute**, our Cause is 05CV495, and, here, we have, roughly, 44

11   objections.

12             What I would propose to do, in the way of proceeding,

13   is a little different than what we've done on the first 14.

14   Obviously, I'd invite co-lead counsel to lead off because the

15   burden, as far as fairness and the fee petition, rests on the

16   class counsel; then invite the objectors to present; then turn

17   to FedEx Ground to see if you have anything to add; then turn

18   it back -- and since the objectors carry a burden on the

19   discovery request and, I think, an effective burden on the

20   megafund issue, will give both class counsel the chance to

21   speak after FedEx does and then the objectors the chance to

22   speak after class counsel does.  So, I think, that way,

23   everybody who has a burden gets a chance to speak twice and

24   comment on what went before.

25             So, Ms. Ross, you may lead off.

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1    **MS. ROSS:**  Okay.  Just as a matter of housekeeping,

2  it appears there's some visuals here that have not been shown

3  to me.  And so if there's going to be any kind of visual

4  presentation, we would like to see whatever slides are going to

5  be presented.

6         **THE COURT:**  Well, I think, given what I proposed, you

7  have the right to respond to whatever they do.

8         If there's anything to be shown in the second time up

9  for the objectors that wasn't for the first time, then I would

10 ask that you show that to Ms. Ross, but that decision can be

11 made after FedEx speaks so she'll have a chance to respond to

12 it.

13        **MS. ROSS:**  Okay.  Very good.  Okay.  Thank you, Your

14 Honor.

15        The **Tofaute** case --

16        **THE COURT:**  Oh, I'm sorry.  Wait, wait, wait, wait.

17        Could I ask you folks to state your appearances, for

18 the record?  I know everybody up here.

19        We can hear there, if you just keep your voices up.

20        **MR. KOHN:**  Greg Kohn, from Nagel Rice, on behalf of

21 the seven New Jersey class reps.

22        **THE COURT:**  Okay.

23        **MR. DiSABATO:**  J. David DiSabato, from DiSabato &

24 Bouckenooghe, on behalf of --

25        **THE COURT:**  Mr. DiSabato.

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1           **COURT REPORTER:**  I didn't hear that last part.

2           On behalf of?

3           **MR. DiSABATO:**  The seven New Jersey representatives.

4           **MS. BOUCKENOOGHE:**  Lisa Bouckenooghe, from DiSabato &

5     Bouckenooghe, also on behalf of the seven class reps.

6           **THE COURT:**  Ms. Bouckenooghe, okay.

7           Now I think I'm done interrupting.  You may proceed.

8           **MS. ROSS:**  Okay.  Thank you, Your Honor.

9           So we're here, Number 20, to talk about the **Tofaute**

10    settlement.  The **Tofaute** case was filed in, I believe, May of

11    2005.  The class period in the case goes back to May 19th,

12    1999, the class cut-off -- the class membership period cut-off

13    in October 15, 2007 when the Court issued its class

14    certification order.

15          There are 889 members of the New Jersey class.  And

16    the case settled, following a long, bruising day of mediation,

17    for $25.5 million on February 1st.  The net settlement fund,

18    after deductions for a 30 percent fee, $105,000 in incentive

19    awards to the seven class representatives, administration costs

20    and so forth, will be $17,430,000.  The average recovery per

21    class member will be $19,301, and the range of recoveries is

22    between 250 and $71,194.

23          The claims in the New Jersey case were threefold.

24    The lead claim and the most valuable of them all was a claim

25    asserted under New Jersey's wage payment law, which, in the

1   scheme of state wage deduction statutes, is extremely

2   protective, stronger than most.  It prohibits wage deductions

3   of any kind from employee compensation, unless specifically

4   enumerated in the statute itself, and so that provided the

5   Plaintiffs, in this case, a very strong platform for recovery

6   of the many forms of expenses that were deducted by FedEx from

7   their compensation, including for things like their uniforms;

8   various forms of insurance; in some cases, for fuel; and so on.

9         In Plaintiffs' view, we had -- there was some

10  authority that FedEx relied upon for the proposition that the

11  uniform costs and the vehicle and work accident insurance

12  deductions were permissible under the statute.  And if FedEx

13  had been correct about that, about 60 percent of the damages

14  would have been compromised.  It was our view that we had the

15  better argument and were very likely to defeat that argument,

16  but we appreciated the risk.

17        The value calculated by our expert for the wage

18  payment law claim was $46,733,000, which included the value of

19  the deductions, plus accrued interest -- accrued statutory

20  interest at 2.25 percent going all the way back to 1999.

21        The second statutory claim asserted in the case was

22  asserted under the New Jersey Consumer Fraud Act, and this was

23  a consumer fraud theory not unlike several of the statutes

24  we've talked about in these hearings.  It was premised on

25  allegations that the independent contractor classification was

1    fraudulent and induced the drivers to purchase trucks and

2    routes and pay certain expenses.  And if that claim were

3    successful, the damages, we believe, would have been properly

4    calculated, really, as the difference between what the FedEx

5    contractors were paid as contractors and what they would have

6    been paid had they been treated the same as FedEx Express

7    employee drivers.

8          The third claim -- set of claims in the case were

9    common law claims for unjust enrichment and rescission, and

10   those claims were not very different than the common law claims

11   that we've discussed already in these hearings asserted in the

12   other cases.

13         Our view of the New Jersey Consumer Fraud Act

14   throughout the litigation and, certainly, at mediation was that

15   it was a highly risky claim.  It was certainly worth pleading

16   because law evolves over time, and there was -- nobody could

17   have predicted how long this litigation would go on or how the

18   case law, under that statute, would develop.

19         There was older authority going back to the 1980s

20   involving a limousine driver, a limousine company called **Morgan**

21   **versus Air ... Limousine** or something like that that applied

22   the New Jersey Consumer Fraud Act to circumstances analogous to

23   these.

24         But subsequent to the **Morgan** case, the Third Circuit

25   Court of Appeals, a federal court, in a case called

1   **J & R Ice Cream**, concluded that the New Jersey Consumer Fraud

2   Act did not apply to transactions, other than retail consumer

3   transactions, and did not apply to the sale of a business

4   opportunity such as a franchise or a distributorship.

5          Now, this case was filed in federal court.  And if

6   this case had been remanded back to a New Jersey District

7   Court, as this Court knows better than anyone sitting in this

8   room, no matter what a District Court judge thinks the lawsuit

9   should be, a District Court judge is bound by precedent and

10  especially is bound by the precedent handed down by the Circuit

11  Court of Appeal to which it answers.  And our concern about the

12  New Jersey Consumer Fraud Act claim, of course, was that it

13  would not survive summary judgment under **J & R Ice Cream.**

14         For purposes of mediation, we looked long and hard at

15  the New Jersey Consumer Fraud Act claim.  We talked about how

16  to value it in terms of negotiating a settlement.  And because

17  the damages available under that statute were fully subsumed

18  within the damages available under the very strong wage payment

19  law claim, it was our view -- and that the only difference

20  between the Consumer Fraud Act statute and the wage payment law

21  was the availability of trebling, a statutory penalty for

22  violation of that statute -- and we'll talk about that in a

23  minute -- it was really our view that the Consumer Fraud Act

24  claim didn't add very much value to the case and especially,

25  especially, given our view that our chances of surviving a

1    motion for summary judgment were probably less than one percent

2    and maybe as good as five percent.  That has always been our

3    view.  It never changed.

4          The unjust enrichment damages were calculated by our

5    expert to be in the range around $32,769,000, and that was the

6    value of the single damages that could be recovered under the

7    New Jersey Consumer Fraud Act.

8          The settlement at $25.5 million, which was a heavy

9    lift on both sides, represents 55 percent of the damages, the

10   maximum achievable recovery, in our view, which is comprised of

11   the damages available under the wage payment law, which

12   subsumes within it the single damages under the Consumer Fraud

13   Act and the common law damages.

14         Now, FedEx, in addition to the **J & R Ice Cream**

15   problem that we had in the New Jersey case, raised a number of

16   additional defenses to the claims in the New Jersey case that

17   really only came up in connection with one other case, and that

18   was the New York case which Mr. Harwood talked about a few

19   minutes ago.

20         There was a change in the law, after this Court

21   entered its summary judgment rulings, with respect to how

22   employment status may be proven under the wage payment law and

23   other statutory claims or under other statutes in New Jersey.

24         While, at the time we briefed class certification and

25   summary judgment before this Court, the employment status test

1    followed by the New Jersey courts was the familiar common law,

2    multi-factor agency principal test, in a case called **Sleepy's**

3    **versus Hargrove**, which I'll note was litigated by our

4    co-counsel, Mr. Marchetti, all the way to the New Jersey

5    Supreme Court.  The New Jersey Supreme Court concluded that,

6    actually, the ABC statutory modified test governs these

7    statutes.

8              On the one hand, the Plaintiffs in these cases said,

9    "Hallelujah, Sleepy's.  That's a much easier test to meet."

10             On the other hand, we all looked at each other and

11   said, "Hmm, Judge Miller in the MDL concluded that the ABC

12   statutes -- the cases that arose under the ABC statutes were

13   not amenable to class adjudication."

14             And in every one of those cases -- there were 12 of

15   them, if the Court has forgotten the number -- certification

16   was denied, and so that posed a risk in this case on appeal.

17             Now, remember, the New Jersey case was pending before

18   the Seventh Circuit.  It is still pending before the Seventh

19   Circuit.  And not only was the Plaintiffs' appeal from this

20   Court's order granting summary judgment to FedEx on the

21   employment status issue before the Seventh Circuit, FedEx filed

22   a cross appeal on the class certification in not only this case

23   but every other.

24             So, if this case were litigated all the way to the

25   Seventh Circuit, we would be addressing not only whether this

1  Court was correct or not on the independent contractor issue

2  under the common law test or, under the modified ABC test, the

3  threshold question to be decided by the Seventh Circuit would

4  be class certification, and we were very concerned about that.

5          Now, as luck would have it, Your Honor, on

6  January 19th, after these mediations commenced, the Seventh

7  Circuit issued a decision in a case called **Costello versus**

8  **BeavEx** in which the Seventh Circuit, in a two-to-one ruling,

9  concluded that certification under the ABC statute in Illinois

10 in an employment misclassification case was properly granted.

11         So, we all breathed a sigh of relief, not only with

12 respect to this case, but also with respect to the New York

13 case.

14         And the Seventh Circuit, at least two of the judges,

15 took a different view than this Court did with regard to

16 whether actual control can be proven on a class-wide basis or

17 not.

18         And, in **Costello**, the Court addressed a second major

19 defense that FedEx was poised to assert in the New Jersey case,

20 and that defense is lovingly referred to by all concerned, the

21 FAAAA defense, which stands for -- somebody jump in and help me

22 out with all the As, but it's the Federal Airline, da, da, da,

23 Regulation Act.  And FAAAA is a federal statute that

24 deregulated the trucking industry.

25         And in a case called **Massachusetts Delivery**

1    **Association versus Coakley**, the First Circuit Court of Appeals,

2    in a recent case, concluded that the FAAAA statute preempted

3    the B Prong of the Massachusetts ABC statute.

4            If that ruling were to be applied to the New Jersey

5    case, under the newly adopted ABC test, the New Jersey Consumer

6    Fraud Act claim and the New Jersey wage payment law claim would

7    have been dismissed, and this case would have had -- the only

8    value left in this case would have been the unjust

9    enrichment/rescission claim.

10           As luck would have it, in **Costello v BeavEx**, the

11   Seventh Circuit reached the opposite conclusion on FAAAA

12   preemption.

13           And, of course, we all breathed a sigh of relief and

14   said, "Okay.  We're good."

15           But we didn't breathe a big sigh of relief because,

16   as we all know -- we're all lawyers -- a circuit split on an

17   important issue of federal statutory construction and

18   preemption, particularly in an area of litigation that is hot,

19   like this one, might well result in Supreme Court review, and

20   that's what everybody's thinking.

21           A cert petition was, in fact, filed in **Costello v**

22   **BeavEx**, in July.  And, in October, the Supreme Court requested

23   briefing from, then, the Solicitor General and now the Acting

24   Solicitor General.

25           And we all know that the Supreme Court has eight

 1    members, soon to have nine, and that ninth justice is not going

 2    to be appointed by Hillary Clinton, so we are very concerned,

 3    as everyone on the Plaintiffs' side of the V in this case

 4    should be, about the risk posed to this case by the FAAAA

 5    preemption defense.  This is no small matter.

 6           That FAAAA preemption defense factored very strongly

 7    in our analysis of the settlement value of this case, and so

 8    our view that a 55 percent recovery to the Plaintiff class in

 9    the New Jersey case now is a far, far better result than to

10    take the risk of going through the Seventh Circuit appeal,

11    going through litigation, and facing all the other defenses I

12    haven't discussed that were pointed at all of these statutory

13    claims.

14           Proof of fraud is no small thing, even if we had

15    gotten past the Seventh Circuit on this Consumer Fraud Act

16    statute.  We felt much better about the wage payment claims.

17    But our damage theory, our damage model, was contested by

18    FedEx.  They had a different damage model.

19           So there was risk all the way around in this case,

20    and so our view that the $25.5 million settlement represents an

21    excellent recovery to the class in this case is indisputable.

22           Now, there are seven objectors, all seven of the

23    named Plaintiffs.  And following the original notice, there was

24    only one other objector, Mr. Ponzoni, and I will incorporate

25    and adopt by reference herein everything Mr. Harwood had to say

1    with respect to Mr. Ponzoni's objections because we have so

2    much else to talk about this morning.  So that objection should

3    be overruled for the reasons stated by Mr. Harwood.

4            With respect to the seven named Plaintiffs, I would

5    submit, you know, Round One, the **Tofaute** objectors made two

6    arguments.

7            They never said a word about our attorneys' fees,

8    Your Honor, in their original objection, and, of course,

9    nothing changed.  That motion was filed in September of 2016,

10   so the newly-filed fee objection, really, we think, may have

11   had something to do with this Court's order rejecting their

12   first objection that the signatures of the named Plaintiffs and

13   their belief that they never assented to the settlement was

14   reason enough for this Court to deny approval to it.

15           And, of course, this Court, in its order dated my

16   birthday, February 14th, 2017, at Document 3004, at Page 5,

17   rejected that objection.  The assent of the named Plaintiffs to

18   a settlement that class counsel believe is in the best interest

19   of the class is not a bar to settlement approval.

20           Their second objection, Round One, was that the

21   $25.5 million settlement was not adequate to resolve and

22   release all of the certified claims and, most particularly, the

23   Consumer Fraud Act claim.  Their view, as stated in their

24   papers, was that class counsel left $50 million on the table.

25           Well, we know that that's not their real view,

1   Your Honor, because they filed papers subsequently in which

2   their clients, candidly, conceded that a $30 million settlement

3   would have been perfectly acceptable to them and that the

4   dispute here concerns -- that the objection to the settlement

5   concerns the agreement at 25.5, instead of at 30, a difference

6   of $4-and-a-half million.

7        They also claim that we assigned too much risk to the

8   FAAAA defense because, in their view, a single District Court

9   in the District of New Jersey agrees, actually, with my

10  position that the FAAAA ought not to preempt these kinds of

11  claims.

12       And as heartened as I am that a District Court judge,

13  in **Echavarria**, ruled as he did -- and I believe his analysis is

14  correct -- the risk posed by the FAAAA to these claims cannot

15  be ignored.  And because our duty is to the class as a whole,

16  we did not ignore it.

17       They also argued that we did not assign enough weight

18  to the change in the law on employment status, that proving

19  these employees were employees would be a lock.

20       Well, we didn't discount in our settlement analysis

21  very heavily for the risk of winning or losing on employment

22  status.  We agree; it would be not difficult to prove.  The

23  discount had to do with class certification, which was a

24  significant risk.  This Court knows that better than anybody

25  else.

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

```
 1              I have a lot of other things to say about the
 2    objections, but maybe, because the Court, you know, wished for
 3    the objectors to make their presentation, I'll reserve and
 4    respond to whatever else they have to say, and I'm reserving my
 5    comments on the attorney fee piece, in particular, unless you
 6    want me to make that presentation now.
 7              THE COURT:  No, that's fine.
 8              MS. ROSS:  Okay.  But I'm not waiving it.  I have a
 9    lot of things to say about that, too.
10              THE COURT:  I anticipated you would cover it, at some
11    point.
12              MS. ROSS:  Okay.  Thank you, Your Honor.
13              THE COURT:  Who is speaking for the class reps?
14              (Discussion held out of reporter's hearing.)
15              THE COURT:  Ms. Bouckenooghe.
16              MS. BOUCKENOOGHE:  Good morning, Judge.
17              THE COURT:  Good morning.
18              MS. BOUCKENOOGHE:  I'll be addressing our objection
19    with respect to the fairness of the substance of the
20    settlement.
21              My colleague, Greg Kohn, from Negal Rice, will, at
22    the appropriate time, deal with the objection with respect to
23    the fee application.
24              THE COURT:  I couldn't hear the last part.
25              MS. BOUCKENOOGHE:  My colleage, Greg Kohn, from Nagel
```

1    Rice, will deal with our arguments with respect to the

2    attorneys' fees.

3              **THE COURT:**  Okay.  Thank you.

4              **MS. BOUCKENOOGHE:**  I just wanted to start by saying

5    that I understand that this case has been pending for a long

6    time.  And here we are at a fairness hearing, and I'm sure no

7    one is pleased to see an objection of this nature raised at

8    this time.  But I think it bears reminding and mentioning that

9    we are on the Plaintiffs' side of the V, too.  We represent all

10   seven of the named Plaintiffs in this litigation with respect

11   to their objection to the proposed settlement.  All seven of

12   them have objected to the amount of the settlement,

13   predominately with respect to the undervaluation of the worth

14   of the CFA claim.  They hired us to object to the fairness

15   because they believe each of the 899  New Jersey class members

16   are not getting what they deserve out of this.

17             This isn't your typical objection where the seven are

18   objecting because they are trying to seek a higher service

19   award for themselves or even where they're objecting based on

20   the structure of the settlement payments that are to be

21   distributed.  They've all risked their recovery and their

22   incentive awards because they believe that, as guardians to the

23   New Jersey class, they have a fiduciary duty to ensure that all

24   of their claims are adequately valued in this case.

25             So our objection was based on, fundamentally, three

1   issues.

2          First, which was already slightly addressed by this

3   Court, we have raised an objection to the idea that the

4   settlement was struck without client authority, and we've

5   presented sworn declarations from Mr. Tofaute and Mr. McMahon

6   with respect to what occurred at the mediation.  Specifically,

7   they objected on the basis that they never assented to settle.

8          Those declarations, and Mr. Tofaute, Mr. McMahon,

9   don't assert that they would happily accept a $30 million

10  settlement.  They specifically stated that they advised their

11  counsel that they would never settle this case at anything

12  below $30 million.  There is a difference there.

13         Now, we understand that class representatives can't

14  veto a settlement, but this is different; this is an instance

15  where a settlement was reached without client authority in the

16  first place, and the fact that all seven of the named

17  Plaintiffs have objected to the settlement needs to be given

18  significant weight by the Court.

19         The second issue with respect to the objection is

20  that the settlement doesn't provide any value for the claims

21  certified by the Court under the New Jersey Consumer Fraud Act.

22         During mediation, co-lead assigned a zero value to

23  the CFA claims.  A claimant in New Jersey would have been the

24  absolute driver of that mediation.

25         The New Jersey CFA has a mandatory treble damages and

1  mandatory attorneys' fee shifting, so a proper valuation of

2  that claim, as we've laid out in our papers, dramatically

3  impacts the outcome of that mediation.  Even with a very

4  conservative view of the likelihood of success under that

5  claim, the settlement value of that claim should have been at

6  least 10 million higher prior to a fee shift.

7         And, third, in addition to the issues under the CFA,

8  under prevailing New Jersey law, the overall value of the

9  settlement is substantially undersold.

10         Co-lead assessed a risk factor of 55 percent to their

11  analysis of the maximum achievable damages.  But, in 2015, the

12  New Jersey Supreme Court adopted the ABC test, **Hargrove v**

13  **Sleepy's**, as Ms. Ross referenced earlier, which we addressed in

14  our papers.

15         But, turning to our first, I guess, point with

16  respect to the objection, all seven court-appointed class

17  representatives have objected to this settlement.

18         This Court recognizes that it's tasked with

19  considering the extent of participation in the settlement

20  negotiations by class representatives --

21         **COURT REPORTER:**  Ma'am, will you slow down, please?

22         **MS. BOUCKENOOGHE:**  Sure.  I'm sorry.

23         **COURT REPORTER:**  "Turning to our first" --

24         **MS. BOUCKENOOGHE:**  -- and examines closely any

25  opposition by class representatives to a proposed settlement.

1          This is not an instance where the seven named

2     Plaintiffs are seeking an increase in their own service awards.

3     They're not holding the settlement hostage for their own gain.

4     They are driven only by their duty to seek the best possible

5     recovery for the class.

6          The cases cited by co-lead, **Kincaid versus General**

7     **Tire and Rubber**, **Parker versus Anderson**, **Lazy Oil versus**

8     **Whitco**, don't stand for the proposition that class counsel can

9     unilaterally create a settlement without client authority.

10    They all only speak to instances where representatives are

11    disrupting a settlement in furtherance of their own interests,

12    and that's not the circumstances that we have here.

13         Settlement of the case, without client authority, is

14    a red flag through the approval process.  Co-leads' briefs and

15    papers all misstate that the settlement was agreed to and

16    assented to by the New Jersey class representatives at the

17    mediation.  We've set forth those specific misrepresentations

18    in our February 3rd proffer.

19         The fact is, Mr. McMahon and Mr. Tofaute did not

20    assent to this settlement at mediation on February 1st.  It's

21    those series of misstatements that we raised by motion with the

22    Court previously and that led to the issuance of a corrected

23    class notice.  As a result of that corrected class notice, 42

24    additional objections have since been filed with respect to the

25    value of the settlement.

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1          Now, digging deeper into this red flag --

2          **THE COURT:**  Let me back up because I'm not sure I

3     followed what you said.

4          **MS. BOUCKENOOGHE:**  Oh, sure.

5          **THE COURT:**  The misrepresentations that I understood

6     you to be asserting are whether the class reps assented to the

7     settlement at the time of the negotiation.  Then, I think you

8     said -- and my hearing isn't what it should be -- that it was

9     those misrepresentations that led to the amended notice.

10         Did I misunderstand what you said or, if I understood

11    it correctly, how did they lead to that?

12         **MS. BOUCKENOOGHE:**  One of the misrepresentations that

13    was in the original notice was that the seven named Plaintiffs

14    all assented to the settlement and they all agreed to resolve

15    the case at $25.5 million.  One of the corrections made in the

16    amended notice was that all seven were, in fact, objecting to

17    the settlement and did not agree to the amount.

18         So, as I've said here, the class reps never assented

19    to settle the case -- never assented to this settlement in the

20    first place, and circumstances like that should be given

21    significant weight by the Court.

22         That has been recognized in this Circuit in **Eubank**

23    **versus Pella**, also in **Mandujano versus Basic Vegetable**, and

24    **Pettway versus American Cast Iron Pipe**, all of which have been

25    referenced in our briefing.

1          The red flags here are easily spotted.  First, the

2     New Jersey class representatives did not agree to the

3     settlement of the New Jersey class, meaning that co-lead did

4     not have authority to settle the case at mediation.

5          And, as I'm about to get further into, co-lead also

6     failed to consider and give adequate weight to the availability

7     of statutory damages under the Consumer Fraud Act claim.

8          Further, attorneys' fees are also coming out of the

9     settlement fund, instead of through a fee-shifting statute,

10    which was available under the Consumer Fraud Act claim.

11         Now, the Court certified the New Jersey Consumer

12    Fraud Act claim, but the proposed settlement does not provide

13    any value for it.

14         The Seventh Circuit, in **Eubank**, has recognized these

15    factors to be indicative of a settlement that's driven by

16    lawyers at the expense of the class.

17         The most valuable claim for relief in this case is

18    the claim under the New Jersey Consumer Fraud Act, and that has

19    not been provided any value through this settlement.

20         The key, here, is figuring out the correct value that

21    should have been considered at mediation for the Consumer Fraud

22    Act claim.  As I mentioned, the Consumer Fraud Act claim is the

23    strongest piece of any case in New Jersey, particularly when

24    you're talking about settling the case.  This is true because

25    of the mandatory treble damages and the mandatory fee shifting.

 1          Particularly, the New Jersey Consumer Fraud Act claim

 2    is one of the strongest consumer protection acts in the

 3    country.  Where you have a CFA claim that wasn't dismissed on a

 4    12(b)(6) motion and is certified to a full class, that becomes

 5    the most valuable claim you've got and will always drive the

 6    settlement discussions.

 7          But here we've heard quite a bit about how the CFA

 8    claim was given zero value.  Particularly, I think, co-lead

 9    certified to that in their joint declaration in support of

10    preliminary approval and reference as much in their papers for

11    preliminary approval in MDL2704 at Page 9 and 10.

12          They've also referenced that Plaintiffs' expert

13    excluded from his analysis damages and statutory penalties for

14    violations of the New Jersey Consumer Fraud Act.  That was in

15    MDL Docket Number 2705 at Paragraph 16.

16          The failure to properly value that CFA claim infected

17    the entire negotiation at --

18          **COURT REPORTER:**  Slow down, please.

19          **MS. BOUCKENOOGHE:**  Still too fast?  I'm sorry.

20          The law is clear, in this Circuit, that a settlement

21    should not be approved under those circumstances.

22          In **Mirfasihi**, the Seventh Circuit reversed the

23    District Court's approval of a class settlement because the

24    analysis did not consider, at a minimum, pertinent consumer

25    protection statutes.  In that case, the Plaintiffs asserted

1    claims under the Massachusetts consumer protection law.  Prior

2    to certification, that case settled.  Over objection, the

3    District Court approved the settlement.  The objectors

4    appealed.  It was reversed.  On remand, the District Court

5    appealed it again -- I'm sorry -- approved it again, and the

6    objectors appealed again.  The objectors argued that the

7    District Court should not have accepted a value of zero for the

8    Massachusetts consumer protection law claims when they had

9    prevailed on two motions to dismiss and found that valuing

10   those claims at zero was improper.

11          Our objection, here, is analogous to that one.  The

12   facts here are even stronger for the New Jersey lead

13   Plaintiffs.

14          Co-lead has assigned a value of zero to the

15   New Jersey Consumer Fraud Act claims, arguing that there is no

16   likelihood of success.  But after all of the years of discovery

17   and litigation in this case, co-lead had, essentially,

18   established all of the elements of a Consumer Fraud Act claim.

19   The class claim was certified.  They've established an unlawful

20   act, causation, and ascertainable loss.  They've stated that

21   they will now value that Consumer Fraud Act claim at

22   $46 million, but then failed to properly attribute a value to

23   it for settlement purposes.

24          In arguing for class certification, co-lead went on

25   at length about the strength and the breadth of the New Jersey

 1    Consumer Fraud Act, the value of those claims, and noticing,

 2    for example, that the CFA or the Consumer Fraud Act has no

 3    reliance element or intent element and provides for mandatory

 4    attorneys' fees and treble damages.

 5            They've also recognized in their class cert motion

 6    that New Jersey applies this statute to allow Consumer Fraud

 7    Act protections to purchasers of business opportunities, which

 8    includes franchises.

 9            The case cited by co-lead as the significant risk

10    factor with respect to the viability of the CFA claim,

11    **J & R Ice Cream**, is distinguishable, in a lot of ways, from the

12    circumstances that we have here, particularly because, in

13    **J & R Ice Cream**, you dealt with two sophisticated businesses

14    that were negotiating amongst each other for the purpose of a

15    business opportunity.

16            That's not what we have here with respect to the

17    claims between Plaintiffs and FedEx.  Here, we are dealing with

18    consumers marketing from FedEx to those consumers for the

19    purchase of a business opportunity.  And New Jersey law is

20    crystal clear that, in those instances, the Consumer Fraud Act

21    will act to apply and protect those purchasers.

22            Co-leads' explanation for attributing zero dollars to

23    the CFA claim is also just that that zero dollars overlaps with

24    other certified claims, but they don't.  I mean, they can't

25    because the actual damages under the CFA are then subject to

1    trebling and fee shifting.  Not to mention, the CFA claim is

2    not mutually exclusive from recovery under the wage payment

3    law.  Recovery under one doesn't exclude recovery under the

4    other here.

5            When we talk about maximum achievable damages, we

6    have to be talking about the maximum recovery the class can

7    achieve under the New Jersey Consumer Fraud Act, which is not

8    single damages; it's treble damages.  Treble damaging is

9    automatic and it's non-discretionary.

10           Now, treble damages here means three times.

11           It's a little muddled how co-lead now arrives at

12   their calculation for the value of the CFA damages claim.

13   After we raised our fairness objection, they provided an

14   after-the-fact analysis of how that claim was valued at.

15           In their joint declaration, at Paragraph 22, MDL

16   Docket Number 2956, co-lead attributes a value of $46,733,000

17   as the actual damages under the CFA.

18           But to calculate the value of that claim, they then

19   take the number 32,769,000, which seems to be the number that

20   Plaintiffs' expert valued for common law claims, and they

21   double that, not triple it, to reach 65 million, so co-lead

22   began with the wrong number, to start, based on their own

23   assertions.  If the CFA was worth 46 million, that's the number

24   that's trebled, not the 32 million.  Then, co-lead doubled that

25   number, rather than tripled it.  Under the CFA, you have to

1    triple treble damages.

2        From there, they attributed a three percent

3    likelihood of success, but only seem to have attributed that to

4    the segmented portion of these doubled damages.  It was then

5    discounted, again, for a 55 percent likelihood of success.

6    This strained approach supports their position that the CFA

7    claim is of negligeable value.

8        But how this should have been calculated was

9    $46 million is the actual damages under the CFA, times three,

10   then apply your risk factors.

11       Under our calculation, as we set forth in our papers,

12   a proper valuation would have resulted in a value of the CFA

13   claim at closer to 20 million to the class.  That's just in

14   damages and for settlement purposes.  That's before we take

15   into account a mandatory fee shift under the CFA.

16       So the proposed settlement is fatally flawed in that

17   it never considered the enormous effect of the CFA's trebling

18   factor and its attorneys' fees in establishing a settlement

19   damage figure.

20       To discount the CFA damages as overlapping and,

21   somehow, subsumed evidences a misunderstanding of how the CFA

22   works and how it might work in conjunction with other claims in

23   this case.  This alone requires that the proposed settlement

24   should be rejected as neither fair nor reasonable.

25       As I've touched upon, something else that's mandatory

1    under the CFA is fee shifting.  Here, the class representatives

2    have submitted sworn declarations stating that co-lead counsel

3    rejected an offer for a fee shifting arrangement, without

4    discussing it first.

5              The fee shifting component under the CFA is also

6    mandatory.  It is not discretionary.  This is significant

7    because, under the current settlement design, the class

8    collectively bears the cost of counsel fees at an ask of 30

9    percent of the total recovery, so the class is paying those

10   fees.  But under a fee shift, the cost of the attorneys' fees

11   wouldn't be taken from the class's recovery.  It would be taken

12   from the Defendant.

13             So, here, the class representatives, David McMahon

14   and Michael Tofaute, who were both present at the February 1,

15   2016 mediation, both submitted sworn declarations stating that

16   counsel outright rejected the very idea of a fee shift during

17   settlement negotiations, during a point at which if it was

18   considered would have yielded a higher recovery for the class.

19             Not only was it not considered, it was not even

20   discussed with them.  This factor can't be ignored because,

21   again, under the Consumer Fraud Act, attorneys' fees are

22   mandatory.

23             Not only that, but there's also no proportionality

24   requirement under the CFA, and what that means is, if your

25   recovery under your CFA claim is even only fractionally

1    successful, the mandatory attorneys' fee award is still

2    triggered in full.

3         The attorneys' fees component should have been

4    factored into co-leads' calculation when valuing the CFA claim.

5    It's part of what makes the claim so valuable in New Jersey.

6    The failure to consider the fee shift demonstrates how the

7    claim was undervalued for purposes of settlement.  Now it's

8    being settled and released for zero dollars.

9         Co-lead stated that they didn't attribute any value

10   to the CFA claim at mediation, but now we are asking -- they

11   are asking this Court to release and extinguish that claim on

12   behalf of 889 members.

13        I know that co-lead has argued that **J & R Ice Cream**

14   diminishes the value of the CFA claim, but it's simply not

15   true.  It wouldn't apply to the New Jersey class's CFA claim

16   for a host of reasons that we've distinguished in our papers.

17   But, as I said, predominately, that is because, in **J & R Ice**

18   **Cream**, you were dealing with two sophisticated businesses.  You

19   were not dealing with instance where you have an entity that is

20   marketing a business opportunity to consumers at large.

21        Specifically, the appellate division has recognized

22   as much and stated:  Notwithstanding our high regard for the

23   Third Circuit, we are unable to agree with its unduly

24   restrictive interpretation of the NJ CFA.  That is not to say

25   that we disagree with the result reached, but that is only

1    because it appears to involve a substantial and complex

2    commercial transaction which likely fell within the Franchise

3    Practices Act.  We cannot endorse **J & R**'s reasoning because

4    that course would deprive citizens of New Jersey of protection

5    under the CFA in pyramid sale schemes and similar mass public

6    frauds.

7           That is the appellate division's ruling in **Kavky**,

8    which we've also referenced in our papers.  It accurately

9    confirms decades of precedent under the New Jersey Consumer

10   Fraud Act.

11          And I would like to just note that, about a month

12   after the February 1, 2016 mediation, local counsel for New

13   Jersey, Mr. Anthony Marchetti, filed a nearly identical

14   consumer fraud class action against FedEx as the one before the

15   Court here.  In that action, the **Caro** Plaintiffs also seek to

16   certify a nearly identical CFA claim to that here.  The

17   difference, largely, seems to be the period of time for which a

18   class would be certified.

19          There, counsel for **Caro**, knowing the facts, the

20   risks, and litigation of this history, of this case,

21   persuasively argued that **J & R Ice Cream** is not controlling and

22   would not apply to the same set of facts.  If the CFA had no

23   value or didn't stand a chance against **J & R Ice Cream**, I'm not

24   sure that Plaintiffs' counsel would have invested so much time

25   and effort in bringing it.

1           And just to address, finally, the risk factors with

2   respect to **Sleepy's**, the risk factors with respect to the FAAAA

3   that Beth Ross had raised earlier, those risk factors impact,

4   as she said, whether or not the wage payment law claim can

5   contain -- the value of that claim, whether it be would subject

6   to decertification on appeal.

7           And even if, worse case scenario, as she described,

8   under the ABC test, the wage payment claim is decertified,

9   under the FAAAA, a series of circumstances happen that make the

10  **Echavarria** opinion in the District of New Jersey become bad law

11  and ultimately decertifies the wage payment law, you still have

12  a certified claim under the CFA.

13          I understand that this is settlement and you've got a

14  certain risk factor, but a lot of the risk factors that

15  Ms. Ross addresses address the viability of the wage payment

16  law claim, not the CFA claim.

17          Unless Your Honor has any other questions, I'll turn

18  it over to FedEx.

19          **THE COURT:** No. I think I understand your position.

20  Thank you.

21          Mr. Kohn.

22          **MS. ROSS:** Your Honor, since I didn't address the

23  attorneys' fees, maybe we should do a round --

24          **THE COURT:** No, I would rather give everybody two

25  chances to speak, rather than four.

 1           **MS. ROSS:**  Okay.  Okay.  Sure.

 2           **MR. NORRIS:**  When does FedEx speak?  Is it after this

 3     round?

 4           **THE COURT:**  I think they've split their first

 5     presentation to two attorneys.

 6           **MR. NORRIS:**  Okay.  Gotcha.

 7           **MR. KOHN:**  Do you want to address the attorneys' fees

 8     and megafund issue now?

 9           **THE COURT:**  Yes, please.

10           **MR. KOHN:**  Thank you for your time this morning,

11     Your Honor.

12           I'm here to address our objection to the attorneys'

13     fees requested by co-lead counsel in this case.

14           As we've heard over the last couple of days, our

15     request does touch upon potentially every one of the MDL cases,

16     but the reason for that and the reason why we're raising it in

17     New Jersey is that Your Honor in these types of cases must

18     scrutinize the attorneys' fees, regardless of whether we raise

19     an objection in New Jersey or whether an objection is raised in

20     every single of the MDL cases, as co-lead counsel has presented

21     them.

22           **THE COURT:**  Well, that leads to my first question.  I

23     agree I need to scrutinize them, but what standing do you have

24     to come in and talk about the percentage for Arizona or Kansas

25     or whatever?  Help me with the standing.

1          **MR. KOHN:**  Sure.

2          Your Honor, the reason we have standing in this

3    matter is co-lead counsel has chosen a procedure with which

4    they want to have the Court approve their fee request,

5    30 percent for each individual one.  The class members, nor any

6    objector, nor any absent class member, had any say in how that

7    was done.

8          We're now saying the Court needs to look at it, at

9    least from New Jersey class reps' perspective, that this is one

10   global settlement, right.  It touches on everybody equally.

11   And if the Court applies the guidelines to large settlements to

12   this, it benefits not only New Jersey because more money would

13   come back to New Jersey, as I'll get to later, but it affects

14   everybody globally and gets more money back to every single of

15   the MDL classes, including New Jersey.  And that's why our

16   money is being -- potentially, the money going to the class

17   members in New Jersey is being tied up in other cases, so

18   that's why we have standing.  They've chosen a mechanism, which

19   we can't challenge it.  We can't challenge that they've chosen

20   to break this case up this way.  We think that's wrong.

21          **THE COURT:**  Let me ask this:  Consistent with, at

22   least standing, as I understand it, since Mr. Tofaute wouldn't

23   get the benefit of a Kentucky settlement, I can understand how

24   you could come in and argue that this is a megafund, the

25   percentage should be 10 to 14 percent or whatever, and so

1    that's what it should be in the New Jersey case.  What I'm not

2    clear on is how you, not representing any member of a class in

3    Arizona, can come in and say, "No, the fee request is too high

4    in Arizona, and so the Arizona class members, whom I do not

5    represent, should get more of the money."  That's what I'm

6    having trouble with.

7            **MR. KOHN:**  Right.

8            Your Honor, the way we're asking -- actually, you

9    know, I'll get to it, but we're asking for -- if the Court

10   finds that the megafund analysis does apply to this situation,

11   a 15 percent global fee would be appropriate.  The way that

12   would break down potentially impacts more money to New Jersey.

13   But, for the others, I understand Your Honor's concern that,

14   well, we don't represent them.

15           But in Your Honor's capacity to be the gatekeeper for

16   the class members and the fiduciary for the class members, in

17   terms of what they're going to get, if the Court's going to

18   apply it to our case in New Jersey, the Court should equally

19   apply it to the other cases under Your Honor's, you know, own

20   guidance.  We're here to present that and give Your Honor what

21   we believe is appropriate.  If Your Honor decides not to apply

22   that to any other case but New Jersey, you know, that's

23   understandable, but we think that the other states should be

24   able to receive the benefit of that analysis if, in New Jersey,

25   it is applied.

1          **THE COURT:** Okay.  I understand your position.  And,

2     again, I'm not ruling on anything today.

3          **MR. KOHN:** Yeah.

4          **THE COURT:** Go ahead.

5          **MR. KOHN:** Your Honor, what I want to talk about in

6     the first instance here is -- so the fee request globally is

7     excessive.  We think it's excessive for multiple reasons.

8          First, we think it should be treated as a megafund or

9     at least under the analysis of a megafund, depending whether or

10    not the Court likes the terminology, apparently, in the Seventh

11    Circuit.

12         Also, counsel is requesting double recovery, and

13    we'll get to that and why that's significant here.

14         The Court should also look at the lodestar submitted

15    by co-lead counsel.  And, again, we'll address some of the

16    issues we've seen with the lodestar and the variations that's

17    been presented to this Court and to other courts around the

18    country.

19         And, at the end of the day, the last approach here is

20    the **Synthroid II** sliding scale, which is what really reflects

21    the market, if we're going to apply the analysis set forth by

22    co-lead counsel.

23         Yesterday, Your Honor heard some background,

24    initially, from co-lead counsel.  And, you know, it piqued my

25    interest when the first thing I heard out of co-lead counsel's

1    mouth was their fees.  They spent the first five to six minutes

2    yesterday telling Your Honor about why their fees in this case

3    are justifiable.

4           We're here to tell you that it's the interest of the

5    class members that need to be put first, the fairness that

6    needs to be put first, okay, and that's why we're here arguing

7    on behalf of the New Jersey class representatives, who believe

8    not only as my co-counsel had, said that the fairness and the

9    value given to their case was wrong, but that what is being

10   taken out of it is wrong, as well.

11          Every dollar that this Court reduces in attorneys'

12   fee award, whether globally or in New Jersey, goes back to the

13   class members.  It doesn't go back to FedEx.  It goes back to

14   the class members.  That's what we're looking at here.

15          So, let's -- you went too far, Dave.  Just leave it

16   there.

17          **MR. DiSABATO:**  (Complies.)

18          **MR. KOHN:**  So, let's talk about the first concept of

19   the megafund.

20          Contrary to co-lead counsel's opposition to our

21   brief, the Court, the Seventh Circuit, has rejected a cap at 10

22   percent on a megafund.  They never said the analysis was

23   improper or that it shouldn't be done.  The **Synthroid I** case

24   said the cap of 10 percent, a hard carp, isn't appropriate.

25          And we're not arguing for that.  We're arguing

1    actually, for 15 percent for co-lead counsel.  We believe that

2    that is what's fair and reasonable under the circumstances.

3            Co-lead counsel has spent a lot of time in this case,

4    without a doubt, but as these cases got MDLed -- and we heard

5    today, which, again, was a little bit different than what we

6    heard yesterday -- yesterday, we were talking about common

7    benefits and we were talking about templates and discovery

8    responses that were templates and briefs that were templates.

9    We heard that yesterday -- but, today, what we've heard

10   stressed is these are individual cases.  "I brought this one

11   individually.  I didn't know these people."

12           Well, that's fine.  That's how a lot of cases get

13   brought, and then they get MDLed, and the situation changes,

14   and you have to adapt and treat the cases as they are then.

15           When this case became an MDL, the goal of co-lead

16   counsel and the Court appointing co-lead counsel and a steering

17   committee is to ensure that there is work done for the common

18   benefit and that it's done appropriately, billed responsibly,

19   and done in a manner in which you're efficient, right, and

20   that's what Mr. Harwood described yesterday when he started

21   talking, initially, about how this case panned out.

22           Despite all of that, despite the fact that everything

23   was together and that the common benefit for 42 cases, for a

24   long time, was done together, we're now at the settlement

25   period going to split all those cases up and say, "Let's treat

1    them all individually and we're going to ask for 30 percent

2    because of all the work we did and all of the risk that we

3    had."

4            But all that work and all that risk was global.  It

5    was for all those cases.  So it's being counted every time, and

6    we're just going to keep counting it and counting it and

7    counting it.  And under their 30 percent fee award, they're

8    going to walk out of this courtroom, when Your Honor finally

9    gives final approval, with over $72 million.

10           When you look at that and you look at the way they've

11   treated this case, their request for fees contradicts the way

12   the case was handled.

13           There was a billing memo put out by Mr. Harwood's

14   office early on about how fees were to be billed for the common

15   benefit of the class.

16           As co-lead counsel has put in their papers, they

17   don't have to state specific lodestars.  They have one lodestar

18   for this case globally.  They have expenses globally.

19           Your Honor, how can you then come to the Court now

20   and say, "This wasn't global.  We didn't treat it as such.

21   These are individuals."

22           Well, where's the time records for that?  Where are

23   the expenses applied to each case?

24           If this was really 20 separate cases, there would be

25   20 separate sets of billing records, and they would all be

1   before Your Honor for each of the specifics classes.  That's

2   not the case.

3           The declarations of counsel also contradict their

4   papers.

5           When seeking approval, say, in the Indiana brief, a

6   quote straight out of their case:  The vast majority of

7   counsel's time is devoted to litigating issues common to all

8   constituent cases.

9           This isn't 20 separate cases.  This is one global

10  case for $243 million, and the analysis should be applied at

11  that level.

12          The declaration from their fee expert,

13  Mr. Fitzpatrick, one fee declaration addressing all the cases,

14  not even individually.  He just says 30 percent is fair because

15  he believes it is.  And we'll get to the problems with

16  Mr. Fitzpatrick in a little bit.

17          This case is no different than a class action with

18  state subclasses.  One big class action with 20 state

19  subclasses would be litigated the same way, but I wouldn't get

20  to come to the Court at the end of the day and say, "I should

21  get paid individually on each subclass."  That's what they're

22  asking for here.

23          And I'll talk a little bit about this further, but,

24  in California, in the **Alexander** case, Judge Chen looked at the

25  fee request by co-lead counsel, by Ms. Ross, and said, "There's

1    something wrong here."

2              MS. ROSS:  Your Honor, I'm so sorry.  Mr. Kohn was

3    not there.  Judge Chen said no such thing.  Misrepresentations

4    in this Court ought not to be tolerated.

5              THE COURT:  I'll invite you to tell me what was

6    misrepresented when you get your chance because, obviously, I

7    can't decide between the two at this point.

8              MR. KOHN:  Your Honor, I would ask --

9              MS. ROSS:  I would ask counsel who was not there to

10   limit his remarks to things he knows and not things he doesn't

11   know.

12             THE COURT:  Anybody who's misrepresenting things to

13   me when I'm taking everything under advisement --

14             MS. ROSS:  Thank you, Your Honor.

15             THE COURT:  -- will see it play out a little later in

16   my rulings.

17             MR. KOHN:  Your Honor, I would ask Ms. Ross to give

18   me my time -- I gave her hers -- and to not object.  She will

19   have her response time.

20             THE COURT:  I've asked her to do that already.

21             MR. KOHN:  And I do find it somewhat interesting

22   that --

23             THE COURT:  No.  Wait.  Wait.  Wait.  Wait.

24             I have a job to do, and I'm not going to be helped at

25   all if this gets personal.

1          **MR. KOHN:**  That's fine, Your Honor.

2          **THE COURT:**  So whether you find it interesting is

3    fine.  Tell me what I need to know.

4          **MR. KOHN:**  So noted, Your Honor.

5          But I will say, in the **Alexander** case -- and I have

6    the Court's opinion if Your Honor wants to read it, if Ms. Ross

7    doesn't like my interpretation of it -- but they found there

8    that the requests made by counsel were seeking money for

9    recoveries that they would get in this case, in the MDL.

10         They said the request of 25 to 30 percent of the work

11   from the MDL was done to benefit the **Alexander** case and that's

12   how they were basing their fees and asked for a multiplier on

13   that.  The Court asked for additional information.  Ms. Ross

14   submitted an additional declaration saying, then, that it

15   was -- 44 percent of the MDL work was attributable to the

16   **Alexander** case.

17         And the Court said:  Not so fast.  All that does is

18   reduce the multiplier here to make your fee more reasonable.

19   I'm going to go with the 25 percent you said originally.

20         So she can argue whether that means the Court thought

21   her analysis was wrong.  We can agree to disagree on that.

22         **THE COURT:**  What was the original percentage

23   requested in **Alexander**?

24         **MR. KOHN:**  The original percentage requested -- well,

25   we're talking about -- the percentage of work done from the MDL

1    attributable to **Alexander** was 25 to 30 percent.  They then said

2    44 percent, initially.

3           But the Court there awarded -- after a fee request of

4    22 percent, they reduced that down to 16.04 percent under the

5    analysis that we're asking the Court to do here.  We're asking

6    the Court to look at what Judge Chen did and apply that

7    analysis to this case, similar size, in terms of global

8    settlement.  Here, we're saying 15 percent.  16.4.  I think

9    that's a negligible difference, if the Court saw fit that way.

10           But that case, Judge Chen was concerned about double

11    recoveries, about getting paid for work pre-remand in those

12    cases and then coming back and seeking those fees from this

13    Court, or vice versa, depending on how the cases played out.

14           What we're asking -- and we'll get to the double

15    recovery bit -- is the money that comes back from those cases

16    and the other remanded cases, which, as the Court's now aware

17    because co-lead counsel in response to our opposition updated

18    the records for the Court, have received over $10 million in

19    fees for remanded cases which is specifically attributable to

20    post-remand MDL work.  We'll talk about how that impacts the

21    recovery here and why that needs to be a line item in the

22    Court's analysis of what the fee should be here.

23           As I said, the proper award in a megafund is 10 to

24    15.  We believe 15 percent is reasonable here.

25           The studies relied upon in co-lead counsel's briefing

1    kind of support what we are asking.  The Eisenberg and Miller

2    Study recognizes that they actually had a 12 percent mean

3    award.  Another one found a mean of 19.4 percent and a median

4    of 19.9 percent.  And the Fitzpatrick Study, the one relied

5    upon by counsel, found where there's over around 250 million.

6    It's 17.8 or 19.5 percent mean and median.

7              Co-lead counsel states in their papers that we're

8    trying to reduce their fee to $13.5 million.  That's not true

9    or accurate.  Fifteen percent of 243 million is approximately

10   36, $37 million, so that's what we think is fair and

11   reasonable.  And by doing that, that initial reduction to

12   15 percent, deals with the issues that we're addressing on the

13   double recovery from the cases that have been remanded and

14   settled.  We feel that that sufficiently deals with that.  So

15   that 36 million would be the final number, and it wouldn't be

16   reduced maybe as co-lead had thought.

17             So, let's talk about that double recovery.  There's

18   about $20 million in fees at stake, I guess, in the **Alexander**

19   case, and there's about 10 million, a little over 10 million,

20   that have already been recovered.

21             Every declaration submitted in the remanded cases,

22   Your Honor, that have settled all state that counsel's

23   recovering fees for work done in the MDL and that those fees

24   would be returned to the MDL.

25             What we're asking is that the Court or co-lead

 1   counsel tell us how they're being accounted for, how is that

 2   being done, because, under our analysis, based on the facts

 3   that we have, which, obviously, are limited -- as Your Honor

 4   knows, we have asked for certain information -- we find that,

 5   if that 20 million comes on top of that 10 million, there's

 6   already $30 million in the bank for pre-remand MDL work, about

 7   2011/'12 back to '06.

 8          How is that money applied?  What's it applied to?  Do

 9   the MDL cases here before the Court today and yesterday get

10   credit for some of that money?

11          They should.  Their fees should be reduced because

12   money was already recovered for the common benefit.  Counsel

13   shouldn't get that, in addition to what they're requesting here

14   today, and that's what their papers seem to indicate.

15          They say, "Well, 30 percent is fair.  Thirty percent

16   is reasonable."

17          But, Your Honor, if we get -- we have 10 million.

18   But if we get to 20 million -- we don't know if we will, but,

19   right now, it's approved.  It's on appeal, but it's been

20   approved.  And the objection doesn't deal with fees.  It deals

21   with fairness.  If we get that 20, don't worry about it.  Let's

22   not look at it.  Let's not consider it.  If anything, it will

23   give us a multiplier.  So, we'll take our 72 million.  We'll

24   add 30 million to it.  So we'll have $102 million settlement --

25   attorneys' fees, but that only just gives us a multiplier, on

1    top of the 30 percent.

2          That's not how the law works.  You don't get a

3    multiplier if you're already adjusting for that risk in your 30

4    percent fee ask.  You get common fund or lodestar with a

5    multiplier.  You don't get common fund and then say, "I get a

6    multiplier on it."

7          That's why we're talking about double recoveries

8    here, all right.  They want to recover that money.  So, they

9    want $104,500, 102 million total fee award on a $243 million

10   settlement.  That's 43 percent recovery, not 30.  That's a

11   windfall to co-lead counsel.  I say "co-lead," but that's a

12   windfall in attorneys' fees that I understand does not only go

13   to co-lead counsel, but to everybody, but it's a windfall of

14   attorneys' fees that harms the classes.

15         How is this accounted for?  We haven't seen it.  They

16   weren't forthcoming in their papers originally.  It was six

17   million.  And, again, they didn't deal with what happens if we

18   get more.  And they asked the Court to ignore the fact that,

19   well, we don't have the 20 yet.  But what if they do?

20         So, in the worst case scenario here, Your Honor, the

21   monies here need to be held until we find out whether that

22   20 million is coming here because, if it does, I think that

23   impacts Your Honor's analysis.

24         They shouldn't be able to say to Your Honor, "Well,

25   we don't know what's going to happen with that 20 mill so don't

1    count it."

2            Because what happens if it does come in, when it does

3    come in?  How does that affect this Court's analysis?

4            That gives them $30 million for work already done in

5    this MDL.  Their lodestar at $74-and-a-half million, arguably,

6    should then be reduced by the 30 million recovery.  So, then,

7    if we're going to talk about multipliers, let's talk about it

8    at $44 million, all right.

9            These are the things that, Your Honor, we're

10   concerned about in this case, and we're concerned that the New

11   Jersey class members are getting a shortfall here because the

12   fees globally are so great, whether you apply it singly to New

13   Jersey or globally, the fees here are great, and it doesn't

14   take into account what's been going on around the country in

15   these cases with these same counsel.

16           Like I said, Judge Chen, in **Alexander**, wanted to

17   ensure that there was no double recovery.  That was the point

18   of the analysis.  And the Court did it sua sponte.  No one

19   raised an objection to fees.  The Court, in its own analysis,

20   looked at it and said:  I need more information here.  This

21   isn't clear.

22           That's what we're looking at, and we ask the Court to

23   take a look at Judge Chen's written opinion, and we're happy to

24   provide a copy.

25           **THE COURT:**  If you would, submit one to the Clerk

1    when you're done, please.

2         **MR. KOHN:**  Yeah.

3         That's really what the template is.  That's what the

4    Court needs to be concerned with.  Judge Chen raised very valid

5    points on how these things should be treated when you have an

6    MDL of this size in other cases that get remanded and getting

7    fees for the same pre-remand work that was done.

8         **THE COURT:**  I think I understand your position on

9    that point.

10        **MR. KOHN:**  And let's talk, one last thing, about

11   double recovery, and I'll move on.

12        We've seen fee expenses in this case, $7.7 million,

13   $8.2 million, give or take, depending on the time frame of

14   which we are following, which, obviously, it's expected that

15   they're going to go up.

16        But, again, when we look at the remanded cases -- and

17   I have the declarations here.  I went through them, and, again,

18   a percentage was received in those cases for expenses for

19   pre-remand MDL work.  I don't know how that was accounted for,

20   Your Honor.  I haven't seen it before the Court.  They haven't

21   put it in any of the fee applications.

22        These expenses coming from these cases in these other

23   declarations say "expenses for pre-remand MDL work."

24        Where's the line item for that in their expenses to

25   the Court which they used to justify a lodestar crosscheck that

1    they say is unnecessary?

2            They add that on and say it's 82 million.  And then

3    that's why, when they get 72 here, we're all great.  But that

4    82 million only counts if those expenses haven't been recovered

5    already.  Maybe they haven't been, but maybe they have, and we

6    don't know that information.

7            What happened to the expenses recovered in those

8    other remanded actions?  We think that they were improperly

9    accounted for.  I'd love to get more information, and we'd be

10   happy to discuss it.

11           In support of counsel's position here that 30 percent

12   is fair and reasonable, they submit the Fitzpatrick

13   declaration, expert hired by them.  Honestly, probably one of

14   the most self-serving declarations I've personally ever read.

15   You would never guess that he was getting paid by co-lead

16   counsel for it based on the terminology and the phraseology he

17   uses to describe the work being done.  But the problems with it

18   are the data is over 10 years old.  He's talking about cases in

19   '05 and '06.  He doesn't look at the recent updates.

20           He did no analysis of any billing records here.  He

21   didn't look at co-lead counsel's lodestar to determine whether

22   there was reasonable or non-duplicative fees or whether any of

23   it was excessive or if it properly allocated between partners,

24   associates, and support staff.

25           He says 30 percent is reasonable in these cases.  He

 1    has no support for that.  All of the cases cited by co-lead

 2    counsel in their opposition -- in their motion, actually, for

 3    fees and in opposition all deal with 30 percent of cases where

 4    the largest settlement value was $15 million.  On a case where

 5    there's $100,000, they got a 30 percent fee award.  On a case

 6    for $416,000, they got a 30 percent fee award.

 7             Sure, in those cases, that's perfectly justifiable.

 8    But when you're talking about a case, if we're going to accept

 9    their number at $25-and-a-half million, 30 percent isn't

10    justifiable, it's not reasonable, and they don't have any cases

11    to support that.

12             The only case that supported a higher fee on a bigger

13    number was when a city was the plaintiff, sophisticated party

14    able to negotiate a lot differently than an individual

15    plaintiff looking to pursue a wage-an-hour claim or a consumer

16    fraud claim when they're looking for their clients -- or

17    looking for an attorney.

18             Fitzpatrick admits, in his study and his declaration,

19    that the nationwide average median for class actions is 25.4

20    percent or 25 percent.  Yet, despite that, despite his own

21    studies finding that, he says 30 percent here.  Don't find any

22    support for that.

23             They ignore -- Mr. Fitzpatrick ignores the contrary

24    case law and the Seventh Circuit precedent.  **Gehrich, Synthroid**

25    **II**, **Capital One**, all of those cases apply a sliding-scale

 1    approach.

 2            If we're just going to talk about New Jersey -- you

 3    can apply it globally, as well.  Let's talk about New Jersey --

 4    that sliding-scale approach needs to be applied, even at

 5    $25-and-a-half million, but he ignores all that and just says:

 6    I -- I, Mr. Fitzpatrick -- don't believe that the sliding scale

 7    would be applied here.

 8            Well, if we had Mr. Fitzpatrick on the stand in a

 9    **Daubert** hearing, I'm not sure that opinion comes in.

10            His opinions with regard to counsel's work and why

11    the risk analysis is the way it is, seemingly non-evidential,

12    as well.  There's nothing there that is a fact that would come

13    before this Court, if pressed.

14            He then says these guys would have agreed to retainer

15    agreements at a third or more and so 30 percent, because we're

16    not asking for a third, is reasonable.

17            But the courts, again, in this circuit, have found

18    that, where individual plaintiffs are seeking representation,

19    they don't have the same negotiating power, they don't have the

20    same leverage to negotiate a sliding-scale fee award, so they

21    find that those retainer agreements and what retainer

22    agreements would be is not really a probative issue.

23            In fact, Mr. Fitzpatrick's own declaration says:

24    Well, we looked at all these cases where these fee retainers

25    were done.

1              But he admits every one of them was an individual

2    employment case.  Not one was a class action, not one was an

3    MDL.

4              And talking about MDLs, Mr. Fitzpatrick didn't

5    address fees in MDLs.  He knew what this case was.  He was

6    doing one certification for 20 cases, but doesn't mention how

7    fees are calculated in an MDL.  He ignores because it hurts

8    co-lead counsel's fee request, not what he was hired to do.

9              He also states, finally, in his declaration that

10   co-lead counsel is not seeking an escalation or a multiplier of

11   their fees.  But as I've tied to my earlier argument, if

12   co-lead counsel gets what they're requesting in this Court,

13   $72 million in fees and gets $30 million more from remanded

14   cases for post- -- or pre-remand MDL work, they are seeking a

15   multiplier, and it's admitted in their papers at 1.3.

16             I wonder if Mr. Fitzpatrick would change his mind

17   after he saw that.

18             Talk about the sliding scale.  At the end of the day,

19   we think the megafund analysis applies.  Let's talk about the

20   sliding scale approach, as well.  There's no doubt that this

21   applies in this case.  There's no contrary law that says it

22   shouldn't be.

23             The Seventh Circuit has indicated, in **Synthroid II**,

24   how it works:  Thirty percent of the first $10 million, 25 of

25   the next 10, 20 percent of the remaining amounts --

```
 1              COURT REPORTER:  Please, slow down.

 2              MR. KOHN:  Sorry.

 3              -- 20 percent of the remaining amounts, from 20 to

 4    40, and 15 percent above that.

 5              If you applied that globally, it results in a fee

 6    award of $39.95 million, which would actually be a

 7    16.44 percent award, basically right in line with what Judge

 8    Chen did in Alexander.

 9              If we look at just New Jersey and we apply it to

10    New Jersey, that $7.65 million fee award would get reduced to

11    6.6, saving the New Jersey class about a million dollars, a

12    little over a million dollars in fees, that would go directly

13    to the 888 class members in New Jersey.

14              Again, we talked about you don't need a lodestar

15    crosscheck.  We think you should.  We think it's prudent.

16              That 39.95 million, if we looked at it globally, is

17    kind of close to the lodestar of 44.  That would be true if you

18    count that 30 million against the recovery that's already being

19    sought here.

20              Let's talk about the lodestar just for a second.  We

21    think the Court should at least consider it.  There's no

22    precedent that says we shouldn't.  There's case law in the

23    circuit that says maybe it's not the best means or use of the

24    Court's time.  But we think, in a case like this, it's prudent,

25    based on the time and length of the case.
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1            The lodestar submitted by co-lead counsel, I can't

2    follow what's going on.

3            We start in Kentucky in October of 2013.  They say

4    the pre-MDL time remand is 133,000 hours and change, about

5    $50 million in fees, at $375 an hour, it would come out to,

6    okay.

7            In New Hampshire, in December of 2014, same amount of

8    time and fees.

9            In February of '16, we're now at 135,000 hours.  Two

10    years later, a couple thousand hours have been added, 57

11    million in fees, $422 an hour.

12            However, get to the MDL, and, in September, we're now

13    at 149,000 hours and $74-and-a-half million in fees, so it's

14    now $500 per hour.

15            Then, in October of 2016, in Arkansas, followed by

16    Mr. Houston who's sitting behind me here, back down to 135,000

17    hours as MDL time.

18            So, somehow, there's an additional 14,000 hours that

19    were added between February and September of 2016.  It's about

20    $7 million in fees.

21            I'm asking the Court -- the Court should look at this

22    lodestar, should figure out what's going on.  I'm not saying

23    that there's something wrong here, but it begs the question on

24    what is going on here.  What is this time for?  We need to look

25    at why we're at 149,000 hours, what's made up that time.  Is

1    there duplicativeness?  Is there excessiveness?  If we're going

2    to do a lodestar crosscheck, it needs to be looked at before

3    Your Honor can determine the reasonableness here.

4           And, then, are they asking for fees on current rates?

5           Again, that was an interest by Judge Chen in

6    **Alexander**.  Are they asking for, you know, the lodestar at the

7    current rate or is it a progressive rate for the time

8    throughout this litigation?  Again, it would go against a

9    multiplier.

10          They then submit to the Court unaudited time from all

11   the local counsel.  They said they self-audited their own time.

12   But they ask the Court to take that into account in that

13   $74-and-a-half million, unaudited time from local counsel.

14          But, as Mr. Harwood said yesterday, "When we get

15   local counsel's time, we're going to audit it."

16          They're going to audit that time, and I'm going to

17   bet every single dollar of that doesn't go back to local

18   counsel, but they want this Court, Your Honor, to accept that

19   unaudited time for the truth.

20          Lastly, Your Honor, I just want to show Your Honor

21   the numbers that we've been talking about just to give a quick

22   summary.

23          So, if you apply the megafund at 15 percent, it's a

24   $36.45 million award globally.

25          If you want to apply that specifically to New

1  Jersey -- the percentage that co-lead counsel has used to

2  represent New Jersey or representing percentages going to

3  individual MDLs has been fluid -- at 4.96 percent, in one of

4  their applications, $1.7 million would be the fee in New

5  Jersey.

6          If you look at the percentage of class members which

7  has been used in **Alexander** as 888 out of the 27,000 class

8  members pre-remand, that's 3.29 percent, so it would be a fee

9  of about $1.2 million, $1.1 million in New Jersey.

10          Let's talk about the double dipping.  The result

11  would be a $44.5 million fee award, if you removed what we

12  talked about, 18.3 percent fee award.  Again, if you apply it

13  just to the results in New Jersey, it would reduce the fee

14  award to $4.5 million, which is 10-and-a-half percent of the

15  recovered remanded case fees being allocated to New Jersey, so

16  it saves the New Jersey class members $3.1,500 in fees.

17          If you do the sliding scale as I showed Your Honor

18  earlier, 39.95 million globally, 16.44 percent fee award in

19  just New Jersey results in a fee award of 6.6, which is a

20  saving of a million fifty.

21          We believe any of those approaches, Your Honor, would

22  be more reasonable and more fair and the proper way to account

23  for the work done by co-lead, which wasn't insignificant, and

24  that's why we're talking about numbers in the multiple tens of

25  millions of dollars.  We're not saying they should be cheated

```
 1   here, that they should be shorted here.  What we're saying is

 2   it needs to be reasonable here, it needs to be looked at that

 3   way, and that's what we think is fair and reasonable under

 4   these circumstances, Your Honor.

 5           THE COURT:  Thank you, Mr. Kohn.

 6           Does Fed Ex have a comment?

 7           MR. NORRIS:  Yes, Your Honor.

 8           Your Honor, I'm going to limit my comments mostly to

 9   the fairness of the settlement and not opine on the

10   reasonableness of the fees, based on the agreements that we've

11   entered in this case, and we put on the docket something to

12   that effect last week.

13           THE COURT:  All right.

14           MR. NORRIS:  But before I, kind of, start about the

15   fairness of this settlement, what I did want to address was the

16   nature of the negotiations that we had in this case.

17           I think that Plaintiffs' counsel and FedEx has

18   represented in each of these hearings that each settlement was

19   the product of arm's length negotiations, and those

20   negotiations were hard fought, and we went toe to toe for,

21   basically, a month, not to mention the prep time that we had

22   leading up to the mediation and the exchange of data on each of

23   these cases.  And each case was negotiated on an individual

24   case basis based on the merits of each individual case, and New

25   Jersey is no exception to that.
```

1              The basic argument that the class reps make in this

2    case is that $30 million would have been sufficient to settle

3    the case.  Mr. McMahon and Mr. Tofaute both swore testimony to

4    that effect in their declarations filed on February 3rd, 2017.

5    McMahon's declaration is at Paragraph 12.  Tofaute's is at --

6    Mr. Tofaute's is at Paragraph 13.

7              We ultimately settled the case.

8              **THE COURT:**  Could you read those to me?  Do you have

9    them there with you?  If not, that's fine.

10             **MR. NORRIS:**  I left them at the table, but we can --

11             **THE COURT:**  Okay.  That's fine.  Go ahead.  I'll

12   track them down.

13             **MR. NORRIS:**  And I believe Ms. Ellingstad, in her

14   papers, recently quoted them, so they're available in class

15   counsel's filings, as well.

16             So, as you know, we settled this case for

17   $25.5 million, which the class reps are claiming is

18   insufficient, which is a difference of 4-and-a-half million.

19             There are two main arguments on the substance of the

20   case that the class reps disagree with.  One is FAAAA, which

21   Ms. Ross and Ms. Bouckenooghe addressed in their opening

22   remarks.  The second one is on the CFA, which was talked about

23   a lot.  And I'm going to add a little bit of color to each one

24   of those.

25             On the FAAAA, the class reps claim that there's no

1   risk of preemption in their papers, and that was docketed in

2   the New Jersey case, Number 218, at Pages 22 and 23.  And

3   basically what the Plaintiffs say is that, in New Jersey, it's

4   conclusively established that there would be no FAAAA

5   preemption.

6         And Ms. Ross did a recitation of the difference

7   between the **BeavEx** case, on the one hand, and the **MDA** case and

8   **Schwann** case in the First Circuit.

9         And where New Jersey, kind of, lands on that

10  continuum is closer, in FedEx's opinion, to the **MDA** and **Schwann**

11  cases in the First Circuit, and the reason for that is

12  identified in the **BeavEx** case.

13        In the **BeavEx** case, the Seventh Circuit identifies

14  that, in that particular case, the ABC test applied to a single

15  statutory scheme.  Whereas, in Massachusetts, the independent

16  contractor statute applies across a lot of different statutory

17  schemes, you know, employment protection statutes, unemployment

18  compensation and the like.

19        The ABC test, as the Plaintiffs have put it forth in

20  this case and in the **Sleepy's** case, has similarly broad

21  application in New Jersey, and that only strengthens FedEx

22  Ground's argument that FAAAA preemption would apply in this

23  case, and that would create a lot of risk for class counsel.

24        On the CFA's score, the CFA claim, the class reps and

25  the Plaintiffs in this case have said that the CFA will apply

1    to sales of businesses between a third party and each of the

2    Plaintiff.

3            Now, that fails for multiple reasons.  The first is

4    that there's an on-point case in New Jersey State Court called

5    **Winslow** which says that employment disputes like this one,

6    misclassification where they're seeking employment-type

7    remedies, are not covered by the CFA, and, so, as a threshold

8    matter, we don't think that the CFA claim would survive

9    scrutiny as a matter of summary judgment.

10            Because of this case, the Plaintiffs and, I suppose,

11    the class representatives pivoted to the sale of business

12    theory, but that runs headlong into the **J & R Ice Cream** line of

13    cases that Ms. Ross described in her remarks.

14            And the cases that follow **J & R Ice Cream**, **Yogo** and

15    **Wingate**, all demonstrate that cases in federal court are to

16    follow the Third Circuit's precedent on the CFA claim, in the

17    absences of counter-veiling Supreme Court authority in New

18    Jersey.  There is no counter-veiling Supreme Court authority in

19    New Jersey which addresses the theory of the case that the

20    Plaintiffs advanced in this one, and so as a matter of -- when

21    this case would be remanded to federal court, we would be

22    dealing with the **J & R Ice Cream** line of cases, which would

23    eviscerate the Plaintiffs' claim.

24            The state law cases that the Plaintiffs cite fair no

25    better because, in each of those cases, the Plaintiff, in those

```
 1   cases, are paying upfront money to the defendant for something.
 2           There's no such transaction in this case.  In the
 3   route sale context, the route sale -- route sales take place
 4   between a new contractor and a third party, or FedEx would give
 5   them a route, so there's no sale at issue.  And each of the
 6   state court cases upon which the Plaintiffs in our mediation
 7   addressed, and the class reps addressed a strong support for
 8   them today, deal with upfront money paid to the defendant,
 9   which is just absent from the fact pattern here.
10           Finally, there is strenuous dispute about what the
11   measure of damages would be in this case.  And in FedEx
12   Ground's assessment of the case, we did place value on the CFA
13   claim, but that value was based on the strength of our
14   defenses, and also we were operating from a much lower base
15   damages because of the way that we calculated those damages.
16           The CFA claim is kind of a square peg in a round hole
17   in this case.
18           But the paradigm CFA claim is:  A consumer buys a
19   widget, and that widget is either defective or not what they
20   thought it was going to be and so it was worth less.  And the
21   measure of damages is the difference between the defective
22   widget and the full value of the widget.  So if you bought the
23   widget for 10, and it was defective and only worth 1, the
24   damages are 9 and then trebled.
25           What the Plaintiffs were going to have to prove here
```

1    was that they were induced to buy a business from a third party

2    and that business was depressed in value as a result of the

3    control that was, allegedly, exercised by FedEx Ground.

4          I think it goes without saying that proving damages

5    in this case would be exceedingly difficult, and, also, there

6    would be a lot of individual issues that would likely result in

7    decertification of the case, and that's the way that we

8    approached it.

9          Also, FedEx Ground would have introduced a tremendous

10   amount of evidence from class members of the profit that these

11   drivers made on route sales and also when they operated

12   multiple routes.  And, at the end of day, those profits far

13   exceeded what the measure of damages would be in this case, and

14   so you would be, essentially, trebling zero in many cases.

15         The alternative that the Plaintiffs offered in this

16   case was this notion of out-of-pocket loss, looking at what the

17   contractor earned and then comparing it to what they would have

18   earned if they were classified as employees.

19         And the New Jersey cases are clear that, even with a

20   measure of damages like this one, under the CFA, there can be

21   no windfall.

22         And, in that analysis, what FedEx looked at was

23   including data like route sales, like the operation of multiple

24   routes, and what we found in multiple cases of class members

25   was that the profits that the contractors enjoyed as a result

1    of this relationship far outweighed whatever hypothetical

2    employee income they would have derived, and so the claim

3    itself was just not worth very much, and the risk was high for

4    the Plaintiffs and low for FedEx in advancing its defense.

5            So, to conclude, our basic position is the same as

6    the position that we've had in each of the cases, which is that

7    the settlement is fair, adequate, and reasonable, and that it

8    should be approved.

9            The difference between the parties in this objection

10   is really a difference in the assessment of litigation risk,

11   and everyone seated at both of these tables assessed that

12   litigation risk and came to a deal at arm's length, and we

13   think that it should be approved.

14           **THE COURT:**  Thank you, sir.

15           Ms. Ross.

16           **MS. ROSS:**  I'm trying to decide what to bring with

17   me.  It's like packing for a trip.

18           Accept my apologies for my little outburst there.  I

19   litigated the **Alexander** case and the **Estrada** case before it,

20   for many years, Your Honor, and it's sometimes difficult to

21   listen to people talk about things that you were present for

22   that they were not, and I am very sorry.

23           I'm going to talk about the attorney fee piece,

24   first, and then will go back to the fairness of the settlement.

25           I join in much of what Mr. Norris had to say.

1          With respect to the attorneys' fees, I think the

2    Court asked the right question.  These objectors have no

3    standing to object to the fee petitions in any of the other

4    cases, and it would be a travesty if judgments were held up in

5    any of the other cases by virtue of what, I imagine, could be

6    an appeal in this New Jersey case to the Seventh Circuit.

7          Second, this is not a global settlement.

8          There was a footnote in Mr. Kohn's brief in which he

9    said something along the lines of:  There's no evidence to

10   suggest that there wasn't a $243 million agreement made that

11   was then carved up into 20 pieces.  I think that was Footnote 2

12   in their brief.

13         There are mountains of evidence to prove to the Court

14   in everything that you've heard for the last two days that each

15   one of these cases was litigated as an independent case with

16   common discovery.  Each case was ruled on by this Court with

17   its own judgment.  Each case was appealed to the respective

18   Courts of Appeal independently.  Some were remanded out of the

19   MDL.

20         And the suggestion that this was one big case where

21   all the work was common and that this is, you know, kind of

22   like a consumer rights action where there are copycat

23   complaints filed all over the country that get consolidated

24   into a single complaint and all litigated together is just not

25   so.

1          I was remembering last night that, at the first

2    hearing before the JPML which Your Honor was a member of, there

3    was concern about the Panel as to why the 12 cases that were at

4    issue in that motion should be put together in an MDL.

5          And if I remember correctly -- and maybe I don't --

6    Your Honor asked:  What's the source of law in each of these

7    cases?

8          And the answer, of course, was:  The source of law

9    was state law.

10          Every one of these cases asserted claims under the

11    laws of the state in which the cases were filed, and the first

12    petition for coordination as an MDL was denied for that reason.

13          So the mantra, the drumbeat that this is a global

14    case and a global settlement is just not borne out by the

15    facts.  It's a fiction and should not -- is not entitled to any

16    credence by this Court.

17          With respect to the megafund argument, there is no

18    question that the Seventh Circuit Court of Appeals has rejected

19    the notion of a megafund.

20          In the **Synthroid** case -- this was like the packing

21    for the trip (indicating) -- in the **Synthroid** case, the Seventh

22    Circuit, the first **Synthroid** opinion -- was this the first

23    **Synthroid** opinion -- **Synthroid I**, the Court expressly rejected

24    the concept of a megafund, a megafund analysis, for looking at

25    large, large class action recoveries and evaluating a fee

 1   petition because, in the Seventh Circuit, it is the market

 2   price for legal services, in light of the risk of nonpayments

 3   and the normal rate of compensation in the market at the time

 4   that governs.

 5         And I believe it was Judge Easterbrook who was on the

 6   Merits Panel in the appeal from this case, said, quite clearly,

 7   that private parties would never contract for such an

 8   arrangement because it would eliminate counsel's incentive to

 9   press for more than the minimum amount in a settlement, knowing

10   that their fees would be capped at the end.

11         The rule in the Seventh Circuit is that fees are to

12   be awarded in a class action case -- I know Your Honor knows

13   this law very, very well -- is what is the hypothetical ex-ante

14   bargain, what would the parties have negotiated for at the

15   beginning of each case.

16         Now, in these cases, every one of them was filed in a

17   District Court somewhere else.  Contingent fee agreements were

18   signed by the named Plaintiffs in each one of the constituent

19   cases, including New Jersey.

20         There's evidence in the record we submitted with our

21   fee petitions that the Plaintiffs in the New Jersey case signed

22   retainer agreements with the Curetan Caplan firm for 30 percent

23   of the recovery.  Those agreements are entitled to great weight

24   because they are one measure of the market, and it's the market

25   that controls.

1          There's other Seventh Circuit authority that says, in

2    contingent fee litigation and particularly contingent fee class

3    action litigation, the contingency fee is the market rate fee.

4          Why?  Because plaintiffs' class action lawyers like

5    me, my colleagues at this table, the company who was here

6    yesterday, we do these cases all the time, and we do these

7    cases with the expectation that, at the end of the day, we will

8    be compensated not just for our lodestar fee.  That I could get

9    by doing hourly work for a corporate client or for my union

10   clients.  You know, I have hourly clients, too.  We do these

11   cases with the expectation that, after taking the risk, we will

12   be -- counsel will be rewarded for that risk, for the delay in

13   payment, for the potential loss of a case, for the time put

14   into a case that could be spent elsewhere in other

15   fee-generating work, with an enhancement.

16         And the Seventh Circuit has concluded that the

17   percentage-of-the-fund approach is the correct approach to

18   apply to fee award in cases like these because it ties the risk

19   -- it ties the compensation of counsel to the compensation for

20   the class, and it incentivizes counsel to get as much money as

21   they can, by judgment or settlement, because, by maximizing the

22   recovery for the class, counsel maximizes the recovery for

23   itself.

24         The lodestar method, which the objectors are very

25   focused on, creates the reverse incentives.  It incentivizes

1    lawyers to run the meter and their clients be dammed, and

2    that's why the Seventh Circuit strongly disfavors using

3    lodestar as the measure of attorneys' fees in contingent fee

4    litigation like this case and others and strongly disfavors the

5    use of a lodestar crosscheck.

6            Although, we have submitted to the Court, in papers

7    that are not difficult to understand and that I will work

8    through again, why a lodestar crosscheck of the fee requests in

9    these cases looked at across the board because all of the cases

10   settled generates either our lodestar fee, after 12 years of

11   litigation, or a very modest multiplier of 1.3.

12           A multiplier of 1.3 on lodestar in contingent fee

13   litigation is a very small enhancement for the amount of work

14   and risk undertaken by the lawyers in these cases on behalf of

15   their clients.

16           So I would submit to the Court that to adopt the

17   megafund approach proposed by the objectors would be reversible

18   error.

19           In the **Synthroid** case, that's exactly what the

20   District Court did, and the Seventh Circuit panel, with Judge

21   Easterbrook writing for the Panel, said:  Not so fast.  That's

22   not the Rule in this Circuit.  It was inappropriate for the

23   Court to do so.

24           And the case got sent back.  And not only did the

25   case get sent back once, **Synthroid** got sent back twice because,

1    on remand, the District Court kind of fudged the numbers around

2    and sort of reached the same result, and the Seventh Circuit,

3    the second time around, said:  The District Court got it wrong

4    again.  Now, we throw up our hands.  We're going to decide the

5    fee.

6                So, that's our position with respect to the megafund.

7                Now, with respect to the sliding-scale approach that

8    the objectors have proposed to be applied either across the

9    board, which would be inappropriate here, or even in the New

10   Jersey case alone, application of the sliding scale is not

11   mandatory in any way, shape, or form, under Seventh Circuit

12   law.

13               In the **Synthroid** case, in **Synthroid II**, Judge

14   Easterbrook, writing for the Panel, said that application of a

15   sliding-scale model was appropriate in that case but most

16   certainly is not appropriate in every case.

17               The Rule in the Seventh Circuit is:  What would the

18   hypothetical ex-ante be?

19               And, in some cases, a sliding scale is a very useful

20   tool for a court to apply for purposes of making that

21   determination, and here's why.

22               The tapering technique, as discussed in **Synthroid** and

23   cases following it, cases cited by the objectors in their

24   papers, too, is an effort to mimmick the market rate fee or the

25   ex-ante bargain by applying a higher percentage of the fee to

1   the first dollars in a settlement, like the first band of

2   recovery where the risk of establishing liability where the

3   greatest risk in the case is present, and then to apply a lower

4   percentage of fee recovery to either the last dollars or lower

5   bands of the tiered recovery to reflect portions of the

6   litigation where the economies of scale cause -- where the

7   economies of scale kick in or where damages -- and, in

8   particular, in cases where damages are not difficult to

9   calculate and can be determined in a mechanical fashion.

10          So, in cases like **Gehrich**, **Capital One**, **Craftswood**,

11  or even **Synthroid II** itself, all cases cited in the objectors'

12  papers, those were consumer fraud cases:  TCPA; you know, calls

13  to the cell phone that were unwanted where the damages -- if

14  the calls can be proven, that's the hard part, the higher

15  percentage of recovery.  The easy part is calculating the

16  damage.  You look at the number of phone calls.  You say,

17  "Here's the statutory damage."  I don't know.  Twenty bucks,

18  whatever.  Do the math.  There are your damages.

19          Okay.  Well, would it be appropriate to apply that

20  model to either the New Jersey case or any of these cases?  And

21  how would one even do so where the risks in each one of these

22  cases was different?

23          The risk of proving damages, as Mr. Norris just

24  described, would potentially be more difficult in these cases

25  than the risk of establishing liability.

1          The New Jersey Wage Payment Act is kind of -- or the

2    Consumer Fraud Act would be, you know, an excellent example of

3    why.

4          Perhaps it wouldn't be very difficult to prove

5    recovery if Ms. -- what's your last name?

6          **MS. BOUCKENOOGHE:**  Bouckenooghe.

7          **MS. ROSS:**  If Ms. Bouckenooghe is correct, maybe all

8    of the elements of proof were there to prove a Consumer Fraud

9    Act claim, so maybe you would apply a lower percentage to the

10   first dollars.  Although, I disagree with her.

11          But you certainly would not apply a lower percentage

12   to the last dollars or subsequent bands of recovery in this

13   case, not on your life.  There were risks of decertification.

14   I mean, the risks ran through from beginning to end.  And the

15   risk at trial in all of these cases was enormous.  In any of

16   these cases, if there were remand from the Seventh Circuit for

17   trial on the employment status issue, you know, that issue has

18   gone both ways.

19          In Seattle, up in the state of Washington, as FedEx

20   told this Court, at various times during the underlying

21   litigation, the Washington state jury found the drivers to be

22   independent contractors.

23          So the application of tapering, under **Synthroid II**,

24   would be entirely inappropriate in this case.

25          Okay.  Let's talk about the **Alexander** fee and let's

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1   talk about what happened because I was there.  It's my case.

2          Judge Chen never once suggested that there was

3   something wrong here.

4          In the California fee petition, we -- the standards

5   for obtaining attorneys' fees in the Ninth Circuit are very

6   different than they are in the Seventh Circuit.  And in the

7   Ninth Circuit, lodestar crosscheck is mandatory.

8          We sought fees in that case at 22 percent as a

9   percentage of the fund, not at 30 percent.  Why?  We recovered

10  $226.5 million.  It was a very large case.  There was no way we

11  were going to ask for more than 22 percent.

12         And the judge -- and we made a presentation to the

13  judge that was our best effort to show him what the California

14  lodestar was in that case, and we did that by isolating from

15  all of the billing records the time put into the case relative

16  to the California claims and the California Plaintiffs, which

17  we were able to do from the group of billing records, and we

18  made an estimation as to what portion of the MDL accumulated

19  lodestar allocated to the omnibus work in the case -- we

20  distinguished between the omnibus lodestar, all the common

21  benefit work, and the state-specific lodestar, and that's in

22  our papers.

23         And if objectors didn't read through the whole file,

24  you know, there's nothing I can do about that.

25         But that's how we presented the lodestar to the

 1    Court.  We were very transparent and very upfront.  And we made

 2    our best estimation to the Court that somewhere between 25 and

 3    30 percent -- this cannot be done precisely because 60 percent

 4    of the work in the cases, as of that date, as of the time we

 5    were remanded out of the MDL in 2010, about 60 percent of the

 6    work was omnibus.  And our best estimation was that, if

 7    **Alexander** had been litigated on a stand-alone basis, 25 percent

 8    of the same work would have been done.

 9         We didn't say to the judge 25 percent of the omnibus

10    lodestar work was done solely for the benefit of the California

11    case.  We gave him our very best estimation as to how the case

12    would have been litigated on a stand-alone basis if we had

13    litigated the case in California without the MDL.

14         The Court, then, at the hearing, asked, "Well, what

15    about" -- you know, "What's going on with the other cases?"

16         And by the time the fairness hearing took place in

17    the California litigation, unlike when we filed the fee motion,

18    these 20 mediations had taken place, so we had more data to

19    provide to the Court.  We didn't hold anything back from the

20    Court.

21         **THE COURT:**  Twenty what had taken place?  I'm sorry.

22    I missed that word.

23         **MS. ROSS:**  When we filed the fee petition in the

24    **Alexander** case, September, 2015, none of these mediations had

25    taken place.  We hadn't even agreed to mediation --

1          **THE COURT:**  That's what I thought you were saying,

2    but I missed the word.

3          **MS. ROSS:**  So, we provided the Court, at that time,

4    in September, 2015, our best estimate of what would have been

5    done in the California case but for the MDL.

6          By the time our fee petition was heard in April of

7    2016, we had been through the mediations in this case.  We had

8    more data points.

9          And so the Judge said, "Well, how will all of these

10   things fit together?"

11         That's what he wanted to know.  He wasn't questioning

12   my ethics.  He wasn't accusing us of double recovery.  There

13   was nothing of the kind.  He gave us a multiplier of three for

14   the excellence of the result, okay.

15         And I said to the Judge, "We'll go back and look at

16   it.  We'll look at it."

17         And I made a proposal, and then I filed a declaration

18   with the Court, which has been filed here, in which, you know,

19   we all, together, took the position that another way of looking

20   at how the MDL fee in total could be allocated between the

21   cases would be to look at the value of the benefit conferred by

22   the settlements themselves on the class members.

23         And for that purpose -- and it was a thought

24   experiment and a proposal we made to the Court as another way

25   he could look at it.  We weren't claiming that we were entitled

1    to 44 percent of the MDL fee in California.  We were helping

2    the Court think through, in his exercise of discretion and as a

3    fiduciary to the California class, the best way to look at the

4    fees.

5            And so we said, "44 percent of the benefit of all the

6    settlements, when you add them all up together, went to the

7    California drivers."

8            Well, why is that?

9            Because we got the most money.  We had the most

10   valuable claims.  No other state has an expense reimbursement

11   claim.

12           So, for my 2,000 drivers, we got several hundred

13   million dollars.  That's how it came out.

14           And Judge Chen, he didn't like that idea, and he

15   said -- and you'll see in his order -- he said that that

16   thought experiment, really, you know, led him to conclude that

17   25 percent of the MDL lodestar for the omnibus work would be

18   fairly attributable to the California case, and he awarded us a

19   lodestar.  He approved an unenhanced lodestar of 12.something,

20   and he gave us a multiplier of three.

21           Well, why did he give us a multiplier of three

22   instead of a multiplier of four?

23           Because the Ninth Circuit case law, you know,

24   suggests that is pretty -- is, kind of, the outer limit of the

25   multiplier on lodestar in a common -- in a

1   percentage-of-the-fund case, and that's how they do it the

2   Ninth Circuit.

3           Did we ask for more?  Yes, we did.

4           Did we ask for 30 percent?  No.

5           Are we unhappy with what we got?  Absolutely not.

6   Less money for us, more for our class members.  That's how it

7   came out.

8           The suggestion that there's a double recovery from

9   what happened in the **Alexander** -- from the fee awarded in the

10  **Alexander** case and the fees requested here strains credulity.

11          I never thought I would say that out loud -- I don't

12  even like to write it -- but I can't think of any other words

13  than the cleche, "strains credulity."

14          Why?  Because the California judgment is on appeal.

15  Not one penny of the California fee has been paid to my firm or

16  anybody else, and I don't know if it ever will.

17          So are we accounting for that in what we're asking

18  the Court to do here?  Yes, we're accounting for it.  It's a

19  possibility.  I think it's -- I'm hoping it's a good

20  possibility, but there is a pending appeal that is not going to

21  be decided for quite a long time because the Ninth Circuit is

22  very backed up.  That's how it goes.

23          I want to address the other aspects of the double

24  recovery arguments that we've heard from our colleagues, and I

25  did prepare a little spreadsheet that kind of shows the math

 1   that is described in detail in our declarations, and so I have

 2   copies for everyone.

 3            And I'm very low tech, so no screens.  Sorry.

 4            So these are for you guys.

 5            May I approach, Your Honor?

 6            **THE COURT:**  You may.

 7            **MS. ROSS:**  I once stepped into the well and got

 8   yelled at.

 9            Okay.  So, what this chart shows, Your Honor, this

10   chart kind of walks through what is described in the

11   declaration that we submitted in support of the fee application

12   and the supplemental declaration, so there's nothing new here.

13   What this shows is that the accumulated MDL lodestar, across

14   the board, as of August of 2016, comes to $74.54 million and

15   change.

16            Now, in the California fee petition, we reported to

17   the Court an accumulated MDL lodestar, as of December 2010 when

18   the California case was remanded back to the Northern District

19   of California in San Francisco, of $56 million.

20            And the difference between the two is six years, a

21   lot more work, and something else, and that something else is

22   that the reported lodestar in the California case was based on

23   time submitted to the co-leads by the Committee of the Whole

24   that was as of that time.  And after we resolved all of --

25   reached the tentative resolutions in all of these cases, a call

1    -- we made the call to the Committee of the Whole for updated

2    time records.  There were some firms who had never submitted

3    back-up for their time and others who had submitted incomplete

4    back-up, and we wanted to be sure that we had everybody's time

5    records because, some day, we're going to allocate the fee, and

6    we want to be sure that that's done fairly.

7           And so part of the difference is that the overall

8    lodestar, as of December 2010 that I reported to the Court in

9    California, was underreported, and that's just how it goes.  I

10   suppose, if we had made the call then, we might have been

11   awarded a higher fee in California, but that's not what

12   happened.

13          The MDL expenses that are shown here -- so that

14   addresses -- actually, Mr. Kohn, in his papers, said that there

15   was a $50 million question.  You know, where's the other

16   $50 million?  Well, that's where it is.  The lodestar was

17   $56 million, not 34, and it was somewhat underreported, and the

18   difference between then and now is that a lot more work has

19   gone into these cases.  We had three rounds of appeal in the

20   Kansas case.  We did a tremendous amount of work to get these

21   cases ready for mediation.  We did, basically, all the damage

22   discovery.  So that's the difference.

23          Okay.  The MDL expenses of $8.6 million as of March

24   of 2015 include expenses that were paid by assessment to the

25   local counsel and the co-leads and the PSC to pay for things

1    like transcripts and filing fees and, you know, all those kinds

2    of routine litigation expenses and also what we called held

3    expenses.  Every firm paid its own travel for the depositions

4    that took place all over the country and so on and so forth.

5    So, you combine the two, and there's $8.6 million.

6              So, the $83.15 million here represents the MDL

7    lodestar through August of 2016 and the expenses as of -- I

8    don't know -- last week.

9              From the remanded cases -- so, that's what's on the

10   table here.

11             From the remanded cases -- and there were -- is this

12   the wrong chart?  No, it's not.

13             The remanded cases in Colorado, Illinois, Kentucky,

14   Nevada, Massachusetts, Connecticut, Vermont, Kentucky, New

15   Hampshire, Florida -- did I miss any?  You get the picture --

16   Michigan, Virginia, a little collection -- we can go back and

17   look at the remand orders -- the vast majority of those,

18   actually all of those cases, have now settled.  Although, I am

19   the lucky bearer of the one up on appeal.

20             From those cases, to date, we have collected back to

21   the MDL $10.145 million.  That's cash in the bank.  That's what

22   we have in the bank.

23             I heard Mr. Kohn say, "I don't know.  $20 million.

24   Maybe they did recover it."

25             We did not recover it.  We have been entirely

1    transparent and truthful with this Court in every filing.

2    That's what's in the bank.  That's what we have collected.

3              There is a possibility that, if the California

4    judgment is affirmed on appeal -- which, you know, I'm going to

5    assume it will be.  But, you know, need I say the word

6    "Brexit"?  Who knows, right -- there will be another

7    $16 million returned to the MDL litigation fund from the

8    California fee representing the unenhanced lodestar for the MDL

9    work, per Judge Chen's analysis, of $10.2 million, plus a

10   multiplier.

11             We also expect that there will be another half a

12   million dollars returned to the MDL from the Arkansas case,

13   which final approval has been granted orally, but there's no

14   written order, but we're expecting -- there is now an order as

15   of -- things change so fast.  Okay.  So another half a million

16   dollars is coming.

17             If you add all of that together and you take account

18   of the uncertain California piece, there will be

19   $26.645 million coming back to the MDL from the remanded cases,

20   representing the work done in the MDL, as represented to every

21   one of those courts, for distribution to all the lawyers who

22   did the work in this case, in these MDL cases, not just these

23   20 cases, all 46 cases, all of them.

24             The fee that we have requested at 30 percent in 19

25   and 33 percent in the last of the cases in front of you now

1  comes to $73.366 million and a half -- $73.366 million.

2       If you subtract the $26 million, if you go to the

3  second to the last line, from the 73.366, that leaves us an

4  unaccounted for MDL lodestar fee of $56.5 million, and a fee

5  award of 73.366 would generate a multiplier of 1.3.  That is a

6  very modest multiplier in contingent fee litigation on the

7  lodestar fee.

8       If California goes south and we never recover

9  anything from that case, a $73.366 million fee award in the

10 remaining cases, taking account of the $10 million and the half

11 a million dollars that's going to come from Arkansas, will

12 generate a lodestar multiplier of zero.  It will be dead on to

13 our lodestar.

14      **THE COURT:**  Wouldn't that be a multiplier of 1?

15      **MS. ROSS:**  That's the multiplier of 1, yeah.  Okay.

16 Not a multiplier of zero, a multiplier of 1.  In other words, 1

17 equals 1.

18      **THE COURT:**  I've never had anyone ask for a zero

19 before.

20      **MS. ROSS:**  Yeah.  No, not a zero multiplier.

21      We have fully accounted for the fees sought in the

22 remanded cases relating to the MDL work.  All of this is in our

23 declarations, and I thought it would be helpful to provide the

24 Court with a more explicit showing of what the math shows.

25      There's no double recovery being sought here.  What

 1  we are asking for in the petition in the New Jersey case and in

 2  all of the other cases, essentially, Your Honor, after 12 plus

 3  years of time, for which some of us have been paid nothing --

 4  that would be me -- we're asking to be paid for our time with a

 5  very modest multiplier on lodestar, in recognition of the high

 6  risk, the delay in payment, the preclusion of other work, the

 7  excellence of the result.  That we were able to settle all of

 8  these cases for such stunning amounts of money, given all the

 9  risks in these cases, is undeniable.  It's indisputable, from

10  our point of view.

11          Okay.  I know this has been a long hearing so I'm

12  going to look at my notes.  I really don't want to try the

13  Court's patience because so much of this is in our papers.

14          **THE COURT:**  I'll tell you what.  We've been at it for

15  a little over two hours.  I always promise the jurors they

16  won't have to sit here for more than two hours, so why don't we

17  take a 10-minute break, let you look over your notes --

18          **MS. ROSS:**  Yeah, and then we'll speed to the end.

19          **THE COURT:**  -- and then we'll hear from the class

20  reps to close us up.

21          **MS. ROSS:**  Thank you, Your Honor.

22          **LAW CLERK:**  All rise.

23          **(All comply; short recess taken.)**

24          **THE COURT:**  You may be seated.

25          **(All comply.)**

1        **THE COURT:**  And, Ms. Ross, I believe that the podium

2   was with you when we broke.

3        **MS. ROSS:**  Okay.  I just have a few more brief

4   comments.

5        I should never say that, right?  It will be like 45

6   minutes, and you'll be saying to yourself, "Brief.  What's that

7   definition of brief in California?"

8        Okay.  I just have a couple more things I want to

9   say.

10       Returning to the question of whether the settlement

11  is fair and adequate and appropriately resolves particularly

12  the Consumer Fraud Act claim, there are two points I would like

13  to make.

14       The first is that -- three points.

15       The first is that --

16       **THE COURT:**  Very lawyer like.

17       **MS. ROSS:**  Very lawyer like, looking at my fingers.

18       Every argument that Ms. Bouckenooghe --

19       Bouckenooghe?

20       **MS. BOUCKENOOGHE:**  Bouckenooghe.

21       **MS. ROSS:**  Bouckenooghe.  Sorry.

22       Dutch, right?

23       **MS. BOUCKENOOGHE:**  Belgian.

24       **MS. ROSS:**  Belgian, okay.

25       Every argument that Ms. Bouckenooghe made in her oral

1    presentation, every one of them is responded to in our final

2    approval brief so I'm not going to try the Court's patience by

3    saying the same things we've said in writing.

4         But I would like to point out, first, there is a body

5    of case law we do discuss in our final approval brief

6    responding to the first iteration of the objections that says:

7    Settlements of claims where treble damages are available are

8    appropriately valued by reference to the single damages that

9    could be recovered because, otherwise, settlement evaluation,

10   including the treble damage piece, would really interfere with

11   many, many settlements, in antitrust cases in consumer fraud

12   cases, and so on and so forth.

13        There's a really nice discussion in a decades-old

14   opinion from the Second Circuit called **City of Detroit versus**

15   **Grinnell** which is talked about in our papers.

16        There's a 2011 Third Circuit opinion called **Sullivan**,

17   also talked about in our papers.

18        And there's a Ninth Circuit case called **Rodriguez**

19   **vest West Publishing**, all of which explain -- lay out the

20   reason why it's not only appropriate, it's preferred to value a

21   claim like this Consumer Fraud Act claim by reference to the

22   single damages, which really reflect the harm to the Plaintiffs

23   as the best measure of settlement, instead of the punishment

24   factor that a successful Plaintiff could get at trial.

25        And that's what we did here, and that's what we've

 1   asked the Court to do, in terms of measuring the settlement in

 2   this New Jersey case at $25.5 million against the net expected

 3   value if no settlement were reached.

 4        So, I think it's really -- you know, it's just not

 5   correct to say that we undervalued the claim because we didn't

 6   take the $32 million or $46 million, multiply it by three, and

 7   then discount for risk.

 8        Had we done so, we would have been asking the

 9   Defendant, as a condition of settlement, to concede to

10   liability, which no defendant will ever do, so that was the

11   first thing I wanted to say.

12        The second point I want to make is that

13   Ms. Bouckenooghe spent some time talking about fee shifting and

14   why the settlement was undervalued because we didn't factor in

15   the value of a possible fee shift.

16        And fee shifting, you know, comes into play if you

17   win the case.  Fee shifting does not come into play if you

18   settle a case.  There's no basis for fee shifting in a

19   settlement.

20        And, you know, we went over this ground, actually,

21   with this Court when we filed our motion for a common benefit

22   set aside, and the Court denied that motion, in part, because

23   we were talking about mixing fee shifting and common benefit

24   recoveries.

25        There's no basis for fee shifting if there's no

1   liability found and no judgment, and that's why we didn't

2   consider the value of fee shifting in terms of the settlement.

3            And last but not least, I want to circle back around

4   to the attorney-fee argument.

5            The chart that we put together for the Court was for

6   the purpose of showing, you know, very concretely -- refuting

7   the claim that we're attempting to double recover.  But we

8   don't want to lose the very important point that fees in this

9   Circuit and in each one of these cases are appropriately

10  awarded as a percentage of the fund and that the lodestar is

11  not really a relevant consideration and that a lodestar

12  crosscheck is not mandatory or required.  And, most certainly,

13  lodestar is not the cap on a common fund fee recovery.  That's

14  just not the law.  If it were, nobody would have a contingent

15  fee practice.  I certainly wouldn't.

16           And so, with that, we would ask the Court to approve

17  the settlement and approve the fee award and overrule all of

18  the objections.

19           **THE COURT:**  Thank you, Ms. Ross.

20           Mr. Kohn.

21           **MS. ROSS:**  I believe Mr. Marchetti wanted to say

22  something.

23           **THE COURT:**  Oh, I'm sorry.

24           Mr. Marchetti.

25           **MR. MARCHETTI:**  Thank you, Your Honor.

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

```
 1              Anthony Marchetti, Jr., of the Marchetti Law Firm.

 2              This is my first time in 12 years to have the

 3    opportunity to speak to the Court, and I didn't want to let it

 4    pass by without taking advantage of that chance.

 5              As the Court may be aware, I've bean in counsel, both

 6    in New Jersey and in other states that are both still within

 7    the MDL, as well as many that have been remanded.

 8              I just wanted to just make sure that it was clear, on

 9    the record, a couple basic points.

10              First of all, I do believe and recommend that the

11    settlement is reasonable and should be accepted.  I believe it

12    basically takes the risks and the benefits, the pros and the

13    cons, as has been discussed today.

14              And I may disagree with Mr. Norris, I may disagree

15    with Ms. Ross about the strength of the consumer fraud claim.

16    However, when you put all of them together, the settlement, as

17    a whole, is fair.

18              And when you look at the numbers, the difference

19    between the proposed resolution that's for Your Honor to

20    determine and what's requested is really a small amount.  It's

21    almost -- I believe the math works out to maybe $12 per week,

22    per driver, a very, very small amount.

23              And the settlement does, in fact, address the issues

24    of risk, both the risk of things like the FAAAA, which, of

25    course, we may disagree with FedEx, but we don't know what's
```

```
 1    going to happen down the road on the Costello versus BeavEx
 2    case and also the risk of the other defenses raised and have
 3    been discussed ad nauseam in the briefing and for the past two
 4    days.
 5              And the last point that I wanted to raise is that
 6    that the settlement does provide a level of certainty and
 7    finality with regard to the class as a whole, as well as the
 8    named Plaintiffs, and that is the case will be resolved,
 9    payment will happen sometime in the, perhaps, foreseeable
10    future, as opposed to the path that the case may take if the
11    settlement is not approved.
12              I was lucky enough to be counsel or brought in as
13    counsel after several years of the remand in Florida where the
14    case had proceeded for a period of time before Mr. Stack asked
15    Mr. Houston and I to come in and assist him.  And then, after
16    we stepped into the case, we were involved in the case for
17    another two-and-a-half or three years before the case was
18    resolved.  And the point being that the cases, even if
19    successful on appeal, if the cases are not resolved, the cases
20    could last three, four, five, six more years going forward.
21              And, as was discussed, as was discussed yesterday, as
22    was discussed today, it's in the interest -- we believe or I
23    believe -- in the interest of the class to actually have
24    payment happen now, as opposed to rolling the dice on what
25    might happen down the road through several different courts,
```

1    for, essentially, $12 per week.

2                Thank you.

3          **THE COURT:**  Thank you, Mr. Marchetti.

4          **MR. HARWOOD:**  Your Honor, before we give Mr. Kohn the

5    last word, I just wanted to respond.

6          **THE COURT:**  You folks had two argue the first time

7    around, Mr. Kohn.

8          **MR. KOHN:**  That's three now, Your Honor.  They all

9    offer the same opinion.

10         **MR. HARWOOD:**  I just wanted to respond to one of

11   Your Honor's questions about the exact language that the

12   objectors employed about settling for $30 million.  It appears

13   in the declaration of Michael Tofaute dated February 3, and in

14   Paragraph 13, it says:  I joined in Mr. McMahon's statement to

15   Ms. Ross that we would not settle this case below $30 million.

16               And two paragraphs later, in Paragraph 15, the last

17   sentence says:  However, she -- Ms. Ross -- already knew that

18   we would not agree to a settlement under $30 million.

19               So, I think someone making a sober evaluation of the

20   risks involved would not walk away from $25.5 million sitting

21   on the table, you know, down an uncertain path into the future.

22   It seems like a reasonable thing to accept.

23               Thank you, Your Honor.

24         **THE COURT:**  Thank you.

25               Mr. Kohn.

1          **MR. KOHN:**  Your Honor, I was going to be briefer, but

2     I wasn't expecting Mr. Marchetti to get up and speak.

3          I find it somewhat interesting, considering he's

4     taken his name off of co-lead counsel's briefs in response to

5     anything that we filed in this case, including the preliminary

6     approval brief, and, yet, has come here with no papers and

7     offered up his opinions, so let me just address a couple of

8     those things.

9          I think that Mr. Marchetti being the only New Jersey

10    counsel at that mediation and the one who's most familiar with

11    the consumer fraud claim, surprising that his opinions weren't

12    given great weight by the rest of co-lead counsel that day

13    because I believe, if asked, he would think that the New Jersey

14    Consumer Fraud Act claim had at least a 20 percent chance of

15    success, which is kind of what we've been arguing in our papers

16    on the fairness.

17         So counsel at the mediation was negotiating from a

18    weak position.  They didn't realize that they had a $10 million

19    hammer to wield to try to drive up the number.  They ignored

20    that, gave it zero, ignored the attorneys' fee shift, gave it

21    zero, and negotiated from a weaker position.

22         So when they say, "We fought hard with FedEx," that's

23    fine, but you forgot half the bullets.

24         That claim is worth at least an additional

25    10 million, which who knows how much that would have resulted

1    in, had it been used properly.  Had it been used to negotiate

2    the settlement here, we believe the settlement would have

3    increased, so the way it is now is unreasonable.

4         That $10 million claim, which one of the red flags

5    Your Honor pointed out in your opinion on the proffer, means

6    that this is unreasonable, means that this isn't fair.  That

7    claim was given zero for no reason.

8         We haven't seen any mediation briefs.  We haven't

9    been given the matrix that we've asked for on how they plugged

10   in play.  From our clients, we've been told that number

11   percentages were put in and values were spit out.  If we had a

12   look at that and Your Honor saw fit, then maybe that will

13   change our opinion or maybe it will support our position.

14   We've been fought every step of the way to get that.

15        The fee shifting that Ms. Ross mentioned, that you

16   don't talk about that as part of settlement, again,

17   Mr. Marchetti being the New Jersey attorney at that mediation

18   knows, when you're dealing with consumer fraud claims and

19   you're negotiating a class action settlement, as we all have

20   done in the past, having fee shifting as part of that is an

21   extraordinary, again, hammer to wield to get extra money,

22   either for the class or in terms of actually discussing, look,

23   we'll settle the class here and we'll fee shift.

24        As we've set forth in our papers, Your Honor, that

25   was proposed by FedEx and ignored and shot down by co-lead

1    counsel.  Yet, when we come to the Court now, this settlement,

2    at least, where the negotiation was at that time -- and,

3    obviously, it wasn't final.  It could have gone up or down --

4    would have resulted in a million more to the class than what

5    they got at 25-and-a-half million.  That shows the

6    extraordinary value that fee shifting has.  They would have

7    gotten more money, with a lesser number, than what co-lead

8    counsel got them after the protracted and long negotiation.

9    They didn't realize the strength of that.

10         As Mr. Harwood pointed out, I think he read -- he did

11    read the declarations of our clients correctly.  At the time,

12    at that mediation, they said they wouldn't settle for less than

13    30.  That doesn't mean they would settle for 30.  They wouldn't

14    settle for less.  That sure as heck doesn't mean he would

15    settle for 30.  That's how that's represented.  Your Honor can

16    read the papers and draw your own conclusions from that, but I

17    think it's clear that they wouldn't have, and they walked out

18    because of that.

19         Let's go back, just real quick.  I'll touch on the

20    attorneys' fees, Your Honor, and, then, hopefully, we can all

21    go have some lunch.

22         So, as it relates to the attorneys' fees, class

23    counsel has said, basically, any mechanism in which the Court

24    should view their fees that would result in less is wrong.

25         Apparently, according to them, the Seventh Circuit

1  allows for bloated and excessive fee awards.  That's not the

2  case.  No court allows for that.  Every court looks at

3  excessive fees.

4          We think the template set forth by Judge Chen

5  provides good guidance to this Court on how these fees should

6  be looked at in this case.

7          And, yet, I'll take Ms. Ross's piece of paper that

8  she gave us.  She said:  It only gives you a 1.3.  Look, it all

9  works out.  The math works out perfectly.

10         She asked for a 30 percent multiplier on her

11 expenses.  I'm sorry.  You don't get a multiplier on your

12 expenses.  That's how she did the math.

13         You take that math out, you're down to 46 million in

14 fees that are left over.  With a 1.3 multiplier, that's 59.8,

15 not 73.

16         So I ask, Your Honor, when you're looking at the

17 reasonableness of these fees -- and, again, Ms. Ross says:

18 Lodestars don't matter.  I don't know why they're raising it.

19 They're wrong.

20         They raised it first.  It was in their motion for

21 fees in September of 2016, long before Your Honor ever got to

22 see our papers from us or know of us.  They raised it then.

23 We've just tried to keep them in check.

24         So, if they raised the lodestar, it's worth looking.

25 They felt it sufficient and important to bring it to the

1    Court's attention back in September before any objections.  Now

2    that there are objections to that, suddenly:  Don't look at our

3    lodestar anymore, Your Honor.  Let's do some creative math.

4    Let's count expenses as our lodestar figure and then multiply

5    them.

6            Again, multipliers is to fees.  And if we give them

7    the credit -- and I don't know how we're at 16 million now.  In

8    California, we were at 20 in their papers.  But I'll take 16

9    for what it is.

10           Again, the Arkansas fee, 500,000.  First time I've

11   heard of that one today.

12           Your Honor, these fees are unchecked.  They've not

13   been accounted for.  They're going to result in a windfall

14   recovery in this case.  So whether Your Honor applies it to

15   just New Jersey or whether you apply it globally, how

16   Your Honor sees fit and what guidance Your Honor gives the

17   Court, at least as it relates to New Jersey, some reduction of

18   fees is appropriate in this circumstance.

19           We've given Your Honor our calculations, from 1.7 or

20   $1.9 million fee to the New Jersey class for that case for the

21   work done, all the way to what we think is 6.6 million, which,

22   I think, is beyond fair and reasonable, but, under that

23   sliding-scale approach, that's what the Court suggests.

24           The sliding-scale approach, again, as counsel says,

25   is not mandatory.  Right, it's not, but the Court should apply

 1  it.

 2          Their response to that:  It's not mandatory so we

 3  shouldn't do it.  That's not the law.

 4          And when we look at what we talked about with the

 5  20 million or 16 million from California, you heard from

 6  Ms. Ross:  I don't know if I'm going to get it so let's not

 7  talk about it.  Let's not count it.  If it's on appeal, it will

 8  be a long time so we shouldn't consider it.

 9          Your Honor, that's not the way the law works to

10  protect the class reps.

11          Ms. Ross talked about making sure that the class gets

12  every dollar that they should.  They were happy with

13  16.4 percent in California for virtually the same amount of

14  work that was done in this case.  16.4 percent sounds like a

15  wonderful number here, and I assume they would be happy with it

16  here, as well.

17          And just before I finish, Your Honor, you know

18  Your Honor commented on Ms. Ross' outburst, for lack of a

19  better word, before, and I thought it was done then.

20          Ms. Ross, when she got up here, also continued to

21  criticize me and my colleagues, trying to mimmick my voice.

22  I'm not going to respond to it, but I just think, Your Honor,

23  that that is uncalled for.

24          **THE COURT:**  Thank you, sir.

25          To those of you who I have been working with on this

 1  case only for the last few months, thank you for your

 2  presentation.

 3          For those of you who have been here for 12 years or

 4  even the session before the Denver session when this MDL was

 5  created, it's been good working with you folks.

 6          I imagine everything I do from here on out will

 7  likely be in writing, whatever it is I do, and, perhaps, more

 8  in writing, depending on what the Court of Appeals does,

 9  depending on what I do.

10          Ms. Ross.

11          **MS. ROSS:**  Yes.

12          I just -- you know, I neglected to say two things not

13  related --

14          **THE COURT:**  We've got to stop at some point.

15          **MS. ROSS:**  Okay.  But this is not related to New

16  Jersey.  It's a matter of housekeeping.

17          **THE COURT:**  Oh, housekeeping?

18          **MS. ROSS:**  Yeah.

19          **THE COURT:**  Okay.

20          **MS. ROSS:**  No, we're done.  I know better.

21          We wanted to jointly alert the Court that, as you've

22  heard a couple of times, we are this close (indicating) to

23  resolving the class ERISA claim.

24          **THE COURT:**  The ERISA claim.

25          **MS. ROSS:**  And that claim was asserted in the Kansas

 1    complaint, and it was dismissed without prejudice.

 2              So, we are expecting to file something with the Court

 3    within the next two weeks to let you know that we have, in

 4    fact, finalized a settlement, a tentative class settlement, and

 5    that we'll be asking the Court to issue a Rule 54(b) judgment

 6    in the Kansas case so that we can amend that complaint,

 7    reassert the claim, and then proceed with settlement.

 8              **THE COURT:**  Okay.

 9              **MS. ROSS:**  So, I just wanted to let you know that.

10              And the second thing I was asked to let the Court

11    know is that there are proposed -- there's a whole batch of

12    proposed final judgments that we have collectively put together

13    that we will supply to the Court.

14              **THE COURT:**  Okay.  Thank you.

15              **MS. ROSS:**  Okay.  Thank you.

16              **THE COURT:**  And I assume you're not proposing that I

17    slow down on these settlements because of the ERISA case?

18              **MR. HARWOOD:**  Please, don't slow down.

19              **MS. ROSS:**  No, not at all, Your Honor.

20              **THE COURT:**  I didn't think so.

21              **MR. KOHN:**  Your Honor, real quick.

22              You asked for me to give the **Alexander** opinion.

23              **THE COURT:**  Yeah.

24              **MR. KOHN:**  I just want to make sure that Ms. Ross

25    knows, because I don't want to be accused of anything, that

 1    there's highlighting in here, but that's the way it came off

 2    ECF.

 3              **THE COURT:**  That's okay.

 4              **(Attorney Kohn not near microphone;**

 5              **Court reporter unable to hear.)**

 6              **MR. KOHN:**  -- so I just wanted Your Honor to know

 7    it's not our highlighting.

 8              **THE COURT:**  Okay.  I appreciate it.  Thank you.

 9              **MS. ROSS:**  It was filed under seal, and then it was

10    unsealed, and that's why the highlighting.

11              **MR. KOHN:**  I just wanted to make the Court aware.

12              **THE COURT:**  No, that's fine.  I appreciate it.

13              **MR. MILCOFF:**  Your Honor, one final thing.  If we

14    could have a quick sidebar about an issue that Mr. Kohn just

15    raised in his remarks, and then I think we're done.

16              **THE COURT:**  I guess I'm confused.  Let me hear what

17    you have to say and then decide whether it should be a sidebar.

18              I assume you want sidebar because --

19              **MR. MILCOFF:**  Of confidentiality, Your Honor.

20              **THE COURT:**  Okay.

21              **MR. NORRIS:**  Is Mr. Kohn welcome?

22              **MS. ROSS:**  Oh, wait.

23              Us, too?

24              **(Simultaneous speaking.)**

25              **COURT REPORTER:**  I'm sorry.  I need to know who's

1   speaking and I need to be able to hear you.

2           **MS. ROSS:**  May I join you or no?

3           **MR. MILCOFF:**  Joseph Milcoff, for FedEx.

4           We have a confidentiality issue, due to the

5   negotiations that were done before the mediator, that we would

6   like to address with the Judge at sidebar, with only people who

7   are a party to that confidentiality agreement so that the Judge

8   may deal with it as he sees fit.

9           **THE COURT:**  All right.  If it's anything that

10   wouldn't be confidential, I'll certainly let you know what was

11   said, Mr. Kohn.

12           **MR. KOHN:**  Okay.

13           **(Sidebar conference commenced.)**

14           **THE COURT:**  You need to talk into this, and you need

15   to identify yourself.

16           **MR. MILCOFF:**  Your Honor, Joseph Milcoff, for FedEx.

17           During Mr. Kohn's remarks, what was represented to

18   the Court is that FedEx made a request that a fee shift be

19   considered as part of settlement discussions.

20           To my knowledge, to my colleagues' knowledge, no such

21   proposal was ever made and believe that's a misrepresentation

22   to the Court.

23           **THE COURT:**  Okay.  I think that was included in his

24   earlier papers, rather than here for the first time, so I'm

25   going to let him know what your concern was.

1        **MR. MILCOFF:**  We didn't want to breach the

2   confidentiality.

3        **MS. ROSS:**  Right.

4        **THE COURT:**  No, I understand.  Yeah, I appreciate it.

5        **MS. ROSS:**  Right, and we conquer.  We all recall

6   what, actually, was said, and we have not responded because we

7   are holding fast to the mediation (inaudible) and don't want to

8   breach it.

9        **THE COURT:**  All right.  Thank you.

10       Mr. Kohn, come on up.

11       Counsel, let me ask you to stay here so you can be

12   here (inaudible) --

13       **COURT REPORTER:**  Judge, I can't hear you.

14       **THE COURT:**  Since confidentiality is involved, I

15   don't want to tell just everybody that's here.

16       You had made reference -- and I know it's in your

17   papers, which is why I don't think you need to make another

18   response -- about the offer to negotiate a settlement with the

19   fees separate.

20       And the position, I'm told -- and they had to do it

21   privately because it was all covered by the confidentiality

22   agreement -- neither side remembers that.

23       Again, I'm not deciding anything today, but I did

24   want to let you know what it was I was told.  And since it was

25   in your papers, it didn't seem --

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS

1          **MR. KOHN:**  Your Honor, we put forth factually what

2    our clients believe was said and done, and Your Honor can

3    determine.

4          **THE COURT:**  Okay.  Thank you.

5          **MR. KOHN:**  Yep.

6          **(Sidebar concluded.)**

7          **THE COURT:**  Last call?

8          **MS. ROSS:**  Thank you, Your Honor.

9          **THE COURT:**  Thank you, folks.

10         **LAW CLERK:**  All rise.

11         **(All comply; proceedings concluded.)**

12                              **\*\*\***

13                           **CERTIFICATE**

14      **I, DEBRA J. BONK, certify that the foregoing is a**

15   **correct transcript from the record of proceedings in the**

16   **above-entitled matter.**

17      **DATED THIS 7TH DAY OF JULY, 2017.**

18                        **S/S DEBRA J. BONK**

19                        **DEBRA J. BONK**
                          **FEDERAL CERTIFIED REALTIME REPORTER**

20

21

22

23

24

25