No. 17-2400

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

**In re FEDEX GROUND PACKAGE SYSTEM, INC.,**
**EMPLOYMENT PRACTICES LITIGATION**

**THIS DOCUMENT RELATES TO:**
**Michael Tofaute, et al. v. FedEx Ground**
**Package System, Inc.**

On Appeal from the United States District Court for
the Northern District of Indiana
Civil No. 3:05-cv-00595-RLM-CAN (NJ)
The Honorable Judge Robert L. Miller Jr.

**BRIEF AND REQUIRED SHORT APPENDIX OF**
**APPELLANTS, MICHAEL TOFAUTE, FRANCIS DENNIS LYNCH, THOMAS**
**MIKULSKI, DAVID MCMAHON, PAT CARRIGAN, MICHAEL B.**
**KILMARTIN, AND FRANK CUCINOTTI**

**DiSABATO & BOUCKENOOGHE LLC**
David J. DiSabato, Esq.
Lisa R. Bouckenooghe, Esq.
4 Hilltop Road
Mendham, New Jersey 07945
Tel.: 973-813-2525
Fax: 973-900-8445
ddisabato@disabatolaw.com
lbouckenooghe@disabatolaw.com

**NAGEL RICE LLP**
Greg M. Kohn, Esq.
103 Eisenhower Parkway
Roseland, New Jersey 07068
Tel.: 973-618-0400
Fax: 973-618-9194
gkohn@nagelrice.com

*Attorneys for Appellants - Objectors/New Jersey Class Representatives*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 17-2400

Short Caption: Tofaute et. al. v. FedEx Ground Package Systems, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[✓]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Michael Tofaute, Francis Dennis Lynch, Thomas Mikulski, David McMahon, Pat Carrigan and Michael B.

Kilmartin

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Nagel Rice, LLP; DiSabato & Bouckenooghe, LLC

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

n/a

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

n/a

Attorney's Signature: s/ Greg M. Kohn        Date: 8/2/17

Attorney's Printed Name: Greg M. Kohn

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☒   No _____

Address: 103 Eisenhower Parkway

Roseland NJ 07068

Phone Number: 973-618-0400        Fax Number: 973-618-9194

E-Mail Address: gkohn@nagelrice.com

rev. 01/15 GA

e

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 17-2400

Short Caption: Tofaute et. al. v. FedEx Ground Package Systems, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Michael Tofaute, Francis Dennis Lynch, Thomas Mikulski, David McMahon, Pat Carrigan and Michael B.

Kilmartin

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Nagel Rice, LLP; DiSabato & Bouckenooghe, LLC

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and

n/a

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

n/a

Attorney's Signature: s/ David J. DiSabato      Date: 9/21/17

Attorney's Printed Name: David J. DiSabato

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ◯    **No** ⊗

Address: 4 Hilltop Road

Mendham, New Jersey 07945

Phone Number: 973-813-2525      Fax Number: 973-900-8445

E-Mail Address: ddisabato@disabatolaw.com

rev. 01/15 GA

e

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 17-2400

Short Caption: Tofaute et. al. v. FedEx Ground Package Systems, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Michael Tofaute, Francis Dennis Lynch, Thomas Mikulski, David McMahon, Pat Carrigan and Michael B.

Kilmartin

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Nagel Rice, LLP; DiSabato & Bouckenooghe, LLC

(3)   If the party or amicus is a corporation:

    i)   Identify all its parent corporations, if any; and

n/a

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

n/a

Attorney's Signature: s/ Lisa R. Bouckenooghe      Date: 9/21/17

Attorney's Printed Name: Lisa R. Bouckenooghe

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ◯    **No** ⊗

Address: 4 Hilltop Road

Mendham, New Jersey 07945

Phone Number: 973-813-2525      Fax Number: 973-900-8445

E-Mail Address: lbouckenooghe@disabatolaw.com

rev. 01/15 GA

# TABLE OF CONTENTS

CIRCUIT COURT RULE 26.1 DISCLOSURE STATEMENTS...................i

TABLE OF CONTENTS..............................................iv

TABLE OF AUTHORITIES...........................................vi

JURISDICTIONAL STATEMENT........................................1

ISSUES PRESENTED FOR REVIEW.....................................2

STATEMENT OF THE CASE...........................................2

STANDARD OF REVIEW.............................................9

SUMMARY OF ARGUMENT...........................................10

ARGUMENT......................................................12

    I.    The District Court Erred In Approving Co-Lead
        Counsel's Fee Request.................................12

      A. The District Court Erred In Not Applying A Sliding
         Scale To The Fee Award In The New Jersey Settlement
         Under "Synthroid II".................................14

      B. The District Court Failed To Properly Reduce The
         Fee Award To Account For Fees Received From
         Overlapping Cases...................................19

      C. The Market Dictates That The Proper Fee Award In
         A Global Settlement Of This Size Range Between 10%
         and 15%.............................................29

    II.   The District Court Erred In Not Considering The NJ
        Class Rep's Request For Discovery....................33

    III. The District Court Erred In Denying The NJ Class
        Rep's Motion For Counsel Fees........................35

      A. Objectors Are Entitled to Obtain A Fee..............36

      B. The District Court Erred In Finding That The NJ
         Class Reps Only Conferred A Small Benefit On
         The Class...........................................39

C. The District Court's Denial Of Fees Because It
Found That The NJ Class Reps Actions Outweighed
Any Benefit Is In Error and Requires Reversal.......44

CONCLUSION.....................................................49

CERTIFICATE OF COMPLIANCE WITH WORD COUNT......................50

CIRCUIT RULE 30(d) STATEMENT...................................51

CERTIFICATE OF SERVICE.........................................52

v

**TABLE OF AUTHORITIES**

**Cases**

Americana Art China v. Foxfire Printing,
  743 F.3d 243 (7th Cir. 2014) ............................... 9, 18
Aranda v. Caribbean Cruise Line, Inc.,
  2017 WL 1369741 (ND. Ill. Apr. 10, 2017) .................... 14
Bell Atlantic Corporation v. Bolger,
  2 F.3d 1304 (3d Cir. 1993) ................................. 36
Craftwood Lumber Co. v. Interline Brands, Inc.,
  2015 WL 1399367 (N.D. Ill., Mar. 23, 2015) ................. 14
Denney v. Jenkens & Gilchrist,
  230 F.R.D. 317 (S.D.N.Y. 2005) ............................. 37
Dutchak v. Int'l Bhd. of Teamsters,
  1989 WL 122394 (N.D. Ill. Oct. 3, 1989) ............... 37, 38
Frankenstein v. McCrory Corp.,
  425 F. Supp. 762 (S.D.N.Y. 1977) ........................... 37
Gehrich v. Chase Bank USA, N.A.,
  316 F.R.D. 215 (N.D. Ill. 2016) ........................ passim
Great Neck Capital Appreciation Investment Partnership v. Price
  WaterhouseCoopers, LLP,
  212 F.R.D. 400 (E.D. Wisc. 2002) ....................... passim
Howes v. Atkins,
  668 F. Supp. 1021 (E.D.K.Y. 1987) ..................... 37, 38
In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.,
  792 F.Supp.2d 1028 (N.D. Ill. 2011) .................... 31, 32
In re Cabletron Sys., Inc. Sec. Litig.,
  239 F.R.D. 30 (D.N.H. 2006) ................................ 30
In re Capital One Telephone Consumer Protection Act Litig.,
  80 F.Supp.3d 781 (N.D. Ill. 2015) ...................... passim
In re Cont'l Ill. Sec. Litig.,
  962 F.2d 566 (7th Cir. 1992) ........................... 13, 30
In re Domestic Air Transportation Antitrust Litigation,
  148 F.R.D. 297 (N.D. Cal. 1993) ........................ 37, 38
In re First Peoples Bank Shareholders Litig.,
  121 F.R.D. 219 (D.N.J. 1988) ............................... 34
In re General Motors Corp. Engine Interchange Litigation,
  594 F.2d 1106 (7th Cir. 1979) .............................. 47
In re General Motors Corp. Pick-up Truck Fuel Tank Litig.,
  55 F.3d 768 (3d Cir. 1995) ................................. 40
In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent
  Actions,
  278 F.3d 175 (3d Cir.2002) ................................. 40
In re Synthroid Mktg. Litig.,
  264 F.3d 712 (7th Cir. 2001) ....................... 30, 45, 46
In re Synthroid Mktg. Litig.,
  325 F.3d 974 (7th Cir. 2003) ........................... 10, 14

In re Trans Union Corp. Privacy Litig.,
   629 F.3d 741 (7th Cir. 2011) ........................ 13, 30, 39
In re Trans Union Privacy Litig.,
   2009 WL 4799954 (N.D. Ill. 2009) ................... 29, 30, 31
Maynard v. Nygren,
   332 F.3d 462 (7th Cir. 2003) ............................... 10
Mirfasihi v. Fleet Mortg. Corp.,
   551 F.3d 682 (7th Cir. 2008) ............................... 36
Petrovic v. Amoco Oil Co.,
   200 F.3d 1140 (8th Cir. 1999) .............................. 38
Ramah Navajo Chapter v. Jewell,
   167 F. Supp. 3d 1217 (D.N.M. 2016) ..................... 31, 32
Redman v. RadioShack,
   768 F.3d 622 (7th Cir. 2014) ...................... 12, 27, 32
Reynolds v. Beneficial Nat. Bank,
   288 F.3d 277 (7th Cir. 2002) ........................... 36, 38
Rodriguez v. West Publ'g. Corp.,
   563 F.3d 948 (9th Cir. 2009) .............................. 38
Silverman v. Motorola Sols., Inc.,
   739 F.3d 956 (7th Cir. 2013) ......................... passim
United States v. Lowe,
   632 F.3d 996 (7th Cir. 2011) .............................. 9
Waste Management Holdings, Inc. v. Mowbray,
   208 F.3d 288 (1st Cir. 2000) .............................. 9
Wilkins v. HSBC Bank Nevada, N.A,
   2015 WL 890566 (N.D. Ill. Feb. 27, 2015) ................. 14

**Statutes**

28 U.S.C. §1291............................................ 1
28 U.S.C. §1331............................................ 1
28 U.S.C. §1332............................................ 1
28 U.S.C. §2201............................................ 1

**Rules**

Fed. R. Civ. P. 23........................................ 40

**Other Authorities**

An Empirical Study of Class Action Settlements and Their Fee
Awards,
   7 J. Empirical Legal Studies 811 (2010) ............... 17, 18
Attorney Fees and Expenses in Class Action Settlements: 1993–
2008,
   7 J. Empirical Legal Studies 248 (2010) ............... 16, 17
Class Action Objectors: Extortionist Free Riders or Fairness
   Guarantors,
   2003 U. Chi. Legal F. 403 (2003) .......................... 41

<u>Manual for Complex Litigation</u> (Fourth) § 14.11 (2004).......... 38

<u>Manual for Complex Litigation</u> (Fourth) § 14.224 (2004)........ 35

<u>Manual for Complex Litigation</u> (Fourth) § 21.724 (2004)........ 35

## JURISDICTIONAL STATEMENT

Federal jurisdiction over the Plaintiffs' claims is based on diversity and federal question. Diversity jurisdiction under 28 U.S.C. §1332. The action was initially filed in District Court for the District of New Jersey because the named Plaintiffs are citizens of New Jersey, Defendant FedEx is incorporated in the State of Delaware with its principal place of business in Pennsylvania and the amount in controversy exceeds $75,000.00. Doc.1, Case 3:05-cv-00595. Federal question jurisdiction under 28 U.S.C. §1331 is based on the claims under the Declaratory Judgment Act, 28 U.S.C. §2201.

The basis for appellate jurisdiction is 28 U.S.C. §1291. The orders appealed from are the District Court's April 28, 2017 Order and Opinion granting final approval and awarding Co-Lead Counsel attorneys' fees and the District Court's June 12, 2017 Order and Opinion denying counsel for Michael Tofaute, Francis Dennis Lynch, Thomas Mikulski, David McMahon, Pat Carrigan, Michael B. Kilmartin, and Frank Cucinotti's (collectively the "NJ Class Reps") motion for attorneys' fees and costs as objectors. This appeal is from two orders that dispose of all parties' claims. A separate Rule 58 judgment is not required. These orders disposed of motions for attorneys' fees under Rule 54. On May 22, 2017, the District Court granted the NJ Class Reps' request to stay the time to appeal the April 28, 2017 Order until after the District Court

ruled on the NJ Class Reps' motion for attorney's fees. The New Jersey Class Representatives filed their notice of appeal on July 10, 2017. This case does not involve a direct appeal from the decision of a magistrate judge.

## ISSUES PRESENTED FOR REVIEW

1.    Did the District Court err in concluding that Co-Lead Counsel's fee request was reasonable?

2.    Did the District Court err in denying the NJ Class Reps' motion for attorneys' fees?

## STATEMENT OF THE CASE

The New Jersey Class is represented by seven Court-approved Class Representatives, the NJ Class Reps, who filed suit against FedEx Ground in New Jersey. All seven NJ Class Reps objected to the proposed settlement, because they believed that the settlement was unreasonable and that the case was settled without their approval and over their explicit objection. See Doc. #218, 3:05-cv-595.[1]

In July 2005, the JPML granted FedEx Ground's second request to centralize a series of cases in which FedEx Ground drivers claimed to be employees, rather than the independent contractor status set forth in their employment contracts. In 2007 and 2008, the District Court certified classes in 26 of the then-40 cases,

---

[1] Hereinafter documents from civil action number 3:05-cv-595 will be referred to as "NJ Doc. #".

2

and in all of the 20 on limited remand from the court of appeals. FedEx Ground sought interlocutory appellate review of the certification grants, and the plaintiffs successfully opposed that effort.

On June 15, 2016, Co-Lead Counsel filed a motion for preliminary approval of the New Jersey class. On August 17, 2016, the District Court preliminary approved the settlement. Recognizing their duty to the New Jersey class members to maximize the overall recovery for their fellow drivers, the NJ Class Reps sought counsel to object to the proposed settlement, and in November 2016, they filed timely written objections to the settlement. Id. On December 15, 2016, Co-Lead Counsel filed their motion for final approval in the New Jersey case. On January 10, 2017, the NJ Class Reps filed their response to Co-Lead Counsel's motion for final approval.

Also on January 10, 2017, the NJ Class Reps filed a motion to compel re-notice of the New Jersey class. On January 17, 2017, Co-Lead Counsel and FedEx Ground conceded that the New Jersey class should be re-noticed. On January 19, 2017, the District Court ordered that the NJ Class Reps file a proffer regarding the validity of the settlement. On January 27, 2017, the NJ Class Reps filed a motion to compel discovery from Co-Lead Counsel regarding the settlement. On February 14, 2017, the District Court denied the NJ Class Reps' proffer.

3

The NJ Class Reps succeeded in getting the class notice reissued to correct errors regarding the average recovery amount and the NJ Class Reps approval of the settlement. See NJ Doc. #226. In addition, the NJ Class Reps shed light on the settlement process, led a deep investigation into the valuation of the settled claims, and opened the door to an important analysis of the counsel fees sought by Co-Lead Counsel from the common fund. See NJ Doc. #218, 221, 227; Doc. #2983, 2998, 3021, 3:05-md-527[2]. These positions provided an adversarial and balancing element that is vital to the approval process and resulted in more and better information being available to the District Court. Id.

Upon being retained, counsel for the NJ Class Reps began reviewing the history of the litigation and attempted to obtain additional information from Co-Lead Counsel. Attempts by the NJ Class Reps to cooperatively obtain relevant information and documents from Co-Lead Counsel were unsuccessful. Co-Lead Counsel refused to provide any of the requested information and the NJ Class Reps' motion to compel was denied. See NJ Doc. #233. Because of this the NJ Class Reps could only rely on the publically available documents filed in this case in preparing their objections, which required more time and effort to review.

---

[2] Hereinafter documents from civil action number 3:05-md-527 will be referred to as "MDL Doc. #".

The NJ Class Reps challenged the fairness of the settlement because the settlement undervalued the New Jersey Consumer Fraud Act claim and gave too much of a discount on the other claims. See NJ Doc. #218. The NJ Class Reps also objected to the notice of settlement because it contained inaccurate information. See NJ Doc. #221. While scrutinizing the notice and briefs filed by Co-Lead Counsel, the NJ Class Reps found that the average recovery amount per class member was overstated by approximately $54,000 and that the notice incorrectly stated that the NJ Class Reps had approved the settlement. See Id. at 4-8. The NJ Class Reps raised this objection to the District Court. Id. The District Court agreed with the NJ Class Reps' objection and ordered that the class members be re-noticed with the correct information regarding the settlement. See NJ Doc. #257 at 8 ("The class representatives also pointed out an error in the notice as to the average amount of recovery for each class member under the settlement agreement and wanted the notice to indicate that the class representatives didn't approve of the settlement. I ordered re-notice to the class members, postponed the fairness hearings, and extended the objection deadlines."). The new notice was sent to class members on January 23, 2017. See MDL Doc. #2979. Because of the revised information in the notice an additional 43 class members objected to the settlement. See A-064.

The new notice sent to class members referred them to the settlement website. However, upon review of the website by the NJ Class Reps, the information on the settlement website was still inaccurate and did not reflect the new information contained in the new notice, including the new date by which objections to the settlement could be filed. See MDL Doc. #2983. On January 27, 2017, the NJ Class Reps informed the District Court of the problems with the settlement website. See Id. Based upon the NJ Class Reps letter, Co-Lead Counsel updated the settlement website the next day to accurately reflect the new class notice. See MDL Doc. #2985.

Additionally, the NJ Class Reps filed a motion to compel discovery from Co-Lead Counsel regarding the fairness of the settlement and how it was reached, and, at the District Court's request, a proffer was filed for the District Court to evaluate the validity of the settlement agreement. See MDL Doc. #2984. The proffer explored the mediation process, and allowed the NJ Class Reps to tell their side of the story and to explain to the District Court that they had never agreed to settle their case at mediation. See MDL Doc. #2998. This information proved vital to the District Court's analysis of the validity of the settlement. The NJ Class Reps made numerous other objections to the proposed settlement as it relates to the adequacy of the settlement. See NJ Doc. #218.

On March 1, 2017, the NJ Class Reps filed opposition to Co-Lead Counsel's application for attorneys' fees. See MDL Doc. #3023.

6

The NJ Class Reps sought a reduction of the attorneys' fees requested by Co-Lead Counsel because of overlapping work that was done by Co-Lead Counsel in other FedEx cases where they already received compensation and because the percentage sought by Co-Lead Counsel was unreasonable. See Id. These objections by the NJ Class Reps resulted in the District Court applying extra scrutiny not only to the New Jersey Class fees, but the fees requested by Co-Lead Counsel on all 20 cases in the MDL. See A-001-058. As with any contested issue, debate is healthy and is consistently useful in providing information and deeper insights to the analysis.

On March 14, 2017, the District Court held the Fairness Hearing. See MDL Doc. #3036. A lengthy oral argument regarding the fairness of the settlement took place. See A-073-172. Ultimately, the District Court approved the settlement as fair over the NJ Class Reps' objections. See A-001-058. However, the objections enhanced the adversarial proceeding and caused the District Court to take a "close look" at the fairness of the settlement. See A-009. Absent the objections by the NJ Class Reps, the District Court would not have known the NJ Class Reps' opinion of the settlement and would not have had the benefit of the resulting additional exploration of the New Jersey claims. Other than the New Jersey case, the remaining 19 cases featured little to no argument or discussion of the merits of the claims. All of the NJ Class Reps'

7

objections were addressed by the parties and the District Court. See A-001-058; A-073-172.

On March 16, 2017, the District Court granting final approval and on April 28, 2017 issued its opinion. The District Court overruled the NJ Class Reps' objections and granted final approval of the settlement and approved Co-Lead Counsel's fee request. See A-001-058. In overruling the NJ Class Reps' objection that the MDL settlements should be treated as a "megafund" or at least subject to a sliding scale approach, the District Court acknowledged that "There's no doubt that much of the discovery behind these cases overlapped, and that co-lead counsel applied a concerted strategy in moving them to settlement. On the other hand, class counsel applied laws specific to New Jersey and conducted case-specific discovery." Id. at A-026. The District Court also stated that "There no doubt was some overlap of the work in those states and the work for the New Jersey class. At least some of the overlap of which the drivers complain no doubt was wastefully duplicative, but some of the overlap produced more generous settlements for drivers in all states, including New Jersey. These circumstances make it impossible to devise an arithmetic adjustment to co-lead counsel's fee request." A-030. Moreover, in awarding Co-Lead Counsel their fees, the District Court found that a lodestar cross-check would be too cumbersome and it would not perform one. See A-034 ("I'm not undertaking such a cross-check. A very complex

8

examination of time sheets, hourly rates in various markets, and records would be needed to arrive at a true lodestar figure for this case alone.")

On May 22, 2017, the District Court granted the NJ Class Reps' motion to stay the time to appeal the April 28, 2017 Order. On May 25, 2017, the NJ Class Reps filed a motion for attorneys' fees and costs. On June 12, 2017, the District Court denied the NJ Class Reps' motion.

## STANDARD OF REVIEW

This Court will "review *de novo* the district court's methodology to determine whether it reflects procedure approved for calculating" Rule 23(h) awards. <u>Americana Art China v. Foxfire Printing</u>, 743 F.3d 243, 246 (7th Cir. 2014)(internal quotation *21 omitted). The fee determination itself is reviewed for abuse of discretion. <u>Id</u>. "Abuse of discretion occurs when the district court commits a serious error of judgment, such as the failure to consider an essential factor." <u>United States v. Lowe</u>, 632 F.3d 996, 997 (7th Cir. 2011). "An abuse occurs when a court, in making a discretionary ruling, relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them." <u>Waste Management Holdings, Inc. v. Mowbray</u>, 208 F.3d 288, 295 (1st Cir. 2000)(citations omitted). And "[a] district court by definition abuses its discretion when it makes an error

9

of law." <u>Maynard v. Nygren</u>, 332 F.3d 462, 467 (7th Cir. 2003) (internal citation omitted).

## SUMMARY OF THE ARGUMENT

The NJ Class Reps appeal the District Court's Order awarding attorneys' fees to Co-Lead Counsel in connection with the settlement of the New Jersey action. The District Court's reasoning was flawed in three fundamental areas.

First, the District Court failed to apply a sliding scale to its assessment of the reasonableness of Co-Lead Counsel's fee request. This Court, in <u>In re Synthroid Mktg. Litig.</u>, 325 F.3d 974 (7th Cir. 2003), set forth guidelines against which fees sought from a common fund should be considered. Under those guidelines, District Courts must take a tiered approach to counsel fee awards and apply a sliding scale that graduates the allowable fees downward as the size of the common fund increases. Proper application of the sliding scale would have reduced the fee award by approximately $900,000, which represents a significant five percent net increase in settlement benefit to the New Jersey class.

Second, although the District Court acknowledged that Co-Lead Counsel stood to receive up to $28,000,000 in duplicate compensation from fee awards granted in several cases that were remanded from the MDL and concluded in the cases' home courts, the Court erred in not reducing the fees awarded in the MDL to account

10

for work for which Co-Lead Counsel had already been paid, or would eventually paid.

Third, the District Court erred in failing to consider the gross MDL settlement as a so-called megafund settlement. The record reflects that the Co-Lead Counsel largely litigated the MDL constituent cases as a single, unified case. The overlapping work resulted in a single lodestar for the entire MDL. Had the Court properly considered the gross size of the MDL settlement, the Court would have been compelled to apply a sliding scale to the gross fees sought, and could have reduced the fee award accordingly.

The NJ Class Reps also appeal from the denial of their request for fees incurred in bringing the objection to the fairness of the settlement and to the fairness of the fee award. The NJ Class Reps provided a significant positive effect on the settlement and approval process. The benefits conferred on the class included discovering material errors in the benefit amounts disclosed in the class notice and causing revised notice to be issued to the New Jersey class, as well as bringing to the District Court's attention the $28,000,000 billing overlap with the remanded home-court cases. Of equal importance was the NJ Class Reps' success in informing the District Court that all seven of the New Jersey named-plaintiffs had affirmatively rejected the proposed settlement on behalf of the class members who they were appointed to represent. This caused the District Court to perform an in-

11

depth analysis of the propriety of allowing class counsel to move forward with a settlement that all of the clients have rejected.

Finally, the NJ Class Reps appeal from the District Court's failure to allow them to conduct discovery into the fairness of the fees sought by Co-Lead Counsel. Many of the issues relating to overlapping work within the MDL and to double collection of fees from the home-court cases, needed to be explored through discovery. The District Court's opinion does not even address the NJ Class Reps' request for discovery.

## ARGUMENT

## I.   The District Court Erred In Approving Co-Lead Counsel's Fee Request

The District Court erred in approving Co-Lead Counsel's request for fees and costs in the amount of $7,627,500, over the objection of the NJ Class Reps.  It is well established in the Seventh Circuit that "attorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services." Silverman v. Motorola Sols., Inc., 739 F.3d 956, 957 (7th Cir. 2013). As part of this inquiry, "the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members." Redman v. RadioShack, 768 F.3d 622, 630 (7th Cir. 2014).

In the Seventh Circuit, courts "must set a fee by approximating the terms that would have been agreed to *ex ante*, had negotiations occurred." Gehrich v. Chase Bank USA, N.A., 316 F.R.D. 215, 235 (N.D. Ill. 2016); see also In re Capital One Telephone Consumer Protection Act Litig., 80 F.Supp.3d 781, 795 (N.D. Ill. 2015)(adopting the calculation method that is most prevalent in the marketplace as it existed at the outset of the litigation is more likely to yield an accurate result). The Seventh Circuit has explained that "[t]he object in awarding a reasonable attorney's fee ... is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible." In re Cont'l Ill. Sec. Litig., 962 F.2d 566, 572 (7th Cir. 1992); See also In re Trans Union Corp. Privacy Litig., 629 F.3d 741, 744 (7th Cir. 2011)(recognizing that "[s]uch [an] estimation is inherently conjectural").

Here, the District Court erred in applying a flat-percentage fee award of 30%. See A-020-021. The District Court reasoned that 30% of the recovery was the market rate for fees based on, amongst other things, the retainers entered into by the individual plaintiffs. See A-028; A-032. This reasoning is flawed and inconsistent with the case law in this Circuit.

**A. The District Court Erred In Not Applying A Sliding Scale To The Fee Award In The New Jersey Settlement Under "Synthroid II"**

This Court, in In re Synthroid Mktg. Litig, 325 F.3d 974 (7th Cir. 2003) ("Synthroid II"), developed a sliding scale providing attorneys' fees equal to (a) 30% of the first $10 million of the settlement; (b) 25% of the next $10 million; (c) 20% of the next $20-40 million, and (d) 15% of any amounts in excess of $45 million.  Id. at 980.  This sliding scale approach has been recognized not only as a reasonable method for arriving at the market rate for services, but as the "standard model" for large class action settlements in the Seventh Circuit.  See Aranda v. Caribbean Cruise Line, Inc., 2017 WL 1369741 (ND. Ill. Apr. 10, 2017)(appeal filed, Grant Birchmeier, et al. v. Caribbean Cruise Line, Inc., et al., No. 17-1984, 7th Cir., May 9, 2017); see also Gehrich, 316 F.R.D. at 239; Craftwood Lumber Co. v. Interline Brands, Inc., 2015 WL 1399367, at *5 (N.D. Ill., Mar. 23, 2015) (applying the Synthroid II approach and awarding the plaintiff's counsel attorney's fees in accordance with sliding scale); Wilkins v. HSBC Bank Nevada, N.A, 2015 WL 890566, at *10-11 (N.D. Ill. Feb. 27, 2015)(same); In re Capital One, 80 F.Supp.3d at 804-05 (same).

The District Court erred by not using the sliding-scale approach to determine Co-Lead Counsel's reasonable fees. The combination of errors that led the District Court to find the

14

sliding scale approach inapplicable requires this Court to reverse the District Court and set forth the appropriate standard to be used to calculate Co-Lead Counsel's reasonable fees.

The District Court errors are as follows: (i) it determined that there is no evidence of tapering in the "market" of named representatives in the MDL docket; (ii) it found that the sliding-scale fee award only applied to cases over $100 million and only to institutional plaintiffs; (iii) it failed to correctly apply the holding in Silverman v. Motorola Solutions, Inc., 739 F.3d 956 (7th Cir. 2013)[3](A-025-028); and (iv) it erred in relying on selective portions of Professor Fitzpatrick's report. See A-026-028. The above errors contradict the case law and require reversal.

In its consideration of whether to apply a sliding scale, the District Court announced several areas of uncertainty: "[I]t's not clear that the Silverman v. Motorola Solutions analysis applies, or applies fully to our case . . . It's also not clear whether I am expected, or even allowed, to consider the nature of the plaintiffs involved in a case." A-027. Despite this, the District Court stated that "there is nothing from which I can infer that unsophisticated (in the market for legal services) clients – when

---

[3] In Silverman, the Seventh Circuit set out the methodology for calculating a fee award. However, despite the law, the appellant had not properly raised those issues so the court reluctantly affirmed the flat-percentage methodology. Id. at 959.

compared with institutional plaintiffs – would request a tapered fee arrangement" is misplaced. A-037.

By rejecting the sliding-scale approach, despite its prevailing use in large class action settlement fee awards, the District Court failed to consider <u>Gehrich</u>, <u>Craftwood Lumber</u>, <u>Wilkins</u>, or <u>In re Capital One</u>. All of these cases set forth that the proper calculation of counsel fees, in settlements like this one, is a sliding-scale as it most replicates what the market would be. <u>Gehrich</u>, <u>supra</u>, at 239; <u>Craftwood Lumber</u>, <u>supra</u>, at *5; <u>Wilkins</u>, <u>supra</u>, at 10-11; <u>In re Capital One</u>, <u>supra</u>, at 804-805. Moreover, none of the named-plaintiffs in the cases cited above are institutional investors, yet all of the fees awarded in those cases were awarded on a sliding-scale methodology. Thus, the District Court applied the wrong methodology in determining Co-Lead Counsel's fee award.

The District Court also erred in relying on selective portions of Professor Fitzpatrick's report and ignoring the empirical data regarding fee awards. MDL Doc. #3021; MDL Doc. #3032. The empirical data establishes that the fee awarded by the District Court is unreasonable. A detailed 2010 study on attorney's fees in class action settlements (cited by <u>Silverman</u>) confirmed empirically that as the size of a settlement increases, the percentage of the total settlement awarded as attorney's fees tends to decrease. Theodore Eisenberg & Geoffrey P. Miller, <u>Attorney Fees and Expenses in Class</u>

16

Action Settlements: 1993–2008, 7 J. Empirical Legal Studies 248 (2010).

That study examined available opinions from 1993 through 2008 on settlements in class actions and shareholder derivative suits in state and federal court. It found that for settlements less than or equal to $1.1 million, the median attorney's fee percentage was 32.3% and the mean was 37.9%. Id. at 265. As the settlement value increased, however, the percentage of the attorney's fee awarded compared to the total settlement amount tended to decrease. For example, in settlements between $2.8 million and $5.3 million, the median attorney's fee percentage was 25% and the mean was 26.4%. Id. For settlements between $22.8 million and $38.3 million (i.e., the range where the settlement at issue here falls), the study found the median attorney's fee percentage to be 24.9% and the mean to be 22.1%. Id. In the highest range, settlements greater than $175.5 million, the median attorney's fee dropped all the way to 10.2% and the mean to 12%. MDL Doc. #3021 at p. 7–8. The District Court erred in not considering these facts.

Another 2010 study noted the same phenomenon. See Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical Legal Studies 811 (2010); Silverman, 739 F.3d at 958. The Fitzpatrick study similarly found that for settlements ranging from $30 million to $72.5 million, the median attorney's fee percentage was 24.9%, and

the mean was 22.3%. Fitzpatrick, <u>An Empirical Study of Class Action Settlements</u>, 7 J. Empirical Legal Studies at 839. Settlements in the highest range of $72.5 million to $6.6 billion had lower attorney's fee percentages (median of 19% and a mean of 18.4%). <u>Id</u>.

Despite the above facts regarding counsel fee awards, the District Court relied on the affidavit from Professor Fitzpatrick to conclude that "the market does not support downward-tapering arrangements." A-027-028. This is directly contradicted by the studies above, including Professor Fitzpatrick's own study. The District Court's reliance on this is therefore misplaced.

Given the settlement amount in this case, instead of using the District Court's flat attorney's fee percentage of thirty percent, the District Court should have relied on the above, which is the more representative attorney's fee percentages in the Eisenberg & Miller and Fitzpatrick studies, for settlement amounts with similar dollar values.

The errors by the District Court in choosing not to apply the sliding-scale to this are reviewed *de novo*. <u>Americana Art China v. FoxFire Printing</u>, 743 F.3d at 246. Had the District Court properly applied the sliding-scale as set forth above, the fee award to Co-Lead Counsel would have been less. MDL Doc. #3021 at p. 17-18. Therefore, the Court should reverse and remand this issue to the District Court to apply the sliding-scale methodology to Co-Lead Counsel's fee request.

18

None of these issues would have arisen had the District Court correctly applied Synthroid II. Synthroid II's sliding scale is directly applicable here. The size of the New Jersey settlement ($25,500,000) fits neatly into the first three tiers of the Synthroid II sliding scale. The District Court identified no sound reasons for ignoring the holding of Synthroid II, and erred in not applying it. Applying the sliding scale created in Synthroid II would have resulted in a net gain for the New Jersey Class of approximately $900,000 and a reduction in Co-Lead Counsel's fees from $7,650,000 to $6,710,000.

**B.    The District Court Failed To Properly Reduce The    Fee Award To Account For Fees Received From Overlapping Cases**

In considering the NJ Class Reps' objection that Co-Lead Counsel was seeking a double recovery in the amount of $28,000,000 (evidenced at MDL Doc. #2786 at ¶23, among other places), the District Court concluded that:

> These circumstances make it impossible to devise an arithmetic adjustment to co-lead counsel's fee request. I will, then, consider the reasonableness of their request while keeping in mind that there was significant overlap of the work of co-lead counsel performed for each of the classes, including the New Jersey class.

A-030. Despite acknowledging this significant overlap, in the end, the District Court did not reduce Co-Lead Counsel's fee award to account for any of the overlapping work. A-037. The District

19

Court's failure to reduce the fee request was an error requiring reversal.

Nine cases were removed from the MDL: California, Florida, Arkansas, Oregon, Colorado, Illinois, Kentucky, Nevada and New Hampshire. In each of those cases, Co-Lead Counsel has or will seek to recover fees that are largely, if not solely, attributable to the time incurred while those cases were part of the MDL. See MDL Doc. #2786 at ¶23. The pre-removal time awarded in those cases is the same pre-removal time that was approved here by the District Court. MDL Doc. #3021 at p. 23.

The District Court declined to consider or account for the overlap in the work done in the MDL and work done in the removed cases. A-030. Had the Court given adequate consideration to this issue, a $28,000,000 offset should have been applied to the fees awarded in the MDL. If this was split equally over the 20 MDL cases, the fee award should have been reduced by $1,400,000.

The NJ Class Reps never suggested that Co-Lead Counsel should not be compensated for their work – they just shouldn't be paid twice for the same work. This precise issue was also raised by the Court in the remanded California action, where Judge Chen ordered Co-Lead Counsel to quantify the amount of fees incurred in the MDL, but sought in Dean Alexander, et al v. FedEx Ground Package System, Inc., et al., Case No. 05-cv-00038-EMC (N.D. Cal. June 15, 2016). In Alexander, Co-Lead Counsel sought a fee of $49,830,000

20

(or 22%) of the $226,500,000 non-reversionary cash settlement. <u>See</u> <u>Alexander</u>, Doc. #185.

Before ruling on the fee application, Judge Chen required Co-Lead Counsel to submit supplemental information as to how much of the omnibus work was allocated to other cases to ensure that counsel will not get a double recovery. To avoid the possibility of duplicate fees, Judge Chen ordered Co-Lead counsel to quantify the overlap:

> [Provide] additional information as to how much of the Omnibus [MDL] work has been allocated to the other cases (i.e., to ensure that counsel will not get double recovery) and the size of the respective recoveries in the other cases which grew out of the MDL, including how much of the proposed recovery in the Alexander (i.e. California) case was compared to all other cases in the MDL.

<u>Alexander</u>, Doc. #215, Order, at ¶ 16.  In response, Co-Lead Beth Ross, Esq. identified an overlap of between 25% and 44%. <u>Alexander</u>, Doc. #259, ¶¶ 18, 19.  Ms. Ross also certified that, based on this significant overlap in work and fees, that "[f]ollowing the pattern set in the previously settled MDL cases, a portion of the fees awarded in this case will be returned to the MDL litigation fund and redistributed proportionate to the resources devoted by each of the contribution firms to the overall effort."  <u>Id</u>. at ¶ 21. Counsel represented that a percentage of the fee recovered in the <u>Alexander</u> action would be returned to the MDL Litigation Fund to

compensate MDL Counsel in the consolidated cases. See Alexander, Doc. #186, Ross Decl., ¶5; See MDL Doc. #3124 at p. 9, n.9 (approximately $16,000,000 will be returned to the MDL Litigation Fund).

The Alexander court ultimately reduced the fee being sought to $37,200,000 (or 16.4% of the common fund), in explicit recognition of the fact that Co-Lead Counsel is guaranteed to receive additional fee awards as other cases stemming from the MDL are resolved.[4] Doc. #246 at 5:14-15. In so awarding, the Alexander Court recognized that 25-30% of the MDL omnibus work was chargeable to the Alexander action. Id. at 4:20. The District Court erred in not applying the same reasoning as Judge Chen in this case and reducing or offsetting the fee award to account for the additional fee recoveries.

The District Court's errors caused Co-Lead Counsel to receive a fee award that cannot be considered reasonable. The record before the District Court clearly and unequivocally showed that Co-Lead Counsel had already received over $10,000,000 in fees from certain of the remanded cases (MDL Doc. #3027-1 at Supplemental Exh. 8) at the time of the Fairness Hearing, and that they expected to receive

---

[4] For perspective, these fees represent approximately 24,000 attorney hours at Co-Lead Counsel's highest rate of $700 per hour. Judge Chen has paid Co-Lead Counsel for those 24,000 hours, yet the District Court here awarded fees for the same hours.

as much as $20,000,000 more in addition to the $10 million already received from the remaining remanded cases. MDL Doc. #2786 at ¶23.

That $10,000,000 (plus the expected additional $20,000,000) is payment for work done by Co-Lead Counsel in the MDL prior to those cases being remanded. This $30,000,000 overlap constitutes a significant portion of the $72,900,000 awarded by the District Court to Co-Lead Counsel here. The undeniable result, which was not adequately considered by the District Court, is that Co-Lead Counsel will actually receive significantly more than $72,900,000 in fees for their work in the MDL cases. MDL Doc. #2786, ¶23 (acknowledging overage results in the equivalent of a 1.3 multiplier); A-034.

Judge Chen's analysis begs the question: If Co-Lead Counsel was to be paid for the Alexander hours incurred in the MDL before Alexander was remanded out of the MDL, why should the District Court award a fee for those same hours now?

As in Alexander, in each of the other remanded cases, Co-Lead Counsel sought to be paid for the pre-remand work done in each case while the case was still in the MDL. For example, in the New Hampshire case, Co-Lead Susan Ellingstad sought and received $500,000 in fees that were incurred in the MDL pre-remand. See, MDL Doc. #3145-6 at ¶ 14. In applying for those fees, Ms. Ellingstad certified that approximately 1,332 hours were worked on the New Hampshire case in the MDL prior to remand, and that the

23

"MDL lodestar attributable to the New Hampshire Class [is] at least $500,000 of the total lodestar." Id.

Critically, Ms. Ellingstad then unequivocally assures the Court that those same fees will not be sought again in the MDL:

> Upon approval and payment of attorney's fees in this [New Hampshire] action, a portion of the attorney's fees will be allocated to the MDL in recognition of work performed and expenses incurred on behalf of the New Hampshire class. This settlement will resolve any claim for entitlement to attorney's fees and costs by the MDL relating to the Gennell v. FedEx Ground case.

Id. at ¶ 15. Contrary to Ms. Ellingstad's sworn statement, Co-Lead Counsel asked the District Court here for those same fees and the District Court awarded them because the Court determined that, despite the acknowledged overlap, it was "impossible to devise an arithmetic adjustment to co-lead counsel's fee request." A-030.

The same pattern was repeated in the rest of the remanded cases, including for example, the Nevada case. In Nevada, Co-Lead Counsel Beth Ross certified that she was seeking "a $405,000 lodestar attributable to the Nevada action from the MDL . . . Upon approval and payment of attorneys' fees in the Nevada action, it is expected that a portion of the fees will be given to the MDL in recognition of the work performed on behalf of the Nevada class." See Joint Declaration of Beth A. Ross and Matthew M. Houston in Support of Motions for Final Settlement Approval, dated April 7, 2014, in the matter of Michael DeCesare et al. v. FedEx Ground

24

Package System, Inc., Case No. 2:07-cv-00098-LDG-GWF, ECF. No. 48-1, ¶ 20. That $405,000, which was sought by and awarded to Ms. Ross in the Nevada action, was also sought and was awarded here in MDL by the District Court. A-035.

In sum, according to Co-Lead Counsel's calculations, the fees reaped in the remanded cases, including New Hampshire, Nevada and the rest, have netted Co-Lead Counsel over $10,000,000 so far. Despite having represented to those remanded home-courts that they would not seek to recover those same fees in the MDL, that is exactly what Co-Lead Counsel did and what the District Court erred in allowing to happen.

The same dynamic is evident in Co-Lead Counsel's collecting of the same expenses here that they have already collected in the remanded cases. For example, in the Nevada remanded case, Co-Lead Counsel sought and received $36,450 in pre-remand MDL expenses – those same expenses that are claimed here:

> Class Counsel's expenses from the MDL represent .81% of the total MDL expense of $4.5 million or $36,450. Upon approval and payment of attorneys' fees in the Nevada action, it is expected that a portion of the fees will be given to the MDL in recognition of the work performed on behalf of the Nevada class.

See DeCesare, supra, Doc. #48-1, ¶ 20.

The same is true in each of the remanded cases. Yet the District Court approved a fee award that recognizes gross expenses

25

of $7,713,000 in the MDL, without subtracting those expenses already accounted for.    A-037.

The double billing issue could have been addressed by the District Court, but it chose not because a "very complex examination of time sheets, hourly rates in various markets, and records would be needed to arrive at a true lodestar figure for this case alone." See A-034. The effort involved in doing the lodestar crosscheck is not a valid reason to not do it.

Despite a lodestar crosscheck being discretionary in this Circuit, this case called out for one. Because of fees being received from multiple cases in and out of the MDL and fees being requested based on work done globally, the only way to determine the reasonableness of Co-Lead Counsel's fee request was to dig into the numbers and ensure that the ultimate fee award is fair and reasonable.

However, the District Court still used Co-Lead Counsel's lodestar to confirm its conclusion that Co-Lead Counsel's fee request was reasonable. See A-034 (the District Court referred to Co-Lead Counsel's gross, unaudited MDL lodestar of $74,540,341 as representing only a 1.3 multiplier when applied to the global fees received in the MDL). Relying on this fact constitutes reversible error because that "unadjusted" lodestar was later significantly reduced by Co-Lead Counsel when completed it audit process.

On September 12, 2016, Co-Lead Counsel submitted an estimated lodestar of $74,540,341 in audited and unaudited hours. See MDL Doc. #2786-5, Joint Declaration of Co-Lead Counsel in Support of New Jersey Plaintiffs' Motion for Fees and Costs.  Of this total, $48,951,100 represented unchallenged self-audited billing for Co-Lead Counsel. See id.

The remaining $25,589,241 was comprised of **unaudited** billing from Plaintiffs' Steering Committee and the 38 reporting firms. Id. Consequently, after the District Court awarded Co-Lead Counsel its fees, Co-Lead Counsel and the Plaintiffs' Steering Committee submitted a proposed fee allocation for the distribution of attorneys' fees to the participating MDL counsel. See MDL Doc. #3091. That submission reflects audits of up to 80.26% of the previously submitted lodestar. See MDL Doc. #3091-1.

This raises two significant issues. First, if the global lodestar was reduced downward by Co-Lead Counsel, it is the class – not Co-Lead Counsel – who should receive the benefit. See Redman v. RadioShack Corp., 768 F.3d at 632; In re Bluetooth Headset Prod. Liab. Litig., 654, F.3d 935, 9949 (9th Cir. 2011) (givebacks to parties instead of class is a sign of impermissible self-dealing because "there is no apparent reason the class should not benefit from the excess allotted for fees).

Second, the lodestar relied upon by the District Court was not the true lodestar. A-034; MDL Doc. #3091-1. If the billing by

27

contributing firms was cut by as much as 80%, the District Court did not have accurate information at the time it was asked to approve Co-Lead Counsel's fees as fair and reasonable.

Thus, the District Court erred by not requiring any evidence from Co-Lead Counsel to support the basis for their fee request other than summary statements from Co-Lead Counsel that they spent 149,393 hours on the MDL litigation and had accumulated approximately $74,540,341.00 in audited and unaudited time. See MDL Doc. #2786-5 through -8. At the time that fees were awarded, there was no indication in the record as to the specific tasks performed, by whom, and how much time was spent. Indeed, it was not until after Co-Lead Counsel were awarded a lump sum of attorneys' fees that Co-Lead Counsel and Plaintiffs' Steering Committee then audited the billing records of other participating MDL law firms and sought court approval for distributions. MDL Doc. #3090-3092, filed July 11-12, 2017. This is precisely the reason that time sheets and billing records were necessary for the Court to make an informed decision regarding the reasonableness of the attorneys' fees requested. See Section II, supra. This is particularly true where Co-Lead Counsel has submitted a collective lodestar intended to cover work done in all twenty of the MDL cases, effectively depriving the District Court of the ability to assess how much work was actually done in the New Jersey case.

The District Court's failure to exercise its discretion to look more closely at the lodestar calculations so as to provide itself with a method for accounting for the overlapping fees collected in the remanded home-court cases resulting in a fee award that is unreasonable and unfair. The District Court's observation that it "would need to deduct the amount of fees expected to be paid in those [remanded cases] that can be attributed to work on cases still in the MDL. I don't have an accurate way to calculate the denominator from which I can then derive a multiplier" is unavailing. <u>See</u> A-035. The Court erred in not performing a lodestar check that would have provided a basis for the adjustments that were due.

### C. The Market Dictates That The Proper Fee Award In A Global Settlement Of This Size Range Between 10% and 15%

To determine the reasonableness of the sought-after fee in a common-fund case, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." <u>In re Synthroid Mktg. Litig.</u>, 264 F.3d 712, 718 (7th Cir. 2001).

The three benchmarks relied upon by the Courts to estimate the prevailing market rate for class action litigation such as this one are (1) actual fee contracts; (2) data from similar common fund cases; and (3) information from class counsel auctions. <u>See</u> <u>In re Capital One</u>, <u>supra</u>, at 796 (citations omitted); <u>In re Trans</u>

Union Privacy Litig., 2009 WL 4799954 at *10-12 (N.D. Ill. 2009) (rev'd on other grounds, 629 F.3d 741 (7th Cir. 2011)); In re Cabletron Sys., Inc. Sec. Litig., 239 F.R.D. 30, 40-45 (D.N.H. 2006)(applying 7th Circuit approach).

With respect to the first benchmark – actual fee contracts – those are considered "of little value to determining the market rate" where the agreement is made by a handful of consumer named plaintiffs, who are often less sophisticated buyers of legal services. See In re Capital One, supra, at 796; In re Trans Union, supra, at 744; Gehrich, 316 F.R.D. at 235. Like most consumer class actions, the only fee agreements are retainer agreements the various local counsel had with the named plaintiffs, which provide for contingent fees around 30% of the settlement fund. These retainer agreements are of little value to determining the market rate because named plaintiffs are less often sophisticated buyers of legal services and more often "the cat's paws of the class lawyers." In re Trans Union, 629 F.3d at 744. Moreover, the agreements here were between local counsel and seven individual plaintiffs who, individually, did not have "a sufficient stake to drive a hard—or any—bargain with the lawyer[s]." Continental, 962 F.2d at 572. The District Court therefore erred in finding that the contingent fee agreements have any bearing as to what Co-Lead Counsel would have received in an *ex ante* negotiation with the

entire class, had such a negotiation occurred. See In re Capital One, 80 F. Supp.3d at 796; see also A-028.

With respect to the second and third benchmarks, because data from pre-suit negotiations and auctions tend to be sparse, district courts have examined empirical data analyzing fee awards in other class actions where fees were awarded at the end of the case. See, e.g., In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig., 792 F.Supp.2d 1028, 1033 (N.D. Ill. 2011); In re Trans Union, 2009 WL 4799954, at *11-13. The Seventh Circuit has relied on this empirical data to determine the norm for fee awards. See Silverman, 739 F.3d at 958; see also Section I(A), supra.

That empirical data reveals that the District Court erred by not properly considering the $243,000,000 aggregate size of the settlement, and by failing to reduce the fee award according to market rates for settlements of that magnitude. In so-called "mega fund" cases, courts have awarded between 10% and 15% of a mega fund. Ramah Navajo Chapter v. Jewell, 167 F. Supp. 3d 1217 (D.N.M. 2016).

The origin of the District Court's error can be found in the District Court's conclusion that the "[o]ur court of appeals – the court that remanded this case for settlement approval and would review my fairness determination – has rejected the concept behind the 'megafund' theory." See A-025.

In reaching this conclusion, the District Court misconstrued

31

the prevailing law of in this Circuit.  Contrary to the District Court's holding, the Seventh Circuit does indeed recognize megafund treatment for common settlement funds of this size.  In re AT&T Mobility, supra.  Although it is true that the Seventh Circuit rejects the "megafund **cap**" on public policy grounds (see, e.g., Synthroid II, 264 F.3d at 636), it certainly recognizes that megafund fee guidelines should be applied where, such as here, it is appropriate to do so.  See In re AT&T Mobility, supra.

Having erroneously concluded that this Circuit has definitively rejected the concept behind the megafund theory (A-025), the District Court failed to properly consider the reasonableness of Co-Lead Counsel's global fee request in light of the gross size of the common fund.  The District Court bears the responsibility of shielding the class from unfair and unreasonable attorneys' fees.  See, e.g., Redman v. RadioShack, 768 F.3d at 630 ("the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members").

Here, Co-Lead Counsel sought – and was awarded – fees of approximately $72,900,000, or thirty percent (30%) of the gross common fund settlement of $243,000,000.  This award is manifestly unfair to the class given the massive overlap in work across the twenty constituent docket numbers in the MDL.

32

For example, the discovery performed in the MDL was universally applicable to all cases, as is evident from a review of the Omnibus Motion. MDL Doc. #2692. The singular nature of the cases is nowhere more evident than in Co-Lead Counsel's lodestar. All of the work done by Co-Lead Counsel in the MDL cases was recorded in a single lodestar that could not be accurately allocated to any one of the constituent cases.

The District Court failed to consider the overlap in work performed across the MDL, and thus, failed to consider the work that was actually done in any single case, including of course New Jersey. Without knowing the extent of work actually performed, the District Court had no factual basis for determining that the fee award sought by Co-Lead Counsel was, in fact, reasonable.

## II. **The District Court Erred In Not Considering The NJ Class Rep's Request For Discovery**

The District Court failed to consider the NJ Class Reps request for discovery into Co-Lead Counsel's fee request. See MDL Doc. #3021 at 24-25. This was an error that requires reversal. The NJ Class Reps sought discovery regarding the conclusory statements set forth by Co-Lead Counsel in their fee request. For example, Co-Lead Counsel failed to provide any information except the blanket statement that they spent 149,000 hours on the MDL litigation. There is no indication as to the specific tasks performed, by whom, and how much time was spent. With numerous

33

firms working on the MDL cases there is the potential for duplicative work and overbilling. Despite these issues, the District Court did not even rule on the NJ Class Reps' request for discovery.

Time sheets and billing records are necessary for the Court to make an informed decision regarding the reasonableness of the attorneys' fees requested. See In re First Peoples Bank Shareholders Litig., 121 F.R.D. 219, 225 (D.N.J. 1988)(requiring counsel to produce all time sheets and billing records of all partners, associates, paralegals and other individuals). Discovery is especially important here because certain cases that were part of the MDL were remanded to their local courts and then settled. The remanded cases that settled resulted in counsel fees that were attributable to time spent in the MDL, as set forth in Section I(B), above. Further, the time submitted to the District Court was unaudited time from the other plaintiffs' firms that worked on the MDL cases. See MDL Doc. #2786-5 through -8. However, it has now become apparent that the unaudited time submitted by Co-Lead Counsel to justify its fee award was later audited by Co-Lead Counsel which resulted in reductions of time as high as 80%. See MDL Doc. #3091-1. This was done by Co-Lead Counsel to justify what portion of the attorneys' fees in the MDL they would pay to the other plaintiffs' firms involved.

34

The party seeking fees has the burden of submitting sufficient information to justify the requested fees.  See Fed. Judicial Ctr., Manual for Complex Litigation, (Fourth) § 21.724 (2004). That was not done here and the NJ Class Reps' request for discovery should have been granted in order to obtain that information. Thus, discovery is needed, including the production of all time sheets and billing records of all partners, associates, paralegals and other individuals for whom fees are sought in the above-captioned litigation.

Although discovery in connection with fee motions is rarely permitted, where attorneys make competing claims to a settlement fund designated for the payment of fees, or where a party or an objector to a settlement requests clarification of the material submitted in support of the fee motion, or requests additional material, the court should determine what information is genuinely needed and arrange for its information production. See Manual for Complex Litigation, (Fourth) § 14.224 (2004).

### III. The District Court Erred In Denying The NJ Class Rep's Motion For Counsel Fees

In denying the NJ Class Reps' counsel fees for the benefits conferred on the class, the District Court erred by relying on facts that were inaccurate and erred by finding no value in the re-notice sent to the class and the increase in objections that resulted from the new notice. In reaching its determination, the

District Court erred in balancing the benefits conferred by the NJ Class Reps with its perceived conduct of counsel. See A-059-072. This error requires reversal of the District Court's denial of the NJ Class Reps' motion for attorneys' fees.

### A. Objectors Are Entitled to Obtain A Fee

To encourage a "'broad range of participants in the [class action] fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally,'" the Seventh Circuit permits objector's counsel who "contribute materially to the proceeding to obtain a fee." Mirfasihi v. Fleet Mortg. Corp., 551 F.3d 682, 697 (7th Cir. 2008) (quoting Reynolds v. Beneficial Nat. Bank, 288 F.3d 277, 288 (7th Cir. 2002). An objector's work benefits the class only when counsel can show that the work "produce[d] an improvement in the settlement worth more than the fee" being sought. Reynolds, 288 F.3d at 288.

Beneficial objectors, such as the NJ Class Reps, "play an important role by giving courts access to information on the settlement's merits." Bell Atlantic Corporation v. Bolger, 2 F.3d 1304, 1310 (3d Cir. 1993); see also Great Neck Capital Appreciation Investment Partnership v. Price WaterhouseCoopers, LLP, 212 F.R.D. 400, 412-413 (E.D. Wisc. 2002) ("objectors serve as a highly useful vehicle for class members, for the court and for the public generally."). "If objectors' appearance sharpens the issues and debate on the fairness of the settlement, **their performance of the**

36

**role of devil's advocate warrants a fee award**." In re Domestic Air Transportation Antitrust Litigation, 148 F.R.D. 297, 358 (N.D. Cal. 1993)(emphasis added); Frankenstein v. McCrory Corp., 425 F. Supp. 762, 767 (S.D.N.Y. 1977); Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 354 (S.D.N.Y. 2005) aff'd in part, vacated in part on other grounds, 443 F.3d 253 (2d Cir. 2006) (awarding fees to objectors' counsel, finding that objections "served to generate debate and focus the issues before the Court[ ]" and "conferred a benefit on the class by forcing the settling parties to clarify the judgment credit provision, removing certain ambiguities that might have worked to the detriment of class members in subsequent proceedings.")

An objector need *not* increase the common fund to confer a substantial benefit on class members. Indeed, even in cases where objectors appeared but the settlement terms were not altered, courts have recognized their value in that their presence improved the process and assisted the court in its scrutiny of the settlement. See Dutchak v. Int'l Bhd. of Teamsters, No. 76-C-3803, 1989 WL 122394, at *2 (N.D. Ill. Oct. 3, 1989)(citing Howes v. Atkins, 668 F. Supp. 1021, 1027 (E.D.K.Y. 1987))(even though nothing was changed, the objections required the court to consider more fully and thoughtfully certain aspects of the settlement and therefore the court awarded two-thirds of the fees requested by the objectors); Frankenstein, supra. Where the objectors

37

significantly participated in the process, performed a valuable service for the class, and continually advance the interests of the class and assisted the court in the consideration of the settlement proposal, compensation is appropriate. In re Domestic Air, 148 F.R.D. at 359; see also Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1156 (8th Cir. 1999) ("To recover fees from a common fund, attorneys must demonstrate that their services . . . enhanced the adversarial process."); Rodriguez v. West Publ'g. Corp., 563 F.3d 948 (9th Cir. 2009) (holding that it was "clearly erroneous" to deny an objector attorneys' fees where the objector had raised issues that the court had not previously considered on the record); Manual for Complex Litigation (Fourth) § 14.11 (2004) ("The court may award fees to objectors who provided services . . . that aided the court's review of a class-action settlement . . . .").[5]

In Dutchak v. Int'l Bhd. of Teamsters, the court awarded fees to objectors despite opposition claiming that no value was created by the objectors. 1989 WL 122395, *2. The court reasoned that the objections required the "court to consider more fully and

---

[5] The District Court erred in concluding that this law does not apply in this circuit. The cases relied upon have been cited positively by courts within this circuit and by the Seventh Circuit. See Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P., 212 F.R.D. 400, 413 (E.D. Wis. 2002)(citing Petrovic, 200 F.3d 1140, In re Domestic Air, 148 F.R.D. 297 citing Howes, 668 F.Supp. 1021); Dutchak, 1989 WL 122394 (citing Howes, 668 F. Supp. 1021); and Reynolds, 288 F.3d at 288 (citing Petrovic, 200 F.3d 1140).

thoughtfully certain aspects of the settlement." Id. In In re Trans Union Corp. Privacy Litig., the Seventh Circuit held that an objector's fee award may be calculated as a percentage of the fee awarded to class counsel. 629 F.3d at 748 (finding that an objector's award was too small).

### B. The District Court Erred In Finding That The NJ Class Reps Only Conferred A Small Benefit On The Class

It is evident that the NJ Class Reps contributed tangible benefits to the proposed class. Despite this, the District Court determined that any benefit conferred by the NJ Class Reps was minimal and did not warrant a fee. The District Court abused its discretion in reaching that conclusion.

A lawyer for an objector who raises pertinent questions about the terms or effects, intended or unintended, of a proposed settlement renders an important service. See Great Neck Capital, supra, 212 F.R.D. at 413. The NJ Class Reps participated in the litigation in a meaningful manner, assisted the court, and continually advanced the interests of the class. In addition, the NJ Class Reps' objections resulted in a revised notice being sent to the class containing correct information, forced the settling parties to justify - on the record - how the proposed settlement was fair, reasonable, and adequate to all class members, and justify why Co-Lead Counsel's attorneys' fee request was reasonable. These benefits to the class were substantial.

Objectors provide great value to the class action process. Settlements, such as this one, can be so complicated that only lawyers who have participated in many class action lawsuits can provide insightful and useful analysis, thoughtful alternatives, and a context within which to identify flaws or oversights in a settlement, and thereby assist a court in fulfilling its duty to examine the settlement as an independent and impartial neutral. This is necessary because courts, too, are often inclined toward favoring the settlement, and the general atmosphere may become largely cooperative. In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions, 278 F.3d 175, 202 (3d Cir.2002) (Rosenn, J., concurring and dissenting).

Objectors serve as a highly useful vehicle for class members, for the court, and for the public generally. From conflicting points of view comes clearer thinking. Id. This adversarial dynamic serves a crucial role in assisting the trial court in ensuring that the proposed settlement meets the requisite legal standards of Fed. R. Civ. P. 23. See In re General Motors Corp. Pick-up Truck Fuel Tank Litig., 55 F.3d 768, 803 (3d Cir. 1995)("where there is an absence of objectors, courts lack the independently derived information about the merits to oppose proposed settlements")[6].

---

[6] Objectors might be in a position to provide beneficial information to a district judge faced with the unenviable task of assessing the validity of a proposed settlement. Such reasoning finds support in Rule 23, which provide more procedural structure

Simply put, it is difficult for a trial court to perform its oversight role in class action settlements without the benefit of the scrutiny and insight of objectors. Therefore, a lawyer for an objector who raises pertinent questions about the terms or effects, intended or unintended, of a proposed settlement renders an important service. See Great Neck Capital, 212 F.R.D. at 412–13.

The NJ Class Reps were the first to raise objections to the fairness of the settlement, its faulty and inaccurate notice to class members, and the attorneys' fees sought by Co-Lead Counsel. The NJ Class Reps were responsible for the Court-ordered re-noticing of the class, which provided the class members with accurate and complete information regarding the settlement. The NJ Class Reps were also responsible for correct information regarding the settlement being posted on the settlement website. These efforts and the new notice led to 43 additional objections (there had been none other than the NJ Class Reps originally). See A-064.

Further, the NJ Class Reps' objections were not frivolous. Without the District Court resolving the issues that were raised by the NJ Class Reps, the settlement would not have received the close attention it deserved. But for the NJ Class Reps' objections and the close scrutiny given to the New Jersey settlement, the

---

and clarity to the settlement approval process. See Edward Brunet, Class Action Objectors: Extortionist Free Riders or Fairness Guarantors, 2003 U. Chi. Legal F. 403, 444 (2003).

41

global issues impacting the other 19 MDL settlements would also not have been considered. The issues raised caused the Fairness Hearing to become a more beneficially adversarial proceeding.

The NJ Class Reps raised numerous issues regarding Co-Lead Counsel's fees that would not have been before the Court but for the objections filed by the NJ Class Reps. For instance, the NJ Class Reps challenged the global attorneys' fees requested because of the duplicative fees received in other cases that were remanded from the MDL and that the global settlement was a megafund. Also, it was not until the NJ Class Reps raised the issue of double-dipping by Co-Lead Counsel did Co-Lead Counsel update the District Court and admit that they had received over $10 million in fees from cases that were once part of the MDL and which the work done in the MDL was used to support the lodestar in those remanded cases. See MDL Doc. #3027-1 at Supplemental Exh. 8. These issues would never have been before the Court without the objections filed by the NJ Class Reps.[7] The NJ Class Reps were the last line of defense to preserve the adversary process without which the fairness of the proposed settlement and the reasonableness of the fees requested would have gone unchallenged. The benefits

---

[7] This is an issue that is still before the District Court because plaintiffs' counsel for the cases that were part of the MDL are fighting with Co-Lead Counsel over fees received by Co-Lead Counsel in cases that were part of the MDL before being remanded. See MDL Doc. #3090-3092, filed July 11-12, 2017, 3143-3145, and subsequent filings.

conferred by the NJ Class Reps in making an otherwise uncontested and unchallenged proceeding adversarial and ensuring that the settlement was fully vetted is of great value to the class even though it cannot be tangibly measured.

While the Court ultimately did not agree with the NJ Class Reps' objections, the NJ Class Reps' objection was the catalyst that inspired the Court to investigate the question of overlapping billing; an inquiry which the Court found to be meritorious.[8] <u>See</u> A-030 ("no doubt was some overlap of the work in those states and the work for the New Jersey class"); A-035 (fees received from other settled FedEx cases "would need to be subtracted out of co-lead counsel's estimated lodestar figure for the MDL").

Moreover, the NJ Class Reps raised issues regarding the propriety of the settlement and the fact that it was reached over the objection of the NJ Class Reps. <u>See</u> NJ Doc. #218, 221, 227, 233. Because of this the District Court, unsolicited, requested a proffer regarding the validity of the settlement. <u>See</u> MDL Doc. #2984. The NJ Class Reps also raised issues regarding the valuation of the New Jersey Consumer Fraud Act claim and the failure of Co-Lead Counsel to discuss fee-shifting as part of the settlement. <u>See</u> NJ Doc. #218. These arguments were advanced in the best

---

[8] The Court's opinion regarding the NJ Class Reps objection to Co-Lead Counsel's fee request was 10 pages long and was copied into each individual MDL case. This issue was the majority of most of the Court's opinion for each case in the MDL.

interests of the class and provided the District Court with information it would not have otherwise had in determining the fairness of the settlement.

There is no doubt that the objections raised by the NJ Class Reps caused the court to consider more fully and thoughtfully the fairness of the settlement and the amount of fees requested by Co-Lead Counsel.  By raising these objections, obtaining new notice, and enhancing the adversarial process, the NJ Class Reps' counsel are entitled to their fees. Thus, the District Court's order should be reversed.

### C. The District Court's Denial Of Fees Because It Found That The NJ Class Reps Actions Outweighed Any Benefit Is In Error and Requires Reversal

The District Court erred in denying the NJ Class Reps' counsel's fee request even though the NJ Class Reps produced benefits for the class. The District Court based its denial of the NJ Class Rep's fee request on two things: (i) that the NJ Class Reps' arguments allegedly ran counter to precedent and (ii) that the NJ Class Reps' were needlessly accusatory of Co-Lead Counsel. See A-071-072. Neither of these reasons are accurate, but even if they were, they do not justify denying the NJ Class Reps' motion for fees. The benefits conferred by the NJ Class Reps through re-notice of the class resulting in additional objections and by bringing forth additional information regarding Co-Lead Counsel's

fee request are sufficient to warrant a fee award and should not have been diminished by the District Court.

The District Court erred by relying on the misplaced assertion that "the class representatives' arguments often ran counter to binding precedent" as the basis for denying a fee award. A-069. In support of its opinion, the District Court provided what it believed was the "most glaring example." A-070. The example provided by the District Court was that in the NJ Class Reps' brief in opposition to Co-Lead Counsel's fee request the NJ Class Reps cited In re Synthroid Mktg. Litig., 264 F.3d 712, 718 (7th Cir. 2001) for the proposition that the MDL should be treated as a "megafund" and that the quote cited by the NJ Class Reps omitted a sentence from the case explicitly rejecting the relief requested. See Id. That is not the case. See MDL Doc. #3023 at 4-5.

The District Court stated that the NJ Class Reps cited In re Synthroid in support of their argument regarding treating the MDL as a "megafund." See A-070. However, the NJ Class Reps relied on In re Synthroid in support of the position that the market dictates that the proper fee award should be between 10% and 15%. Id. Contrary to the District Court's analysis, In re Synthroid does not preclude the NJ Class Reps from arguing that the MDL should be treated as a "megafund." In re Synthroid only states that the court never suggested that "a "megafund rule" trumps these market rates, or that as a matter of law no recovery can exceed 10% of a

45

"megafund"." In re Synthroid Mktg. Litig., 264 F.3d at 718. Nothing in In re Synthroid Mktg. Litig. bars the use of "megafunds" or precludes the NJ Class Reps from arguing that the "megafund" treatment should have been used in this case. Despite the District Court's conclusion that this argument should not have been made, the District Court tacitly admitted that In re Synthroid Mktg. Litig. **"arguably allow[s]" for the argument made by the NJ Class Reps**." See A-070. Considering that this is the "most glaring" example that the District Court relied on to show the NJ Class Reps allegedly contradictory arguments, the District Court's decision is not supported by the facts.

Further, the District Court erred in finding that because it was forced to spend time and energy addressing the "megafund" argument it warrants denying the NJ Class Reps' request for attorneys' fees. See A-070. The District Court erred because there is no case law that specifically prohibits the use of "megafunds" or its guidelines in the Seventh Circuit. The analysis relied upon by the NJ Class Reps' in support of the "megafund" treatment dealt with estimating the prevailing market rate, which is the same analysis that the District Court was required to do in determining Co-Lead Counsel's fee award even without the "megafund" argument. Compare MDL Doc. #3023 at 5 to A-021-022. The District Court was not forced to spend any time or energy addressing an issue that should not have been made as it overlapped with the analysis the

46

District Court was required to perform in determining the prevailing market rate for legal fees. The fact that there were two paths to reach that analysis does not necessitate the NJ Class Reps to choose the District Court's path or face a denial of their fees. Otherwise, the NJ Class Reps or any objector would not be able to fully advocate for their clients.

The District Court also justified its denial of fees to the NJ Class Reps on the basis of its belief that the NJ Class Reps wrongfully accused Co-Lead Counsel and Defendants of agreeing to a total settlement amount and then dividing that up for each individual case. See A-070-071. The District Court relied on its February 14, 2017 opinion denying the NJ Class Reps request for discovery in support of the fact that the NJ Class Reps offered no foundation for collusion justifying a denial of fees.

However, the NJ Class Reps' argument did not wrongfully accuse Co-Lead Counsel of anything. See MDL Doc. #2984-1. In fact, the argument made by the NJ Class Reps followed Seventh Circuit case law, which states that "the conduct of the negotiations was relevant to the fairness of the settlement and that the trial court's refusal to permit discovery or examination of the negotiations constituted an abuse of discretion." In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1116 (7th Cir. 1979). The NJ Class Reps argument followed the case law. See MDL Doc. #2984-1 at 10-13.

47

The District Court also stated that the only evidence of collusion was the NJ Class Reps' allegations. But, this is the very reason why discovery was sought because the limited facts available to the NJ Class Reps called into question how the settlements were reached.[9] With no access to any information or documents, the District Court made it impossible for the NJ Class Reps to substantiate their allegations. This does not make the allegations made untrue or improper. Like many other cases, this was simply a factual dispute between Co-Lead Counsel and the NJ Class Reps as to what occurred. To use strong advocacy as a basis to deny the NJ Class Reps' fees is an abuse of discretion that requires reversal.

The District Court abused its discretion in determining that the NJ Class Reps' actions outweighs the benefits conferred by the NJ Class Reps. As the NJ Class Reps have shown, none of the facts relied upon by the District Court support that the "modest benefit to the class was far outweighed by the resources spent litigating points of law that were contrary to precedent, and accusations that undermined faith in the proceedings." See A-072. Where, as here, a benefit was conferred to the class by the objector, counsel fees are warranted. The District Court found not only that the NJ

---

[9] The NJ Class Reps sought discovery on, amongst other things, how the full settlement value for the MDL was determined. See NJ Doc. #218 at 28; and MDL Doc. #2959 at 13.

Class Reps made the Fairness Hearing more adversarial but also found that "the new notice helped provide class members with information that could assist them in deciding whether or how to object." <u>See</u> A-067. These benefits outweigh the alleged faults that the District Court incorrectly applied to justify denying the fee request. Therefore, the District Court's order denying the NJ Class Reps' motion for fees should be reversed.

**CONCLUSION**

The District Court's April 28, 2017 and June 12, 2017 Orders must be reversed. As to the April 28, 2017 Order, this Court should reverse and remand to the District Court with the instruction to apply either the sliding-scale methodology or "megafund" guidelines to Co-Lead Counsel's fee request. As to the June 12, 2017 Order, this Court should reverse and grant the NJ Class Reps' motion for counsel fees and costs.

Dated: October 12, 2017

Respectfully submitted,

**NAGEL RICE, LLP**

By: */s/ Greg M. Kohn*
       Greg M. Kohn, Esq.
       103 Eisenhower Parkway
       Roseland, New Jersey 07068
       973-618-0400
       gkohn@nagelrice.com

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

The undersigned certifies that the foregoing Brief of Appellants complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)because it contains 11,685 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii). The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared with 12-point Courier New, a monospaced font.

__s/ Greg M. Kohn_____
GREG M. KOHN

## <u>CIRCUIT RULE 30(d) STATEMENT</u>

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the Appendix.

__*s/ Greg M. Kohn*_____
GREG M. KOHN

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2017 the Brief of Appellants was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. All interested counsel are registered CM/ECF users and will be served by the appellate CM/ECF system.

__s/ Greg M. Kohn_____
GREG M. KOHN

# SHORT

# <u>APPENDIX</u>

## INDEX TO APPENDIX

Order and Opinion dated April 28, 2017 (Docket 257).....A-001-058

Order and Opinion dated June 12, 2017 (Docket 266)......A-059-072

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) |
| | Case No. 3:05-MD-527 RLM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) ) ) |
| *Michael Tofaute, et al. v. FedEx Ground Package System, Inc.,* Civil No. 3:05cv595 RLM-MGG (NJ) | ) ) ) ) |

OPINION AND ORDER

Twenty proposed class actions in this multi-district litigation docket came before me on March 13-14 for fairness hearings. The cases are on limited remand from the court of appeals, where nineteen of them awaited resolution. The Judicial Panel on Multi-District Litigation centralized the cases under 28 U.S.C. § 1407, but the cases haven't been consolidated, so each proposed settlement must be examined separately.

I. HISTORY OF THE MDL DOCKET

In July 2005, the JPMDL granted (over the plaintiffs' objections) FedEx Ground's second request to centralize a series of cases in which FedEx Ground drivers claimed to be employees, rather than the independent contractors their employment contracts announced. The Panel reasoned that economies were to be gained because all drivers were governed by the same contract. The MDL process proved cumbersome. Even if the wording of each contract was the same,

each state's agency law varied, and differences in operation from one terminal to the next had the potential of affecting the decision.

The number of cases in the MDL docket eventually grew to 40. I appointed attorneys from three law firms to serve as co-lead counsel: Lockridge Grindal Nauen P.L.L.P. of Minneapolis, Harwood Feffer LLP of New York City, and Leonard Carder LLP of Oakland. I also appointed attorneys from three other firms – Cureton Caplan, P.C. of Delran, NJ; Siegel, Brill, Greupner, Duffy & Foster, P.A. of Minneapolis; and Zimmerman Reed P.L.L.P. of Minneapolis – to complete the plaintiffs' steering committee.

The stakes were enormous. Not only did the plaintiffs' co-lead counsel seek to represent upwards of 10,000 arguably under-compensated drivers, but the attack on drivers' independent contractor status threatened FedEx Ground's entire business model.

Consistent with those stakes, discovery was more than extensive. Although damages discovery was deferred, merits discovery and class discovery were conducted simultaneously. Some 3.2 million documents were produced and analyzed; seventeen sets of interrogatories were answered; 215 named plaintiffs answered fifteen requests for admission and sat for depositions; 105 FedEx Ground personnel sat for daylong depositions; 20 expert witnesses produced reports and sat for daylong depositions; *Daubert* motions were filed and defended. The class representatives were heavily involved in tracking down records and documents, as well as in preparing for, and giving, their own depositions.

The plaintiffs filed class certification motions in each of the cases; FedEx Ground opposed each motion. The plaintiffs filed an omnibus fact memorandum supported by 65 bankers' boxes of documents. In 2007 and 2008, I certified classes in 26 of the then-40 cases, and in all of the 20 on limited remand from the court of appeals. FedEx Ground sought interlocutory appellate review of the certification grants, and the plaintiffs successfully opposed that effort. Class notifications were hampered by spotty databases.

Sixty summary judgment motions and briefing followed. The drivers filed a 75-page statement of undisputed material facts with citations to 12 volumes. In 2010 and 2011, I denied a few of FedEx Ground's summary judgment motions but granted most, and granted all in the 20 cases now on limited remand. With respect to some of the cases, I suggested remand and the Panel sent the cases back to the transferor courts. Co-lead counsel appealed the summary judgment grants in these 20 cases to the United States Court of Appeals for the Seventh Circuit; in most of those cases, FedEx Ground cross-appealed the class certifications.

In both this court and the court of appeals, the parties recommended that the Kansas *Craig* case be addressed first, as something of a quasi-bellwether case. After briefing and argument, the court of appeals certified the employee/independent contractor case to the Kansas Supreme Court, which devised a new 18-part test and answered the certified question in the drivers' favor. Craig v. FedEx Ground Package Sys., Inc., 335 P.3d 66 (Kan. 2014). The court of appeals ultimately reversed my grant of summary judgment to FedEx

Ground in *Craig*, and remanded the case. <u>In re FedEx Ground Package Sys., Inc. Emp't Practices Litig.</u>, 792 F.3d 818 (7th Cir. 2015). In addition to the reversal in the Kansas case, rulings in other courts were trending toward findings of employee status, *see* <u>Alexander v. FedEx Ground Package Sys., Inc.</u>, 765 F.3d 981 (9th Cir. 2014) (California law); <u>Slayman v. FedEx Ground Package Sys., Inc.</u>, 765 F.3d 1033 (9th Cir. 2015) (Oregon law), or at least toward fact issues for trial. *See* <u>Gray v. FedEx Ground Package Sys., Inc.</u>, 799 F.3d 995 (8th Cir. 2015) (Missouri law); <u>Carlson v. FedEx Ground Package Sys., Inc.</u>, 787 F.3d 1313 (11th Cir. 2015) (Florida law).

The parties didn't immediately ask me to find for the Kansas drivers on liability and suggest remand to the United States District Court for the District of Kansas. Instead, the parties had chosen a mediator in an effort to resolve all of the cases remaining in the Seventh Circuit.

Each case was mediated separately, with some cases requiring several sessions. Each case was mediated with an eye on the governing law, which varied from case to case. The mediation spanned four weeks. The drivers and FedEx Ground exchanged experts' views as to the maximum recovery for each case if the drivers prevailed across the board. Settlements were reached in each case, and the court granted preliminary approval of each of the settlements. The plaintiffs then retained Rust Consulting to administer the settlements.

I conducted fairness hearings on March 13 and 14, 2017, and on March 15 and 16, I notified the court of appeals of my inclination to enter final approval

of the class settlements. The court of appeals entered a second limited remand order on March 22 to allow me to do so.

## II. FAIRNESS OF THE SETTLEMENT

### A. Terms and History of the Proposed Settlement

Parties can't settle class actions without the court finding that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); Synfuel Technologies, Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 652 (7th Cir. 2006); *see also* EEOC v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th Cir. 1985) ("The district court may not deny approval of a consent decree unless it is unfair, unreasonable, or inadequate."). In that effort, we in this circuit consider several circumstantial factors:

> (1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) stage of the proceedings and the amount of discovery completed.

Wong v. Accretive Health, Inc., 773 F.3d 859, 863 (7th Cir. 2014) (quoting Gautreaux v. Pierce, 690 F.2d 616, 631 (7th Cir. 1982)). Of those, the first is the most important. Martin v. Reid, 818 F.3d 302, 306 (7th Cir. 2016).

The *Tofaute* case was filed in the District of New Jersey in May 2005, and was centralized in this court under 28 U.S.C. § 1407 in August 2005. I granted the plaintiffs' motion for certification of a class in October 2007, and granted summary judgment to FedEx Ground in December 2010, finding that the

plaintiffs were independent contractors under New Jersey law. The class appealed.

In June 2016, the parties reached a proposed settlement. FedEx Ground would pay $25,500,000 to the plaintiffs. For each workweek of 35 or more hours during the class period, each class member would receive $72.39; for each workweek of 16-35 hours, each class member would receive $25.34. No class member would receive less than a $250 lump sum. The average recovery per class member would be $19,301, with the highest share being $71,194. No plaintiff would be required to fill out, or collect the information needed for, a claim form. No part of the settlement fund would revert to FedEx Ground if anything were left over.

The proposed settlement resulted from arms-length negotiations with a private mediator. Each side took stock of potential liability and damages under New Jersey law. The class consulted an expert in accounting and damages, who concluded that the maximum recovery the plaintiffs could achieve would be $46,733,000, exclusive of interest. FedEx Ground assessed the claims' value at less than that. The proposed settlement amounts to about 55 percent of a perfect outcome.

A perfect outcome would be a long way off. At this point, my ruling that these drivers are independent contractors under New Jersey law is the only judicial determination. The class would need for the court of appeals to find my ruling to have been in error; such an appellate ruling might consist only of a determination that New Jersey drivers might be employees, but a trial is needed.

Such a ruling would be followed by a likely FedEx Ground motion to decertify the class (seeking to exclude drivers who hired others to handle routes and arguing that "full time" drivers would be too difficult to identify), a remand to the district court in New Jersey, and a need to overcome defenses FedEx Ground didn't need to raise at the summary judgment stage (FedEx Ground had succeeded on some of those defenses in other states). If the plaintiffs prevailed at trial, FedEx Ground would likely appeal. Before the settlement, then, the class needed to string together victories in many skirmishes, beginning with a reversal in the court of appeals. The position of an appellant is not one of strength. And receipt of any money by any plaintiffs would be a long time off, well beyond the eleven years already invested in this litigation.

The plan for giving notice of the proposed settlement, and the third party administrator's execution of the plan, are detailed thoroughly in the papers supporting the plaintiffs' motions, and comply with the preliminary approval order, Federal Rule of Civil Procedure 23(e), and 28 U.S.C. § 1715.

### B. Objections to the Proposed Settlement

All seven New Jersey class representatives and at least 19 other class members object to the fairness of the settlement agreement. The court also received 24 documents that appear to be photocopies or photographs of objections. They lack original signatures and appear to have been mailed by a third party, from the same location, on the same date. [3:05-cv-595, Doc. No.

247] All 24 of these objections simply log their support for the class representatives' objections and are identical to 18 of the other objections on file.

I granted co-lead counsel's unopposed motion for preliminary approval of the New Jersey class action settlement. Co-lead counsel notified the class members about the process for final approval of the settlement and their right to object. All seven class representatives objected to final approval of the settlement. The class representatives also pointed out an error in the notice as to the average amount of recovery for each class member under the settlement agreement and wanted the notice to indicate that the class representatives didn't approve of the settlement. I ordered re-notice to the class members, postponed the fairness hearings, and extended the objection deadlines.

The class representatives also seemed to mount a campaign to other class members to object to the settlement agreement. They sent communications to other class members explaining that co-lead counsel misstated the average settlement amount in its first notice and that they think the case is worth more than the amount for which the attorneys settled it. Attached was a form for the recipient to sign indicating that she objects to the settlement amount, and that if class representatives don't agree with the settlement, then she won't agree either. Co-lead counsel asked me to enjoin the class representatives from circulating these forms, but I declined to do so.

Before addressing the fairness of the settlement agreement, the class representatives raised the threshold issue of whether a settlement agreement that all class representatives oppose, that awards no damages under one of the

class members' claims, and that arguably undervalues the remaining claims, could be valid. I rejected this threshold concern as related only to the issue of the fairness of the agreement. I also denied the class representatives' request for discovery into the settlement process.

The class representatives raise two potential problems with the settlement. Co-lead counsel settled the class's claims under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 et seq., for nothing. The class representatives argue that this was a strong claim that would have entitled the class to treble damages and attorneys' fees. Second, they argue that the class counsel undervalued the rest of the claims when it settled them for 55 percent of their potential return.

The number of objectors in this case, particularly the objection of all class representatives, is also a red flag that supports the court conducting a close look into the assumptions underlying the settlement agreement. *See* Eubank v. Pella Corp., 753 F.3d 718, 721 (7th Cir. 2014); Mirfasihi v. Fleet Mortg. Co., 356 F.3d 781, 785 (7th Cir. 2004); Manual for Complex Litigation (Fourth) § 21.642 (2004).

### 1. *Valuation of the New Jersey Consumer Fraud Act Claim*

The class representatives first argue that co-lead counsel undervalued the class' claims under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 et seq., when it settled those claims for nothing.

Co-lead counsel say that the likelihood of success on these claims was negligible. They argue that the Court of Appeals for the Third Circuit already decided that the NJCFA applies to consumers only, which would eliminate any

protection for the drivers. *See* <u>J & R Ice Cream Corp. v. Cal. Smoothie Licensing</u> <u>Corp.</u>, 31 F.3d 1259 (3d Cir. 1994) (holding that the NJCFA was designed to protect consumers, not those acquiring businesses, and so the law doesn't apply to franchisees). In weighing the settlement value of this claim, co-lead counsel thought that if the Seventh Circuit Court of Appeals held that the New Jersey drivers were misclassified, it would reverse my grant of summary judgment for FedEx, and I would then remand the case back to the federal district court in New Jersey. That court would then be bound by the Third Circuit's decision in *J & R*, which wouldn't allow the drivers an NJCFA claim.

The class representatives argue that in the years since *J & R*, a New Jersey state appeals court deviated from *J & R* to conclude that the NJCFA includes transactions held out to the public generally, which they say would include the FedEx drivers. The federal district court in New Jersey wouldn't be rigidly bound to the Third Circuit decision, the class representatives say, but instead would be obliged to guess at how the New Jersey Supreme Court would decide, and could be swayed by this development.

The class representatives might be right about what the transferor court could do. The Third Circuit's decision only represents its best guess at the time as to how the New Jersey Supreme Court would rule on a question of state substantive law. *See* <u>Comm'r v. Bosch</u>, 387 U.S. 456, 465 (1967); <u>Erie R.R. Co.</u> <u>v. Tompkins</u>, 304 U.S. 64, 78 (1938). If the state appellate courts' interpretation has evolved since the Third Circuit's decision, the new appellate court decisions create more data points to guide the district court's guess as to the New Jersey

Supreme Court's likely opinion. *See* <u>Scadron v. City of Des Plaines</u>, 734 F. Supp. 1437, 1452 (N.D. Ill. 1990) ("[T]his Court is not bound to rigidly follow the Seventh Circuit's result [on a question of state law] . . . , but before it may depart from the precedent it must be convinced that subsequent events would lead the Seventh Circuit to reach a differing result today."); <u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 635 (7th Cir. 2002) ("If the mandate of *Erie* is to be satisfied and the law ultimately employed is to be the law of the state, the federal court, exercising its authority to hear diversity cases, must make a predictive judgment as to how the supreme court of the state would decide the matter if it were presented presently to that tribunal.").

Even if the class representatives are correct that the New Jersey federal district court could rule contrary to the Third Circuit on this question of state law, that doesn't mean it would do so. A single intermediate appeals court decision pointing to a contrary interpretation doesn't mean there's much chance the federal district court would be swayed to depart from the persuasive rationale of its own federal appeals court, and that that federal appeals court would agree with that departure once appealed.

*J & R* thoroughly analyzes New Jersey Supreme Court and Appellate Division opinions. In particular, it relies on two New Jersey Supreme Court opinions for the proposition that "although the Consumer Fraud Act does not define the term 'consumer' or contain an explicit 'retail restriction,' it was intended to protect persons engaging in 'consumer' transactions, not those acquiring businesses." <u>J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.</u>,

31 F.3d at 1272 (discussing <u>Daaleman v. Elizabethtown Gas Co.</u>, 390 A.2d 566 (N.J. 1978) and <u>Kugler v. Romain</u>, 279 A.2d 640 (N.J. 1971)). It's not a far leap for the Third Circuit to rely on these cases, among other Appellate Division cases, to conclude that the only time the law protects businesses is when a business "finds itself in a consumer oriented situation, such as when it acts as the purchaser of a tow truck, as the purchaser of a yacht, or as the purchaser of computer peripherals." <u>Id</u>. at 1273 (internal citations of myriad Appellate Division cases omitted). Relying on more state court precedent, the court goes on to conclude "that even where franchises or distributorships are available to the public at large in the same sense as are trucks, boats or computer peripherals, they are not covered by the Consumer Fraud Act because they are businesses, not consumer goods or services. They never are purchased for consumption." <u>Id</u>. at 1274. Under *J & R*, FedEx drivers fall outside the protections of the NJCFA because they aren't purchasing routes as consumers.

The class representatives rely on <u>Kavky v. Herbalife International</u>, 820 A.2d 677 (N.J. Super. Ct. App. Div. 2003) as intervening precedent that the New Jersey federal district court (and then the Third Circuit) might use to change its mind as to how the New Jersey Supreme Court would interpret the NJCFA. *Kavky* still carves out "substantial and complex commercial transactions" from the NJCFA, but makes sure that the NJCFA covers transactions "offered to the general public," such as "pyramid sales schemes, and similar mass public frauds." <u>Kavky v. Herbalife Int'l of Am.</u>, 820 A.2d at 679-680. The theory under

*Kavky* would be that FedEx offered contracts for various delivery routes to the general public, the drivers entered into them, and so the NJCFA protects them.

I needn't decide whose interpretation better predicts how the New Jersey Supreme Court would rule. What matters is that co-lead counsel had good reason to assume that the federal court that would have to answer the question on remand would almost certainly follow the Third Circuit's *J & R* precedent. That's what has happened in other cases decided in the District of New Jersey. *See* Shogen v. Global Aggressive Growth Fund, Ltd., No. 04-5695, 2007 WL 1237829, at *8 n.7 (D.N.J. April 26, 2007) (holding that the court's obligated to follow *J & R*, not *Kavky*); Ramada Worldwide Inc. v. Sayo, Inc., No. 05-5506, 2007 WL 7754199, at *6 n.11 (D.N.J. July 10, 2007) (following *J & R* over *Kavky*); Trans USA Prods., Inc. v. Howard Berger Co., No. 07-5924, 2008 WL 3154753 (D.N.J. Aug. 4, 2008) (agreeing with *J & R* over *Kavky*); In re Schering-Plough Corp. Intron/Temodar Consumer Class Action, No. 2:06-cv-5774, 2009 WL 2043604, at *31-32 (D.N.J. July 10, 2009) (holding that the court is obligated to follow *J & R*, not *Kavky*); Wingate Inns Int'l, Inc. v. P.G.S., LLC, No. 09-cv-6198, 2012 WL 3550764, at *9 (D.N.J. Aug. 16, 2012) (following *J & R* over *Kavky*); Wingate Inns Int'l, Inc. v. Swindall, No. 12-248, 2012 WL 5252247, at *4 (D.N.J. Oct. 23, 2012) (following *J & R* and distinguishing *Kavky* as "carv[ing] out a narrow exception to the rule delineated in *J & R Ice Cream*"); Robinson v. Wingate Inns Int'l, Inc., No. 13-cv-2468, 2013 WL 6860723, at *4 (D.N.J. Dec. 20, 2013) (holding that the court is obligated to follow *J & R*, not *Kavky*); Yogo Factory Franchising, Inc. v. Ying, No. 13-630, 2014 WL 1783146, at *11 (D.N.J.

May 5, 2014) (holding that the court's obligated to follow *J & R*, not *Kavky*); Kumon N. Am. v. Timban, No. 13-4809, 2014 WL 2812122, at *10 (D.N.J. June 23, 2014) (following *J & R* over *Kavky*). No New Jersey district court opinion follows *Kavky* over *J & R*.

Co-lead counsel had good reason to think the New Jersey federal district court would follow *J & R* if the case was ever remanded there, and that the Third Circuit would follow its own rationale in *J & R* if appealed there. *See* Debiec v. Cabot Corp., 352 F.3d 117, 131 (3d Cir. 2003) (holding that the appeals court is bound by its own prior case-law guessing an issue of state law notwithstanding new, contradictory state appellate court precedent). A single new intermediate appellate court decision likely wouldn't change that. It was reasonable for co-lead counsel to believe its likelihood of success on the NJCFA claim is negligible and to settle it for nothing.

### 2. Valuation of the Remaining Claims

Next, the class representatives argue that co-lead counsel undervalued the class's remaining claims when it settled them for $25.5 million, or about 55 percent of what co-lead counsel thought to be the maximum amount achievable. I granted summary judgment for FedEx based on my reading that the New Jersey class members are independent contractors. Several years later, the New Jersey Supreme Court changed its employee classification test for purposes of the Wage Payment Law, N.J. Stat. Ann. § 34:11-4.1 to -4.14. Hargrove v. Sleepy's, LLC, 106 A.3d 449 (N.J. 2015).

Before *Hargrove*, it was ambiguous what test governed relations under the WPL. The New Jersey Supreme Court used the multi-factor "right to control" test from the Restatement (Second) of Agency § 220 to address issues of vicarious liability. *See* Carter v. Reynolds, 815 A.2d 460, 464 (N.J. 2003). I applied that test when granting summary judgment to FedEx and dismissing the class' claims. But then in *Hargrove*, the New Jersey Supreme Court explicitly adopted the "ABC" test used in the state's Wage and Hour Law, N.J. Stat. Ann. § 43:21-19(i)(6), for WPL claims. Hargrove v. Sleepy's, 106 A.3d at 463.

The class representatives are certain that the New Jersey class members are employees after *Hargrove*, and so the settlement should have reflected much more than a 55 percent chance of success on the merits. Had the class's appeal continued, they believe the court of appeals would have been obliged to follow Hargrove and to conclude the drivers were employees.

Co-lead counsel doesn't disagree with the class representatives that the court of appeals would likely deem the drivers employees under *Hargrove* and the "ABC" test. Instead, co-lead counsel believes that adoption of the "ABC" test could lead to other consequences that would undermine the New Jersey class' claims, supporting a 45 percent discount at settlement.

First, co-lead counsel argues that following the "ABC" test could have led to decertification of the class, based on my refusal to certify claims in other states that applied similar tests. For example, I declined to certify the Montana class, which was governed by an "AB" test similar to New Jersey's "ABC" test. Whether the employer controls the work of the driver was a question that couldn't be

resolved on the contract alone. I said, "neither unanimity of perception nor uniformity are hallmarks of individual drivers' experiences. Something very close to a driver-by-drive analysis will be needed." The common question of the effect of the Operating Agreement didn't predominate over the individualized issues under Montana law (as I saw it) and so I didn't certify the Montana class. Fed. R. Civ. P. 23(b)(3). The proposed Illinois class action might have required a similarly individualized analysis and so I declined to certify a class there.

In addition to the class' appeal from the grant of summary judgment, FedEx Ground conditionally cross-appealed my certification of the New Jersey class. Applying *Hargrove*'s "ABC" rule to the New Jersey class opened up an individualized inquiry that might have advanced each driver's claims on the merits, but could easily have destroyed the class in the process. As class counsel weighed the possibilities, the likelihood of destroying the class justified a steep enough discount to support settling the remaining claims for 55 percent of their maximum value.

Class counsel and the class representatives seem to believe that the likelihood of the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501(c)(1), preempting the class' claims, is modest, even if significant enough to justify discounting the claim further. Co-lead counsel didn't elaborate greatly on it, but also explained that the WPL could allow FedEx to deduct various costs from driver's wages, such as the cost of uniforms and insurance policy premiums, which could have significantly reduced the amount of damages available to the class. The risk of destroying the class justified the substantial

discount on its own, so I don't need a ballpark estimate of the risk of preemption or deductions on top of it.

"[A]n assessment of the likely complexity, length and expense of the litigation" is also valuable to assessing a settlement agreement. <u>Synfuel Techs., Inc. v. DHL Express (USA) Inc.</u>, 463 F.3d 646, 653 (7th Cir. 2006). This case has been in litigation for about 12 years. Even if the class representatives' rosy projections about their likelihood of success are correct, it could take years more for our court of appeals to rule on both the alleged misclassification and class certification, only for the case, if class counsel succeeds, to be remanded for further litigation. The preemption defense and various deductions already mentioned, as well as defenses to the rescission claim, haven't even been briefed, and would take time to resolve. There's great value in being able to bring these proceedings to a close after years of vigorous litigation without clear end in sight.

The class representatives don't have veto power over the settlement. *See* <u>In re Gen. Motors Corp. Engine Interchange Litig.</u>, 549 F.2d 1106, 1128 n.34 (7th Cir. 1979); <u>Charron v. Wiener</u>, 731 F.3d 241, 253 (2d Cir. 2013). That all of the class representatives objected gives the court pause to examine why co-lead counsel might have agreed to settling on terms that left them all dissatisfied. But class counsel had good reason for their assumptions. Almost all of the other objectors didn't raise independent arguments, but backed the class representatives' objections, so their objections don't require additional analysis.

Last, the class representatives urge me to allow discovery into the settlement process to examine the bases for class counsel's assumptions about

the strength of the class members' claims. As I explained in the order on the underlying validity of the settlement agreement:

> [T]o get discovery, the class representatives must first "lay[ ] a foundation by adducing from other sources evidence indicating that the settlement may be collusive." <u>Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.</u>, 834 F.2d 677, 684 (7th Cir. 1987); Manual for Complex Litigation, supra, § 21.643. Besides their own allegations that co-lead counsel was self-dealing, class representatives don't point to anything that actually shows it. As mentioned, a knee-jerk rejection to a fee-shifting arrangement might only inhibit collusion. <u>In re Gen. Motors Corp. Engine Interchange Litig.</u>, 549 F.2d at 1130. Without foundation to support a finding of collusion, discovery won't proceed.

[3:05-md-527, Doc. No. 3004]. There's still no evidence that co-lead counsel colluded with FedEx to prepare a settlement that undersold the interests of the class members. I won't allow any discovery on this issue.

Class counsel's assumptions were reasonable and there's no evidence to support opening the settlement process up to discovery.

### 3. George Ponzoni's Objection

Class member George Ponzoni objected to the settlement, arguing that his estimated compensation is too low. He believes he should be compensated for uniform rental, which he says FedEx now pays for; insuring his cargo and truck; truck purchase and maintenance; decals; and damaged deliveries. The extent to which Mr. Ponzoni might be entitled to compensation for these expenses under New Jersey law was built into the compromise settlement under the Wage Payment Law and common law claims. This was a compromise that prevented years of additional litigation and the possibility of not recovering anything. Mr.

Ponzoni also objects to not being compensated for health and welfare benefits. These claims are still being litigated and negotiated.

### 4. Conclusion on Fairness

Every settlement is a compromise, but this settlement achieves a tremendous percentage of what the plaintiffs might have won had the case ever reached trial. In the absence of settlement, the best case scenario for the class is probably complex, would very likely take many more years, and is certain to be expensive – perhaps more than what has been incurred to get to this point. There is objection, but in the discussion just concluded I decided that objectors' arguments have little impact on the fairness determination. There is no indication or suggestion of collusion. Based on all of this, I find that the proposed settlement is fair, reasonable and adequate.

### III. ATTORNEY FEES

Plaintiffs' co-lead counsel seek an award of attorney fees of $7,650,000 from the settlement amount. Our court of appeals favors the percentage-of-the-fund fee in common fund cases because it provides the best hope of estimating what a willing seller and a willing buyer seeking the largest recovery in the shortest time would have agreed to *ex ante*. *See* <u>In re Synthroid Marketing Litig.</u>, 325 F.3d 974, 979-980 (7th Cir. 2003). As co-lead counsel calculate, that would be 30 percent of the $25.5 million settlement fund. As I understand the law of

this circuit, I must take another step or two before I can identify determine attorney fees.

In <u>Redman v. RadioShack Corp.</u>, 768 F.3d 622, 630 (7th Cir. 2014), the court of appeals explained that if we simply divide the gross settlement figure by the attorney fee request, we saddle the class members with the costs of administration, which benefit the attorneys as well as the class members. Accordingly, the court explained, "[t]he ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." <u>Id</u>.

In their memorandum in support of their motion for final approval, co-lead counsel expect the $25,500,000 class settlement fund to be allocated and distributed this way: about $17,430,000 to the class; $7,650,000 (if I award what counsel seek) for attorney's fees and costs; $60,000 to the third-party administrator for settlement administration; $15,0000 (if I award what counsel seek) in service fees for each of the 7 named class representative who sat for depositions in this action; and about $255,000 (1 percent of the settlement) for a reserve fund for later payments to any self-identified class members.

The affidavit of the third-party administrator's representative in support of the motion, however, estimates about $69,145 needed for settlement administration [Doc. No. 2955]. The exhibit attached to the settlement agreement itself estimates only about $55,605 for settlement administration [Doc. No. 2705-8]. I will base the amount withheld for administrative costs on the third-party administrator's estimates, and will authorize payment up to $75,000 for the cost

of settlement administration, to provide an adequate buffer for any additional costs that may be incurred. The service fees and the reserve fund would go to class members, so the total going to class members plus the requested attorney fees (and costs) would be $25,425,000. A 30 percent fee, as calculated in accordance with *Redman v. RadioShack*, would be $7,627,500.

The objectors in the New Jersey case filed a motion to treat all of the settlements as an aggregated "megafund," and award much lower percentages for attorney fees across the board. At the fairness hearing, counsel for New Jersey objectors didn't persuade me that the New Jersey objectors have standing to object to proposed settlements in cases to which they aren't parties. I am denying their requests to treat these cases as a single "megafund," but the ruling and its reasoning are to be found only in the opinion and order in the New Jersey case – the case in which the objectors have standing.

The Manual for Complex Litigation reports that in deciding an award of attorney fees, courts should consider the size of the fund to be shared by the attorneys and class members; the number of class members who will share; any understandings on attorney compensation methods actually reached at the outset of the attorney-client relationship; any side agreements class counsel might have made; any objections by class members; the attorneys' skill and efficiency; the litigation's complexity and duration; the risks of nonrecovery and nonpayment; the amount of time reasonably devoted to the case by counsel (a factor not favored in our circuit); and awards in similar cases. Manual for Complex Litigation (Fourth) § 14.121 (2004). Guides to determining a prevailing

market rate include comparable contracts, data from large common-pool cases where fees were privately negotiated, and information on class-counsel auctions. In re Synthroid Marketing Litig., 264 F.3d at 712, 719-722 (7th Cir. 2001). I must bear in mind that the greater the fee award, the lower the recovery by each class member. Redman v. RadioShack, 768 F.3d at 629. In evaluating these factors, I have relied on the convincing affidavit of Professor Brian T. Fitzpatrick, as well as the rest of the record in this case.

### A. The Megafund Objection

The class representatives object to the fee request, contending that the settlements in these cases should be viewed holistically as a single settlement for some $243 million, and settlements of that size are treated as a "megafund" from which attorneys should receive a lower percentage than they would for smaller recoveries. As Professor Rubenstein explained the principle, "The mega-fund approach holds that courts should award lower fee percentages in large fund cases." 5 William B. Rubenstein, Newberg on Class Actions § 15:81, at 300 (5th ed. 2016).

Co-counsel object to the class representatives' effort to create a megafund, as do several of the classes in the companion cases. To fully implement the objectors' theory, the fee award would have to be lowered (by roughly two-thirds) in each of the other cases on limited remand to me. I asked the objectors' counsel at the fairness hearing how the New Jersey objectors have standing to seek reduction of fee awards in cases in which they aren't parties; the strongest

response is that Rule 23 places a responsibility on me to evaluate the fairness (and reasonableness of the fee award) of each case's settlement, and the objectors are pointing out a reason why those settlements should be considered unfair. The premise of that argument is indisputable. *See* Fed. R. Civ. P 23(e)(2) ("If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."). But that doesn't mean I can listen to the opinion of every stranger to the case who might find himself in my courtroom.

The objecting New Jersey class representatives have no standing to be heard on the reasonableness of the fee requests made in conjunction with the other 19 settlements. *See* Fed. R. Civ. P. 23(h)(2) ("A class member, or a party from whom payment is sought, may object to the motion."). For that reason, my rulings in the other cases in this MDL docket don't address the merits of the megafund argument.

The argument remains in this case: if this is a case to which the megafund theory applies, I can reduce the New Jersey settlement attorney fees and expenses accordingly, even if the fee awards in the other cases remain unaffected.

But there is no megafund here. Although these cases all find themselves centralized in a single multi-district litigation docket, they haven't been consolidated. There are 20 different district court docket numbers, 20 different complaints governed by the laws of 20 different states, 20 different class certifications, 20 different summary judgment decisions, 20 different notices of

appeal, 20 different appellate docket numbers. There were 20 different mediations. Both parties to those mediations brought individual valuations based on the facts and state law of each. Had those mediations been unsuccessful, there would have been appellate briefing in 19 more cases.

A glance at the other settlements shows the individuality of each negotiation. Setting aside Kansas (the only case with a judicial determination in the drivers' favor), the weekly compensation for driving more than 35 hours ran from as high as $83.83 in Indiana and $76.49 in Minnesota to as low as $12.91 in Texas and $14.48 in Georgia (for New Jersey drivers, the rate was near the high end, at $72.39). The weekly compensation for driving between 16 and 35 hours ran from as high as $29.54 in Indiana and $25.34 in New Jersey to as low as $4.52 for Texas and $6.25 for South Carolina. The average individual recovery ranged from Indiana's $25,722 (higher even than Kansas) and West Virginia's $22,306 to Georgia's $3,840 and Alabama's $5,620. A state's class of drivers' place on these spectra roughly reflect the favorability of that state's laws.

An order from the JPML centralizing cases under 28 U.S.C. § 1407 doesn't consolidate the cases; it reflects the Panel's determination that centralization during the pretrial period will be more economical and convenient for the parties than leaving them in a number of districts. A transferee court's order consolidating the cases so that a filing or discovery in one is deemed a filing or discovery is all is a far cry from making a single case of many. These cases were centralized under one umbrella but remained individual cases governed by the laws of individual states.

Our court of appeals – the court that remanded this case for settlement approval and would review my fairness determination – has rejected the concept behind the "megafund" theory:

> We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time. . . . We have never suggested that a 'megafund rule' trumps these market rates, or that as a matter of law no recovery can exceed 10% of a 'megafund' even if counsel considering the representation in a hypothetical arms' length bargain at the outset of the case would decline the representation if offered only that prospective return.

In re Synthroid Marketing Litig., 264 F.3d 712, 718 (7th Cir. 2001) (citations omitted). The class representatives referenced this case in their brief, and even quoted the first sentence of this quotation, though not the last.

This isn't a single megafund case and our court of appeals hasn't recognized the megafund as a separate concept when determining the reasonableness of a common fund fee request. I decline to treat the settlement of this New Jersey case as a piece of the settlements of the cases remaining in this docket, and so a megafund.

### B. The Tapered Fee Method

The New Jersey class representatives argue that even if their megafund theory is rejected, I should apply a sliding scale, or tapered fee, approach to determining the attorneys' share of the common fund.

In some settings, the prevailing market rate for class counsel depends in part on the expected size of the payout at the end of the litigation. Professor

Fitzpatrick concedes that his sample of awards in labor and employment class actions didn't include recoveries in large amounts. In the setting of a securities class action, the court of appeals said "[d]ata show that 27.5% is well above the norm for cases in which $100 million or more changes hands. Eisenberg and Miller find that the mean award from settlements in the $100 to $250 million range is 12% and the median 10.2%." Silverman v. Motorola Solutions, Inc., 739 F.3d 956, 958 (7th Cir. 2013).

The size of the class action settlement is much smaller than the $200 million involved in *Silverman*. But it blinks reality to ignore that while this case was settled individually, it's one of 20 that remain on the MDL docket, and if aggregated, the 20 proposed settlements total more than $200 million, and far more when counting cases that have already been remanded. The remanded California case settled for $226.5 million on its own. *See* Alexander v. FedEx Ground Package Sys., Inc., No. 05-cv-38, 2016 WL 3351017 (N.D. Cal. June 15, 2016). There's no doubt that much of the discovery behind these cases overlapped, and that co-lead counsel applied a concerted strategy in moving them to settlement. On the other hand, class counsel applied laws specific to New Jersey and conducted case-specific discovery. The settlement I am considering at this point only involves the New Jersey plaintiffs and fees.

*Silverman v. Motorola Solutions* doesn't present an apples-to-apples analysis. First, Professor Fitzpatrick points out that securities cases like *Silverman v. Motorola Solutions* differ from wage and hour litigation in many ways, not least of which that class certification in securities cases is nearly

automatic under today's laws. In *Tofaute v. FedEx Ground*, as with all the other cases in this MDL docket, class counsel fought hard to get large classes certified, and (at the time of the settlements) would have seen those certifications revisited in every case in which they prevailed at the court of appeals.

Second, it's not clear that the *Silverman v. Motorola Solutions* analysis applies, or applies fully, to our case. As already noted, the settlement amount in this case – the *Tofaute v. FedEx Ground* case – isn't even in the ballpark of what was involved in *Silverman v. Motorola Solutions*; I have to look at many other cases even to reach the $50 million amount the *Silverman* court also mentioned.

It's also not clear whether I am expected, or even allowed, to consider the nature of the plaintiffs involved in a case. Our court of appeals has suggested that at least when individual plaintiffs can expect only infinitesimal recoveries, "named plaintiffs are usually cat's paws of the class lawyers, In re Trans. Union Corp. Privacy Litigation, 629 F.3d 741, 744 (7th Cir. 2011). This is not such a case, and the objecting class representatives can't be described as cat's paws of the class counsel. The plaintiffs in *Silverman* were investors in Motorola; the class representatives were institutional investors. Silverman v. Motorola, Inc., No. 07-C-4507, 2012 WL 1597388, at *4 (N.D. Ill. May 7, 2012). Institutional investors are likely to be more sophisticated in the market for legal services than the individual drivers in this case, and so likelier to agree at the outset to a tapered fee arrangement rather than a simple percentage-of-the-recovery arrangement.

Third, even with plaintiffs who are sophisticated in the market for legal services, Professor Fitzpatrick explains that the market usually does not support downward-tapering arrangements: large, sophisticated corporate clients often take the opposite approach, increasing fees as the size of the award grows to create incentive to pursue even the most difficult dollars.

Fourth, if I am to consider the other settlements in this MDL docket, it seems appropriate to consider as well that many of the named plaintiffs agreed at the outset to pay the attorney 33 percent of any recovery, and some agreed to pay as much as 40 percent, without limitation as to how much the recovery might be. None of the class representatives in the 20 cases remanded to me have fee agreements for any percentage less than 30 percent. There is no evidence of tapering in this 'market.'

## C. Double Dipping; Reasonableness of Request

Finally, the objectors argue that there was too much overlap between this case (and others) for a 30 percent fee award to be reasonable. They point to the efforts of Judge Chen in the *Alexander* case in the Northern District of California to discount the fee award to reflect that overlap. But *Alexander* throws little light on our issue. The settlement in *Alexander* exceeded the settlements in these 20 cases combined, invoking the rationales behind the megafund and tapered fees theories. The law of the Ninth Circuit is also more favorable to a megafund theory than the Seventh Circuit, and expressly rejects the Seventh Circuit's effort to

conceive of a reasonable *ex ante* market rate. *See* <u>Vizcaino v. Microsoft Corp.</u>, 290 F.3d 1043, 1049 (9th Cir. 2002).

*Alexander* reminds us that an overlap of services is something that must be considered, but it doesn't tell us what to do with it. The overlap might be among the reasons co-lead counsel ask for a 30 percent award rather than the more commonly seen 33 percent. There might have been more overlap than a 3 percent reduction would account, but any effort to quantify the overlap any further would be no better than reaching into a hat to draw a different number.

There is a significant spillover between the 20 cases remaining in MDL-1700. It seems certain that the objectors couldn't have settled for 55 percent of what they could for on their best day at trial had co-lead counsel not gotten a favorable ruling from the Kansas Supreme Court, <u>Craig v. FedEx Ground Package Sys., Inc.</u>, 335 P.3d 66 (Kan. 2014), and a reversal of my ruling when the federal court of appeals got the case back. <u>In re FedEx Ground Package Sys., Inc., Employment Practices Litig.</u>, 792 F.3d 818 (7th Cir. 2015). It seems equally certain that all the drivers in these 20 cases that remain in the MDL docket would have gotten less by way of settlement had the Ninth Circuit Court of Appeals not decided in favor of California drivers and Oregon drivers, <u>Alexander v. FedEx Ground Package Sys., Inc.</u>, 765 F.3d 981 (9th Cir. 2014); <u>Slayman v. FedEx Ground Package Sys., Inc.</u>, 765 F.3d 1033 (9th Cir. 2014), or if the Eighth and Eleventh Circuit Courts of Appeal hadn't found the drivers from Missouri and Florida to be entitled to trials. *See* <u>Gray v. FedEx Ground Package Sys., Inc.</u>, 799 F.3d 995 (8th Cir. 2015) (Missouri law); <u>Carlson v. FedEx Ground Package</u>

<u>Sys., Inc.</u>, 787 F.3d 1313 (11th Cir. 2015) (Florida law). Those cases were part of the trend in the law that seemed to be shifting away from FedEx Ground's legal position, and the New Jersey class benefitted from it. The depositions co-lead counsel took of FedEx Ground's national officers produced information that applied to all of the cases.

But the spillover might be less than it appears at first blush. Substantial discovery surrounded local dispatch terminals, and the lion's share of the briefs on class certification and summary judgment were devoted to the specific laws of the various states.

There no doubt was some overlap of the work in those states and the work for the New Jersey class. At least some of the overlap of which the drivers complain no doubt was wastefully duplicative, but some of the overlap produced more generous settlements for drivers in all states, including New Jersey. These circumstances make it impossible to devise an arithmetic adjustment to co-lead counsel's fee request. I will, then, consider the reasonableness of their request while keeping in mind that there was significant overlap of the work co-lead counsel performed for each of the classes, including the New Jersey class.

### D. The Megafund Briefs

Before I turn away from the objectors' principal arguments, a little more comment on their argument is appropriate. The objectors' briefs on the attorney fee petition contain a variety of accusatory words directed at co-lead counsel: "sleight of hand"; "efforts to misdirect this Court"; "red-handed double dipping";

"this nefarious approach". The use of such language mystifies me: it doesn't persuade, it doesn't add credibility to the rest of the argument, and it serves to reduce even further the esteem with which public sees the legal profession.

Still more troubling is the following suggestion, for which no evidence at all was cited in the briefs or at the fairness hearing: "Further, there is nothing in the record that indicates that the $243 million was not an agreed upon number by FedEx that only then had to be distributed to each of the MDL cases." [Doc. No. 3021, at 5 n.2]. When the objectors filed the brief that contained that statement, the record already contained affirmations of all 3 co-lead counsel, filed almost 6 months earlier, explaining the negotiations with no suggestion of a pre-approved bottom line. The record also contained the affirmation of Beth Ross, one of the co-lead counsel, filed about 6 weeks before the objectors' briefs, explaining the negotiating process. The record also contained the affidavits of the 2 objectors who had participated in the mediation session; their affidavits provided no support for the objectors' brief's suggestion.

Strong advocacy is one thing; accusing an opponent of unethical conduct is another. *Pro hac vice* admission in MDL-1700 required that counsel certify having read the Seventh Circuit's Rules of Civility. I urge counsel for the objectors to refresh their familiarity with those Rules.

E. Reasonableness of the 30 Percent Request for Attorney Fees and Expenses

The sheer number of objections amounts to a red flag that demands I examine the request more carefully. I have no information that any side agreements are involved, and the attorneys involved as co-lead counsel are very capable and experienced in wage and hour litigation (and they faced very capable and experienced attorneys that FedEx Ground hired). The size of the settlement fund is $25,425,000 after the third party administrator is paid, and up to 901 class members will share in the recovery.

The named plaintiffs and their attorneys agreed at the outset of the litigation that counsel would be compensated with 30 percent of any recovery.

The duration of the litigation has been far greater than usual – this case is nearly 12 years old. In part, that duration reflects this case's having been co-mingled with the other cases in the MDL docket – it would have taken a judge in the District of New Jersey far less time to resolve class certification issues and summary judgment motions under New Jersey law than it took me to decide such things under the laws of 40 or so states – but it also reflects the complexity and risk involved. This class attacked FedEx Ground's business model, which was firmly grounded on the principle of using independent contractors rather than employees. The class members had a lot at stake, as shown by the damages expert's opinion that the class might recover nearly $47 million if everything broke for the plaintiffs. This was no nuisance suit or likely coupon settlement. A hard battle was predictable from day one.

The attorneys handled this case on a pure contingent fee basis. Whatever investment they made in discovery and briefing of class certification and summary judgment motion was made largely between 2005 and 2008 – 11 years ago, give or take a year. That's much longer than average for contingent fee attorneys in class actions, according to Professor Fitzpatrick.

The plaintiffs faced legal challenges they needed to overcome to establish their employee status and obtain meaningful damages. I discussed the issues surrounding the claims under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 et seq., the New Jersey Wage Payment Law, N.J. Stat. Ann. § 34:11-4.1 to -4.14, and the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. §14501(c)(1) in Part II-B of this opinion. There was no directly favorable New Jersey precedent to support the common law claims. They faced (and overcame) a challenge in obtaining certification of a statewide class that included drivers with single routes, drivers with multiple routes, drivers who hired others to handle a route, drivers who signed employment contracts and those who signed as corporate entities. So while the plaintiffs' bar generally views wage and hour cases as undesirable, Mr. Tofaute and his fellow drivers presented challenges that went well beyond the normal wage and hour case. The risk of non-liability and no compensation was great; these plaintiffs were in the court of appeals trying to reverse a finding of no-liability.

With all of that in their way, class counsel – armed primarily by a new direction in Kansas law and a few federal court of appeals decisions in cases the Panel remanded to transferor courts – achieved a truly remarkable result. FedEx

Ground agreed to pay $25.5 million, reflecting over half of what the plaintiffs' damages expert thought they could recover if they ran the table.

Professor Fitzpatrick's analysis of recent cases from our circuit – which seems to have a greater preference than other circuits for the percentage-of-the-fund method of valuation – supports a fee award of 30 percent of the fund to be shared by counsel and class members. He reports that the average and median findings of market rate in contingent fee awards in labor and employment cases were 34.3 percent and 33.3 percent. He also noted that the awards he studied addressed only attorney fees and not expenses; co-lead counsel have included expenses within their requests. Plaintiffs' counsel report that expenses incurred in the MDL docket (not just in the New Jersey case) exceeded $7,713,000.

A lodestar cross-check – inquiring into billable hours and billing rates – isn't encouraged in this circuit, *see* Williams v. Rohm & Haas Pension Plan, 658 F.3d 629, 638 (7th Cir. 2011); Cook v. Niedert, 142 F.3d 1004, 1013 (7th Cir. 1998), and I'm not undertaking such a cross-check. A very complex examination of time sheets, hourly rates in various markets, and records would be needed to arrive at a true lodestar figure for this case alone. Co-lead counsel report, just in case, that across this litigation (not just this case), co-lead counsel and their firms have devoted more than 149,393 hours, producing an unadjusted collective lodestar fee of $74,540,341 had they billed by the hour. It would take only a modest 1.3 multiplier, co-lead counsel tell me, for the lodestar calculation to match the percentage-of-the-fund calculation across the litigation.

The objectors' arguments about the overlap of services provided to the various classes would add another dimension to any attempted lodestar calculation and check. In *Alexander v. FedEx Ground*, for example, Judge Chen attributed about $12.4 million in lodestar work on the MDL to *Alexander*. *See* <u>Alexander v. FedEx Ground</u>, No. 05-cv-38, 2016 WL 3351017, at *3 (N.D. Cal. June 15, 2016). This would need to be subtracted out of co-lead counsel's estimated lodestar figure for the MDL, but the fee award in that case is on appeal and might be adjusted. The fee award is unpaid. Fee awards in other remanded cases total $6,304,893, and I would need to deduct the amount of fees expected to be paid in those that can be attributed to work on cases still in the MDL. I don't have an accurate way to calculate the denominator from which I can then derive a multiplier.

For me to count up, or assign weight to, the various points I have discussed (effectively transforming them into "factors") would be inconsistent with the law of our circuit. It would be what our court of appeals has called "chopped salad". <u>In Re Synthroid Marketing Litig.</u>, 264 F.3d 712, 719 (7th Cir. 2001). But these are the reasons I conclude that the requested 30 percent (after accounting for the costs of administration) produces a reasonable attorney fee:

1. At the outset of the attorney-client relationship, it would have been plain to the clients and attorneys that this litigation would be hard fought and would take years. FedEx Ground's very business model was at stake, and, if the class was defined broadly, the drivers would have hundreds of thousands – maybe millions – at stake. The history of this

case – what would have been the future at the outset of the relationship – was even worse, with the case being centralized in a multidistrict litigation docket, the extensive discovery already discussed, and a decade of litigation, and no end in sight that would benefit the plaintiffs.

2. Because of the anticipated duration of the case, it also would have been plain to all that the attorneys would have to turn away prospective clients and tie up their own funds for the life of the case.

3. Counsel produced exceptional results in the face of long odds. New Jersey law provided no assurance of success, and these plaintiffs were appellants at the time of the settlement. *See* <u>Redman v. RadioShack</u>, 768 F.3d at 633 ("the central consideration is what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation.").

4. The amount of recovery would have been a fraction of what this settlement proposal contains had counsel not persuaded me to certify a class that included drivers with a single work area, drivers with multiple work areas, drivers who contracted with FedEx Ground under a corporate identity, and drivers who simply hired others to cover some of their assigned routes.

5. Of the 20 fee contracts in the cases that remain in MDL-1700, none set a percentage of the recovery less than the 30 percent requested here, and some set the percentage at one-third of any recovery.

6. There is nothing from which I can infer that unsophisticated (in the market for legal services) clients – when compared with institutional plaintiffs – would request a tapered-fee arrangement.

7. The fee request, unlike those to which it might be compared, includes expenses rather than seeking them separately. While I can't say how much is attributable to the New Jersey case as opposed to the others co-lead counsel was handling, the overall total of expenses was $7.7 million.

For all of these reasons, I approve, in large part, the proposed settlement agreement's proposed award of attorneys' fees and expenses, in the total amount of $7,627,500 (30 percent of the gross settlement amount, less the cost of administration).

## IV. SERVICE AWARDS TO CLASS REPRESENTATIVE

Class counsel request service awards of $15,000 to each of the 7 named plaintiffs. They explain that (in addition to the extraordinary duration of their service) the class representatives did far more than the average class representatives. Reams of records had to be collected, the class representatives sat for grueling day-long depositions. Class counsel notes that the requested awards are in line with several that have been approved in cases from within this circuit, citing Cook v. Niedert, 142 F.3d at 1016 ($25,000); In re Southwest Airlines Voucher Litig., No. 11 C 8176, 2013 WL 4510197, at *11 (N.D. Ill., Aug. 26, 2013) ($15,000 to 2 plaintiffs); Heekin v. Anthem, Inc., No. 05-cv-1908, 2012

WL 5878032 at *1 (S.D. Ind. Nov. 20, 2012) ($25,000); <u>Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.</u>, No. 07 C 2898, 2012 WL 651727, at *17 (N.D. Ill. Feb. 28, 2012); ($25,000 to each of 7 plaintiffs); <u>Will v. Gen. Dynamics Corp.</u>, Civ. No. 06-698, 2010 WL 4818174, at *4 (S.D. Ill. Nov. 22, 2010) ($25,000 to 3 plaintiffs). No objections were directed to this request.

The request for $15,000 service awards for each of the seven class representatives is just, fair and reasonable.


V. CONCLUSION

Based on the foregoing, the court:

(1) OVERRULES the objections of Mr. Ponzoni, the seven class representatives, and all others filed.

(2) GRANTS IN PART the plaintiffs' unopposed motion for final approval of the New Jersey class action settlement calling for payment of $25,500,000 to the plaintiffs [Doc. No. 2952].

(3) DENIES as moot the plaintiffs' earlier motion for final approval [Doc. No. 2869].

(4) GRANTS IN PART the plaintiffs' motion for attorney's fees and costs [Doc. No. 2782]; AWARDS Patrick Carrigan, Frank Cucinotti, Michael Kilmartin, Francis Dennis Lynch, David McMahon, Thomas Mikulski and Michael Tofaute each $15,000 for their services in this case; DIRECTS payment of that amount from the settlement fund to them, in accordance with the terms of the settlement

agreement; and AWARDS plaintiffs' counsel $7,627,500 for their services on this case.

(5) ORDERS that:

A. The parties shall perform, or cause to be performed, the remaining terms of the settlement as set forth in the settlement agreement. The court authorizes the payment by the settlement administrator of the settlement funds in accordance with the terms of the settlement agreement.

B. Prior timely opt-outs on the list maintained by the claims administrator are not included in, or bound by, this order and final judgment. Those timely opt-outs are not entitled to any recovery from the settlement proceeds obtained through this settlement.

C. The court hereby DISMISSES with prejudice this action, specifically including the Released Claims, with each party to bear its own costs and attorney's fees, except as provided below. The court incorporates the Class Action Settlement Agreement [Doc. No. 2705-1] by reference in this order.

As set forth in the Settlement Agreement, "Released Claims" means all claims, actions, causes of action, administrative claims, demands, debts, damages, penalties, costs, interest, attorneys' fees, obligations, judgments, expenses, or liabilities, in law or in equity, whether now known or unknown, contingent or absolute, which: (i) are owned or held by the plaintiffs and class members and/or by their affiliated business entities (if any), or any of them, as against Releasees, or any of them; (ii) arise under any statutory or common law claim which was asserted in this lawsuit or, whether or not asserted, could have

been brought arising out of or related to the allegations of misclassification of plaintiffs and class members as independent contractors set forth in the operative complaint; and (iii) pertain to any time in the Release Period. The Released Claims include any known or unknown claims for damages and injunctive relief. The Released Claims include but are not limited to claims under The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., the New Jersey Wage Payment law, N.J.S.A. 34:11-4.1 et seq., the Declaratory Judgment Act, 28 U.S.C. § 2201, and common law claims for fraud, breach of contract, rescission, unjust enrichment, or declaratory judgment. The release excludes claims arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. Further definitions of "Released Claims" can be found in Sec. I, para. S of the Settlement Agreement [Doc. No. 2705-1].

"Releasees" means: "(a) [FedEx Ground], and its consolidated subsidiaries, successors, predecessors, assigns, affiliates, parent companies, shareholders, officers, directors, agents, insurers, attorneys, and employees; and (b) [FedEx Ground's] past, present, and future shareholders, officers, directors, agents, employees, attorneys, and insurers." (Settlement Agreement, Sec I, para. T). "Release Period" refers to the time period from May 19, 1999 through April 30, 2016. (Settlement Agreement, Sec. I, para. U). [Doc. No. 2705-1].

D. Upon the entry of this order, the plaintiffs and all class members shall be deemed to have fully, finally, and forever released, relinquished, and discharged all Released Claims against all Releasees. "Class members" include "All persons who: 1) entered into a FedEx Ground or FedEx Home Delivery form

Operating Agreement (now known as form OP-149 and Form OP-149-RES); 2) drove a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) from May 19, 1999 through October 15, 2007 to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of New Jersey." [Doc. No. 2705-1]. A list of the class members is attached to this order as Exhibit A. To the extent additional individuals are identified who qualify as class members under the terms of the settlement agreement, they will be bound by this order.

E. Upon the entry of this final approval order, the plaintiffs and all class members are barred and enjoined from asserting, filing, maintaining, or prosecuting, or in any way participating in the assertion, filing, maintenance or prosecution, of any action asserting any Released Claim against any of the Releasees, as set forth in and in accordance with the terms of the settlement agreement. Nothing in this order shall in any way impair or restrict the right of the parties to enforce the terms of the settlement.

F. The Parties' agreed upon procedure for disbursement of the $255,000 reserve fund provided for in the Settlement Agreement and the Plaintiffs' Motion for Final Approval [Doc. No. 2952], with such claims to be paid approximately 220 days after checks are issued to pay the claims of persons who fit the class definition but who were not previously identified as members of the plaintiff class according to the settlement formula described in the Settlement Agreement, is APPROVED.  FedEx Ground will submit a list containing the names of such

persons within 220 days of this order; this list will supplement the class member list attached as Exhibit A and such persons will be bound by this order.

G. The parties' request for appointment of Legal Services of New Jersey, P.O. Box 1357, Edison, NJ 08818-1357 to be the *cy pres* beneficiary is APPROVED.

H. Neither the settlement, nor any act performed or document executed pursuant to or in furtherance of the settlement, is or may be deemed to be or may be used as: (a) an admission of, or evidence of, the validity of any Released Claim or any wrongdoing or liability of any Releasee; (b) an admission or concession by the plaintiff or any class member of any infirmity in the claims asserted in the operative complaint filed in this action; (c) an admission of, or evidence of, any fault or omission of any of the Releasees in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal.

I. The third-party administrator, Rust Consulting, Inc., may retain up to $75,000 as compensation for settlement administration.

J. Without affecting the finality of this judgment in any way, the court retains continuing jurisdiction over: (1) the enforcement of this order and final judgment; (2) the enforcement of the settlement agreement; (3) the distribution of the settlement proceeds to the class members and the *cy pres* beneficiary; and (4) class counsel's proposed allocation of attorney's fees to plaintiffs' counsel to be submitted to the court.

The clerk of this court is directed to enter judgment accordingly.

SO ORDERED.

ENTERED:  April 28, 2017

                 /s/ Robert L. Miller, Jr.

                Judge
                United States District Court

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 1 | 10000014 | ANDREOLI, GIACOMO C | A 2 B DELIVERY LLC | A2B EXPRESS CORP | | |
| 2 | 10000021 | NEVRUZ, ABDULLAH | SILPAGAR INC | | | |
| 3 | 10000038 | HIMES, ADAM | | | | |
| 4 | 10000045 | BURGOS, ADIEL B | AB77 INC | | | |
| 5 | 10000052 | RODRIGUEZ, ADRIANA | | | | |
| 6 | 10000069 | CATALANO, GIACOMO | AGMC ENT | AGMC ENTERPRISES | | |
| 7 | 10000076 | AHERN, DONALD E | AHERN INC | | | |
| 8 | 10000083 | VANYO, ALAN | MAJIC EXPRESS INC | | | |
| 9 | 10000090 | HOPKINS, ALBERT | | | | |
| 10 | 10000106 | SLENDZOKA, ALBINAS | | | | |
| 11 | 10000113 | TAPIA, ALEXANDER | | | | |
| 12 | 10000120 | RAPOZO, ALEXIS MANUEL | ALEXPRESS LLC | | | |
| 13 | 10000137 | HUBER, ALFONS | | | | |
| 14 | 10000144 | ALTIMIRANDA, ALFREDO | | | | |
| 15 | 10000151 | PRIOLO, ANTHONY | | | | |
| 16 | 10000168 | ARZUNIAN, LEON | AVAL INC | | | |
| 17 | 10000175 | SCHNEIDER, JONATHAN | BAM EXPRESS 5 INC | | | |
| 18 | 10000182 | LUBERTO, BENJAMIN | | | | |
| 19 | 10000199 | BORGES, ANDERSON | BORGES TRANSPORTATION | | | |
| 20 | 10000205 | WYMAN, BRADLEY | | | | |
| 21 | 10000212 | BRANEG TRUCKING CORP | BRANEG TRUCKING CORP | | | |
| 22 | 10000229 | BRUCK, BRENDA | | | | |
| 23 | 10000236 | MCLAUGHLIN, BRIAN CHRISS | J&B DELIVERY LLC | MAC HAULING INC | | |
| 24 | 10000243 | MACDONALD, BRIAN V | | | | |
| 25 | 10000250 | EUFEMIA, BRUCE | METONE CORPORATION | | | |
| 26 | 10000267 | GENTILE, BRYAN GENE | | | | |
| 27 | 10000274 | WILCOX, BRYAN | | | | |
| 28 | 10000281 | LEE, BYUNG | BS LEE, INC | | | |
| 29 | 10000298 | CORTEZ, CAIRO | | | | |
| 30 | 10000304 | ALVAREZ, CARLOS | | | | |
| 31 | 10000311 | NAULAGUARI, CARLOS F | CFNV CORP | | | |
| 32 | 10000328 | GARCIA, CARLOS | | | | |
| 33 | 10000335 | ROZO, CARLOS J | | | | |
| 34 | 10000342 | COLOMA, CARLOS M | | | | |
| 35 | 10000359 | CARROLL, DOUGLAS ALAN | CARROLL TRUCKING | JKM TRANSPORT, INC | | |
| 36 | 10000366 | VIRGIL, CARL K | CASSR INC | | | |
| 37 | 10000373 | DURAND, CHARLES R | CHARLES DURAND INCORPORATED | | | |
| 38 | 10000380 | WADE, CHARLES | | | | |
| 39 | 10000397 | MIRANDA, CHRISTIAN JUSTIN | KAD CORPORATION | | | |
| 40 | 10000403 | SMITH, CHRISTIAN M | | | | |
| 41 | 10000410 | DAVISON, CHRISTOPHER | | | | |
| 42 | 10000427 | MIRASOLA, CHRISTOPHER | | | | |
| 43 | 10000434 | SCOTT, CHRISTOPHER | | | | |
| 44 | 10000441 | WYATT, CHRISTOPHER OLIVER | CHRYSHEL LLC | | | |
| 45 | 10000458 | CARMODY, CRAIG | CJ'S P&D INC | | | |
| 46 | 10000465 | BENNETT, CLINTON | | | | |
| 47 | 10000472 | SYKES, CONROY | | | | |
| 48 | 10000489 | WEISS, PAUL | CRACK OF DAWN LOGISTICS LLC | | | |
| 49 | 10000496 | CORALES, DANIEL A | D CORALES DELIVERY LLC | D CORALES DELIVERY INC | | |
| 50 | 10000502 | FERNANDEZ, DANGER | | | | |
| 51 | 10000519 | DRUMMOND, DANIEL | DOUBLE D TRUCKING INC | | | |
| 52 | 10000526 | JANKOWSKI, DANIEL | D W J TRANSPORTATION INC | | | |
| 53 | 10000533 | MICHEL, DANIEL JUNIOR | | | | |
| 54 | 10000540 | ORTS, DARLENE | | | | |
| 55 | 10000557 | GRANATO, DARRIN J | | | | |
| 56 | 10000564 | DOYLE, DAVID | | | | |
| 57 | 10000571 | LOHOFF, DAVID | SCRABBLETOWN INC | | | |
| 58 | 10000588 | PARMEGIANI, DAVID | | | | |
| 59 | 10000595 | ROMANO, DAVID | | | | |
| 60 | 10000601 | DIPACE, DEAN | | | | |
| 61 | 10000618 | DEGROOT, JASON | DEGROOT INC | T D N  INC | | |
| 62 | 10000625 | STEPHENS, MARC T | DENMARC INC | | | |
| 63 | 10000632 | BOWDEN, DENNIS A | BOWDEN'S EXPRESS, INC | | | |
| 64 | 10000649 | COOPER, DENNIS ALAN | DENNISCOOP CORPORATION | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 65 | 10000656 | GAUNTT, DENNIS | | | | |
| 66 | 10000663 | LOTA, DAVID G | DGL ENTERPRISES INC | | | |
| 67 | 10000670 | VENTURA, DOMINGO | | | | |
| 68 | 10000687 | SMITH, DON | | | | |
| 69 | 10000694 | CIRCELLI, DONATO | | | | |
| 70 | 10000700 | THOMPSON, EDMIL | | | | |
| 71 | 10000717 | GIST, EDWARD | | | | |
| 72 | 10000724 | STEWARD III, EDWARD JAMES | EDWARD STEWARD CORPORATION | | | |
| 73 | 10000731 | HAGAN, EDWIN | | | | |
| 74 | 10000748 | ORENGO, ELMER H | | | | |
| 75 | 10000755 | GONZALEZ, EMILIO | | | | |
| 76 | 10000762 | LUDWIG, ESTHER | ERL INC | | | |
| 77 | 10000779 | MARCELINO, ERNESTO PONS | E MARCELINO CORPORATION | | | |
| 78 | 10000786 | MEDINA, ERVIN | NJ DELIVERY EXPRESS | MEDINA GLOBAL INNOVATION CORP | | |
| 79 | 10000793 | BROWN, EUGENE F | | | | |
| 80 | 10000809 | KHAN, AMIR | KHAN INC | | | |
| 81 | 10000816 | GLEMBOCKI, ANTHONY J | | | | |
| 82 | 10000823 | LAWSON, WILLIAM | ASW LOGISTICS, LLC | SONBY CORP | | |
| 83 | 10000830 | GIFFORD, DREW L | | | | |
| 84 | 10000847 | NEAL, ERNEST | | | | |
| 85 | 10000854 | LEE, EUN S | WIJUS TRANSPORT INC | | | |
| 86 | 10000861 | GOMEZ, FELIX E | | | | |
| 87 | 10000878 | PEREZALBALADEJO, GUILLERMO | FINASRIN INC | | | |
| 88 | 10000885 | SULEIMAN, AYMAN T | AA EXPRESS LLC | | | |
| 89 | 10000892 | ILIC, ALEKSANDAR | | | | |
| 90 | 10000908 | KARGBO, ALEX | | | | |
| 91 | 10000915 | BILEN, ALI | JONALL TRUCKING LLC | DALI TRANSPORTATION, INC | | |
| 92 | 10000922 | HALL JR , ROBERT E | ALYROB INC | | | |
| 93 | 10000939 | ASSAF, AHMAD OMAR | AMSX INC | | | |
| 94 | 10000946 | MARAGOTO, ANDRES L | | | | |
| 95 | 10000953 | ARENA, ANDREW | DARENA, INC | | | |
| 96 | 10000960 | CRONIN, ANDREW | | | | |
| 97 | 10000977 | BRUNO, ANTHONY | | | | |
| 98 | 10000984 | DISERIO, ANTHONY | APD TRUCKING INC | | | |
| 99 | 10000991 | BRYANT, ARTHUR | | | | |
| 100 | 10001004 | GOMES, AVERALDO | | | | |
| 101 | 10001011 | ELSAKKA, AYMAN | NEW JERSEY EXPRESS INC | | | |
| 102 | 10001028 | BALUYOT JR, GERARDO | BALUYOT SERVICES | | | |
| 103 | 10001035 | CONDON JR , BOB VINCENT | RVC TRUCKING INC | | | |
| 104 | 10001042 | BOMTEMPO, MARIO LUCIO | BOMTEMPO CLEANING CORP | MLDB EXPRESS CORP | | |
| 105 | 10001059 | KEEGAN, BRIAN | KEEGAN TRUCKING INC | | | |
| 106 | 10001066 | SCHROB, BRIAN L | SCHROB CORP | | | |
| 107 | 10001073 | GANN, BRUCE | | | | |
| 108 | 10001080 | BENNEWITZ, BRYAN | | | | |
| 109 | 10001097 | CARRERA, GERARDO | J A  CARRERA SERVICES INC | | | |
| 110 | 10001103 | FULCO, CARL | | | | |
| 111 | 10001110 | SCHAFFER, CARLON | CARPAT TRANSPORTATION INC | | | |
| 112 | 10001127 | IRIZARRY, CARLOS | C I  DISTRIBUTORS, INC | | | |
| 113 | 10001134 | CUBAS, CESAR A | | | | |
| 114 | 10001141 | COVINGTON, CHARLES | | | | |
| 115 | 10001158 | IRIZARRY, CHUVANO | | | | |
| 116 | 10001165 | OBREGON, WILLIAM M | COISCO EXPRESS SERVICES CORP | WAF EXPRESS | WAF EXPRESS CORPORATION | |
| 117 | 10001172 | WATSON, COLLIN C | COLLIN WATSON PICK UP & DELIVERY SERVICE INC | | | |
| 118 | 10001189 | RANDALL, COURTNEY EDWARD | | | | |
| 119 | 10001196 | KAUFMAN, CARL I | CRVN LLC | | | |
| 120 | 10001202 | ACOSTA, DANIEL | DACOSTA SERVICES | DACOSTA SERVICES INC | | |
| 121 | 10001219 | MROCZKOWSKI, DANIEL | MROCZKOWSKI TRUCKING INC | | | |
| 122 | 10001226 | MCMAHON, DAVID A | | | | |
| 123 | 10001233 | SALTER, DAVID | | | | |
| 124 | 10001240 | SHELL, DAVID | | | | |
| 125 | 10001257 | STEARLEY, DAVID | STEARLEY, INC | | | |
| 126 | 10001264 | NOON, DENNIS J | MARLTON GROUND INCORPORATED | | | |
| 127 | 10001271 | PALMIERI, DENNIS | | | | |
| 128 | 10001288 | CARVAJAL, DIDIER | | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 129 | 10001295 | HAS, YUSUF | DILARA SHIPPING LLC | DILARA SHIPPING CORPORATION | | |
| 130 | 10001301 | START, DOUGLAS A | | | | |
| 131 | 10001318 | HENSAS SR , EDMUND ANTHONY | | | | |
| 132 | 10001325 | CAULFIELD JR , EDWARD T | EDEX INCORPORATED | | | |
| 133 | 10001332 | PETERS, EDWARD F | | | | |
| 134 | 10001349 | GIL, EDWARD | | | | |
| 135 | 10001356 | CALIXTE, EDY | | | | |
| 136 | 10001363 | ESPOSITO, ANTHONY | ELITE DEVELOPMENT PARTNERS, LLC | | | |
| 137 | 10001370 | DUZGUN, ERCAN | DUZGUN TRUCKING INC | | | |
| 138 | 10001387 | KHALIL, FADI | FADI'S EXPRESS | FADI EXPRESS CORPORATION | | |
| 139 | 10001394 | LENZ, SCOTT | FOCUS ENTERPRISES LLC | | | |
| 140 | 10001400 | RAJABI, FOUAD | FOUAD'S TRANSPORT CORP | | | |
| 141 | 10001417 | DIAZ, FRANCISCO | | | | |
| 142 | 10001424 | GOTAY, FRANCISCO | | | | |
| 143 | 10001431 | ALFONSO, FRANK | ALFONSO TRUCKING | BULK TRUCKS INC | | |
| 144 | 10001448 | CUCINOTTI, FRANK | | | | |
| 145 | 10001455 | HAUN, FRANK | FFH LOGISTICS INC | | | |
| 146 | 10001462 | SCHIOPPO, FRANK | | | | |
| 147 | 10001479 | ULLOA, FREDDY | DEIZY ENTERPRISES CORPORATION | | | |
| 148 | 10001486 | SELMECI, GABOR | GABOTRANS LLC | SELTRANS CORPORATION | | |
| 149 | 10001493 | VAIDY, GANGADHAR | | | | |
| 150 | 10001509 | LLOYD, EVERAL | GARDEN STATE COURIER INC | GARDEN STATE DEL  & LOGISTICS | | |
| 151 | 10001516 | JARRETT, GARTH | JARRETT'S EXPRESS, INC | | | |
| 152 | 10001523 | BILLUPS, GARY | | | | |
| 153 | 10001530 | CUNNINGHAM, GLENFORD | GDC TRANSPORT CORPORATION | | | |
| 154 | 10001547 | GABEL, GENE B | GBG TRUCKING INCORPORATED | | | |
| 155 | 10001554 | CRACCO, GENNARO | | | | |
| 156 | 10001561 | COUTERMARSHJR, GEORGE C | | | | |
| 157 | 10001578 | DARKO, GEORGE | | | | |
| 158 | 10001585 | PONZONI, GEORGE W | | | | |
| 159 | 10001592 | ORTEGA, GERARD R | | | | |
| 160 | 10001608 | WAIGUCHU, GITONGA | | | | |
| 161 | 10001615 | GLEESON, EDWARD | GLEESON DISTRIBUTIONS INC | | | |
| 162 | 10001622 | PERKINS, DARYL | GOD IS FAITHFUL INC | | | |
| 163 | 10001639 | ROPERTO, GREGG | | | | |
| 164 | 10001646 | FREEMAN, GREGORY | | | | |
| 165 | 10001653 | FOX, GREGORY J | GREGORY J  FOX INC | | | |
| 166 | 10001660 | JOSEPH, GRISETA | | | | |
| 167 | 10001677 | MONA, GUSTAVO | | | | |
| 168 | 10001684 | PATEL, HARESH R | | | | |
| 169 | 10001691 | HENRY, HARRY | | | | |
| 170 | 10001707 | STAGGS, HARRY | | | | |
| 171 | 10001714 | HASPEL, KENNETH A | HASPEL SERVICES INC | | | |
| 172 | 10001721 | AROESTE, IAN H | | | | |
| 173 | 10001738 | LUKIC, IGOR | | | | |
| 174 | 10001745 | KIAWU, ISAAC | ISAAC TRUCKING LLC | | | |
| 175 | 10001752 | FEIST, GERARD | J&L ELITE ENTERPRISES, INC | | | |
| 176 | 10001769 | JOHNSON, JACK | | | | |
| 177 | 10001776 | BROWN, JACKSON | | | | |
| 178 | 10001783 | BORDETSKY, JACOB N | | | | |
| 179 | 10001790 | GEPHART, JOEL | EASTERN GRANITE INC | JAGCOR LLC | | |
| 180 | 10001806 | RAMIREZ, JORGE A | JAM RAMIREZ LLC | | | |
| 181 | 10001813 | DUTTON JR , JAMES | | | | |
| 182 | 10001820 | HOUGH, JAMES | | | | |
| 183 | 10001837 | ISREAL, JAMES | | | | |
| 184 | 10001844 | SMITH, JAMES J | | | | |
| 185 | 10001851 | FINNEY, JAMES S | | | | |
| 186 | 10001868 | IBARRA, JAMIE | | | | |
| 187 | 10001875 | WILLIAMS, JAMIE | | | | |
| 188 | 10001882 | SUTKOWSKI, JAN | | | | |
| 189 | 10001899 | JARAMILLO, MARIO | JARAMILLO TRUCKING CORP | | | |
| 190 | 10001905 | DAINO, JASON | | | | |
| 191 | 10001912 | WOODY, JASON HARLEY | | | | |
| 192 | 10001929 | ZVOLENSKY, JASON | | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 193 | 10001936 | RUIZ, JAVIER A | ANGELINNE TRANSPORTATION INC | | | |
| 194 | 10001943 | PAUCAR, JAVIER | | | | |
| 195 | 10001950 | SMARGIASSI, JEFF | | | | |
| 196 | 10001967 | ADDINO, JEFFERY J | | | | |
| 197 | 10001974 | MEYER, WILLIAM J | JENALI INC | WILLIAM MEYER LLC | | |
| 198 | 10001981 | KUAN, JERRY | | | | |
| 199 | 10001998 | TLATENCHI, JESUS | JESUS & BESSY TRANSPORTATION CORP | | | |
| 200 | 10002001 | CARDONA, JHON ALEXANDER | | | | |
| 201 | 10002018 | ENGERT, TED | JNJE INC | | | |
| 202 | 10002025 | SILVA, JOAO | JON'S TRUCKING INC | | | |
| 203 | 10002032 | JIMENEZ, JOEL | JOEL'S TRUCKING INC | | | |
| 204 | 10002049 | WOLF, JOHN B | ALPHA WOLF CORPORATION | | | |
| 205 | 10002056 | DESIMONE, JOHN | | | | |
| 206 | 10002063 | ELLEY, JOHN | | | | |
| 207 | 10002070 | FISCAL, JOHN | | | | |
| 208 | 10002087 | CARR, JOHN J | JC ALOHA TRUCKING INC | | | |
| 209 | 10002094 | PIEKARSKI, JOHN J | | | | |
| 210 | 10002100 | POST, JOHN J | | | | |
| 211 | 10002117 | MASON, JOHN | | | | |
| 212 | 10002124 | PROSS, JOHN MATTHEW | | | | |
| 213 | 10002131 | PALUGHI, JOHN | | | | |
| 214 | 10002148 | SALIBA, JOHN | | | | |
| 215 | 10002155 | STAFFORD, JOHN | | | | |
| 216 | 10002162 | TARQUINO, JOHN | | | | |
| 217 | 10002179 | WALLACE, JOHN | | | | |
| 218 | 10002186 | NAVAS, JORGE | | | | |
| 219 | 10002193 | ORMENO, JORGE | KIAISMA SERVICE INC | | | |
| 220 | 10002209 | GOMEZ, JOSE ALBERTO | GOMEZ FLASH SERVICES INC | LILI-ANGE SERVICE INC | | |
| 221 | 10002216 | LEZCANO, JOSE LUIS | | | | |
| 222 | 10002223 | VELAZQUEZ, JOSE M | | | | |
| 223 | 10002230 | MANUEL, JOSE | | | | |
| 224 | 10002247 | OSORIO, JOSE MANUEL | JOSE M OSORIO INC | V AND J'S TRUCKING INCORPORATED | | |
| 225 | 10002254 | GARCIA, JOSE MISAEL | E&M GARCIA LLC | M & G GARCIA CORP | | |
| 226 | 10002261 | PADILLA, JOSE | | | | |
| 227 | 10002278 | SERRANO, JOSE | | | | |
| 228 | 10002285 | BARTOLOMEI, JOSEPH | JOE BART, INC | | | |
| 229 | 10002292 | COLLINS, JOSEPH F | J COLLINS TRANSFER INCORPORATED | | | |
| 230 | 10002308 | LUIPERSBECK, JOSEPH G | | | | |
| 231 | 10002315 | EVANOFF JR , JOSEPH M | HAICO INC | | | |
| 232 | 10002322 | TREGL, JOSEPH M | J T TRUCKING INC | | | |
| 233 | 10002339 | OWENS, JOSEPH | | | | |
| 234 | 10002346 | DELUCIA, JOSEPH R | | | | |
| 235 | 10002353 | SANTARSIERO, JOSEPH | | | | |
| 236 | 10002360 | SMASHEY SR , JOSEPH NORMAN | SMASH N DASH DELIVERIES | | | |
| 237 | 10002377 | NEWTON, JOSHARIF | S N  TRUCKING INC | | | |
| 238 | 10002384 | OBREGON, JOSHUA | | | | |
| 239 | 10002391 | ORE, JUAN E | | | | |
| 240 | 10002407 | HONG, JUNG | | | | |
| 241 | 10002414 | LUKOMSKI, GREG | K & G SHIPPING LLC | G&K SHIPPING INC | | |
| 242 | 10002421 | GHERARDI, KENNETH A | KAG DISTRIBUTION SERVICES LLC | KG2 SERVICES INC | | |
| 243 | 10002438 | FUNG, KAM TING | FUNG & CO  INC | | | |
| 244 | 10002445 | TOZUN, KAMIL | | | | |
| 245 | 10002452 | MATHERS, KAREN P | | | | |
| 246 | 10002469 | SCHUCKER, KARL | | | | |
| 247 | 10002476 | CARTER, WILLIAM | K B  CARTER INC | | | |
| 248 | 10002483 | KEARNEY, STEVE | KEARNEY & ASSOCIATES INC | ALREADY GONE INCORPORATED | | |
| 249 | 10002490 | SICKNICK, KEN | | | | |
| 250 | 10002506 | HARRIS, KEVIN | | | | |
| 251 | 10002513 | HUSSEY, KEVIN | | | | |
| 252 | 10002520 | GREENJACK, KEVIN J | | | | |
| 253 | 10002537 | BADWAN, KHALED | CALDWELL TRANSIT INC | | | |
| 254 | 10002544 | KANESKY, KIMBERLY | | | | |
| 255 | 10002551 | PERICCIUOLI, KIRK | KWP TRUCKING INC | | | |
| 256 | 10002568 | KISH, FRANK | | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 257 | 10002575 | DAVILA, EDWIN | KIWI EXPRESS | | | |
| 258 | 10002582 | KOZUCH, KRZYSZTOF | JAKPOL TRANSPORT LLC | JAKPOL SERVICES CORP | | |
| 259 | 10002599 | MIODUSZEWSKI, KRZYSZTOF | | | | |
| 260 | 10002605 | FERNANDEZ, SAMUEL | LA&S TRANSPORT | | | |
| 261 | 10002612 | SPENCER, HERBERT | LABASH TRANSPORTATION LLC | LABASH TRANSPORTATION, INC | | |
| 262 | 10002629 | SULLIVAN, LARRY ALLEN | | | | |
| 263 | 10002636 | MCCAFFERTY, LARRY | | | | |
| 264 | 10002643 | DECKER, LAURIE BETH | | | | |
| 265 | 10002650 | FERMIN, LEANDRO | | | | |
| 266 | 10002667 | GONZALEZ, LEONARDO F | GONZALEZ TRANSPORTATION SERVICE LLC | L & Y GONZALEZ INC | | |
| 267 | 10002674 | KERSAINT, LESLY | | | | |
| 268 | 10002681 | LEKA, ZAB | LEX EXPRESS INC | | | |
| 269 | 10002698 | CROSTA, SCOTT M | LEXCO INC | | | |
| 270 | 10002704 | FORMAN, STEVEN | LEXJON TRUCKING LLC | LEXJON TRUCKING INC | | |
| 271 | 10002711 | ARCINIEGAS, LIBARDO | | | | |
| 272 | 10002728 | BROCK, LOUIS J | L J BROCK INC | | | |
| 273 | 10002735 | PEDALINO, LOUISIII | LP3 SERVICES LLC | | | |
| 274 | 10002742 | AREIZA, LUIS | | | | |
| 275 | 10002759 | ACEVEDO, LUIS F | FERNANDO EXPRESS | | | |
| 276 | 10002766 | ROCHA, LUIS | | | | |
| 277 | 10002773 | PINHEIRO, LUIS HENRIQUE | LUPI SERVICES | LUPI SERVICES CORPORATION | | |
| 278 | 10002780 | KHALIL, SAM A | LUTFI FEDEX GROUND LLC | | | |
| 279 | 10002797 | GONZALEZ, LYNDON | | | | |
| 280 | 10002803 | DAVIS, LYNNE E | | | | |
| 281 | 10002810 | SOLORZANO, MACK ARTHUR | SOLORZANO TRUCKING INC | | | |
| 282 | 10002827 | RUOCCO, ANTHONY | M A N  TRUCKING INC | | | |
| 283 | 10002834 | COSTA, MANUEL FILIPE | | | | |
| 284 | 10002841 | VELASQUEZ, MANUEL H | | | | |
| 285 | 10002858 | PUJOLS, MANUEL | | | | |
| 286 | 10002865 | GLORIANDE, MARCALLYN P | | | | |
| 287 | 10002872 | LOPEZ, MARIA | | | | |
| 288 | 10002889 | PADILLA, MARIO | | | | |
| 289 | 10002896 | HUSTED, MARK D | | | | |
| 290 | 10002902 | CONSTANTINO, MARK J | | | | |
| 291 | 10002919 | KENNEDY, MARK | | | | |
| 292 | 10002926 | LAVILLA, MARK S | MRL TRANSPORT INC | | | |
| 293 | 10002933 | SCHUMANN, MARK | | | | |
| 294 | 10002940 | KENNEY, MARTIN | MARTIN KENNEY TRUCKING INC | | | |
| 295 | 10002957 | GALLIANO, MARK | MASM INC | | | |
| 296 | 10002964 | TREML, MATTHEW ANTHONY | QIK DELIVERY INC | | | |
| 297 | 10002971 | BARTLETT, GREGORY M | MAXTRANS LLC | MAXXPRESS CORP | | |
| 298 | 10002988 | BATIR, MEHMET AKIF | EAST EX CORP | EASTEX CORPORATION | | |
| 299 | 10002995 | AYDOGAN, MEHMET | | | | |
| 300 | 10003008 | BALDWIN, MICHAEL MARTIN-LAWRENCE | | | | |
| 301 | 10003015 | DEAS, MICHAEL | | | | |
| 302 | 10003022 | LEPORE, MICHAEL THOMAS | LEPORE'S TRUCKING | | | |
| 303 | 10003039 | SARY, MICHAEL J | | | | |
| 304 | 10003046 | JENKINS, MICHAEL JAMES | | | | |
| 305 | 10003053 | KEYS, MICHAEL | | | | |
| 306 | 10003060 | KILMARTIN, MICHAEL | | | | |
| 307 | 10003077 | KOHLHEPP, MICHAEL | | | | |
| 308 | 10003084 | LEIDERMAN, MICHAEL | | | | |
| 309 | 10003091 | LEONE, MICHAEL | | | | |
| 310 | 10003107 | LOUIS, MICHAEL | | | | |
| 311 | 10003114 | MCKENZIE, MICHAEL | | | | |
| 312 | 10003121 | MCMULLEN, MICHAEL | | | | |
| 313 | 10003138 | MORGAN, MICHAEL | | | | |
| 314 | 10003145 | MASTRO, MICHAEL R | | | | |
| 315 | 10003152 | ROMANCHAK, MICHAEL | | | | |
| 316 | 10003169 | SCHOETTLER, MICHAEL | | | | |
| 317 | 10003176 | TOFAUTE, MICHAEL | | | | |
| 318 | 10003183 | WARD, MICHAEL | CAPTAIN COURIER, INC | | | |
| 319 | 10003190 | WASSMER, MICHAEL | | | | |
| 320 | 10003206 | CIELEMECKI, MICHAL | | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 321 | 10003213 | PIERRE, MICHEL GRAND | | | | |
| 322 | 10003220 | GORGA, MIKE | | | | |
| 323 | 10003237 | MONK, MIKE | | | | |
| 324 | 10003244 | VILLANUEVA, MIKE | | | | |
| 325 | 10003251 | BLAGOJEVIC, MIROSLAV | MOAM TRUCKING INC | | | |
| 326 | 10003268 | HUSSEIN, MOHAMED | | | | |
| 327 | 10003275 | HAMEEN, MUHAMMAD TALID | LET US M U H INCORPORATED | | | |
| 328 | 10003282 | WILLIAMS, MUHAMMED | MUHAMMAD'S TRUCKING INC | | | |
| 329 | 10003299 | MAUNG, NAYLYNN | | | | |
| 330 | 10003305 | SPIRKOVIC, NEBOJSA | | | | |
| 331 | 10003312 | MEKHEIL, GEORGE R | G M EXPRESS CO | GM EAST COAST INC | NEW GM EXPRESS INC | CK&G TRUCKING INC |
| 332 | 10003329 | ERFE, NOEL | | | | |
| 333 | 10003336 | MALAVARCA, NORMAN | | | | |
| 334 | 10003343 | GUADAGNI, NUNZIO S | | | | |
| 335 | 10003350 | YUKSEL, OGUZHAN | | | | |
| 336 | 10003367 | COLON, OMALIEL | | | | |
| 337 | 10003374 | PEREZ, ORLANDO | ORLANDO PEREZ INC | KAP TRANSPORT INC | | |
| 338 | 10003381 | BOWEN, ORTHNEAL DANLEY | | | | |
| 339 | 10003398 | VENEGAS, OSCAR | | | | |
| 340 | 10003404 | BARLOW, PATRICIA ANN | | | | |
| 341 | 10003411 | MCHALEEOSSO, PATRICIA | | | | |
| 342 | 10003428 | BALSHEM, PAUL HARRIS | PAUL H BALSHEM ENTERPRISES, INC | | | |
| 343 | 10003435 | FLOYD JR , PAUL WILLIAM | | | | |
| 344 | 10003442 | SATTAR, PERWEZ | PEJAYS INC | | | |
| 345 | 10003459 | WOODS, JEFFERY P | PERFORMANCE FUEL OIL CO | | | |
| 346 | 10003466 | MORGAN, PETER S | PETER MORGAN INC | | | |
| 347 | 10003473 | CAMPBELL, PHILIP | | | | |
| 348 | 10003480 | LEPERA, PHILIP R | | | | |
| 349 | 10003497 | MEANY, PHILIP THOMAS | | | | |
| 350 | 10003503 | TOSTI, PHILIP | DAP COURIER SERVICE CORPORATION | | | |
| 351 | 10003510 | WASHINGTON, PHILLIP | | | | |
| 352 | 10003527 | NIELSEN, ERIC | PIRANHA BROTHERS LLC | | | |
| 353 | 10003534 | LICSAUER, PAUL N | P-N-L TRANSPORTATION INC | P-N-L TRUCKING LLC | P-N-L TRANSPORTATION INC | |
| 354 | 10003541 | TETTYENSKY, ALEX | PRO DESIGN INC | | | |
| 355 | 10003558 | POINTKOWSKI, JOSEPH ROBERT | PT2PT LLC | | | |
| 356 | 10003565 | WARNER, ROBERT JOHN | R J WARNER LLC | RJ WARNER EXPRESS CORPORATION | | |
| 357 | 10003572 | PISAREK, RADOMIR MARCIN | | | | |
| 358 | 10003589 | BISOGNO, RALPH S | STELLATONY INC | | | |
| 359 | 10003596 | REESE, RALPH W | | | | |
| 360 | 10003602 | EYSTAD, RANDALL | J THRU W INC | | | |
| 361 | 10003619 | HALL, RANDOLPH | | | | |
| 362 | 10003626 | MASON, RANDY | | | | |
| 363 | 10003633 | DELPINO, GEORGE T | RAPTURE LOGISTICS CORP | | | |
| 364 | 10003640 | GIBBS, RASHEEN | R L GIBBS INC | | | |
| 365 | 10003657 | SEGADO, RAUL R | | | | |
| 366 | 10003664 | CHALENSKI, RAYMOND | | | | |
| 367 | 10003671 | FORTINO, RAYMOND | | | | |
| 368 | 10003688 | CALVO, RAYMOND J | | | | |
| 369 | 10003695 | PAUL, RAYMOND J | RIDGEWOOD DISTRIBUTION INC | | | |
| 370 | 10003701 | MEJIAS, REY ANIBAL | | | | |
| 371 | 10003718 | SCAGLIONE, RICARDO | | | | |
| 372 | 10003725 | SINDONI, RICCARDO | | | | |
| 373 | 10003732 | RICE, RAY C | RICE INC | | | |
| 374 | 10003749 | ANICOLA, RICHARD | | | | |
| 375 | 10003756 | BAILEY, RICHARD | | | | |
| 376 | 10003763 | MURRAY, RICHARD D | RDM SERVICES | | | |
| 377 | 10003770 | DECKER, RICHARD | | | | |
| 378 | 10003787 | FARRELL, RICHARD | | | | |
| 379 | 10003794 | MOSZCZYNSKI, RICHARD FRANK | AUNT REY LLC | R&N AND SONS TRANSPORT INC | | |
| 380 | 10003800 | STERNBERG, RICHARD | RICH WORKS INC | | | |
| 381 | 10003817 | FALCONE, ROBERT A | | | | |
| 382 | 10003824 | DOUCETTE, ROBERT | | | | |
| 383 | 10003831 | BEATRICE, ROBERT J | | | | |
| 384 | 10003848 | NORBERG, ROBERT J | | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 385 | 10003855 | DILLER, ROBERT JOHN | | | | |
| 386 | 10003862 | SKEHAN, ROBERT JOHN | | | | |
| 387 | 10003879 | ZINSLEY, ROBERT K | | | | |
| 388 | 10003886 | COLLETTI, ROBERT N | | | | |
| 389 | 10003893 | POLL, ROBERT | POLL TRUCKING INC | | | |
| 390 | 10003909 | PROVOST, ROBERT | | | | |
| 391 | 10003916 | RISTOSKI, ROBERT | ROMAN EXPRESS INC | | | |
| 392 | 10003923 | ROSENWEIG, ROBERT | ROBERT ROSENWEIG INC | | | |
| 393 | 10003930 | FAJGIER, ROBERT S | | | | |
| 394 | 10003947 | SANTINI, ROBERT S | FIRST FRUIT DELIVERIES INC | | | |
| 395 | 10003954 | CLARK, ROBERT W | | | | |
| 396 | 10003961 | JARRELL, ROBERT WALTER | JARRELL & SONS TRUCK | RWJ TRUCKING INC | | |
| 397 | 10003978 | WARD, ROBERT | | | | |
| 398 | 10003985 | WHEELER, ROBERT | | | | |
| 399 | 10003992 | MARTINEZ, ROBERTO | | | | |
| 400 | 10004005 | ALSTON, RODNEY E | | | | |
| 401 | 10004012 | DEPAULA, RODRIGO A | | | | |
| 402 | 10004029 | LOPERA, ROGELIO | | | | |
| 403 | 10004036 | PITSKER, ROMAN | | | | |
| 404 | 10004043 | RIVERS, ROMEO R | | | | |
| 405 | 10004050 | RODRIGUEZ, ROMULO B | TRED CORP | | | |
| 406 | 10004067 | DAVIS, RON | RCD LOGISTICS, INC | | | |
| 407 | 10004074 | DESTEFANO, RONALD | | | | |
| 408 | 10004081 | THOMPSON, RANDOLPH | R TEE EXPRESS INC | | | |
| 409 | 10004098 | TRBOVICH, RUDY | SILK CITY ENTERPRISES INC | | | |
| 410 | 10004104 | ALY, SHEHATA MOHAMED | ALY LLC | S ALY CORP | S ALY CORP | |
| 411 | 10004111 | ZAPATA, FELIPE A | ITZEL 94 LLC | ITZEL 94 INC | SADDAI INC | |
| 412 | 10004128 | SAXTON, PETER | SAXTON DELIVERY SERVICE LLC | PMS DELIVERY CORP | | |
| 413 | 10004135 | CONNOR, SCOTT C | | | | |
| 414 | 10004142 | KIGER, SCOTT GLENN | | | | |
| 415 | 10004159 | STULTS, SCOTT RANDELL | MUDD CITY INCORPORATED | | | |
| 416 | 10004166 | STOKES, SCOTT | | | | |
| 417 | 10004173 | GRANIT, SCOTT THOMAS | | | | |
| 418 | 10004180 | HOFFMAN, SEAN | | | | |
| 419 | 10004197 | SENATORE, ALBERT | SENATORE TRANSPORT INC | | | |
| 420 | 10004203 | PASTORE, SERGIO J | SERGEPAT INC | | | |
| 421 | 10004210 | SEVERINO, JOAO | SF 21 CO | | | |
| 422 | 10004227 | JAMES, SIDNEY B | SIDNEY JAMES INC | | | |
| 423 | 10004234 | MARTINEZ, JESUS B | SJR SOULUTIONS LLC | | | |
| 424 | 10004241 | TRIPOLITIS, SOTIRIS | | | | |
| 425 | 10004258 | BROWN, SCOTT | STANLEASE INC | | | |
| 426 | 10004265 | VENTO, STEPHEN MICHAEL | SAND M TRUCKING LLC | MVPS TRUCKING INC | | |
| 427 | 10004272 | NUCIFORA, STEVEN MARC | | | | |
| 428 | 10004289 | OZGEN, SULTAN | | | | |
| 429 | 10004296 | KIM, SUNG MIN | | | | |
| 430 | 10004302 | SINGH, SWARN | | | | |
| 431 | 10004319 | GERMAIN, TROY D | TDG CAPITAL INC | | | |
| 432 | 10004326 | REYNOLDS, THOMAS L | | | | |
| 433 | 10004333 | LUTTMAN, THOMAS | | | | |
| 434 | 10004340 | TOPPI, THOMAS | | | | |
| 435 | 10004357 | WRIGHT, THOMAS | | | | |
| 436 | 10004364 | ZANE, THOMAS | | | | |
| 437 | 10004371 | HARUNAH, ABDUL | | | | |
| 438 | 10004388 | TURKMANI, AMIR | AHSZN INC | | | |
| 439 | 10004395 | ELTORKY, AMR | JEN TRANSIT INC | | | |
| 440 | 10004401 | SANOFF, ANDREW J | | | | |
| 441 | 10004418 | SIMONS, ANDREW | | | | |
| 442 | 10004425 | PAPIOMITIS, ANESTO | | | | |
| 443 | 10004432 | BUENO, ANGEL | | | | |
| 444 | 10004449 | FIGUEROA, ANGEL | | | | |
| 445 | 10004456 | MOSQUERA, ANIBAL | CLEVELAND TRUCKING CORPORATION | | | |
| 446 | 10004463 | NAIL, ANTHONY | | | | |
| 447 | 10004470 | OGILVIE, ANTHONY | | | | |
| 448 | 10004487 | KOCH, RICHARD | BASE RUNNER EXPRESS INC | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 449 | 10004494 | PERSAUD, BIDESH | | | | |
| 450 | 10004500 | GOMEZ, CLAUDIO ALBERTO | | | | |
| 451 | 10004517 | DINGERDISSEN, CHARLES F | CD LOGISTICS INC | | | |
| 452 | 10004524 | FRANCHINE JR , CHARLES LEON | | | | |
| 453 | 10004531 | CHUMPITAZI, CARLOS | CHUMPITAZI CORPORATION | | | |
| 454 | 10004548 | EL, CLAUDE | | | | |
| 455 | 10004555 | CABANELAS, CLAUDIO A | | | | |
| 456 | 10004562 | GRANT, CLEON | | | | |
| 457 | 10004579 | JORDAN, COREY NIEL | | | | |
| 458 | 10004586 | FOURATT, CRAIG | | | | |
| 459 | 10004593 | MCKOY, CRAIG | | | | |
| 460 | 10004609 | CUTRONA, DAVID A | D CUTRONA INC | | | |
| 461 | 10004616 | SCHER, MARC JOSEPH | DA EXPRESS LLC | AD EXPRESS INC | | |
| 462 | 10004623 | SMITH, DALKEITH L | | | | |
| 463 | 10004630 | COPELAND, DANA ERSKINE | | | | |
| 464 | 10004647 | DOUGHERTY, DANIEL | | | | |
| 465 | 10004654 | OSULLIVAN, DANIEL K | OSULLY CORP | | | |
| 466 | 10004661 | DEAL, DANIEL M | | | | |
| 467 | 10004678 | RIVERA, DANIEL | | | | |
| 468 | 10004685 | BEIHL, DARREN ANTHONY | STAGECOACH TRANSPORT INC | | | |
| 469 | 10004692 | MINNICH, DAVID | | | | |
| 470 | 10004708 | WHIRLEDGE, DAVID W | WHIRLY RIG CORPORATION | | | |
| 471 | 10004715 | DJORDJEVIC, DEJAN | | | | |
| 472 | 10004722 | DENSON, DELMAR | | | | |
| 473 | 10004739 | VEGA, DIEGO | | | | |
| 474 | 10004746 | LUCAS, DONALD | | | | |
| 475 | 10004753 | SOLOMON, DONALD | C L ALCOBA INC | | | |
| 476 | 10004760 | QUINN, DOROTHY A | | | | |
| 477 | 10004777 | BURKE, EDWARD | | | | |
| 478 | 10004784 | NKETIAH, EDWARD | | | | |
| 479 | 10004791 | CRESPO, EDWIN | | | | |
| 480 | 10004807 | VALENTIN, EDWIN | LEV TRANSPORT, INC | | | |
| 481 | 10004814 | MCMILLAN, COLEMAN | EVICON INC | | | |
| 482 | 10004821 | LEVY, EYAL | EYAL LEVY INDUSTRIES INC | | | |
| 483 | 10004838 | HILL, FLETCHER | FLETCHER HILL INC | | | |
| 484 | 10004845 | DEFEO, CHARLES | FOUR DE INC | | | |
| 485 | 10004852 | PERNICE, FRANK ALFRED | | | | |
| 486 | 10004869 | SUGLIA, FRANK | FRANK A  SUGLIA LLC | F  A  SUGLIA INC | | |
| 487 | 10004876 | ARMENTI, GARY A | | | | |
| 488 | 10004883 | HARSCH, GARY | | | | |
| 489 | 10004890 | CORDI, GARY | CORDI TRUCKING INC | | | |
| 490 | 10004906 | YUKSEL, GOKHAN | EFES EXPRESS | EFES EXPRESS II INC | | |
| 491 | 10004913 | HARRIS, GORDON | | | | |
| 492 | 10004920 | SAYLOR, GORDON | | | | |
| 493 | 10004937 | GROMYAK, TARAS | GT TRANSPORTER | T TRANSPORTER INC | | |
| 494 | 10004944 | ESCOBAR, HECTOR | HECTOR ESCOBAR TRUCKING, INC | | | |
| 495 | 10004951 | HEDIAN, JORGE F | HEDIANS TRANSPORT SERVICE | | | |
| 496 | 10004968 | MORERA, HENRY | | | | |
| 497 | 10004975 | DZENIS, INTIS | | | | |
| 498 | 10004982 | THOMAS, JOSEPH F | JF THOMAS INC | | | |
| 499 | 10004999 | OCONNOR, JAMES DENNIS | | | | |
| 500 | 10005002 | WARD, JAMES F | | | | |
| 501 | 10005019 | PUORRO, JAMES | | | | |
| 502 | 10005026 | NEMORIN, JEAN T | | | | |
| 503 | 10005033 | MARRA, JEFFREY | | | | |
| 504 | 10005040 | SMITH, JEFFREY S | | | | |
| 505 | 10005057 | YOKA, JEROMIS W | JEROMIS INC | | | |
| 506 | 10005064 | CAPERS, JESSE | | | | |
| 507 | 10005071 | ALFONSO, ALEJANDRO | JETSET EXPRESS LLC | | | |
| 508 | 10005088 | MATIAS, JIMMY | EE TRUCKING DELIVERY | ES TRUCKING DELIVERY INC | | |
| 509 | 10005095 | BUENANO, JOSE LUIS | JLB TRANSPORT LLC | JLT TRANSPORT CORP | | |
| 510 | 10005101 | SALCEDO, JOSE | J L S  SERVICE | | | |
| 511 | 10005118 | ALBANESE, JOHN | | | | |
| 512 | 10005125 | GLADDEN, JOHN | | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 513 | 10005132 | ROCHFORD III, JOHN J | | | | |
| 514 | 10005149 | HILDUM, JON E | SUNRISE DELIVERY SERVICE CORPORATION | | | |
| 515 | 10005156 | STOTTLEMYER, JOHN | JONNICK INC | | | |
| 516 | 10005163 | SANTIAGO, JOSE | | | | |
| 517 | 10005170 | DUNN, JOSEPH | GET R DUNN TRUCKING INC | | | |
| 518 | 10005187 | MONDEROY, JOSHUA DELANO | J D MONDEROY INC | | | |
| 519 | 10005194 | CIARDIELLO, KARL J | | | | |
| 520 | 10005200 | WATERMASYSK, KEITH M | | | | |
| 521 | 10005217 | NUNES, KEITH | | | | |
| 522 | 10005224 | DESOUZA, KELSEI J | | | | |
| 523 | 10005231 | ROWE, KENNETH BOUVIER | | | | |
| 524 | 10005248 | CUNNIFFE, KEVIN | | | | |
| 525 | 10005255 | FORD, MICHAEL | KNS TRUCKING LLC | FORDS TRUCKING COMPANY | | |
| 526 | 10005262 | HILL, LAWRENCE JAMES | LAW HILL CORPORATION | | | |
| 527 | 10005279 | LARA, LEONARDO | | | | |
| 528 | 10005286 | REAVES, LEROY | | | | |
| 529 | 10005293 | KOZARSKI, LINDA | LINKO CO  INC | | | |
| 530 | 10005309 | ROBERSTON, LAWRENCE | LNR DELIVERY SERVICES | | | |
| 531 | 10005316 | VILLAFUERTE, LUIS A | LOU'S DELIVERY SVC LLC | | | |
| 532 | 10005323 | VICTORIA, LUDIVIA | | | | |
| 533 | 10005330 | VENEGAS, LUIS M | | | | |
| 534 | 10005347 | MARROQUIN, MARCOS | KARREL'S TRUCKING INC | | | |
| 535 | 10005354 | SIMMONS, MARK | | | | |
| 536 | 10005361 | SOJKA, MARK | | | | |
| 537 | 10005378 | THOMAS, MARLON O | THOMAS, MARLON O | MARPAL DELIVERY SERVICE INC | | |
| 538 | 10005385 | JAKIMOWICZ, MATTHEW T | M JAK TRANSPORT INC | | | |
| 539 | 10005392 | MESSINA, MICHAEL | | | | |
| 540 | 10005408 | MORINGIELLO, MICHAEL | | | | |
| 541 | 10005415 | ONEILL, MICHAEL | | | | |
| 542 | 10005422 | PRICE, MICHAEL | | | | |
| 543 | 10005439 | CAPRERA, MIKE | | | | |
| 544 | 10005446 | DAVIS, MIKE | | | | |
| 545 | 10005453 | OZGEN, MUHAMET H | | | | |
| 546 | 10005460 | ZITA, DAN | NEW JERSEY ERRAND SERVICE INC | | | |
| 547 | 10005477 | BONSANTO, NICHOLAS | | | | |
| 548 | 10005484 | MARIOTTI, NICHOLAS STEPHEN | | | | |
| 549 | 10005491 | MORALES, NICHOLAS | MORALES EXPRESS INC | | | |
| 550 | 10005507 | CARRIGAN, PATRICK | | | | |
| 551 | 10005514 | HAUGHEY, PATRICK MICHAEL | | | | |
| 552 | 10005521 | NGEI, PATRICK | | | | |
| 553 | 10005538 | WHILDEN JR , PAUL A | | | | |
| 554 | 10005545 | WINKELMAN, PAUL | PJSJW CORP | | | |
| 555 | 10005552 | PROFANATO, JAMES | PROFANATO TRANSPORT INC | | | |
| 556 | 10005569 | WHITE, WILLIAM | PULPWOOD INC | | | |
| 557 | 10005576 | LOGAN JR , RALPH W | | | | |
| 558 | 10005583 | ZUNIGA, RAMON A | RAMON ZUNIGA, INC | | | |
| 559 | 10005590 | KONOPKA, ROBERT | RHK DELIVERY LLC | | | |
| 560 | 10005606 | LUCEY, RICHARD | | | | |
| 561 | 10005613 | SNYDER, RICHARD | | | | |
| 562 | 10005620 | SUNDERLAND, RICHARD | | | | |
| 563 | 10005637 | RIVITZ, MICHAEL I | R I NO 2 CORPORATION | R I  NO  2 CORPORATION | R I  NO 2 CORPORATION | |
| 564 | 10005644 | SKIPTUNIS, RAYMOND | RMS DELIVERY LLC | MNR ENTERPRISES INCORPORATED | | |
| 565 | 10005651 | DUNLAP, ROBERT | | | | |
| 566 | 10005668 | CONOVER, ROBERT J | | | | |
| 567 | 10005675 | BAER, ROBERT S | R  S  BAER INCORPORATED | | | |
| 568 | 10005682 | HANSEN, ROBERT W | | | | |
| 569 | 10005699 | BELLO, ROBERTO | | | | |
| 570 | 10005705 | CONTRERAS, RONALD | | | | |
| 571 | 10005712 | VENEZIA, RONALD | | | | |
| 572 | 10005729 | KUNICKI, RYSZARD | RYMAK INC | | | |
| 573 | 10005736 | RIVELL, RYNE FRANK | RIVELL TRANSPORT INCORPORATED | | | |
| 574 | 10005743 | ESPOSITO, SANTOLO D | | | | |
| 575 | 10005750 | LEVINE, SCOTT | SDB TRUCKING LLC | SDB PACKAGE AND DELIVERY CORPORATION | | |
| 576 | 10005767 | NOWAK, SEBASTIAN | | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 577 | 10005774 | SHEPHERD, TIMOTHY WAYNE | SHEPEXPRESS INC | | | |
| 578 | 10005781 | FILOZOF SR , JOHN | SI EXPRESS, LLC | | | |
| 579 | 10005798 | BROWN, STANLEY L | | | | |
| 580 | 10005804 | SUDIA JR , STEPHEN | | | | |
| 581 | 10005811 | KIERNAN, THOMAS | | | | |
| 582 | 10005828 | LEE, THOMAS | | | | |
| 583 | 10005835 | KAYS, THOMAS M | | | | |
| 584 | 10005842 | GRANDE, THOMAS O | | | | |
| 585 | 10005859 | FORREST, THOMAS R | FORREST TRUCKING INC | | | |
| 586 | 10005866 | REYNOSO, THOMAS | | | | |
| 587 | 10005873 | WILSON, TIM | | | | |
| 588 | 10005880 | HAGAR, TIMOTHY | | | | |
| 589 | 10005897 | HEALE, TIMOTHY | | | | |
| 590 | 10005903 | ROONEY, TIMOTHY P | | | | |
| 591 | 10005910 | SMITH, TODD | AUTUMN WIND ENTERPRISES, INC | | | |
| 592 | 10005927 | SALVO, TOM | | | | |
| 593 | 10005934 | MAKOWSKI, TOMASZ | MAK ENTERPRISE INC | | | |
| 594 | 10005941 | BARRETT, TRACI | | | | |
| 595 | 10005958 | TUNCEL, HAKAN | | | | |
| 596 | 10005965 | CLARK, TYRONE ANTHONY | | | | |
| 597 | 10005972 | COLTER, TYRONE | | | | |
| 598 | 10005989 | URREGO, JAVIER | URREGO INC | J U, INC | | |
| 599 | 10005996 | VARJABEDIAN, VAHAN THOMAS | BOX HUMPERS INC | | | |
| 600 | 10006009 | DIAZPOLANCO, VLADIMIR | VEMJ CORPORATION | | | |
| 601 | 10006016 | MIRANDA, VICENTE | | | | |
| 602 | 10006023 | GANPAT, VIJAY | | | | |
| 603 | 10006030 | GUIDO, VINCENT | | | | |
| 604 | 10006047 | IANNOTTA, VINCENT | | | | |
| 605 | 10006054 | PETRINO, VINCENT | | | | |
| 606 | 10006061 | VILLANUEVA, VIRGIL | A  V  C  EXPRESS, INC | | | |
| 607 | 10006078 | FELDMAN, VLADIMIR | | | | |
| 608 | 10006085 | BONHEUR, VORBE A | BONHEUR P & D, INC | | | |
| 609 | 10006092 | PIZARRO, WANDA | | | | |
| 610 | 10006108 | CLUGSTEN, WAYNE BARRY | | | | |
| 611 | 10006115 | KAUFHOLD, WAYNE | | | | |
| 612 | 10006122 | SCAFE, WAYNE LAWSON | | | | |
| 613 | 10006139 | PAVLINET, WAYNE MICHAEL | PAVLINET TRUCKING INC | | | |
| 614 | 10006146 | LOPEZ, MIGUEL | WHITE FLOWERS INC | | | |
| 615 | 10006153 | HEWAUITHARANA, WIJESIRI | | | | |
| 616 | 10006160 | CONVERY III, WILLIAM F | | | | |
| 617 | 10006177 | WERN, WILLIAM D | BILL W TRUCKING INC | | | |
| 618 | 10006184 | GLOWATZ, WILLIAM | | | | |
| 619 | 10006191 | DOWLING, WILLIAM | | | | |
| 620 | 10006207 | KEEGAN, WILLIAM | | | | |
| 621 | 10006214 | LAVERDE, WILLIAM | | | | |
| 622 | 10006221 | LOMBO, WILLIAM | | | | |
| 623 | 10006238 | RIESS, WILLIAM | | | | |
| 624 | 10006245 | DIPOMPO, WILLIAM S | | | | |
| 625 | 10006252 | GOMEZ, WILSON | | | | |
| 626 | 10006269 | DABNEY SR , WAYNE G | WK DISTRIBUTORS | WGD ENTERPRISES, INC | | |
| 627 | 10006276 | MICHNIK, WOJCIECH L | WO MI TRANSPORT LIMITED LIAB | WO-MI TRUCKING INC | | |
| 628 | 10006283 | YATES, MICHAEL ALAN | YATES EXPRESS LIMITED LIABILITY | M&R EXPRESS CORPORTION | | |
| 629 | 10006290 | DEYER, YILDIRIM | GRAYWOLF TRUCKING INC | | | |
| 630 | 10006306 | KIM, YONG | YKIM INC | | | |
| 631 | 10006313 | JALOUDI, FERAS | YOUNG ENTREPRENEURSHIP LLC | YOUNG ENTREPRENEUR EXPRESS CORPORATION | | |
| 632 | 10006320 | YOUNG, MICHAEL | | | | |
| 633 | 10006337 | OLIVEIRA, EDUARDO | YOUNGCREW LLC | | | |
| 634 | 10006344 | DIEPPA, ARMANDO | A  DIEPPA, INC | | | |
| 635 | 10006351 | VARAVKO, PAVLO V | AAO TRUCKING LLC | STONE AAO TRUCKING CORPORATION | | |
| 636 | 10006368 | OZBEK, ADEM | OZ TRUCKING INC | | | |
| 637 | 10006375 | WHITTAKER, ADRIAN G | | | | |
| 638 | 10006382 | NASRA, AHMAD | | | | |
| 639 | 10006399 | SIMOES, ANTONIO | AJPS ENTERPRISES INC | | | |
| 640 | 10006405 | SCHILIS, SAMUEL ROBERT | AKS TRUCKING INC | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 641 | 10006412 | SALAS, ALADINO | SALI TRUCKING INCORPORATED | | | |
| 642 | 10006429 | HYMAN, ALAN | | | | |
| 643 | 10006436 | VELASQUEZ, ALFRED V | | | | |
| 644 | 10006443 | JIMENEZ, ALFREDO | | | | |
| 645 | 10006450 | SHIRAZI, ALI | | | | |
| 646 | 10006467 | KATTAH, ALPHONSE | | | | |
| 647 | 10006474 | MALAVE, ANDY | AM'S COURIER SERVICES | | | |
| 648 | 10006481 | NUNEZ, ADRIAN A | A N TRANSPORT LLC | | | |
| 649 | 10006498 | MELO, ANDRES B | | | | |
| 650 | 10006504 | PATENTE, ADILSON F | ANGELMINAS LLC | ANJOMINAS INCORPORATED | | |
| 651 | 10006511 | HUTNIK, ANDREW G | | | | |
| 652 | 10006528 | GINOLFI, ANIELLO | | | | |
| 653 | 10006535 | ALLMAN, ANTHONY | | | | |
| 654 | 10006542 | COGDELL, ANTHONY | FOOTWORX DELIVERY CORPORATION | | | |
| 655 | 10006559 | RUFFINO, ANTHONY | | | | |
| 656 | 10006566 | RAYMONDI, ANTONIO | | | | |
| 657 | 10006573 | TOMASSINI JR , BENJAMIN | | | | |
| 658 | 10006580 | DAVIS, BERNARD CHARLES | | | | |
| 659 | 10006597 | DEOSARAN, BINDRABAN | DEOSARAN INC | | | |
| 660 | 10006603 | HIPPLE, BRAD WARD | | | | |
| 661 | 10006610 | BOGUSZEWSKI, BRADFORD H | | | | |
| 662 | 10006627 | MCDONALD, BRIAN | | | | |
| 663 | 10006634 | CANZATER, JON | BRITISH DEUCES LTD | | | |
| 664 | 10006641 | STEPANIAN, ROBERT J | BSTEP EXPRESS INC | | | |
| 665 | 10006658 | YATSONSKY, CHARLES | C A Y INC | | | |
| 666 | 10006665 | HERNANDEZ, JUAN C | C & C ROTILLE INC | | | |
| 667 | 10006672 | STUART, CALVIN | | | | |
| 668 | 10006689 | PANARELLA JR , CARL THOMAS | | | | |
| 669 | 10006696 | MUNERA, CARLOS A | CC MUNERA LLC | | | |
| 670 | 10006702 | O'BRIAN, CAROLE | | | | |
| 671 | 10006719 | BOYKO, DENNIS | CBI EXPRESS INC | | | |
| 672 | 10006726 | BLOODGOOD, CHARLES | | | | |
| 673 | 10006733 | CARROLL, CHARLES CHRISTOPHER | CARROLL COURIER CORPORATION | | | |
| 674 | 10006740 | MIANO, CHARLES | | | | |
| 675 | 10006757 | SANTOS, CHARLES | | | | |
| 676 | 10006764 | BASELICE, CHRIS J | | | | |
| 677 | 10006771 | DELLISANTI, CHRIS | DELLISANTI TRUCKING INC | | | |
| 678 | 10006788 | HEIPP, CHRISTIAN D | | | | |
| 679 | 10006795 | MEDRANDA, CHRISTIAN G | | | | |
| 680 | 10006801 | BROWN, CHRISTOPHER | CJRJ TRUCKING, INC | | | |
| 681 | 10006818 | CORDERO, CHRISTOPHER | | | | |
| 682 | 10006825 | WALLACE, DANIEL F | | | | |
| 683 | 10006832 | BLISS, DANIEL SCOTT | | | | |
| 684 | 10006849 | ARRIETA, DARWIN J | D&V SUCCESS ON WHEELS INC | | | |
| 685 | 10006856 | LYNCH, FRANCIS | DELIVERITE CORP | | | |
| 686 | 10006863 | PETILLO, MIKE | D L V R TRUCKING INC | | | |
| 687 | 10006870 | ODES, DOGAN | | | | |
| 688 | 10006887 | LOFTON, DORIAN A | | | | |
| 689 | 10006894 | TAYLOR, DOUGLAS KENT | | | | |
| 690 | 10006900 | DOW, DOUGLAS | DOUGLAS DOW, LLC | DDOW INC | | |
| 691 | 10006917 | RACIOPPI, DANIEL E | DRAC INC | | | |
| 692 | 10006924 | STEFANOVIC, DRAGAN | | | | |
| 693 | 10006931 | SMITH, DEWAYNE ANTHONY | DSV TRUCKING LLC | | | |
| 694 | 10006948 | BRAKE, DWAYNE L | DL2 BRAKE INCOPORATED | | | |
| 695 | 10006955 | ROBOTHAM, ERIC | E&J TRUCKING INC | ER DELIVERY INC | | |
| 696 | 10006962 | DIXON, ED | | | | |
| 697 | 10006979 | DRAHOS, EDWARD M | EMD SERVICES INC | | | |
| 698 | 10006986 | ARMSTRONG, EDWIN | ARMSTRONG TRUCKING INC | | | |
| 699 | 10006993 | SZABO, ERIC J | M & E TRUCKING OF NJ, INC | | | |
| 700 | 10007006 | HUSSLEIN, ERIK | IRON BLUE ENTERPRISES | BLUE METTLE, INC | | |
| 701 | 10007013 | ALCANTARA, ERNESTO | ALCANTARA TRANSPORT CORP | | | |
| 702 | 10007020 | SONSIADEK, FRANK | F19 STAGE, LLC | | | |
| 703 | 10007037 | CASTILLO, FRANKLIN | FCF TRANSPORT INC | | | |
| 704 | 10007044 | PARRA, FREDDY GEOVANNY | GAMAJ EXPRESS INC | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 705 | 10007051 | AGUDELO, GERSAIN | G A INSTANT DELIVERIES | | | |
| 706 | 10007068 | FALITZ, GARY | COMASH TRUCKING INC | | | |
| 707 | 10007075 | KLESH JR , GEORGE ROBERT | M G CORPORATION | | | |
| 708 | 10007082 | WALSH, GEORGE | | | | |
| 709 | 10007099 | PILEGGI, GIOVANNI | | | | |
| 710 | 10007105 | HINDS, GREGORY | | | | |
| 711 | 10007112 | MOLINA, GUS M | GUS JAGG LLC | GUSS JAGG INC | | |
| 712 | 10007129 | PENNISI, GUY | GVMG TRANSPORT INC | GVMG TRANSPORT INC | | |
| 713 | 10007136 | KNIGHT, HARLAN | | | | |
| 714 | 10007143 | GLASSMAN, HAROLD | | | | |
| 715 | 10007150 | ARMSTRONG, W DAVID | HOT CORNER CARRIERS | | | |
| 716 | 10007167 | HAINES, ROBERT | HPDS LLC | | | |
| 717 | 10007174 | COLE, JACK | | | | |
| 718 | 10007181 | D'AURIA, JACK | | | | |
| 719 | 10007198 | LIOTARD JR , JAMES L | | | | |
| 720 | 10007204 | BUISSERETH, JEAN CLAUDE | | | | |
| 721 | 10007211 | REID, JOEL K | | | | |
| 722 | 10007228 | GREY, JOHN F | LINDY TRUCKING CORPORATION | | | |
| 723 | 10007235 | MAGRINI, JOHN V | | | | |
| 724 | 10007242 | HURTADO, JORGE | | | | |
| 725 | 10007259 | RODRIGUEZ, JOSE A | JAR TRUCKING, INC | | | |
| 726 | 10007266 | VALLE, JOSE A | BINO CORP | | | |
| 727 | 10007273 | LAIETA, JOSEPH | | | | |
| 728 | 10007280 | CHANG, ED | JOVAN CORPORATION | | | |
| 729 | 10007297 | TORRES, JUAN | LAD TRANS | JR TRANSPORT | JEMA TRANSPORT CORPORATION | |
| 730 | 10007303 | WEIR, JOHN ROBERT | JRW TRUCKING LLC | | | |
| 731 | 10007310 | GACHARNA, JUAN | | | | |
| 732 | 10007327 | BELTRE, JULIO A | J A B COURIER CORP | | | |
| 733 | 10007334 | SWANTEK, KARIN | | | | |
| 734 | 10007341 | MUSHALA, KARL | | | | |
| 735 | 10007358 | METZ, KENTON L | | | | |
| 736 | 10007365 | ESHELMAN, KEVIN CHARLES | | | | |
| 737 | 10007372 | HIGGINS, VINCENT JOSEPH | KMA TRUCKING INC | | | |
| 738 | 10007389 | AHENKORAH, KOFI | | | | |
| 739 | 10007396 | HARGROVE, LAMAR | | | | |
| 740 | 10007402 | LANG, JOHN | LANG DELIVERY SERVICE LLC | | | |
| 741 | 10007419 | SILVESTRO, LOUIS | | | | |
| 742 | 10007426 | NIEVES, LOVELYNN | | | | |
| 743 | 10007433 | YU, HENRY | LUCKY DRAGON LLC | EIGHT-8 CORPORATION | | |
| 744 | 10007440 | DINIZ, LUIZ | | | | |
| 745 | 10007457 | DEJESUS, MARCOS | | | | |
| 746 | 10007464 | ZEPEDA, MARIO | | | | |
| 747 | 10007471 | MCGREGOR, MARK ANTHONY | | | | |
| 748 | 10007488 | ZOFREA, MARK | | | | |
| 749 | 10007495 | JACOB, MATTHEW J | | | | |
| 750 | 10007501 | DICKINSON, MATT T | | | | |
| 751 | 10007518 | LIEBLANG, MATTHEEW J | | | | |
| 752 | 10007525 | TAYLOR, MERLE | | | | |
| 753 | 10007532 | UGUR, METIN | | | | |
| 754 | 10007549 | BLANCHARD, MICHAEL T | MTCR INC | | | |
| 755 | 10007556 | HUNSBERGER, MICHAEL | | | | |
| 756 | 10007563 | LEBERS, MICHAEL J | | | | |
| 757 | 10007570 | LEHMANN, MICHAEL | | | | |
| 758 | 10007587 | SCOTT, MIKE | M T SCOTT'S TRUCKING INC | | | |
| 759 | 10007594 | DELEON, MIGUEL | | | | |
| 760 | 10007600 | ROMERO, MIGUEL | DAVRIC DELIVERY INC | | | |
| 761 | 10007617 | UKU, MORRIS G | | | | |
| 762 | 10007624 | HATALA, MIKE | MRH TRANSPORT | MRHH TRANSPORT INC | | |
| 763 | 10007631 | TERESCHUK, MYROSLAV | MAXX TRUCKING LLC | MSD TRUCKING CORPORATION | | |
| 764 | 10007648 | SROUJI, NABIL G | | | | |
| 765 | 10007655 | PLASKY, NEIL B | | | | |
| 766 | 10007662 | DELAHOZ, NELSON | | | | |
| 767 | 10007679 | SOTO, NELSON | | | | |
| 768 | 10007686 | SIMIC, NENAD | SHONDEX INC | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 769 | 10007693 | SAHIN, NURI | | | | |
| 770 | 10007709 | BURSAKOVSKIY, OLEKSANDR | | | | |
| 771 | 10007716 | ORTIZ, ORLANDO | | | | |
| 772 | 10007723 | ADELSON, WILLIAM | PARK STREET FULFILLMENT CO INC | | | |
| 773 | 10007730 | ESCHER, PATRICK | | | | |
| 774 | 10007747 | ZIMMERMAN, PAUL | | | | |
| 775 | 10007754 | LAZOROSKI, ZORAN | PELICICA EXPRESS LLC | SUPERIOR DELIVERY SYSTEMS INC | | |
| 776 | 10007761 | KAMINSKI, PETER | | | | |
| 777 | 10007778 | TAPIA JR , RAFAEL N | TAPIA DELIVERY SERVICE CORPORATION | | | |
| 778 | 10007785 | GIACOBBE, RALPH | | | | |
| 779 | 10007792 | PAGLIUCO, RALPH R | | | | |
| 780 | 10007808 | BURNETT, RAY | | | | |
| 781 | 10007815 | PATEL, RITESH | | | | |
| 782 | 10007822 | HARMON, CHARLES D | RITE-WAY TRANSPORTATION INC | | | |
| 783 | 10007839 | ADAMS, ROBERT | | | | |
| 784 | 10007846 | GRASSBERGER, ROBERT | | | | |
| 785 | 10007853 | GROZALIS, ROBERT H | | | | |
| 786 | 10007860 | LEIDER, ROBERT J | | | | |
| 787 | 10007877 | PETERSON, ROBERT | | | | |
| 788 | 10007884 | WOODSON JR , ROBERT W | | | | |
| 789 | 10007891 | PRINCE JR , ROLAND | | | | |
| 790 | 10007907 | GALLEGOS, ROLANDO J | | | | |
| 791 | 10007914 | ROBBINS, RONALD | | | | |
| 792 | 10007921 | WALKER, RUSSELL | | | | |
| 793 | 10007938 | BROWN, SCOTT | STANLEASE INC | | | |
| 794 | 10007945 | HOSEIN, SHAWN | | | | |
| 795 | 10007952 | EATON, SIDNEY | | | | |
| 796 | 10007969 | SIWIELA, PIOTR ARTUR | PIOTR SIWIELA | | | |
| 797 | 10007976 | RIGGINS, STEPHEN | | | | |
| 798 | 10007983 | KINCH, STEVE A | | | | |
| 799 | 10007990 | STOUDT, THOMAS | STOUDT LOGISTICS LLC | | | |
| 800 | 10008003 | RUTLEDGE, TAUHEED | | | | |
| 801 | 10008010 | MIKULSKI, THOMAS C | | | | |
| 802 | 10008027 | CONNORS, THOMAS | | | | |
| 803 | 10008034 | CARHART, THOMAS RUSSELL | | | | |
| 804 | 10008041 | CRUSE, TODD | | | | |
| 805 | 10008058 | SPENCER, TREVOR G | | | | |
| 806 | 10008065 | ODES, UGUR | | | | |
| 807 | 10008072 | SANCHEZ, VICTOR EMILIO | | | | |
| 808 | 10008089 | AFRIYIEKORRIE, VINCENT | KORRIE INTERNATIONAL CORPORATION | | | |
| 809 | 10008096 | CUTRO, VINCENT | VKC TRUCKING INC | | | |
| 810 | 10008102 | PEARSON, WAYNE C | CHARBAM, INC | | | |
| 811 | 10008119 | HALDANE, WILLIAM D | | | | |
| 812 | 10008126 | DELLO, WILLIAM | DELLO DELIVERY INC | | | |
| 813 | 10008133 | DICKSON, WILLIAM | | | | |
| 814 | 10008140 | REAGAN, WILLIAM | | | | |
| 815 | 10008157 | ROSATI, WILLIAM | | | | |
| 816 | 10008164 | VAZQUEZ, WILLIAM | | | | |
| 817 | 10008171 | KANSAY, YUSUF HIKMET | | | | |
| 818 | 10008188 | SALGADO, CARLOS | C A  SALGADO DELIVERY SVC INC | | | |
| 819 | 10008195 | DELROSSO, LOUIS | C A L  SERVICES INC | | | |
| 820 | 10008201 | DELACRUZ, CESAR | C J R  EXPRESS INC | SENTINELS EXPRESS INC | | |
| 821 | 10008218 | DELACRUZ, CESAR | C J R  EXPRESS INC | SENTINELS EXPRESS INC | | |
| 822 | 10008225 | OWEN, CHRISTOPHER J | WOODSHER INC | | | |
| 823 | 10008232 | ARCINIEGAS, JEIMMY | COLPER INC | CJ & J SERVICE INC | | |
| 824 | 10008249 | CONTRERAS, RAMIRO | CONTRERAS INC | | | |
| 825 | 10008256 | DELILLO, CRAIG | NIKA TRUCKING CORP | DELILLO TRUCKING LLC | C  DELILLO TRUCKING CORP | |
| 826 | 10008263 | PENICARO, DAVID | D A  PENICARO LLC | | | |
| 827 | 10008270 | TRAJANOSKI, DANNY | KOJNE TRUCKING INC | TRAJANOSKI TRUCKING INC | | |
| 828 | 10008287 | CASTRO, JOSEPH | J-N-M TRKG & TRANSPORTATION IN | DNJ TRUCKING | | |
| 829 | 10008294 | DOLEGA, MARCIN | DOL-MAR TRUCKING CO | | | |
| 830 | 10008300 | DASILVA, ENEAS | ENEAS LOPES DA SILVA INC | | | |
| 831 | 10008317 | CORTEZ, ENRIQUE F | JOCELYN CORTEZ INC | | | |
| 832 | 10008324 | LAMBERT JR , MYLES J | | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 833 | 10008331 | TORRES, JOSE L | FATHER & SON CORP | TORRFEX INC | | |
| 834 | 10008348 | CARRERA, GERARDO | J A  CARRERA SERVICES INC | | | |
| 835 | 10008355 | GRUJIC, LAZAR | GRUJIC TRUCKING LLC | GRUJIC TRUCKING | SIRMIUM CORP | |
| 836 | 10008362 | COACHMAN, IRWIN G | I  COACHMAN INC | 744 STONE STREET, INC | | |
| 837 | 10008379 | JARVIE, JOHN SCOTT | JARVIE CORPORATION | JARVIE CORPORATION INC | | |
| 838 | 10008386 | ROBINSON, JERRY | JERVON CORP | | | |
| 839 | 10008393 | SULZER, JERRY | JM TRUCKING & SONS LLC | M J  & SONS TRUCKING, INC | | |
| 840 | 10008409 | OSORIO, JOSE MANUEL | JOSE M OSORIO INC | V AND J'S TRUCKING INCORPORATED | | |
| 841 | 10008416 | TORRES, JUAN | LAD TRANS | JR TRANSPORT | JEMA TRANSPORT CORPORATION | |
| 842 | 10008423 | CARTER, WILLIAM | K B  CARTER INC | | | |
| 843 | 10008430 | DEPAULI, KEVIN | KDV ENTERPRISES INC | | | |
| 844 | 10008447 | SCHMIDT, LOUIS | LK TRANSPORTATION INC | LINCART TRUCKING LLC | CARTLIN TRUCKING, INC | |
| 845 | 10008454 | SCHMIDT, LOUIS | LK TRANSPORTATION INC | LINCART TRUCKING LLC | CARTLIN TRUCKING, INC | |
| 846 | 10008461 | ABUHAMDA, LUFTI | LUTFI & ASSOCIATES CORP | LUTFI EXPRESS LLC | | |
| 847 | 10008478 | CARTER, LUIS A | LUIS A CARTER INC | | | |
| 848 | 10008485 | DASILVA, MARCEL | M X SILVA SERVICE | | | |
| 849 | 10008492 | JOSEPIN, MARCO A | MARLO INC | | | |
| 850 | 10008508 | THOMAS, MARLON O | THOMAS, MARLON O | MARPAL DELIVERY SERVICE INC | | |
| 851 | 10008515 | ROCCO, ANTHONY M | | | | |
| 852 | 10008522 | AYDOGAN, MEHMET | | | | |
| 853 | 10008539 | SIVRI, MELEN | SIVRI CORP | | | |
| 854 | 10008546 | STARKS, MICHAEL | MS TRUCKING LLC | | | |
| 855 | 10008553 | CIARDIELLO, NICHOLAS | N C TRUCKING INC | NC ENTERPRISES INC | | |
| 856 | 10008560 | GOBIN, NIZAMUDEEN | Z'S COURIER SERVICE INC | | | |
| 857 | 10008577 | GREENE, MIKE | AT LAST DELIVERY SERVICE INC | | | |
| 858 | 10008584 | GREENE, MIKE | AT LAST DELIVERY SERVICE INC | | | |
| 859 | 10008591 | MORGAN, PETER S | PETER MORGAN INC | | | |
| 860 | 10008607 | AGUILOPERALTA, RAMON | AGUILO TRUCKING INC | | | |
| 861 | 10008614 | CIARDIELLO, ROBERT | BAL SERVICES INC | | | |
| 862 | 10008621 | RIVITZ, MICHAEL I | R I NO 2 CORPORATION | R I  NO  2 CORPORATION | R I  NO  2 CORPORATION | |
| 863 | 10008638 | KONOP, RICHARD | R K  HOLDINGS INC | | | |
| 864 | 10008645 | KUGELMAN, ROBERT SCOTT | ROBERT S  KUGELMAN INC | | | |
| 865 | 10008652 | TRBOVICH, RUDY | SILK CITY ENTERPRISES INC | | | |
| 866 | 10008669 | HAQ, SAER S | SAER XPRESS LIMITED LIABILITY | | | |
| 867 | 10008676 | ROBLES JR , ISAURO J | BLACK MADONNA INC | | | |
| 868 | 10008683 | RAVEL, STEPHEN P | STEPHEN P  RAVEL CORP | | | |
| 869 | 10008690 | BASKERVILLE, TARIQ | TARIQ BASKERVILLE INC | | | |
| 870 | 10008706 | BABBS, TERRY | TERRY TRANSPORTATION | | | |
| 871 | 10008713 | MEYER, WILLIAM J | JENALI INC | WILLIAM MEYER LLC | | |
| 872 | 10008720 | SURIEL, GABRIEL | | | | |
| 873 | 10008737 | GARCIA, ADALBERTO | | | | |
| 874 | 10008744 | PLUMMER, GARY | | | | |
| 875 | 10008751 | MENDEZ, VICTOR O | | | | |
| 876 | 10008768 | KIRCHHOFER, ROBERT | | | | |
| 877 | 10008775 | RODRIGUEZ, CARMEN | CARMEN AND LOVEN CORP | | | |
| 878 | 10008782 | GEPHART, JOEL | EASTERN GRANITE INC | JAGCOR LLC | | |
| 879 | 10008799 | MAHAND, CHAD WESLEY | HANDCO INCORPORATED | | | |
| 880 | 10008805 | MAHAND, CHAD WESLEY | HANDCO INCORPORATED | | | |
| 881 | 10008812 | NERIS, JEFFREY | NERIS LOGISTICS INC | | | |
| 882 | 10008829 | AUSTIN, WESTON RICARDO GUNN | | | | |
| 883 | 10008836 | QUINN, DOROTHY A | | | | |
| 884 | 10008843 | VASQUEZ, RENE | RAN TRUCKING INC | | | |
| 885 | 10008850 | LITARDO, ALFREDO | | | | |
| 886 | 10008867 | ARCHER, DANIEL | | | | |
| 887 | 10008874 | RODRIGUEZ, CARMEN | CARMEN AND LOVEN CORP | | | |
| 888 | 10008881 | FERRAU, ANTHONY | | | | |
| 889 | 10008898 | KROMER, BLAKE | | | | |
| 890 | 10008904 | LLOYD, EVERAL | GARDEN STATE COURIER INC | GARDEN STATE DEL  & LOGISTICS | | |
| 891 | 10008911 | PASSALACQUA, ROBERTO | | | | |
| 892 | 10008928 | CATALANO, GIACOMO | AGMC ENT | AGMC ENTERPRISES | | |
| 893 | 10008935 | SCHMIDT, THOMAS S | T S S TRUCKING, INC | | | |
| 894 | 10008942 | SCHNEIDER, WILLIAM J | | | | |
| 895 | 10008959 | SANCHEZ, CARLOS F | WHITE ISLAND INC | | | |
| 896 | 10008966 | WITHEROW, THOMAS E | | | | |

| Count | Main_RustID | Contractor Name | Company Name 1 | Company Name 2 | Company Name 3 | Company Name 4 |
|---|---|---|---|---|---|---|
| 897 | 10008973 | LAWRENCE, DAMION M | AMAI & SON LLC | | | |
| 898 | 10008980 | ROTH, BENNETT | | | | |
| 899 | 10008997 | HERNANDEZ, DAVID S | | | | |
| 900 | 10009000 | MILLER, GARY J | | | | |
| 901 | 10009017 | ROCHA, ROBERTO | | | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| IN RE: FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION (MDL 1700) | ) ) ) ) | CAUSE NOS. 3:05-MD-527 RLM |
| *This Document Relates to:* TOFAUTE ET AL. V. FEDEX GROUND PACKAGE SYSTEMS, INC. | ) ) ) ) ) | CAUSE NO. 3:05-CV-595 RLM |

OPINION AND ORDER

I recently approved the final settlement agreements in this class action and eighteen others, all consolidated in an MDL that's now twelve years old, all resolving claims related to whether FedEx Ground truck drivers were employees or independent contractors. I also granted in part the class counsel's fee requests in each.[1] Counsel for the objecting class representatives in *Tofaute*, the New Jersey class action, now ask for fees and costs. Fed. R. Civ. P. 23(h).

If the named plaintiffs in a typical class action are mere "pawns" or "paws" of the class lawyers, Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co., 834 F.2d 677, 681 (7th Cir. 1987); In re Trans Union Corp. Privacy Litig., 629 F.3d 741, 744 (7th Cir. 2011), then this class action is far from typical. After I granted preliminary approval of the New Jersey action's settlement agreement, the seven class representatives retained counsel to fight against final approval and class counsel's fee petition.

---

[1] The motions for final approval of the settlement agreement and attorney fees in the Kansas class action, Craig v. FedEx Ground Package Systems, Inc., 3:05-cv-530, are still pending.

I. Background

This opinion starts with an overview of the class representatives' litigation leading up to my order approving the settlement agreement and granting in part the class counsel's fee request. An overview of the history of the class action and this MDL can be found in that order. [Doc. No. 257]; <u>Tofaute v. FedEx Ground Package Sys., Inc.</u>, No. 3:05-cv-595, 2017 WL 1716276, at *1-4 (N.D. Ind. Apr. 28, 2017).

After preliminary approval of the settlement agreement between class counsel and FedEx Ground, all seven class representatives retained Nagel Rice LLP and DiSabato & Bouckenooghe LLC to object to the fairness of the agreement. The grounds for their objections were that class counsel undervalued the drivers' claims under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 *et seq.*, when it settled those claims for nothing, and under the remaining claims when class counsel settled them for about 55 percent of class counsel's estimate of their potential value.

Fairness hearings on the settlement agreements resolving all twenty cases in the MDL were scheduled for January 23 and 24, 2017. The court was to hold a meeting on January 17 to discuss the format for the upcoming fairness hearings. Before the January 17 meeting, the class representatives found an error in the notice to class members as to the average amount of recovery under the settlement agreement[2] and as to whether the class representatives approved

---

[2] The notice stated that the average recovery for the New Jersey class was $71,194 when, in fact, it was $19,301. This was a clerical error. $71,194 was actually the maximum amount a class member would recover. The notice correctly stated the recipient's estimated settlement payment.

the settlement. They asked that new notice be issued showing the corrected average recovery amount and explaining that the class representatives don't approve of the settlement. They also asked that the fairness hearings be adjourned.

The class representatives then asked to be allowed to appear at the upcoming organizational meeting, which I granted. They reiterated the problems with notice and also indicated that they intend to challenge the underlying validity of a settlement agreement that isn't approved by any of the class representatives. For reasons unrelated to the notice issue, I decided that the fairness hearings would need to be postponed. At the request of class counsel and FedEx Ground, I rescheduled the hearings for March 13 and 14, 2017. Given the additional time before the fairness hearings, the class representatives sent another request to the court to order a revised notice.

Before ruling on the class representatives' re-notice requests, class counsel and FedEx Ground stipulated that they would re-notice the class. Their proposed notice said that this notice was amended to correct certain errors, which would appear in boldface throughout the notice. It updated the fairness hearing date, the average settlement figure, and sentences about who supported the agreement to say that the class representatives didn't support it. It also included an extended objection deadline.

Class counsel and FedEx Ground said they didn't believe the errors in the first notice were material, but that they were willing to re-notice the class out of "an abundance of caution," and "to eliminate any possible doubt as to whether

the Class had sufficient information." The class representatives asked for the new notice to mention several more times that the class representatives don't agree with the settlement and that they've hired their own counsel to pursue their objections. I found the stipulated re-notice to be sufficient and the class representatives' proposed additions to be overkill that could confuse more than educate. I ordered the re-notice according to the stipulation, extended the objection deadline, and gave the class representatives time to argue about the validity of a settlement agreement that all class representatives oppose. [MDL Doc. No. 2979]. About a week later, the class representatives filed a letter saying that the class action website still contained the old and inaccurate information from the initial notice. Class counsel promptly updated the website.

Next, the class representatives submitted a brief explaining that they had asked class counsel for documents relating to the mediation and for the opportunity to depose class counsel, but that class counsel never responded. They argued that class counsel, as the class representatives' lawyers until the class representatives obtained outside counsel, must give the class representatives access to their file. They also sought discovery. They then sent another letter to the court requesting discovery to aid their argument that the parties never reached a valid settlement.

By this time, it became known to class counsel that the class representatives were organizing an objection campaign amongst the class members. The class representatives sent out letters to class members explaining the error in the initial notice and that they believe the case to be worth more

than the amount for which it was settled. Attached to the letters were forms the recipients could fill out and send back to the court to register their objections. The forms said that the signatory objects to an average settlement amount that's lower than originally noticed, and that if the class representatives don't agree with the settlement, the signatory won't agree either.

Class counsel asked me to issue a corrective notice to class members who might have received the communication, to enjoin the class representatives from circulating the form, and to order the class representatives to show cause why they shouldn't have to pay for the corrective notice. I held that the class representatives have the right to drum up objections from their peers as long as they don't misinform them, and so I denied class counsel's request. [MDL Doc. No. 3001].

While awaiting my opinion on the emergency injunction, the class representatives filed their brief addressing the facial validity of the settlement agreement. They argued that during settlement negotiations, class counsel didn't discuss a proposed settlement with the class representatives that involved fee-shifting. They argued that this failure, combined with the class representatives' unanimous opposition and class counsel's alleged undervaluing of the claims, makes the settlement invalid on its face. I rejected these arguments. Even though the class representatives' opposition and class counsel's settling one of the claims for nothing raise red flags for fairness review, *see* Eubank v. Pella Corp., 753 F.3d 718, 721 (7th Cir. 2014), none of these is sufficient to knock out a settlement agreement before fairness review. I also denied the class

representatives' request for discovery because they didn't lay a foundation of collusion or self-dealing that justified prying open the settlement process. [MDL Doc. No. 3004]. And so we marched on toward the fairness hearings.

On the last day of the newly-extended objection period, the class representatives filed a brief opposing class counsel's request for fees of thirty percent of the class's $25.5 million recovery. First, they argued that all twenty of the cases in the MDL should be treated as a single "megafund" that, because of its enormity and the overlap in work across state class actions, merits a reduced percentage recovery for class counsel. In the alternative, they recommended a "sliding scale" for recovery. They also sought a lodestar cross-check to make sure the fees are reasonable and to prevent class counsel from recovering multiple times for work performed in other class actions in the MDL.

In the meantime, the court received objections from 43 other class members who filled out the objection form that the class representatives circulated.[3]

The class representatives' counsel appeared at the fairness hearing on the New Jersey class action on March 14, 2017. I gave all sides opportunity to argue over whether class counsel and FedEx Ground reached a fair compromise of the New Jersey class's claims, and whether class counsel sought a reasonable fee

---

[3] Months earlier, the court also received an unrelated objection from George Ponzoni, who wasn't represented, and whose objection I addressed and overruled in the order approving the final settlement agreement. [Doc. No. 257]; Tofaute v. FedEx Ground Package Sys., Inc., No. 3:05-cv-595, 2017 WL 1716276, at *8 (N.D. Ind. Apr. 28, 2017).

award. About six weeks later, I approved the final settlement agreement and awarded almost all of class counsel's requested fee.[4]

The class representatives' counsel now asks for $388,006 in attorney fees and $7,836.13 in costs for their work on this litigation, to be paid from fees otherwise designated for class counsel.

## II. STANDARD OF REVIEW

"[O]bjectors play an essential role in judicial review of proposed [class action] settlements" because they guard against collusive deals between class counsel and defendants. Pearson v. NBTY, Inc., 772 F.3d 778, 787 (7th Cir. 2014). Class counsel "may be willing to settle for less for the class if the defendants will help them obtain a generous fee award, and the defendants will be happy to help them if the sum of the fee award and the relief granted to the class is smaller than it would be if the class lawyers pressed for more generous relief for the class." In re Trans Union Corp. Privacy Litig., 629 F.3d 741, 743 (7th Cir. 2011) (italics omitted). "It is desirable to have as broad a range of participants in the fairness hearings as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally." Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 288 (7th Cir. 2002).

Rule 23(h) allows for objectors' counsel "who contribute materially to the proceeding to obtain a fee." Id. at 288; Fed. R. Civ. P. 23(h). To contribute

---

[4] I reduced the fee slightly only because I deducted administrative costs before deriving the final fee amount. See Redman v. RadioShack Corp., 768 F.3d 622, 630 (7th Cir. 2014). This wasn't done at the request of the class representatives or any other party.

materially, "the objectors [must] produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class." *Id.* at 286. While settling class counsel has incentive to undervalue a claim, objectors can be "motivated to exaggerate the value of the claim . . . so that they could get a generous award of attorneys' fees." <u>Mirfasihi v. Fleet Mortg. Corp.</u>, 551 F.3d 682, 687 (7th Cir. 2008).

Just as class counsel acts on a contingency basis, so too do the objectors. If their work doesn't benefit the class enough to justify paying them, they lose the gamble and don't get paid. "A proper attorneys' fee award is based on success obtained *and* expense (including opportunity cost of time) incurred." *Id.*

## III. DISCUSSION

The benefit the objecting class representatives produced for the class was a modest one. They caught the errors in the notice, which understated the class members' average recovery and indicated that the class representatives supported the deal. Through their litigation of this issue, the class (or at least those members who read the notice) became better informed as to how their fellow drivers would be compensated and the strength of opposition to the deal.

Class counsel argues that the class representatives shouldn't be credited for the re-notice. They say that they stipulated to re-noticing the class without a court order and that they weren't obligated to re-notice because the estimated recovery for each class member was correct in the original notice. Regardless of whether the updated notice was required or only done out of "an abundance of

caution," the new notice helped provide class members with information that could assist them in deciding whether or how to object. The settlements in this class action, averaging $19,301 per member, were large enough that this information could have swayed members to retain counsel to handle their objections. Class counsel also caught similar errors on the class action website.

But there's no other area where the class representatives' litigation could be considered a "success" in that it actually resulted in an improvement for the class. The class representatives' argument that the settlement agreement was facially invalid because all class representatives opposed it and because it settled one of the claims for no value had little basis in law and just reiterated arguments that came out in assessing the settlement's fairness. Their requests for discovery didn't provide a foundation for collusion that the law required. I refused to prohibit the class representatives from circulating fliers to other class members to encourage them to object, but the objections the class representatives elicited didn't bring out any new issues or reasons for disapproval.[5]

As to the fairness of the settlement agreement, after I evaluated the class's claims under the New Jersey Consumer Fraud Act, I concluded that class counsel was perfectly reasonable in treating the likelihood of success on those claims as negligible and settling them for nothing. A settlement on the remaining claims at fifty-five percent of their maximum expected return, given the likelihood

---

[5] It was also never explained how involved the class representatives' attorneys were in the objection campaign. Because the attorneys never took credit for the campaign, even if the campaign resulted in stronger arguments for disapproval, the attorneys wouldn't have deserved compensation for it.

of further deductions as well as the added time and expense of continuing to litigate, also seemed perfectly reasonable. In evaluating class counsel's fee request, I determined that a thirty percent award seemed a good approximation of what class counsel could have negotiated with the plaintiffs *ex ante*, and so I approved that too.

The class representatives argue that the settlement doesn't have to be improved to qualify for fees if "[t]he objections to the settlement caused th[e] Court to spend even more hours in analyzing and assessing the complex settlement agreement, and cast in sharp focus the question of the fairness and adequacy of the settlement to all the members of the class." <u>Frankenstein v. McCrory Corp.</u>, 425 F. Supp. 762, 767 (S.D.N.Y. 1977). They argue that even if objections don't improve the terms of the settlement, objectors should be paid if "their efforts have been of assistance to the court." <u>Howes v. Atkins</u>, 668 F. Supp. 1021, 1027 (E.D. Ky. 1987); <u>In re Domestic Air Transp. Antitrust Litig.</u>, 148 F.R.D. 297, 358 (N.D. Ga. 1993) ("If objectors' appearance sharpens the issues and debate on the fairness of the settlement, their performance of the role of devil's advocate warrants a fee award.").

Regardless of whether the objectors assisted the court through added debate alone, this isn't the law in our circuit. To get paid, the objectors must "produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class." <u>Reynolds v. Beneficial Nat'l Bank</u>, 288 F.3d 277, 288 (7th Cir. 2002). "A proper attorneys' fee award is based on success obtained *and* expense (including opportunity cost of

time) incurred." Mirfasihi v. Fleet Mortg. Corp., 551 F.3d 682, 687 (7th Cir. 2008). Without tangible benefit to the class, there's no basis for a fee award.

The class representatives rely on a case from a sister district, *Great Neck Capital Appreciation Investment Partnership, L.P. v. PricewaterhouseCoopers, L.L.P.* for the proposition that "enhanc[ing] the adversarial process by generating debate about issues relating to the proposed settlement" merits fees. 212 F.R.D. 400, 412 (E.D. Wis. 2002). The critical distinction in *Great Neck Capital* is that the objector there did much more than just get the court to write a more elaborate opinion. The objector's litigation resulted in a renegotiated settlement agreement that preserved the class's ERISA claims, which the original agreement would have released. The objector merited fees because she "contributed materially to the proceeding *both* by benefitting a given group of litigants and the class a whole, and also by assisting the court and enhancing the adversarial process." *Id.* at 413. In contrast, these class representatives certainly made the fairness hearings more adversarial, but their arguments ultimately held no water, which provided no benefit to the class.

Not only did the settlement agreement and the attorney fee award remain unchanged as a result of the class representatives' litigation, but some of the objectors' tactics were vexatious. First, the class representatives' arguments often ran counter to binding precedent. Rather than discard those arguments or at least acknowledge the inconsistency, they selectively quoted, conveniently ignoring the language that outright contradicted them.

The most glaring example of this was in the class representatives' brief opposing the class counsel's fee request. Their primary argument was that all cases in the MDL should be treated as a single "megafund." Because of the sheer size of the total MDL settlements, they argued, the attorneys should receive a lower percentage award than they would for smaller recoveries. The class representatives cited a portion of binding case-law that could arguably allow for this proposition. *See* In re Synthroid Mktg. Litig., 264 F.3d 712, 718 (7th Cir. 2001) ("[W]hen deciding on appropriate fee levels in common-fund cases, court must do their best to award counsel the market price for legal services . . . ."). But they omitted the sentence from that same paragraph explicitly rejecting what they asked the court to do. *Id.* ("We have never suggested that a 'megafund rule' trumps these market rates . . . ."), *quoted in* Tofaute v. FedEx Ground Package Sys., Inc., No. 3:05-cv-595, 2017 WL 1716276, at *11 (N.D. Ind. Apr. 28, 2017). This didn't "enhance the adversarial process." Rather, it only "compelled [the court] to expend time and energy addressing an argument that [the objectors] should not have made and that did not benefit the class." Gehrich v. Chase Bank USA, N.A., 12 C 5510, 2016 WL 3027831, at *5 (N.D. Ill. May 27, 2016).

Second, I was disappointed with the objectors' accusations that class counsel and FedEx Ground colluded in this case on a total payout for the entire MDL, regardless of the strength of the individual state-law claims. [Doc. No. 257]; Tofaute v. FedEx Ground Package Sys., Inc., No. 3:05-cv-595, 2017 WL 1716276, at *13-14 (N.D. Ind. Apr. 28, 2017). Their language of "sleight of hand" and "efforts to misdirect this Court" wasn't grounded in evidence, and "it doesn't

persuade, it doesn't add credibility to the rest of the argument, and it serves to reduce even further the esteem with which [the] public sees the legal profession." *Id.*

The law abounds with examples of class counsel, in exchange for fast or fat attorney fees, selling out a class whose claims are worth more, and whose interests are too diffuse to monitor their attorneys' performance. *See, e.g.*, Eubank v. Pella Corp., 753 F.3d 718 (7th Cir. 2014); Synfuel Techs., Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 652-654 (7th Cir. 2006); Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir. 2004). But I had no reason to think this was such a case. The objectors offered no foundation for collusion when they sought discovery into the settlement process. [MDL Doc. No. 3004]; Tofaute v. FedEx Ground Package Sys., Inc., No. 3:05-cv-595, 2017 WL 632119, at *3 (N.D. Ind. Feb. 14, 2017) (quoting Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi., 834 F.2d 677, 684 (7th Cir. 1987)). Class and co-lead counsel worked on these cases for more than a decade, litigating them past my grants of summary judgment on to our court of appeals, to the Kansas Supreme Court, and then to intensive negotiations based on calculated assessments of the strengths of the various state-law claims. The payoff for the lawyers was undoubtedly large. But that doesn't indicate collusion, and that doesn't indicate a fee different from what an *ex ante* bargain likely would have produced.

Where objectors' benefits to the class are meager and their litigation tactics are misleading or needlessly accusatory, I find little basis for a fee award. *See* Mirfasihi v. Fleet Mortg. Corp., 551 F.3d 682, 688 (7th Cir. 2008) ("The

improvement that the objectors produced in this case, minus the detriment caused by their courtroom antics, barely justified the modest fee that the judge awarded them."). The class representatives improved the notice to the class about the average fee award and the class representatives' opposition to the settlement. But this benefit was modest at best. The new notice resulted in more objections, but no better bases for objection. It resulted in no change to the settlement agreement or to class counsel's fee award. The modest benefit to the class was far outweighed by the resources spent litigating points of law that were contrary to precedent, and accusations that undermined faith in the proceedings. I don't find a fee to be warranted here.

## IV. CONCLUSION

Based on the foregoing, the class representatives' motion for attorney fees and costs [Doc. No. 259] is DENIED.

SO ORDERED.

ENTERED:  June 12, 2017

 /s/ Robert L. Miller, Jr.
Judge
United States District Court

14

No. 17-2400

---

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

---

**In re FEDEX GROUND PACKAGE SYSTEM, INC.,
EMPLOYMENT PRACTICES LITIGATION**

**THIS DOCUMENT RELATES TO:**
**Michael Tofaute, et al. v. FedEx Ground
Package System, Inc.**

---

On Appeal from the United States District Court for
the Northern District of Indiana
Civil No. 3:05-cv-00595-RLM-CAN (NJ)
The Honorable Judge Robert L. Miller Jr.

---

**APPENDIX**

---

**DiSABATO & BOUCKENOOGHE LLC**
David J. DiSabato, Esq.
Lisa R. Bouckenooghe, Esq.
4 Hilltop Road
Mendham, New Jersey 07945
Tel.: 973-813-2525
Fax: 973-900-8445
ddisabato@disabatolaw.com
lbouckenooghe@disabatolaw.com

**NAGEL RICE LLP**
Greg M. Kohn, Esq.
103 Eisenhower Parkway
Roseland, New Jersey 07068
Tel.: 973-618-0400
Fax: 973-618-9194
gkohn@nagelrice.com

*Attorneys for Appellants - Objectors/New Jersey Class Representatives*

## INDEX TO APPENDIX

Transcript of Oral Argument held on March 14, 2017.....A-0073-172

# <u>APPENDIX</u>

## INDEX TO APPENDIX

Transcript of Oral Argument held on March 14, 2017.....A-0073-172

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF INDIANA
 2                         SOUTH BEND DIVISION

 3    IN RE:   FEDEX GROUND PACKAGE
      SYSTEM, INC., EMPLOYMENT PRACTICES   CAUSE NUMBER
 4    LITIGATION                           3:05MD00527 (MDL 1700)

 5
                      excerpt TRANSCRIPT OF PROCEEDINGS
 6                           MARCH 14, 2017
                 BEFORE THE HONORABLE ROBERT L. MILLER, JR.
 7

 8    APPEARANCES:

 9    For Plaintiffs:        MR. ROBERT HARWOOD
                             MR. MATTHEW HOUSTON
10                           MS. SUSAN ELLINGSTAD
                             MS. BETH ROSS
11                           MR. GORDON RUDD
      For NJ Plaintiffs:     MR. GREG M. KOHN
12                           MS. LISA R. BOUCKENOOGHE
                             (See docket for addresses)
13

14    For the Defendant:     MS. ALISON FOX
                             MR. BENJAMIN FERRON
15                           MR. JIM ENGLISH
                             MR. JASON NORRIS
16                           MR. JOSEPH MILCOFF
                             MR. SCOTT VOELZ
17                           (See docket for address)

18

19                           DEBRA J. BONK
          Federal Certified Realtime and Registered Merit Reporter
20                       United States District Court
                      204 South Main Street - Room 323
21                        South Bend, Indiana 46601
                        debra_bonk@innd.uscourts.gov
22                            574-246-8039

23

24    Proceedings reported in machine shorthand.  Transcript
      produced by Computer-Aided Transcription - ECLIPSE
25
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1                                    ***

2

3

4

5

6          **THE COURT:**  Well, we're about 40 minutes early for

7   New Jersey.

8          Do you have people who are going to be on the phone

9   listening in or are you folks all ready to roll?

10         **MR. KOHN:**  We're ready to roll, Your Honor.

11         **THE COURT:**  Okay.  Are you folks ready to roll?

12         **MR. KOHN:**  Your Honor, we've got to plug in a

13  computer there.

14         Should we do that now before we get started?

15         **THE COURT:**  Yeah, why don't we take a break and let

16  you do that.

17         **MR. KOHN:**  I think FedEx will be nice enough to let

18  us use a spot over there.

19         **THE COURT:**  Okay.  We'll take a break to let you set

20  up your presentation.

21         **MS. ROSS:**  Do we have time for the restroom?

22         **THE COURT:**  I'm sorry?

23         **MS. ROSS:**  Time for the restroom?

24         **THE COURT:**  Oh, yes.

25         We'll plan to start, say, at five after 10:00.  Let

1    us know if you need more time than that to set up the

2    equipment.

3          **MR. KOHN:**  Thank you, Your Honor.

4          **(Short recess taken.)**

5          **MS. ROSS:**  Your Honor.

6          **THE COURT:**  Yes.

7          **MS. ROSS:**  Just whenever you're ready.

8          **THE COURT:**  Okay.  This is the final one of these

9    hearings.  This is the New Jersey case, **Tofaute**, I'm told, or

10   **Tofaute**, our Cause is 05CV495, and, here, we have, roughly, 44

11   objections.

12          What I would propose to do, in the way of proceeding,

13   is a little different than what we've done on the first 14.

14   Obviously, I'd invite co-lead counsel to lead off because the

15   burden, as far as fairness and the fee petition, rests on the

16   class counsel; then invite the objectors to present; then turn

17   to FedEx Ground to see if you have anything to add; then turn

18   it back -- and since the objectors carry a burden on the

19   discovery request and, I think, an effective burden on the

20   megafund issue, will give both class counsel the chance to

21   speak after FedEx does and then the objectors the chance to

22   speak after class counsel does.  So, I think, that way,

23   everybody who has a burden gets a chance to speak twice and

24   comment on what went before.

25          So, Ms. Ross, you may lead off.

1          **MS. ROSS:**  Okay.  Just as a matter of housekeeping,

2    it appears there's some visuals here that have not been shown

3    to me.  And so if there's going to be any kind of visual

4    presentation, we would like to see whatever slides are going to

5    be presented.

6          **THE COURT:**  Well, I think, given what I proposed, you

7    have the right to respond to whatever they do.

8          If there's anything to be shown in the second time up

9    for the objectors that wasn't for the first time, then I would

10   ask that you show that to Ms. Ross, but that decision can be

11   made after FedEx speaks so she'll have a chance to respond to

12   it.

13         **MS. ROSS:**  Okay.  Very good.  Okay.  Thank you, Your

14   Honor.

15         The **Tofaute** case --

16         **THE COURT:**  Oh, I'm sorry.  Wait, wait, wait, wait.

17         Could I ask you folks to state your appearances, for

18   the record?  I know everybody up here.

19         We can hear there, if you just keep your voices up.

20         **MR. KOHN:**  Greg Kohn, from Nagel Rice, on behalf of

21   the seven New Jersey class reps.

22         **THE COURT:**  Okay.

23         **MR. DiSABATO:**  J. David DiSabato, from DiSabato &

24   Bouckenooghe, on behalf of --

25         **THE COURT:**  Mr. DiSabato.

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

```
 1              COURT REPORTER:  I didn't hear that last part.

 2         On behalf of?

 3              MR. DiSABATO:  The seven New Jersey representatives.

 4              MS. BOUCKENOOGHE:  Lisa Bouckenooghe, from DiSabato &

 5    Bouckenooghe, also on behalf of the seven class reps.

 6              THE COURT:  Ms. Bouckenooghe, okay.

 7         Now I think I'm done interrupting.  You may proceed.

 8              MS. ROSS:  Okay.  Thank you, Your Honor.

 9         So we're here, Number 20, to talk about the Tofaute

10    settlement.  The Tofaute case was filed in, I believe, May of

11    2005.  The class period in the case goes back to May 19th,

12    1999, the class cut-off -- the class membership period cut-off

13    in October 15, 2007 when the Court issued its class

14    certification order.

15         There are 889 members of the New Jersey class.  And

16    the case settled, following a long, bruising day of mediation,

17    for $25.5 million on February 1st.  The net settlement fund,

18    after deductions for a 30 percent fee, $105,000 in incentive

19    awards to the seven class representatives, administration costs

20    and so forth, will be $17,430,000.  The average recovery per

21    class member will be $19,301, and the range of recoveries is

22    between 250 and $71,194.

23         The claims in the New Jersey case were threefold.

24    The lead claim and the most valuable of them all was a claim

25    asserted under New Jersey's wage payment law, which, in the
```

1   scheme of state wage deduction statutes, is extremely

2   protective, stronger than most.  It prohibits wage deductions

3   of any kind from employee compensation, unless specifically

4   enumerated in the statute itself, and so that provided the

5   Plaintiffs, in this case, a very strong platform for recovery

6   of the many forms of expenses that were deducted by FedEx from

7   their compensation, including for things like their uniforms;

8   various forms of insurance; in some cases, for fuel; and so on.

9           In Plaintiffs' view, we had -- there was some

10  authority that FedEx relied upon for the proposition that the

11  uniform costs and the vehicle and work accident insurance

12  deductions were permissible under the statute.  And if FedEx

13  had been correct about that, about 60 percent of the damages

14  would have been compromised.  It was our view that we had the

15  better argument and were very likely to defeat that argument,

16  but we appreciated the risk.

17          The value calculated by our expert for the wage

18  payment law claim was $46,733,000, which included the value of

19  the deductions, plus accrued interest -- accrued statutory

20  interest at 2.25 percent going all the way back to 1999.

21          The second statutory claim asserted in the case was

22  asserted under the New Jersey Consumer Fraud Act, and this was

23  a consumer fraud theory not unlike several of the statutes

24  we've talked about in these hearings.  It was premised on

25  allegations that the independent contractor classification was

```
 1   fraudulent and induced the drivers to purchase trucks and

 2   routes and pay certain expenses.  And if that claim were

 3   successful, the damages, we believe, would have been properly

 4   calculated, really, as the difference between what the FedEx

 5   contractors were paid as contractors and what they would have

 6   been paid had they been treated the same as FedEx Express

 7   employee drivers.

 8            The third claim -- set of claims in the case were

 9   common law claims for unjust enrichment and rescission, and

10   those claims were not very different than the common law claims

11   that we've discussed already in these hearings asserted in the

12   other cases.

13            Our view of the New Jersey Consumer Fraud Act

14   throughout the litigation and, certainly, at mediation was that

15   it was a highly risky claim.  It was certainly worth pleading

16   because law evolves over time, and there was -- nobody could

17   have predicted how long this litigation would go on or how the

18   case law, under that statute, would develop.

19            There was older authority going back to the 1980s

20   involving a limousine driver, a limousine company called **Morgan**

21   **versus Air ... Limousine** or something like that that applied

22   the New Jersey Consumer Fraud Act to circumstances analogous to

23   these.

24            But subsequent to the **Morgan** case, the Third Circuit

25   Court of Appeals, a federal court, in a case called
```

Page 134

1    **J & R Ice Cream**, concluded that the New Jersey Consumer Fraud

2    Act did not apply to transactions, other than retail consumer

3    transactions, and did not apply to the sale of a business

4    opportunity such as a franchise or a distributorship.

5            Now, this case was filed in federal court.  And if

6    this case had been remanded back to a New Jersey District

7    Court, as this Court knows better than anyone sitting in this

8    room, no matter what a District Court judge thinks the lawsuit

9    should be, a District Court judge is bound by precedent and

10   especially is bound by the precedent handed down by the Circuit

11   Court of Appeal to which it answers.  And our concern about the

12   New Jersey Consumer Fraud Act claim, of course, was that it

13   would not survive summary judgment under **J & R Ice Cream.**

14           For purposes of mediation, we looked long and hard at

15   the New Jersey Consumer Fraud Act claim.  We talked about how

16   to value it in terms of negotiating a settlement.  And because

17   the damages available under that statute were fully subsumed

18   within the damages available under the very strong wage payment

19   law claim, it was our view -- and that the only difference

20   between the Consumer Fraud Act statute and the wage payment law

21   was the availability of trebling, a statutory penalty for

22   violation of that statute -- and we'll talk about that in a

23   minute -- it was really our view that the Consumer Fraud Act

24   claim didn't add very much value to the case and especially,

25   especially, given our view that our chances of surviving a

1    motion for summary judgment were probably less than one percent

2    and maybe as good as five percent.  That has always been our

3    view.  It never changed.

4         The unjust enrichment damages were calculated by our

5    expert to be in the range around $32,769,000, and that was the

6    value of the single damages that could be recovered under the

7    New Jersey Consumer Fraud Act.

8         The settlement at $25.5 million, which was a heavy

9    lift on both sides, represents 55 percent of the damages, the

10   maximum achievable recovery, in our view, which is comprised of

11   the damages available under the wage payment law, which

12   subsumes within it the single damages under the Consumer Fraud

13   Act and the common law damages.

14        Now, FedEx, in addition to the **J & R Ice Cream**

15   problem that we had in the New Jersey case, raised a number of

16   additional defenses to the claims in the New Jersey case that

17   really only came up in connection with one other case, and that

18   was the New York case which Mr. Harwood talked about a few

19   minutes ago.

20        There was a change in the law, after this Court

21   entered its summary judgment rulings, with respect to how

22   employment status may be proven under the wage payment law and

23   other statutory claims or under other statutes in New Jersey.

24        While, at the time we briefed class certification and

25   summary judgment before this Court, the employment status test

 1   followed by the New Jersey courts was the familiar common law,

 2   multi-factor agency principal test, in a case called **Sleepy's**

 3   **versus Hargrove**, which I'll note was litigated by our

 4   co-counsel, Mr. Marchetti, all the way to the New Jersey

 5   Supreme Court.  The New Jersey Supreme Court concluded that,

 6   actually, the ABC statutory modified test governs these

 7   statutes.

 8        On the one hand, the Plaintiffs in these cases said,

 9   "Hallelujah, Sleepy's.  That's a much easier test to meet."

10        On the other hand, we all looked at each other and

11   said, "Hmm, Judge Miller in the MDL concluded that the ABC

12   statutes -- the cases that arose under the ABC statutes were

13   not amenable to class adjudication."

14        And in every one of those cases -- there were 12 of

15   them, if the Court has forgotten the number -- certification

16   was denied, and so that posed a risk in this case on appeal.

17        Now, remember, the New Jersey case was pending before

18   the Seventh Circuit.  It is still pending before the Seventh

19   Circuit.  And not only was the Plaintiffs' appeal from this

20   Court's order granting summary judgment to FedEx on the

21   employment status issue before the Seventh Circuit, FedEx filed

22   a cross appeal on the class certification in not only this case

23   but every other.

24        So, if this case were litigated all the way to the

25   Seventh Circuit, we would be addressing not only whether this

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

```
 1    Court was correct or not on the independent contractor issue

 2    under the common law test or, under the modified ABC test, the

 3    threshold question to be decided by the Seventh Circuit would

 4    be class certification, and we were very concerned about that.

 5            Now, as luck would have it, Your Honor, on

 6    January 19th, after these mediations commenced, the Seventh

 7    Circuit issued a decision in a case called **Costello versus**

 8    **BeavEx** in which the Seventh Circuit, in a two-to-one ruling,

 9    concluded that certification under the ABC statute in Illinois

10    in an employment misclassification case was properly granted.

11            So, we all breathed a sigh of relief, not only with

12    respect to this case, but also with respect to the New York

13    case.

14            And the Seventh Circuit, at least two of the judges,

15    took a different view than this Court did with regard to

16    whether actual control can be proven on a class-wide basis or

17    not.

18            And, in **Costello**, the Court addressed a second major

19    defense that FedEx was poised to assert in the New Jersey case,

20    and that defense is lovingly referred to by all concerned, the

21    FAAAA defense, which stands for -- somebody jump in and help me

22    out with all the As, but it's the Federal Airline, da, da, da,

23    Regulation Act.  And FAAAA is a federal statute that

24    deregulated the trucking industry.

25            And in a case called **Massachusetts Delivery**
```

1    **Association versus Coakley**, the First Circuit Court of Appeals,

2    in a recent case, concluded that the FAAAA statute preempted

3    the B Prong of the Massachusetts ABC statute.

4        If that ruling were to be applied to the New Jersey

5    case, under the newly adopted ABC test, the New Jersey Consumer

6    Fraud Act claim and the New Jersey wage payment law claim would

7    have been dismissed, and this case would have had -- the only

8    value left in this case would have been the unjust

9    enrichment/rescission claim.

10        As luck would have it, in **Costello v BeavEx**, the

11   Seventh Circuit reached the opposite conclusion on FAAAA

12   preemption.

13        And, of course, we all breathed a sigh of relief and

14   said, "Okay.  We're good."

15        But we didn't breathe a big sigh of relief because,

16   as we all know -- we're all lawyers -- a circuit split on an

17   important issue of federal statutory construction and

18   preemption, particularly in an area of litigation that is hot,

19   like this one, might well result in Supreme Court review, and

20   that's what everybody's thinking.

21        A cert petition was, in fact, filed in **Costello v**

22   **BeavEx**, in July.  And, in October, the Supreme Court requested

23   briefing from, then, the Solicitor General and now the Acting

24   Solicitor General.

25        And we all know that the Supreme Court has eight

```
 1   members, soon to have nine, and that ninth justice is not going

 2   to be appointed by Hillary Clinton, so we are very concerned,

 3   as everyone on the Plaintiffs' side of the V in this case

 4   should be, about the risk posed to this case by the FAAAA

 5   preemption defense.  This is no small matter.

 6         That FAAAA preemption defense factored very strongly

 7   in our analysis of the settlement value of this case, and so

 8   our view that a 55 percent recovery to the Plaintiff class in

 9   the New Jersey case now is a far, far better result than to

10   take the risk of going through the Seventh Circuit appeal,

11   going through litigation, and facing all the other defenses I

12   haven't discussed that were pointed at all of these statutory

13   claims.

14         Proof of fraud is no small thing, even if we had

15   gotten past the Seventh Circuit on this Consumer Fraud Act

16   statute.  We felt much better about the wage payment claims.

17   But our damage theory, our damage model, was contested by

18   FedEx.  They had a different damage model.

19         So there was risk all the way around in this case,

20   and so our view that the $25.5 million settlement represents an

21   excellent recovery to the class in this case is indisputable.

22         Now, there are seven objectors, all seven of the

23   named Plaintiffs.  And following the original notice, there was

24   only one other objector, Mr. Ponzoni, and I will incorporate

25   and adopt by reference herein everything Mr. Harwood had to say
```

 1   with respect to Mr. Ponzoni's objections because we have so

 2   much else to talk about this morning.  So that objection should

 3   be overruled for the reasons stated by Mr. Harwood.

 4        With respect to the seven named Plaintiffs, I would

 5   submit, you know, Round One, the **Tofaute** objectors made two

 6   arguments.

 7        They never said a word about our attorneys' fees,

 8   Your Honor, in their original objection, and, of course,

 9   nothing changed.  That motion was filed in September of 2016,

10   so the newly-filed fee objection, really, we think, may have

11   had something to do with this Court's order rejecting their

12   first objection that the signatures of the named Plaintiffs and

13   their belief that they never assented to the settlement was

14   reason enough for this Court to deny approval to it.

15        And, of course, this Court, in its order dated my

16   birthday, February 14th, 2017, at Document 3004, at Page 5,

17   rejected that objection.  The assent of the named Plaintiffs to

18   a settlement that class counsel believe is in the best interest

19   of the class is not a bar to settlement approval.

20        Their second objection, Round One, was that the

21   $25.5 million settlement was not adequate to resolve and

22   release all of the certified claims and, most particularly, the

23   Consumer Fraud Act claim.  Their view, as stated in their

24   papers, was that class counsel left $50 million on the table.

25        Well, we know that that's not their real view,

```
 1    Your Honor, because they filed papers subsequently in which

 2    their clients, candidly, conceded that a $30 million settlement

 3    would have been perfectly acceptable to them and that the

 4    dispute here concerns -- that the objection to the settlement

 5    concerns the agreement at 25.5, instead of at 30, a difference

 6    of $4-and-a-half million.

 7            They also claim that we assigned too much risk to the

 8    FAAAA defense because, in their view, a single District Court

 9    in the District of New Jersey agrees, actually, with my

10    position that the FAAAA ought not to preempt these kinds of

11    claims.

12            And as heartened as I am that a District Court judge,

13    in **Echavarria**, ruled as he did -- and I believe his analysis is

14    correct -- the risk posed by the FAAAA to these claims cannot

15    be ignored.  And because our duty is to the class as a whole,

16    we did not ignore it.

17            They also argued that we did not assign enough weight

18    to the change in the law on employment status, that proving

19    these employees were employees would be a lock.

20            Well, we didn't discount in our settlement analysis

21    very heavily for the risk of winning or losing on employment

22    status.  We agree; it would be not difficult to prove.  The

23    discount had to do with class certification, which was a

24    significant risk.  This Court knows that better than anybody

25    else.
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**                                    Page 142

```
 1              I have a lot of other things to say about the

 2     objections, but maybe, because the Court, you know, wished for

 3     the objectors to make their presentation, I'll reserve and

 4     respond to whatever else they have to say, and I'm reserving my

 5     comments on the attorney fee piece, in particular, unless you

 6     want me to make that presentation now.

 7              THE COURT:  No, that's fine.

 8              MS. ROSS:  Okay.  But I'm not waiving it.  I have a

 9     lot of things to say about that, too.

10              THE COURT:  I anticipated you would cover it, at some

11     point.

12              MS. ROSS:  Okay.  Thank you, Your Honor.

13              THE COURT:  Who is speaking for the class reps?

14              (Discussion held out of reporter's hearing.)

15              THE COURT:  Ms. Bouckenooghe.

16              MS. BOUCKENOOGHE:  Good morning, Judge.

17              THE COURT:  Good morning.

18              MS. BOUCKENOOGHE:  I'll be addressing our objection

19     with respect to the fairness of the substance of the

20     settlement.

21              My colleague, Greg Kohn, from Negal Rice, will, at

22     the appropriate time, deal with the objection with respect to

23     the fee application.

24              THE COURT:  I couldn't hear the last part.

25              MS. BOUCKENOOGHE:  My colleage, Greg Kohn, from Nagel
```

1    Rice, will deal with our arguments with respect to the

2    attorneys' fees.

3          **THE COURT:**  Okay.  Thank you.

4          **MS. BOUCKENOOGHE:**  I just wanted to start by saying

5    that I understand that this case has been pending for a long

6    time.  And here we are at a fairness hearing, and I'm sure no

7    one is pleased to see an objection of this nature raised at

8    this time.  But I think it bears reminding and mentioning that

9    we are on the Plaintiffs' side of the V, too.  We represent all

10   seven of the named Plaintiffs in this litigation with respect

11   to their objection to the proposed settlement.  All seven of

12   them have objected to the amount of the settlement,

13   predominately with respect to the undervaluation of the worth

14   of the CFA claim.  They hired us to object to the fairness

15   because they believe each of the 899  New Jersey class members

16   are not getting what they deserve out of this.

17          This isn't your typical objection where the seven are

18   objecting because they are trying to seek a higher service

19   award for themselves or even where they're objecting based on

20   the structure of the settlement payments that are to be

21   distributed.  They've all risked their recovery and their

22   incentive awards because they believe that, as guardians to the

23   New Jersey class, they have a fiduciary duty to ensure that all

24   of their claims are adequately valued in this case.

25          So our objection was based on, fundamentally, three

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS Page 144

1    issues.

2            First, which was already slightly addressed by this

3    Court, we have raised an objection to the idea that the

4    settlement was struck without client authority, and we've

5    presented sworn declarations from Mr. Tofaute and Mr. McMahon

6    with respect to what occurred at the mediation.  Specifically,

7    they objected on the basis that they never assented to settle.

8            Those declarations, and Mr. Tofaute, Mr. McMahon,

9    don't assert that they would happily accept a $30 million

10   settlement.  They specifically stated that they advised their

11   counsel that they would never settle this case at anything

12   below $30 million.  There is a difference there.

13           Now, we understand that class representatives can't

14   veto a settlement, but this is different; this is an instance

15   where a settlement was reached without client authority in the

16   first place, and the fact that all seven of the named

17   Plaintiffs have objected to the settlement needs to be given

18   significant weight by the Court.

19           The second issue with respect to the objection is

20   that the settlement doesn't provide any value for the claims

21   certified by the Court under the New Jersey Consumer Fraud Act.

22           During mediation, co-lead assigned a zero value to

23   the CFA claims.  A claimant in New Jersey would have been the

24   absolute driver of that mediation.

25           The New Jersey CFA has a mandatory treble damages and

1    mandatory attorneys' fee shifting, so a proper valuation of

2    that claim, as we've laid out in our papers, dramatically

3    impacts the outcome of that mediation.  Even with a very

4    conservative view of the likelihood of success under that

5    claim, the settlement value of that claim should have been at

6    least 10 million higher prior to a fee shift.

7          And, third, in addition to the issues under the CFA,

8    under prevailing New Jersey law, the overall value of the

9    settlement is substantially undersold.

10          Co-lead assessed a risk factor of 55 percent to their

11    analysis of the maximum achievable damages.  But, in 2015, the

12    New Jersey Supreme Court adopted the ABC test, **Hargrove v**

13    **Sleepy's**, as Ms. Ross referenced earlier, which we addressed in

14    our papers.

15          But, turning to our first, I guess, point with

16    respect to the objection, all seven court-appointed class

17    representatives have objected to this settlement.

18          This Court recognizes that it's tasked with

19    considering the extent of participation in the settlement

20    negotiations by class representatives --

21          **COURT REPORTER:**  Ma'am, will you slow down, please?

22          **MS. BOUCKENOOGHE:**  Sure.  I'm sorry.

23          **COURT REPORTER:**  "Turning to our first" --

24          **MS. BOUCKENOOGHE:**  -- and examines closely any

25    opposition by class representatives to a proposed settlement.

1          This is not an instance where the seven named

2    Plaintiffs are seeking an increase in their own service awards.

3    They're not holding the settlement hostage for their own gain.

4    They are driven only by their duty to seek the best possible

5    recovery for the class.

6          The cases cited by co-lead, **Kincaid versus General**

7    **Tire and Rubber**, **Parker versus Anderson**, **Lazy Oil versus**

8    **Whitco**, don't stand for the proposition that class counsel can

9    unilaterally create a settlement without client authority.

10    They all only speak to instances where representatives are

11    disrupting a settlement in furtherance of their own interests,

12    and that's not the circumstances that we have here.

13          Settlement of the case, without client authority, is

14    a red flag through the approval process.  Co-leads' briefs and

15    papers all misstate that the settlement was agreed to and

16    assented to by the New Jersey class representatives at the

17    mediation.  We've set forth those specific misrepresentations

18    in our February 3rd proffer.

19          The fact is, Mr. McMahon and Mr. Tofaute did not

20    assent to this settlement at mediation on February 1st.  It's

21    those series of misstatements that we raised by motion with the

22    Court previously and that led to the issuance of a corrected

23    class notice.  As a result of that corrected class notice, 42

24    additional objections have since been filed with respect to the

25    value of the settlement.

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS** 147

```
 1              Now, digging deeper into this red flag --

 2         THE COURT:  Let me back up because I'm not sure I

 3   followed what you said.

 4         MS. BOUCKENOOGHE:  Oh, sure.

 5         THE COURT:  The misrepresentations that I understood

 6   you to be asserting are whether the class reps assented to the

 7   settlement at the time of the negotiation.  Then, I think you

 8   said -- and my hearing isn't what it should be -- that it was

 9   those misrepresentations that led to the amended notice.

10              Did I misunderstand what you said or, if I understood

11   it correctly, how did they lead to that?

12         MS. BOUCKENOOGHE:  One of the misrepresentations that

13   was in the original notice was that the seven named Plaintiffs

14   all assented to the settlement and they all agreed to resolve

15   the case at $25.5 million.  One of the corrections made in the

16   amended notice was that all seven were, in fact, objecting to

17   the settlement and did not agree to the amount.

18              So, as I've said here, the class reps never assented

19   to settle the case -- never assented to this settlement in the

20   first place, and circumstances like that should be given

21   significant weight by the Court.

22              That has been recognized in this Circuit in **Eubank**

23   **versus Pella**, also in **Mandujano versus Basic Vegetable**, and

24   **Pettway versus American Cast Iron Pipe**, all of which have been

25   referenced in our briefing.
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

```
 1              The red flags here are easily spotted.  First, the
 2    New Jersey class representatives did not agree to the
 3    settlement of the New Jersey class, meaning that co-lead did
 4    not have authority to settle the case at mediation.
 5              And, as I'm about to get further into, co-lead also
 6    failed to consider and give adequate weight to the availability
 7    of statutory damages under the Consumer Fraud Act claim.
 8              Further, attorneys' fees are also coming out of the
 9    settlement fund, instead of through a fee-shifting statute,
10    which was available under the Consumer Fraud Act claim.
11              Now, the Court certified the New Jersey Consumer
12    Fraud Act claim, but the proposed settlement does not provide
13    any value for it.
14              The Seventh Circuit, in Eubank, has recognized these
15    factors to be indicative of a settlement that's driven by
16    lawyers at the expense of the class.
17              The most valuable claim for relief in this case is
18    the claim under the New Jersey Consumer Fraud Act, and that has
19    not been provided any value through this settlement.
20              The key, here, is figuring out the correct value that
21    should have been considered at mediation for the Consumer Fraud
22    Act claim.  As I mentioned, the Consumer Fraud Act claim is the
23    strongest piece of any case in New Jersey, particularly when
24    you're talking about settling the case.  This is true because
25    of the mandatory treble damages and the mandatory fee shifting.
```

1              Particularly, the New Jersey Consumer Fraud Act claim

2     is one of the strongest consumer protection acts in the

3     country.  Where you have a CFA claim that wasn't dismissed on a

4     12(b)(6) motion and is certified to a full class, that becomes

5     the most valuable claim you've got and will always drive the

6     settlement discussions.

7              But here we've heard quite a bit about how the CFA

8     claim was given zero value.  Particularly, I think, co-lead

9     certified to that in their joint declaration in support of

10    preliminary approval and reference as much in their papers for

11    preliminary approval in MDL2704 at Page 9 and 10.

12             They've also referenced that Plaintiffs' expert

13    excluded from his analysis damages and statutory penalties for

14    violations of the New Jersey Consumer Fraud Act.  That was in

15    MDL Docket Number 2705 at Paragraph 16.

16             The failure to properly value that CFA claim infected

17    the entire negotiation at --

18             **COURT REPORTER:**  Slow down, please.

19             **MS. BOUCKENOOGHE:**  Still too fast?  I'm sorry.

20             The law is clear, in this Circuit, that a settlement

21    should not be approved under those circumstances.

22             In **Mirfasihi**, the Seventh Circuit reversed the

23    District Court's approval of a class settlement because the

24    analysis did not consider, at a minimum, pertinent consumer

25    protection statutes.  In that case, the Plaintiffs asserted

1    claims under the Massachusetts consumer protection law.  Prior

2    to certification, that case settled.  Over objection, the

3    District Court approved the settlement.  The objectors

4    appealed.  It was reversed.  On remand, the District Court

5    appealed it again -- I'm sorry -- approved it again, and the

6    objectors appealed again.  The objectors argued that the

7    District Court should not have accepted a value of zero for the

8    Massachusetts consumer protection law claims when they had

9    prevailed on two motions to dismiss and found that valuing

10    those claims at zero was improper.

11            Our objection, here, is analogous to that one.  The

12    facts here are even stronger for the New Jersey lead

13    Plaintiffs.

14            Co-lead has assigned a value of zero to the

15    New Jersey Consumer Fraud Act claims, arguing that there is no

16    likelihood of success.  But after all of the years of discovery

17    and litigation in this case, co-lead had, essentially,

18    established all of the elements of a Consumer Fraud Act claim.

19    The class claim was certified.  They've established an unlawful

20    act, causation, and ascertainable loss.  They've stated that

21    they will now value that Consumer Fraud Act claim at

22    $46 million, but then failed to properly attribute a value to

23    it for settlement purposes.

24            In arguing for class certification, co-lead went on

25    at length about the strength and the breadth of the New Jersey

 1    Consumer Fraud Act, the value of those claims, and noticing,

 2    for example, that the CFA or the Consumer Fraud Act has no

 3    reliance element or intent element and provides for mandatory

 4    attorneys' fees and treble damages.

 5          They've also recognized in their class cert motion

 6    that New Jersey applies this statute to allow Consumer Fraud

 7    Act protections to purchasers of business opportunities, which

 8    includes franchises.

 9          The case cited by co-lead as the significant risk

10    factor with respect to the viability of the CFA claim,

11    **J & R Ice Cream**, is distinguishable, in a lot of ways, from the

12    circumstances that we have here, particularly because, in

13    **J & R Ice Cream**, you dealt with two sophisticated businesses

14    that were negotiating amongst each other for the purpose of a

15    business opportunity.

16          That's not what we have here with respect to the

17    claims between Plaintiffs and FedEx.  Here, we are dealing with

18    consumers marketing from FedEx to those consumers for the

19    purchase of a business opportunity.  And New Jersey law is

20    crystal clear that, in those instances, the Consumer Fraud Act

21    will act to apply and protect those purchasers.

22          Co-leads' explanation for attributing zero dollars to

23    the CFA claim is also just that that zero dollars overlaps with

24    other certified claims, but they don't.  I mean, they can't

25    because the actual damages under the CFA are then subject to

 1    trebling and fee shifting.  Not to mention, the CFA claim is

 2    not mutually exclusive from recovery under the wage payment

 3    law.  Recovery under one doesn't exclude recovery under the

 4    other here.

 5         When we talk about maximum achievable damages, we

 6    have to be talking about the maximum recovery the class can

 7    achieve under the New Jersey Consumer Fraud Act, which is not

 8    single damages; it's treble damages.  Treble damaging is

 9    automatic and it's non-discretionary.

10         Now, treble damages here means three times.

11         It's a little muddled how co-lead now arrives at

12    their calculation for the value of the CFA damages claim.

13    After we raised our fairness objection, they provided an

14    after-the-fact analysis of how that claim was valued at.

15         In their joint declaration, at Paragraph 22, MDL

16    Docket Number 2956, co-lead attributes a value of $46,733,000

17    as the actual damages under the CFA.

18         But to calculate the value of that claim, they then

19    take the number 32,769,000, which seems to be the number that

20    Plaintiffs' expert valued for common law claims, and they

21    double that, not triple it, to reach 65 million, so co-lead

22    began with the wrong number, to start, based on their own

23    assertions.  If the CFA was worth 46 million, that's the number

24    that's trebled, not the 32 million.  Then, co-lead doubled that

25    number, rather than tripled it.  Under the CFA, you have to

1    triple treble damages.

2         From there, they attributed a three percent

3    likelihood of success, but only seem to have attributed that to

4    the segmented portion of these doubled damages.  It was then

5    discounted, again, for a 55 percent likelihood of success.

6    This strained approach supports their position that the CFA

7    claim is of negligeable value.

8         But how this should have been calculated was

9    $46 million is the actual damages under the CFA, times three,

10   then apply your risk factors.

11        Under our calculation, as we set forth in our papers,

12   a proper valuation would have resulted in a value of the CFA

13   claim at closer to 20 million to the class.  That's just in

14   damages and for settlement purposes.  That's before we take

15   into account a mandatory fee shift under the CFA.

16        So the proposed settlement is fatally flawed in that

17   it never considered the enormous effect of the CFA's trebling

18   factor and its attorneys' fees in establishing a settlement

19   damage figure.

20        To discount the CFA damages as overlapping and,

21   somehow, subsumed evidences a misunderstanding of how the CFA

22   works and how it might work in conjunction with other claims in

23   this case.  This alone requires that the proposed settlement

24   should be rejected as neither fair nor reasonable.

25        As I've touched upon, something else that's mandatory

1    under the CFA is fee shifting.  Here, the class representatives

2    have submitted sworn declarations stating that co-lead counsel

3    rejected an offer for a fee shifting arrangement, without

4    discussing it first.

5         The fee shifting component under the CFA is also

6    mandatory.  It is not discretionary.  This is significant

7    because, under the current settlement design, the class

8    collectively bears the cost of counsel fees at an ask of 30

9    percent of the total recovery, so the class is paying those

10   fees.  But under a fee shift, the cost of the attorneys' fees

11   wouldn't be taken from the class's recovery.  It would be taken

12   from the Defendant.

13        So, here, the class representatives, David McMahon

14   and Michael Tofaute, who were both present at the February 1,

15   2016 mediation, both submitted sworn declarations stating that

16   counsel outright rejected the very idea of a fee shift during

17   settlement negotiations, during a point at which if it was

18   considered would have yielded a higher recovery for the class.

19        Not only was it not considered, it was not even

20   discussed with them.  This factor can't be ignored because,

21   again, under the Consumer Fraud Act, attorneys' fees are

22   mandatory.

23        Not only that, but there's also no proportionality

24   requirement under the CFA, and what that means is, if your

25   recovery under your CFA claim is even only fractionally

 1    successful, the mandatory attorneys' fee award is still

 2    triggered in full.

 3            The attorneys' fees component should have been

 4    factored into co-leads' calculation when valuing the CFA claim.

 5    It's part of what makes the claim so valuable in New Jersey.

 6    The failure to consider the fee shift demonstrates how the

 7    claim was undervalued for purposes of settlement.  Now it's

 8    being settled and released for zero dollars.

 9            Co-lead stated that they didn't attribute any value

10    to the CFA claim at mediation, but now we are asking -- they

11    are asking this Court to release and extinguish that claim on

12    behalf of 889 members.

13            I know that co-lead has argued that **J & R Ice Cream**

14    diminishes the value of the CFA claim, but it's simply not

15    true.  It wouldn't apply to the New Jersey class's CFA claim

16    for a host of reasons that we've distinguished in our papers.

17    But, as I said, predominately, that is because, in **J & R Ice**

18    **Cream**, you were dealing with two sophisticated businesses.  You

19    were not dealing with instance where you have an entity that is

20    marketing a business opportunity to consumers at large.

21            Specifically, the appellate division has recognized

22    as much and stated:  Notwithstanding our high regard for the

23    Third Circuit, we are unable to agree with its unduly

24    restrictive interpretation of the NJ CFA.  That is not to say

25    that we disagree with the result reached, but that is only

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS

1    because it appears to involve a substantial and complex

2    commercial transaction which likely fell within the Franchise

3    Practices Act.  We cannot endorse **J & R**'s reasoning because

4    that course would deprive citizens of New Jersey of protection

5    under the CFA in pyramid sale schemes and similar mass public

6    frauds.

7         That is the appellate division's ruling in **Kavky**,

8    which we've also referenced in our papers.  It accurately

9    confirms decades of precedent under the New Jersey Consumer

10   Fraud Act.

11        And I would like to just note that, about a month

12   after the February 1, 2016 mediation, local counsel for New

13   Jersey, Mr. Anthony Marchetti, filed a nearly identical

14   consumer fraud class action against FedEx as the one before the

15   Court here.  In that action, the **Caro** Plaintiffs also seek to

16   certify a nearly identical CFA claim to that here.  The

17   difference, largely, seems to be the period of time for which a

18   class would be certified.

19        There, counsel for **Caro**, knowing the facts, the

20   risks, and litigation of this history, of this case,

21   persuasively argued that **J & R Ice Cream** is not controlling and

22   would not apply to the same set of facts.  If the CFA had no

23   value or didn't stand a chance against **J & R Ice Cream**, I'm not

24   sure that Plaintiffs' counsel would have invested so much time

25   and effort in bringing it.

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS                    Page 157

```
 1              And just to address, finally, the risk factors with

 2   respect to **Sleepy's**, the risk factors with respect to the FAAAA

 3   that Beth Ross had raised earlier, those risk factors impact,

 4   as she said, whether or not the wage payment law claim can

 5   contain -- the value of that claim, whether it be would subject

 6   to decertification on appeal.

 7              And even if, worse case scenario, as she described,

 8   under the ABC test, the wage payment claim is decertified,

 9   under the FAAAA, a series of circumstances happen that make the

10   **Echavarria** opinion in the District of New Jersey become bad law

11   and ultimately decertifies the wage payment law, you still have

12   a certified claim under the CFA.

13              I understand that this is settlement and you've got a

14   certain risk factor, but a lot of the risk factors that

15   Ms. Ross addresses address the viability of the wage payment

16   law claim, not the CFA claim.

17              Unless Your Honor has any other questions, I'll turn

18   it over to FedEx.

19              **THE COURT:**  No.  I think I understand your position.

20   Thank you.

21              Mr. Kohn.

22              **MS. ROSS:**  Your Honor, since I didn't address the

23   attorneys' fees, maybe we should do a round --

24              **THE COURT:**  No, I would rather give everybody two

25   chances to speak, rather than four.
```

1          **MS. ROSS:**  Okay.  Okay.  Sure.

2          **MR. NORRIS:**  When does FedEx speak?  Is it after this

3   round?

4          **THE COURT:**  I think they've split their first

5   presentation to two attorneys.

6          **MR. NORRIS:**  Okay.  Gotcha.

7          **MR. KOHN:**  Do you want to address the attorneys' fees

8   and megafund issue now?

9          **THE COURT:**  Yes, please.

10          **MR. KOHN:**  Thank you for your time this morning,

11   Your Honor.

12          I'm here to address our objection to the attorneys'

13   fees requested by co-lead counsel in this case.

14          As we've heard over the last couple of days, our

15   request does touch upon potentially every one of the MDL cases,

16   but the reason for that and the reason why we're raising it in

17   New Jersey is that Your Honor in these types of cases must

18   scrutinize the attorneys' fees, regardless of whether we raise

19   an objection in New Jersey or whether an objection is raised in

20   every single of the MDL cases, as co-lead counsel has presented

21   them.

22          **THE COURT:**  Well, that leads to my first question.  I

23   agree I need to scrutinize them, but what standing do you have

24   to come in and talk about the percentage for Arizona or Kansas

25   or whatever?  Help me with the standing.

```
 1              MR. KOHN:  Sure.

 2         Your Honor, the reason we have standing in this

 3  matter is co-lead counsel has chosen a procedure with which

 4  they want to have the Court approve their fee request,

 5  30 percent for each individual one.  The class members, nor any

 6  objector, nor any absent class member, had any say in how that

 7  was done.

 8         We're now saying the Court needs to look at it, at

 9  least from New Jersey class reps' perspective, that this is one

10  global settlement, right.  It touches on everybody equally.

11  And if the Court applies the guidelines to large settlements to

12  this, it benefits not only New Jersey because more money would

13  come back to New Jersey, as I'll get to later, but it affects

14  everybody globally and gets more money back to every single of

15  the MDL classes, including New Jersey.  And that's why our

16  money is being -- potentially, the money going to the class

17  members in New Jersey is being tied up in other cases, so

18  that's why we have standing.  They've chosen a mechanism, which

19  we can't challenge it.  We can't challenge that they've chosen

20  to break this case up this way.  We think that's wrong.

21              THE COURT:  Let me ask this:  Consistent with, at

22  least standing, as I understand it, since Mr. Tofaute wouldn't

23  get the benefit of a Kentucky settlement, I can understand how

24  you could come in and argue that this is a megafund, the

25  percentage should be 10 to 14 percent or whatever, and so
```

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS                160

```
 1    that's what it should be in the New Jersey case.  What I'm not
 2    clear on is how you, not representing any member of a class in
 3    Arizona, can come in and say, "No, the fee request is too high
 4    in Arizona, and so the Arizona class members, whom I do not
 5    represent, should get more of the money."  That's what I'm
 6    having trouble with.
 7             MR. KOHN:  Right.
 8             Your Honor, the way we're asking -- actually, you
 9    know, I'll get to it, but we're asking for -- if the Court
10    finds that the megafund analysis does apply to this situation,
11    a 15 percent global fee would be appropriate.  The way that
12    would break down potentially impacts more money to New Jersey.
13    But, for the others, I understand Your Honor's concern that,
14    well, we don't represent them.
15             But in Your Honor's capacity to be the gatekeeper for
16    the class members and the fiduciary for the class members, in
17    terms of what they're going to get, if the Court's going to
18    apply it to our case in New Jersey, the Court should equally
19    apply it to the other cases under Your Honor's, you know, own
20    guidance.  We're here to present that and give Your Honor what
21    we believe is appropriate.  If Your Honor decides not to apply
22    that to any other case but New Jersey, you know, that's
23    understandable, but we think that the other states should be
24    able to receive the benefit of that analysis if, in New Jersey,
25    it is applied.
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS** Page 161

1          **THE COURT:**  Okay.  I understand your position.  And,

2    again, I'm not ruling on anything today.

3          **MR. KOHN:**  Yeah.

4          **THE COURT:**  Go ahead.

5          **MR. KOHN:**  Your Honor, what I want to talk about in

6    the first instance here is -- so the fee request globally is

7    excessive.  We think it's excessive for multiple reasons.

8          First, we think it should be treated as a megafund or

9    at least under the analysis of a megafund, depending whether or

10   not the Court likes the terminology, apparently, in the Seventh

11   Circuit.

12         Also, counsel is requesting double recovery, and

13   we'll get to that and why that's significant here.

14         The Court should also look at the lodestar submitted

15   by co-lead counsel.  And, again, we'll address some of the

16   issues we've seen with the lodestar and the variations that's

17   been presented to this Court and to other courts around the

18   country.

19         And, at the end of the day, the last approach here is

20   the **Synthroid II** sliding scale, which is what really reflects

21   the market, if we're going to apply the analysis set forth by

22   co-lead counsel.

23         Yesterday, Your Honor heard some background,

24   initially, from co-lead counsel.  And, you know, it piqued my

25   interest when the first thing I heard out of co-lead counsel's

 1  mouth was their fees.  They spent the first five to six minutes

 2  yesterday telling Your Honor about why their fees in this case

 3  are justifiable.

 4        We're here to tell you that it's the interest of the

 5  class members that need to be put first, the fairness that

 6  needs to be put first, okay, and that's why we're here arguing

 7  on behalf of the New Jersey class representatives, who believe

 8  not only as my co-counsel had, said that the fairness and the

 9  value given to their case was wrong, but that what is being

10  taken out of it is wrong, as well.

11        Every dollar that this Court reduces in attorneys'

12  fee award, whether globally or in New Jersey, goes back to the

13  class members.  It doesn't go back to FedEx.  It goes back to

14  the class members.  That's what we're looking at here.

15        So, let's -- you went too far, Dave.  Just leave it

16  there.

17        **MR. DiSABATO:**  (Complies.)

18        **MR. KOHN:**  So, let's talk about the first concept of

19  the megafund.

20        Contrary to co-lead counsel's opposition to our

21  brief, the Court, the Seventh Circuit, has rejected a cap at 10

22  percent on a megafund.  They never said the analysis was

23  improper or that it shouldn't be done.  The **Synthroid I** case

24  said the cap of 10 percent, a hard carp, isn't appropriate.

25        And we're not arguing for that.  We're arguing

```
 1    actually, for 15 percent for co-lead counsel.  We believe that
 2    that is what's fair and reasonable under the circumstances.
 3            Co-lead counsel has spent a lot of time in this case,
 4    without a doubt, but as these cases got MDLed -- and we heard
 5    today, which, again, was a little bit different than what we
 6    heard yesterday -- yesterday, we were talking about common
 7    benefits and we were talking about templates and discovery
 8    responses that were templates and briefs that were templates.
 9    We heard that yesterday -- but, today, what we've heard
10    stressed is these are individual cases.  "I brought this one
11    individually.  I didn't know these people."
12            Well, that's fine.  That's how a lot of cases get
13    brought, and then they get MDLed, and the situation changes,
14    and you have to adapt and treat the cases as they are then.
15            When this case became an MDL, the goal of co-lead
16    counsel and the Court appointing co-lead counsel and a steering
17    committee is to ensure that there is work done for the common
18    benefit and that it's done appropriately, billed responsibly,
19    and done in a manner in which you're efficient, right, and
20    that's what Mr. Harwood described yesterday when he started
21    talking, initially, about how this case panned out.
22            Despite all of that, despite the fact that everything
23    was together and that the common benefit for 42 cases, for a
24    long time, was done together, we're now at the settlement
25    period going to split all those cases up and say, "Let's treat
```

```
 1   them all individually and we're going to ask for 30 percent

 2   because of all the work we did and all of the risk that we

 3   had."

 4              But all that work and all that risk was global.  It

 5   was for all those cases.  So it's being counted every time, and

 6   we're just going to keep counting it and counting it and

 7   counting it.  And under their 30 percent fee award, they're

 8   going to walk out of this courtroom, when Your Honor finally

 9   gives final approval, with over $72 million.

10              When you look at that and you look at the way they've

11   treated this case, their request for fees contradicts the way

12   the case was handled.

13              There was a billing memo put out by Mr. Harwood's

14   office early on about how fees were to be billed for the common

15   benefit of the class.

16              As co-lead counsel has put in their papers, they

17   don't have to state specific lodestars.  They have one lodestar

18   for this case globally.  They have expenses globally.

19              Your Honor, how can you then come to the Court now

20   and say, "This wasn't global.  We didn't treat it as such.

21   These are individuals."

22              Well, where's the time records for that?  Where are

23   the expenses applied to each case?

24              If this was really 20 separate cases, there would be

25   20 separate sets of billing records, and they would all be
```

1  before Your Honor for each of the specifics classes.  That's
2  not the case.
3          The declarations of counsel also contradict their
4  papers.
5          When seeking approval, say, in the Indiana brief, a
6  quote straight out of their case:  The vast majority of
7  counsel's time is devoted to litigating issues common to all
8  constituent cases.
9          This isn't 20 separate cases.  This is one global
10 case for $243 million, and the analysis should be applied at
11 that level.
12         The declaration from their fee expert,
13 Mr. Fitzpatrick, one fee declaration addressing all the cases,
14 not even individually.  He just says 30 percent is fair because
15 he believes it is.  And we'll get to the problems with
16 Mr. Fitzpatrick in a little bit.
17         This case is no different than a class action with
18 state subclasses.  One big class action with 20 state
19 subclasses would be litigated the same way, but I wouldn't get
20 to come to the Court at the end of the day and say, "I should
21 get paid individually on each subclass."  That's what they're
22 asking for here.
23         And I'll talk a little bit about this further, but,
24 in California, in the **Alexander** case, Judge Chen looked at the
25 fee request by co-lead counsel, by Ms. Ross, and said, "There's

```
 1   something wrong here."

 2           MS. ROSS:  Your Honor, I'm so sorry.  Mr. Kohn was

 3   not there.  Judge Chen said no such thing.  Misrepresentations

 4   in this Court ought not to be tolerated.

 5           THE COURT:  I'll invite you to tell me what was

 6   misrepresented when you get your chance because, obviously, I

 7   can't decide between the two at this point.

 8           MR. KOHN:  Your Honor, I would ask --

 9           MS. ROSS:  I would ask counsel who was not there to

10   limit his remarks to things he knows and not things he doesn't

11   know.

12           THE COURT:  Anybody who's misrepresenting things to

13   me when I'm taking everything under advisement --

14           MS. ROSS:  Thank you, Your Honor.

15           THE COURT:  -- will see it play out a little later in

16   my rulings.

17           MR. KOHN:  Your Honor, I would ask Ms. Ross to give

18   me my time -- I gave her hers -- and to not object.  She will

19   have her response time.

20           THE COURT:  I've asked her to do that already.

21           MR. KOHN:  And I do find it somewhat interesting

22   that --

23           THE COURT:  No.  Wait.  Wait.  Wait.  Wait.

24           I have a job to do, and I'm not going to be helped at

25   all if this gets personal.
```

1          **MR. KOHN:**  That's fine, Your Honor.

2          **THE COURT:**  So whether you find it interesting is

3    fine.  Tell me what I need to know.

4          **MR. KOHN:**  So noted, Your Honor.

5          But I will say, in the **Alexander** case -- and I have

6    the Court's opinion if Your Honor wants to read it, if Ms. Ross

7    doesn't like my interpretation of it -- but they found there

8    that the requests made by counsel were seeking money for

9    recoveries that they would get in this case, in the MDL.

10         They said the request of 25 to 30 percent of the work

11   from the MDL was done to benefit the **Alexander** case and that's

12   how they were basing their fees and asked for a multiplier on

13   that.  The Court asked for additional information.  Ms. Ross

14   submitted an additional declaration saying, then, that it

15   was -- 44 percent of the MDL work was attributable to the

16   **Alexander** case.

17         And the Court said:  Not so fast.  All that does is

18   reduce the multiplier here to make your fee more reasonable.

19   I'm going to go with the 25 percent you said originally.

20         So she can argue whether that means the Court thought

21   her analysis was wrong.  We can agree to disagree on that.

22         **THE COURT:**  What was the original percentage

23   requested in **Alexander**?

24         **MR. KOHN:**  The original percentage requested -- well,

25   we're talking about -- the percentage of work done from the MDL

```
 1   attributable to **Alexander** was 25 to 30 percent.  They then said

 2   44 percent, initially.

 3            But the Court there awarded -- after a fee request of

 4   22 percent, they reduced that down to 16.04 percent under the

 5   analysis that we're asking the Court to do here.  We're asking

 6   the Court to look at what Judge Chen did and apply that

 7   analysis to this case, similar size, in terms of global

 8   settlement.  Here, we're saying 15 percent.  16.4.  I think

 9   that's a negligible difference, if the Court saw fit that way.

10            But that case, Judge Chen was concerned about double

11   recoveries, about getting paid for work pre-remand in those

12   cases and then coming back and seeking those fees from this

13   Court, or vice versa, depending on how the cases played out.

14            What we're asking -- and we'll get to the double

15   recovery bit -- is the money that comes back from those cases

16   and the other remanded cases, which, as the Court's now aware

17   because co-lead counsel in response to our opposition updated

18   the records for the Court, have received over $10 million in

19   fees for remanded cases which is specifically attributable to

20   post-remand MDL work.  We'll talk about how that impacts the

21   recovery here and why that needs to be a line item in the

22   Court's analysis of what the fee should be here.

23            As I said, the proper award in a megafund is 10 to

24   15.  We believe 15 percent is reasonable here.

25            The studies relied upon in co-lead counsel's briefing
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**     Page 169

1  kind of support what we are asking.  The Eisenberg and Miller

2  Study recognizes that they actually had a 12 percent mean

3  award.  Another one found a mean of 19.4 percent and a median

4  of 19.9 percent.  And the Fitzpatrick Study, the one relied

5  upon by counsel, found where there's over around 250 million.

6  It's 17.8 or 19.5 percent mean and median.

7          Co-lead counsel states in their papers that we're

8  trying to reduce their fee to $13.5 million.  That's not true

9  or accurate.  Fifteen percent of 243 million is approximately

10  36, $37 million, so that's what we think is fair and

11  reasonable.  And by doing that, that initial reduction to

12  15 percent, deals with the issues that we're addressing on the

13  double recovery from the cases that have been remanded and

14  settled.  We feel that that sufficiently deals with that.  So

15  that 36 million would be the final number, and it wouldn't be

16  reduced maybe as co-lead had thought.

17          So, let's talk about that double recovery.  There's

18  about $20 million in fees at stake, I guess, in the **Alexander**

19  case, and there's about 10 million, a little over 10 million,

20  that have already been recovered.

21          Every declaration submitted in the remanded cases,

22  Your Honor, that have settled all state that counsel's

23  recovering fees for work done in the MDL and that those fees

24  would be returned to the MDL.

25          What we're asking is that the Court or co-lead

1 | counsel tell us how they're being accounted for, how is that
2 | being done, because, under our analysis, based on the facts
3 | that we have, which, obviously, are limited -- as Your Honor
4 | knows, we have asked for certain information -- we find that,
5 | if that 20 million comes on top of that 10 million, there's
6 | already $30 million in the bank for pre-remand MDL work, about
7 | 2011/'12 back to '06.

8 | How is that money applied?  What's it applied to?  Do
9 | the MDL cases here before the Court today and yesterday get
10 | credit for some of that money?

11 | They should.  Their fees should be reduced because
12 | money was already recovered for the common benefit.  Counsel
13 | shouldn't get that, in addition to what they're requesting here
14 | today, and that's what their papers seem to indicate.

15 | They say, "Well, 30 percent is fair.  Thirty percent
16 | is reasonable."

17 | But, Your Honor, if we get -- we have 10 million.
18 | But if we get to 20 million -- we don't know if we will, but,
19 | right now, it's approved.  It's on appeal, but it's been
20 | approved.  And the objection doesn't deal with fees.  It deals
21 | with fairness.  If we get that 20, don't worry about it.  Let's
22 | not look at it.  Let's not consider it.  If anything, it will
23 | give us a multiplier.  So, we'll take our 72 million.  We'll
24 | add 30 million to it.  So we'll have $102 million settlement --
25 | attorneys' fees, but that only just gives us a multiplier, on

1    top of the 30 percent.

2            That's not how the law works.  You don't get a

3    multiplier if you're already adjusting for that risk in your 30

4    percent fee ask.  You get common fund or lodestar with a

5    multiplier.  You don't get common fund and then say, "I get a

6    multiplier on it."

7            That's why we're talking about double recoveries

8    here, all right.  They want to recover that money.  So, they

9    want $104,500, 102 million total fee award on a $243 million

10   settlement.  That's 43 percent recovery, not 30.  That's a

11   windfall to co-lead counsel.  I say "co-lead," but that's a

12   windfall in attorneys' fees that I understand does not only go

13   to co-lead counsel, but to everybody, but it's a windfall of

14   attorneys' fees that harms the classes.

15           How is this accounted for?  We haven't seen it.  They

16   weren't forthcoming in their papers originally.  It was six

17   million.  And, again, they didn't deal with what happens if we

18   get more.  And they asked the Court to ignore the fact that,

19   well, we don't have the 20 yet.  But what if they do?

20           So, in the worst case scenario here, Your Honor, the

21   monies here need to be held until we find out whether that

22   20 million is coming here because, if it does, I think that

23   impacts Your Honor's analysis.

24           They shouldn't be able to say to Your Honor, "Well,

25   we don't know what's going to happen with that 20 mill so don't

1    count it."

2         Because what happens if it does come in, when it does

3    come in?  How does that affect this Court's analysis?

4         That gives them $30 million for work already done in

5    this MDL.  Their lodestar at $74-and-a-half million, arguably,

6    should then be reduced by the 30 million recovery.  So, then,

7    if we're going to talk about multipliers, let's talk about it

8    at $44 million, all right.

9         These are the things that, Your Honor, we're

10   concerned about in this case, and we're concerned that the New

11   Jersey class members are getting a shortfall here because the

12   fees globally are so great, whether you apply it singly to New

13   Jersey or globally, the fees here are great, and it doesn't

14   take into account what's been going on around the country in

15   these cases with these same counsel.

16        Like I said, Judge Chen, in **Alexander**, wanted to

17   ensure that there was no double recovery.  That was the point

18   of the analysis.  And the Court did it sua sponte.  No one

19   raised an objection to fees.  The Court, in its own analysis,

20   looked at it and said:  I need more information here.  This

21   isn't clear.

22        That's what we're looking at, and we ask the Court to

23   take a look at Judge Chen's written opinion, and we're happy to

24   provide a copy.

25        **THE COURT:**  If you would, submit one to the Clerk

1    when you're done, please.

2          **MR. KOHN:**  Yeah.

3          That's really what the template is.  That's what the

4    Court needs to be concerned with.  Judge Chen raised very valid

5    points on how these things should be treated when you have an

6    MDL of this size in other cases that get remanded and getting

7    fees for the same pre-remand work that was done.

8          **THE COURT:**  I think I understand your position on

9    that point.

10         **MR. KOHN:**  And let's talk, one last thing, about

11   double recovery, and I'll move on.

12         We've seen fee expenses in this case, $7.7 million,

13   $8.2 million, give or take, depending on the time frame of

14   which we are following, which, obviously, it's expected that

15   they're going to go up.

16         But, again, when we look at the remanded cases -- and

17   I have the declarations here.  I went through them, and, again,

18   a percentage was received in those cases for expenses for

19   pre-remand MDL work.  I don't know how that was accounted for,

20   Your Honor.  I haven't seen it before the Court.  They haven't

21   put it in any of the fee applications.

22         These expenses coming from these cases in these other

23   declarations say "expenses for pre-remand MDL work."

24         Where's the line item for that in their expenses to

25   the Court which they used to justify a lodestar crosscheck that

1   they say is unnecessary?

2           They add that on and say it's 82 million.  And then

3   that's why, when they get 72 here, we're all great.  But that

4   82 million only counts if those expenses haven't been recovered

5   already.  Maybe they haven't been, but maybe they have, and we

6   don't know that information.

7           What happened to the expenses recovered in those

8   other remanded actions?  We think that they were improperly

9   accounted for.  I'd love to get more information, and we'd be

10  happy to discuss it.

11          In support of counsel's position here that 30 percent

12  is fair and reasonable, they submit the Fitzpatrick

13  declaration, expert hired by them.  Honestly, probably one of

14  the most self-serving declarations I've personally ever read.

15  You would never guess that he was getting paid by co-lead

16  counsel for it based on the terminology and the phraseology he

17  uses to describe the work being done.  But the problems with it

18  are the data is over 10 years old.  He's talking about cases in

19  '05 and '06.  He doesn't look at the recent updates.

20          He did no analysis of any billing records here.  He

21  didn't look at co-lead counsel's lodestar to determine whether

22  there was reasonable or non-duplicative fees or whether any of

23  it was excessive or if it properly allocated between partners,

24  associates, and support staff.

25          He says 30 percent is reasonable in these cases.  He

1   has no support for that.  All of the cases cited by co-lead

2   counsel in their opposition -- in their motion, actually, for

3   fees and in opposition all deal with 30 percent of cases where

4   the largest settlement value was $15 million.  On a case where

5   there's $100,000, they got a 30 percent fee award.  On a case

6   for $416,000, they got a 30 percent fee award.

7           Sure, in those cases, that's perfectly justifiable.

8   But when you're talking about a case, if we're going to accept

9   their number at $25-and-a-half million, 30 percent isn't

10  justifiable, it's not reasonable, and they don't have any cases

11  to support that.

12          The only case that supported a higher fee on a bigger

13  number was when a city was the plaintiff, sophisticated party

14  able to negotiate a lot differently than an individual

15  plaintiff looking to pursue a wage-an-hour claim or a consumer

16  fraud claim when they're looking for their clients -- or

17  looking for an attorney.

18          Fitzpatrick admits, in his study and his declaration,

19  that the nationwide average median for class actions is 25.4

20  percent or 25 percent.  Yet, despite that, despite his own

21  studies finding that, he says 30 percent here.  Don't find any

22  support for that.

23          They ignore -- Mr. Fitzpatrick ignores the contrary

24  case law and the Seventh Circuit precedent.  **Gehrich, Synthroid**

25  **II**, **Capital One**, all of those cases apply a sliding-scale

1    approach.

2          If we're just going to talk about New Jersey -- you

3    can apply it globally, as well.  Let's talk about New Jersey --

4    that sliding-scale approach needs to be applied, even at

5    $25-and-a-half million, but he ignores all that and just says:

6    I -- I, Mr. Fitzpatrick -- don't believe that the sliding scale

7    would be applied here.

8          Well, if we had Mr. Fitzpatrick on the stand in a

9    **Daubert** hearing, I'm not sure that opinion comes in.

10          His opinions with regard to counsel's work and why

11    the risk analysis is the way it is, seemingly non-evidential,

12    as well.  There's nothing there that is a fact that would come

13    before this Court, if pressed.

14          He then says these guys would have agreed to retainer

15    agreements at a third or more and so 30 percent, because we're

16    not asking for a third, is reasonable.

17          But the courts, again, in this circuit, have found

18    that, where individual plaintiffs are seeking representation,

19    they don't have the same negotiating power, they don't have the

20    same leverage to negotiate a sliding-scale fee award, so they

21    find that those retainer agreements and what retainer

22    agreements would be is not really a probative issue.

23          In fact, Mr. Fitzpatrick's own declaration says:

24    Well, we looked at all these cases where these fee retainers

25    were done.

1             But he admits every one of them was an individual

2    employment case.  Not one was a class action, not one was an

3    MDL.

4             And talking about MDLs, Mr. Fitzpatrick didn't

5    address fees in MDLs.  He knew what this case was.  He was

6    doing one certification for 20 cases, but doesn't mention how

7    fees are calculated in an MDL.  He ignores because it hurts

8    co-lead counsel's fee request, not what he was hired to do.

9             He also states, finally, in his declaration that

10   co-lead counsel is not seeking an escalation or a multiplier of

11   their fees.  But as I've tied to my earlier argument, if

12   co-lead counsel gets what they're requesting in this Court,

13   $72 million in fees and gets $30 million more from remanded

14   cases for post- -- or pre-remand MDL work, they are seeking a

15   multiplier, and it's admitted in their papers at 1.3.

16            I wonder if Mr. Fitzpatrick would change his mind

17   after he saw that.

18            Talk about the sliding scale.  At the end of the day,

19   we think the megafund analysis applies.  Let's talk about the

20   sliding scale approach, as well.  There's no doubt that this

21   applies in this case.  There's no contrary law that says it

22   shouldn't be.

23            The Seventh Circuit has indicated, in **Synthroid II**,

24   how it works:  Thirty percent of the first $10 million, 25 of

25   the next 10, 20 percent of the remaining amounts --

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

```
 1              COURT REPORTER:  Please, slow down.

 2              MR. KOHN:  Sorry.

 3              -- 20 percent of the remaining amounts, from 20 to

 4     40, and 15 percent above that.

 5              If you applied that globally, it results in a fee

 6     award of $39.95 million, which would actually be a

 7     16.44 percent award, basically right in line with what Judge

 8     Chen did in Alexander.

 9              If we look at just New Jersey and we apply it to

10     New Jersey, that $7.65 million fee award would get reduced to

11     6.6, saving the New Jersey class about a million dollars, a

12     little over a million dollars in fees, that would go directly

13     to the 888 class members in New Jersey.

14              Again, we talked about you don't need a lodestar

15     crosscheck.  We think you should.  We think it's prudent.

16              That 39.95 million, if we looked at it globally, is

17     kind of close to the lodestar of 44.  That would be true if you

18     count that 30 million against the recovery that's already being

19     sought here.

20              Let's talk about the lodestar just for a second.  We

21     think the Court should at least consider it.  There's no

22     precedent that says we shouldn't.  There's case law in the

23     circuit that says maybe it's not the best means or use of the

24     Court's time.  But we think, in a case like this, it's prudent,

25     based on the time and length of the case.
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1          The lodestar submitted by co-lead counsel, I can't

2    follow what's going on.

3          We start in Kentucky in October of 2013.  They say

4    the pre-MDL time remand is 133,000 hours and change, about

5    $50 million in fees, at $375 an hour, it would come out to,

6    okay.

7          In New Hampshire, in December of 2014, same amount of

8    time and fees.

9          In February of '16, we're now at 135,000 hours.  Two

10   years later, a couple thousand hours have been added, 57

11   million in fees, $422 an hour.

12         However, get to the MDL, and, in September, we're now

13   at 149,000 hours and $74-and-a-half million in fees, so it's

14   now $500 per hour.

15         Then, in October of 2016, in Arkansas, followed by

16   Mr. Houston who's sitting behind me here, back down to 135,000

17   hours as MDL time.

18         So, somehow, there's an additional 14,000 hours that

19   were added between February and September of 2016.  It's about

20   $7 million in fees.

21         I'm asking the Court -- the Court should look at this

22   lodestar, should figure out what's going on.  I'm not saying

23   that there's something wrong here, but it begs the question on

24   what is going on here.  What is this time for?  We need to look

25   at why we're at 149,000 hours, what's made up that time.  Is

```
 1   there duplicativeness?  Is there excessiveness?  If we're going

 2   to do a lodestar crosscheck, it needs to be looked at before

 3   Your Honor can determine the reasonableness here.

 4          And, then, are they asking for fees on current rates?

 5          Again, that was an interest by Judge Chen in

 6   Alexander.  Are they asking for, you know, the lodestar at the

 7   current rate or is it a progressive rate for the time

 8   throughout this litigation?  Again, it would go against a

 9   multiplier.

10          They then submit to the Court unaudited time from all

11   the local counsel.  They said they self-audited their own time.

12   But they ask the Court to take that into account in that

13   $74-and-a-half million, unaudited time from local counsel.

14          But, as Mr. Harwood said yesterday, "When we get

15   local counsel's time, we're going to audit it."

16          They're going to audit that time, and I'm going to

17   bet every single dollar of that doesn't go back to local

18   counsel, but they want this Court, Your Honor, to accept that

19   unaudited time for the truth.

20          Lastly, Your Honor, I just want to show Your Honor

21   the numbers that we've been talking about just to give a quick

22   summary.

23          So, if you apply the megafund at 15 percent, it's a

24   $36.45 million award globally.

25          If you want to apply that specifically to New
```

1  Jersey -- the percentage that co-lead counsel has used to

2  represent New Jersey or representing percentages going to

3  individual MDLs has been fluid -- at 4.96 percent, in one of

4  their applications, $1.7 million would be the fee in New

5  Jersey.

6          If you look at the percentage of class members which

7  has been used in **Alexander** as 888 out of the 27,000 class

8  members pre-remand, that's 3.29 percent, so it would be a fee

9  of about $1.2 million, $1.1 million in New Jersey.

10         Let's talk about the double dipping.  The result

11  would be a $44.5 million fee award, if you removed what we

12  talked about, 18.3 percent fee award.  Again, if you apply it

13  just to the results in New Jersey, it would reduce the fee

14  award to $4.5 million, which is 10-and-a-half percent of the

15  recovered remanded case fees being allocated to New Jersey, so

16  it saves the New Jersey class members $3.1,500 in fees.

17         If you do the sliding scale as I showed Your Honor

18  earlier, 39.95 million globally, 16.44 percent fee award in

19  just New Jersey results in a fee award of 6.6, which is a

20  saving of a million fifty.

21         We believe any of those approaches, Your Honor, would

22  be more reasonable and more fair and the proper way to account

23  for the work done by co-lead, which wasn't insignificant, and

24  that's why we're talking about numbers in the multiple tens of

25  millions of dollars.  We're not saying they should be cheated

1    here, that they should be shorted here.  What we're saying is

2    it needs to be reasonable here, it needs to be looked at that

3    way, and that's what we think is fair and reasonable under

4    these circumstances, Your Honor.

5              **THE COURT:**  Thank you, Mr. Kohn.

6              Does Fed Ex have a comment?

7              **MR. NORRIS:**  Yes, Your Honor.

8              Your Honor, I'm going to limit my comments mostly to

9    the fairness of the settlement and not opine on the

10   reasonableness of the fees, based on the agreements that we've

11   entered in this case, and we put on the docket something to

12   that effect last week.

13             **THE COURT:**  All right.

14             **MR. NORRIS:**  But before I, kind of, start about the

15   fairness of this settlement, what I did want to address was the

16   nature of the negotiations that we had in this case.

17             I think that Plaintiffs' counsel and FedEx has

18   represented in each of these hearings that each settlement was

19   the product of arm's length negotiations, and those

20   negotiations were hard fought, and we went toe to toe for,

21   basically, a month, not to mention the prep time that we had

22   leading up to the mediation and the exchange of data on each of

23   these cases.  And each case was negotiated on an individual

24   case basis based on the merits of each individual case, and New

25   Jersey is no exception to that.

1          The basic argument that the class reps make in this

2    case is that $30 million would have been sufficient to settle

3    the case.  Mr. McMahon and Mr. Tofaute both swore testimony to

4    that effect in their declarations filed on February 3rd, 2017.

5    McMahon's declaration is at Paragraph 12.  Tofaute's is at --

6    Mr. Tofaute's is at Paragraph 13.

7          We ultimately settled the case.

8          **THE COURT:**  Could you read those to me?  Do you have

9    them there with you?  If not, that's fine.

10         **MR. NORRIS:**  I left them at the table, but we can --

11         **THE COURT:**  Okay.  That's fine.  Go ahead.  I'll

12   track them down.

13         **MR. NORRIS:**  And I believe Ms. Ellingstad, in her

14   papers, recently quoted them, so they're available in class

15   counsel's filings, as well.

16         So, as you know, we settled this case for

17   $25.5 million, which the class reps are claiming is

18   insufficient, which is a difference of 4-and-a-half million.

19         There are two main arguments on the substance of the

20   case that the class reps disagree with.  One is FAAAA, which

21   Ms. Ross and Ms. Bouckenooghe addressed in their opening

22   remarks.  The second one is on the CFA, which was talked about

23   a lot.  And I'm going to add a little bit of color to each one

24   of those.

25         On the FAAAA, the class reps claim that there's no

1  risk of preemption in their papers, and that was docketed in

2  the New Jersey case, Number 218, at Pages 22 and 23.  And

3  basically what the Plaintiffs say is that, in New Jersey, it's

4  conclusively established that there would be no FAAAA

5  preemption.

6        And Ms. Ross did a recitation of the difference

7  between the **BeavEx** case, on the one hand, and the **MDA** case and

8  **Schwann** case in the First Circuit.

9        And where New Jersey, kind of, lands on that

10  continuum is closer, in FedEx's opinion, to the **MDA** and **Schwann**

11  cases in the First Circuit, and the reason for that is

12  identified in the **BeavEx** case.

13        In the **BeavEx** case, the Seventh Circuit identifies

14  that, in that particular case, the ABC test applied to a single

15  statutory scheme.  Whereas, in Massachusetts, the independent

16  contractor statute applies across a lot of different statutory

17  schemes, you know, employment protection statutes, unemployment

18  compensation and the like.

19        The ABC test, as the Plaintiffs have put it forth in

20  this case and in the **Sleepy's** case, has similarly broad

21  application in New Jersey, and that only strengthens FedEx

22  Ground's argument that FAAAA preemption would apply in this

23  case, and that would create a lot of risk for class counsel.

24        On the CFA's score, the CFA claim, the class reps and

25  the Plaintiffs in this case have said that the CFA will apply

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS    Page 185

```
 1    to sales of businesses between a third party and each of the

 2    Plaintiff.

 3              Now, that fails for multiple reasons.  The first is

 4    that there's an on-point case in New Jersey State Court called

 5    Winslow which says that employment disputes like this one,

 6    misclassification where they're seeking employment-type

 7    remedies, are not covered by the CFA, and, so, as a threshold

 8    matter, we don't think that the CFA claim would survive

 9    scrutiny as a matter of summary judgment.

10              Because of this case, the Plaintiffs and, I suppose,

11    the class representatives pivoted to the sale of business

12    theory, but that runs headlong into the J & R Ice Cream line of

13    cases that Ms. Ross described in her remarks.

14              And the cases that follow J & R Ice Cream, Yogo and

15    Wingate, all demonstrate that cases in federal court are to

16    follow the Third Circuit's precedent on the CFA claim, in the

17    absences of counter-veiling Supreme Court authority in New

18    Jersey.  There is no counter-veiling Supreme Court authority in

19    New Jersey which addresses the theory of the case that the

20    Plaintiffs advanced in this one, and so as a matter of -- when

21    this case would be remanded to federal court, we would be

22    dealing with the J & R Ice Cream line of cases, which would

23    eviscerate the Plaintiffs' claim.

24              The state law cases that the Plaintiffs cite fair no

25    better because, in each of those cases, the Plaintiff, in those
```

```
 1    cases, are paying upfront money to the defendant for something.
 2            There's no such transaction in this case.  In the
 3    route sale context, the route sale -- route sales take place
 4    between a new contractor and a third party, or FedEx would give
 5    them a route, so there's no sale at issue.  And each of the
 6    state court cases upon which the Plaintiffs in our mediation
 7    addressed, and the class reps addressed a strong support for
 8    them today, deal with upfront money paid to the defendant,
 9    which is just absent from the fact pattern here.
10            Finally, there is strenuous dispute about what the
11    measure of damages would be in this case.  And in FedEx
12    Ground's assessment of the case, we did place value on the CFA
13    claim, but that value was based on the strength of our
14    defenses, and also we were operating from a much lower base
15    damages because of the way that we calculated those damages.
16            The CFA claim is kind of a square peg in a round hole
17    in this case.
18            But the paradigm CFA claim is:  A consumer buys a
19    widget, and that widget is either defective or not what they
20    thought it was going to be and so it was worth less.  And the
21    measure of damages is the difference between the defective
22    widget and the full value of the widget.  So if you bought the
23    widget for 10, and it was defective and only worth 1, the
24    damages are 9 and then trebled.
25            What the Plaintiffs were going to have to prove here
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1   was that they were induced to buy a business from a third party

2   and that business was depressed in value as a result of the

3   control that was, allegedly, exercised by FedEx Ground.

4         I think it goes without saying that proving damages

5   in this case would be exceedingly difficult, and, also, there

6   would be a lot of individual issues that would likely result in

7   decertification of the case, and that's the way that we

8   approached it.

9         Also, FedEx Ground would have introduced a tremendous

10   amount of evidence from class members of the profit that these

11   drivers made on route sales and also when they operated

12   multiple routes.  And, at the end of day, those profits far

13   exceeded what the measure of damages would be in this case, and

14   so you would be, essentially, trebling zero in many cases.

15         The alternative that the Plaintiffs offered in this

16   case was this notion of out-of-pocket loss, looking at what the

17   contractor earned and then comparing it to what they would have

18   earned if they were classified as employees.

19         And the New Jersey cases are clear that, even with a

20   measure of damages like this one, under the CFA, there can be

21   no windfall.

22         And, in that analysis, what FedEx looked at was

23   including data like route sales, like the operation of multiple

24   routes, and what we found in multiple cases of class members

25   was that the profits that the contractors enjoyed as a result

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

 1   of this relationship far outweighed whatever hypothetical

 2   employee income they would have derived, and so the claim

 3   itself was just not worth very much, and the risk was high for

 4   the Plaintiffs and low for FedEx in advancing its defense.

 5           So, to conclude, our basic position is the same as

 6   the position that we've had in each of the cases, which is that

 7   the settlement is fair, adequate, and reasonable, and that it

 8   should be approved.

 9           The difference between the parties in this objection

10   is really a difference in the assessment of litigation risk,

11   and everyone seated at both of these tables assessed that

12   litigation risk and came to a deal at arm's length, and we

13   think that it should be approved.

14           **THE COURT:**  Thank you, sir.

15           Ms. Ross.

16           **MS. ROSS:**  I'm trying to decide what to bring with

17   me.  It's like packing for a trip.

18           Accept my apologies for my little outburst there.  I

19   litigated the **Alexander** case and the **Estrada** case before it,

20   for many years, Your Honor, and it's sometimes difficult to

21   listen to people talk about things that you were present for

22   that they were not, and I am very sorry.

23           I'm going to talk about the attorney fee piece,

24   first, and then will go back to the fairness of the settlement.

25           I join in much of what Mr. Norris had to say.

1          With respect to the attorneys' fees, I think the

2    Court asked the right question.  These objectors have no

3    standing to object to the fee petitions in any of the other

4    cases, and it would be a travesty if judgments were held up in

5    any of the other cases by virtue of what, I imagine, could be

6    an appeal in this New Jersey case to the Seventh Circuit.

7          Second, this is not a global settlement.

8          There was a footnote in Mr. Kohn's brief in which he

9    said something along the lines of:  There's no evidence to

10   suggest that there wasn't a $243 million agreement made that

11   was then carved up into 20 pieces.  I think that was Footnote 2

12   in their brief.

13         There are mountains of evidence to prove to the Court

14   in everything that you've heard for the last two days that each

15   one of these cases was litigated as an independent case with

16   common discovery.  Each case was ruled on by this Court with

17   its own judgment.  Each case was appealed to the respective

18   Courts of Appeal independently.  Some were remanded out of the

19   MDL.

20         And the suggestion that this was one big case where

21   all the work was common and that this is, you know, kind of

22   like a consumer rights action where there are copycat

23   complaints filed all over the country that get consolidated

24   into a single complaint and all litigated together is just not

25   so.

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

```
 1              I was remembering last night that, at the first
 2   hearing before the JPML which Your Honor was a member of, there
 3   was concern about the Panel as to why the 12 cases that were at
 4   issue in that motion should be put together in an MDL.
 5              And if I remember correctly -- and maybe I don't --
 6   Your Honor asked:  What's the source of law in each of these
 7   cases?
 8              And the answer, of course, was:  The source of law
 9   was state law.
10              Every one of these cases asserted claims under the
11   laws of the state in which the cases were filed, and the first
12   petition for coordination as an MDL was denied for that reason.
13              So the mantra, the drumbeat that this is a global
14   case and a global settlement is just not borne out by the
15   facts.  It's a fiction and should not -- is not entitled to any
16   credence by this Court.
17              With respect to the megafund argument, there is no
18   question that the Seventh Circuit Court of Appeals has rejected
19   the notion of a megafund.
20              In the **Synthroid** case -- this was like the packing
21   for the trip (indicating) -- in the **Synthroid** case, the Seventh
22   Circuit, the first **Synthroid** opinion -- was this the first
23   **Synthroid** opinion -- **Synthroid I**, the Court expressly rejected
24   the concept of a megafund, a megafund analysis, for looking at
25   large, large class action recoveries and evaluating a fee
```

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS                191

```
 1   petition because, in the Seventh Circuit, it is the market

 2   price for legal services, in light of the risk of nonpayments

 3   and the normal rate of compensation in the market at the time

 4   that governs.

 5           And I believe it was Judge Easterbrook who was on the

 6   Merits Panel in the appeal from this case, said, quite clearly,

 7   that private parties would never contract for such an

 8   arrangement because it would eliminate counsel's incentive to

 9   press for more than the minimum amount in a settlement, knowing

10   that their fees would be capped at the end.

11           The rule in the Seventh Circuit is that fees are to

12   be awarded in a class action case -- I know Your Honor knows

13   this law very, very well -- is what is the hypothetical ex-ante

14   bargain, what would the parties have negotiated for at the

15   beginning of each case.

16           Now, in these cases, every one of them was filed in a

17   District Court somewhere else.  Contingent fee agreements were

18   signed by the named Plaintiffs in each one of the constituent

19   cases, including New Jersey.

20           There's evidence in the record we submitted with our

21   fee petitions that the Plaintiffs in the New Jersey case signed

22   retainer agreements with the Curetan Caplan firm for 30 percent

23   of the recovery.  Those agreements are entitled to great weight

24   because they are one measure of the market, and it's the market

25   that controls.
```

1          There's other Seventh Circuit authority that says, in

2   contingent fee litigation and particularly contingent fee class

3   action litigation, the contingency fee is the market rate fee.

4          Why?  Because plaintiffs' class action lawyers like

5   me, my colleagues at this table, the company who was here

6   yesterday, we do these cases all the time, and we do these

7   cases with the expectation that, at the end of the day, we will

8   be compensated not just for our lodestar fee.  That I could get

9   by doing hourly work for a corporate client or for my union

10  clients.  You know, I have hourly clients, too.  We do these

11  cases with the expectation that, after taking the risk, we will

12  be -- counsel will be rewarded for that risk, for the delay in

13  payment, for the potential loss of a case, for the time put

14  into a case that could be spent elsewhere in other

15  fee-generating work, with an enhancement.

16          And the Seventh Circuit has concluded that the

17  percentage-of-the-fund approach is the correct approach to

18  apply to fee award in cases like these because it ties the risk

19  -- it ties the compensation of counsel to the compensation for

20  the class, and it incentivizes counsel to get as much money as

21  they can, by judgment or settlement, because, by maximizing the

22  recovery for the class, counsel maximizes the recovery for

23  itself.

24          The lodestar method, which the objectors are very

25  focused on, creates the reverse incentives.  It incentivizes

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS

```
 1   lawyers to run the meter and their clients be dammed, and
 2   that's why the Seventh Circuit strongly disfavors using
 3   lodestar as the measure of attorneys' fees in contingent fee
 4   litigation like this case and others and strongly disfavors the
 5   use of a lodestar crosscheck.
 6        Although, we have submitted to the Court, in papers
 7   that are not difficult to understand and that I will work
 8   through again, why a lodestar crosscheck of the fee requests in
 9   these cases looked at across the board because all of the cases
10   settled generates either our lodestar fee, after 12 years of
11   litigation, or a very modest multiplier of 1.3.
12        A multiplier of 1.3 on lodestar in contingent fee
13   litigation is a very small enhancement for the amount of work
14   and risk undertaken by the lawyers in these cases on behalf of
15   their clients.
16        So I would submit to the Court that to adopt the
17   megafund approach proposed by the objectors would be reversible
18   error.
19        In the **Synthroid** case, that's exactly what the
20   District Court did, and the Seventh Circuit panel, with Judge
21   Easterbrook writing for the Panel, said:  Not so fast.  That's
22   not the Rule in this Circuit.  It was inappropriate for the
23   Court to do so.
24        And the case got sent back.  And not only did the
25   case get sent back once, **Synthroid** got sent back twice because,
```

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS                194

1    on remand, the District Court kind of fudged the numbers around

2    and sort of reached the same result, and the Seventh Circuit,

3    the second time around, said:  The District Court got it wrong

4    again.  Now, we throw up our hands.  We're going to decide the

5    fee.

6              So, that's our position with respect to the megafund.

7              Now, with respect to the sliding-scale approach that

8    the objectors have proposed to be applied either across the

9    board, which would be inappropriate here, or even in the New

10   Jersey case alone, application of the sliding scale is not

11   mandatory in any way, shape, or form, under Seventh Circuit

12   law.

13             In the **Synthroid** case, in **Synthroid II**, Judge

14   Easterbrook, writing for the Panel, said that application of a

15   sliding-scale model was appropriate in that case but most

16   certainly is not appropriate in every case.

17             The Rule in the Seventh Circuit is:  What would the

18   hypothetical ex-ante be?

19             And, in some cases, a sliding scale is a very useful

20   tool for a court to apply for purposes of making that

21   determination, and here's why.

22             The tapering technique, as discussed in **Synthroid** and

23   cases following it, cases cited by the objectors in their

24   papers, too, is an effort to mimmick the market rate fee or the

25   ex-ante bargain by applying a higher percentage of the fee to

1    the first dollars in a settlement, like the first band of

2    recovery where the risk of establishing liability where the

3    greatest risk in the case is present, and then to apply a lower

4    percentage of fee recovery to either the last dollars or lower

5    bands of the tiered recovery to reflect portions of the

6    litigation where the economies of scale cause -- where the

7    economies of scale kick in or where damages -- and, in

8    particular, in cases where damages are not difficult to

9    calculate and can be determined in a mechanical fashion.

10           So, in cases like **Gehrich**, **Capital One**, **Craftswood**,

11    or even **Synthroid II** itself, all cases cited in the objectors'

12    papers, those were consumer fraud cases:   TCPA; you know, calls

13    to the cell phone that were unwanted where the damages -- if

14    the calls can be proven, that's the hard part, the higher

15    percentage of recovery.  The easy part is calculating the

16    damage.  You look at the number of phone calls.  You say,

17    "Here's the statutory damage."  I don't know.  Twenty bucks,

18    whatever.  Do the math.  There are your damages.

19           Okay.  Well, would it be appropriate to apply that

20    model to either the New Jersey case or any of these cases?  And

21    how would one even do so where the risks in each one of these

22    cases was different?

23           The risk of proving damages, as Mr. Norris just

24    described, would potentially be more difficult in these cases

25    than the risk of establishing liability.

```
1              The New Jersey Wage Payment Act is kind of -- or the

2     Consumer Fraud Act would be, you know, an excellent example of

3     why.

4              Perhaps it wouldn't be very difficult to prove

5     recovery if Ms. -- what's your last name?

6              MS. BOUCKENOOGHE:  Bouckenooghe.

7              MS. ROSS:  If Ms. Bouckenooghe is correct, maybe all

8     of the elements of proof were there to prove a Consumer Fraud

9     Act claim, so maybe you would apply a lower percentage to the

10    first dollars.  Although, I disagree with her.

11             But you certainly would not apply a lower percentage

12    to the last dollars or subsequent bands of recovery in this

13    case, not on your life.  There were risks of decertification.

14    I mean, the risks ran through from beginning to end.  And the

15    risk at trial in all of these cases was enormous.  In any of

16    these cases, if there were remand from the Seventh Circuit for

17    trial on the employment status issue, you know, that issue has

18    gone both ways.

19             In Seattle, up in the state of Washington, as FedEx

20    told this Court, at various times during the underlying

21    litigation, the Washington state jury found the drivers to be

22    independent contractors.

23             So the application of tapering, under Synthroid II,

24    would be entirely inappropriate in this case.

25             Okay.  Let's talk about the Alexander fee and let's
```

```
 1    talk about what happened because I was there.  It's my case.

 2              Judge Chen never once suggested that there was

 3    something wrong here.

 4              In the California fee petition, we -- the standards

 5    for obtaining attorneys' fees in the Ninth Circuit are very

 6    different than they are in the Seventh Circuit.  And in the

 7    Ninth Circuit, lodestar crosscheck is mandatory.

 8              We sought fees in that case at 22 percent as a

 9    percentage of the fund, not at 30 percent.  Why?  We recovered

10    $226.5 million.  It was a very large case.  There was no way we

11    were going to ask for more than 22 percent.

12              And the judge -- and we made a presentation to the

13    judge that was our best effort to show him what the California

14    lodestar was in that case, and we did that by isolating from

15    all of the billing records the time put into the case relative

16    to the California claims and the California Plaintiffs, which

17    we were able to do from the group of billing records, and we

18    made an estimation as to what portion of the MDL accumulated

19    lodestar allocated to the omnibus work in the case -- we

20    distinguished between the omnibus lodestar, all the common

21    benefit work, and the state-specific lodestar, and that's in

22    our papers.

23              And if objectors didn't read through the whole file,

24    you know, there's nothing I can do about that.

25              But that's how we presented the lodestar to the
```

 1   Court.  We were very transparent and very upfront.  And we made

 2   our best estimation to the Court that somewhere between 25 and

 3   30 percent -- this cannot be done precisely because 60 percent

 4   of the work in the cases, as of that date, as of the time we

 5   were remanded out of the MDL in 2010, about 60 percent of the

 6   work was omnibus.  And our best estimation was that, if

 7   **Alexander** had been litigated on a stand-alone basis, 25 percent

 8   of the same work would have been done.

 9        We didn't say to the judge 25 percent of the omnibus

10   lodestar work was done solely for the benefit of the California

11   case.  We gave him our very best estimation as to how the case

12   would have been litigated on a stand-alone basis if we had

13   litigated the case in California without the MDL.

14        The Court, then, at the hearing, asked, "Well, what

15   about" -- you know, "What's going on with the other cases?"

16        And by the time the fairness hearing took place in

17   the California litigation, unlike when we filed the fee motion,

18   these 20 mediations had taken place, so we had more data to

19   provide to the Court.  We didn't hold anything back from the

20   Court.

21        **THE COURT:**  Twenty what had taken place?  I'm sorry.

22   I missed that word.

23        **MS. ROSS:**  When we filed the fee petition in the

24   **Alexander** case, September, 2015, none of these mediations had

25   taken place.  We hadn't even agreed to mediation --

 1          **THE COURT:**  That's what I thought you were saying,

 2    but I missed the word.

 3          **MS. ROSS:**  So, we provided the Court, at that time,

 4    in September, 2015, our best estimate of what would have been

 5    done in the California case but for the MDL.

 6          By the time our fee petition was heard in April of

 7    2016, we had been through the mediations in this case.  We had

 8    more data points.

 9          And so the Judge said, "Well, how will all of these

10    things fit together?"

11          That's what he wanted to know.  He wasn't questioning

12    my ethics.  He wasn't accusing us of double recovery.  There

13    was nothing of the kind.  He gave us a multiplier of three for

14    the excellence of the result, okay.

15          And I said to the Judge, "We'll go back and look at

16    it.  We'll look at it."

17          And I made a proposal, and then I filed a declaration

18    with the Court, which has been filed here, in which, you know,

19    we all, together, took the position that another way of looking

20    at how the MDL fee in total could be allocated between the

21    cases would be to look at the value of the benefit conferred by

22    the settlements themselves on the class members.

23          And for that purpose -- and it was a thought

24    experiment and a proposal we made to the Court as another way

25    he could look at it.  We weren't claiming that we were entitled

 1    to 44 percent of the MDL fee in California.  We were helping

 2    the Court think through, in his exercise of discretion and as a

 3    fiduciary to the California class, the best way to look at the

 4    fees.

 5              And so we said, "44 percent of the benefit of all the

 6    settlements, when you add them all up together, went to the

 7    California drivers."

 8              Well, why is that?

 9              Because we got the most money.  We had the most

10    valuable claims.  No other state has an expense reimbursement

11    claim.

12              So, for my 2,000 drivers, we got several hundred

13    million dollars.  That's how it came out.

14              And Judge Chen, he didn't like that idea, and he

15    said -- and you'll see in his order -- he said that that

16    thought experiment, really, you know, led him to conclude that

17    25 percent of the MDL lodestar for the omnibus work would be

18    fairly attributable to the California case, and he awarded us a

19    lodestar.  He approved an unenhanced lodestar of 12.something,

20    and he gave us a multiplier of three.

21              Well, why did he give us a multiplier of three

22    instead of a multiplier of four?

23              Because the Ninth Circuit case law, you know,

24    suggests that is pretty -- is, kind of, the outer limit of the

25    multiplier on lodestar in a common -- in a

1    percentage-of-the-fund case, and that's how they do it the

2    Ninth Circuit.

3           Did we ask for more?  Yes, we did.

4           Did we ask for 30 percent?  No.

5           Are we unhappy with what we got?  Absolutely not.

6    Less money for us, more for our class members.  That's how it

7    came out.

8           The suggestion that there's a double recovery from

9    what happened in the **Alexander** -- from the fee awarded in the

10   **Alexander** case and the fees requested here strains credulity.

11          I never thought I would say that out loud -- I don't

12   even like to write it -- but I can't think of any other words

13   than the cleche, "strains credulity."

14          Why?  Because the California judgment is on appeal.

15   Not one penny of the California fee has been paid to my firm or

16   anybody else, and I don't know if it ever will.

17          So are we accounting for that in what we're asking

18   the Court to do here?  Yes, we're accounting for it.  It's a

19   possibility.  I think it's -- I'm hoping it's a good

20   possibility, but there is a pending appeal that is not going to

21   be decided for quite a long time because the Ninth Circuit is

22   very backed up.  That's how it goes.

23          I want to address the other aspects of the double

24   recovery arguments that we've heard from our colleagues, and I

25   did prepare a little spreadsheet that kind of shows the math

 1   that is described in detail in our declarations, and so I have
 2   copies for everyone.
 3           And I'm very low tech, so no screens.  Sorry.
 4           So these are for you guys.
 5           May I approach, Your Honor?
 6   **THE COURT:**  You may.
 7   **MS. ROSS:**  I once stepped into the well and got
 8   yelled at.
 9           Okay.  So, what this chart shows, Your Honor, this
10   chart kind of walks through what is described in the
11   declaration that we submitted in support of the fee application
12   and the supplemental declaration, so there's nothing new here.
13   What this shows is that the accumulated MDL lodestar, across
14   the board, as of August of 2016, comes to $74.54 million and
15   change.
16           Now, in the California fee petition, we reported to
17   the Court an accumulated MDL lodestar, as of December 2010 when
18   the California case was remanded back to the Northern District
19   of California in San Francisco, of $56 million.
20           And the difference between the two is six years, a
21   lot more work, and something else, and that something else is
22   that the reported lodestar in the California case was based on
23   time submitted to the co-leads by the Committee of the Whole
24   that was as of that time.  And after we resolved all of --
25   reached the tentative resolutions in all of these cases, a call

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1   -- we made the call to the Committee of the Whole for updated

2   time records.  There were some firms who had never submitted

3   back-up for their time and others who had submitted incomplete

4   back-up, and we wanted to be sure that we had everybody's time

5   records because, some day, we're going to allocate the fee, and

6   we want to be sure that that's done fairly.

7           And so part of the difference is that the overall

8   lodestar, as of December 2010 that I reported to the Court in

9   California, was underreported, and that's just how it goes.  I

10  suppose, if we had made the call then, we might have been

11  awarded a higher fee in California, but that's not what

12  happened.

13          The MDL expenses that are shown here -- so that

14  addresses -- actually, Mr. Kohn, in his papers, said that there

15  was a $50 million question.  You know, where's the other

16  $50 million?  Well, that's where it is.  The lodestar was

17  $56 million, not 34, and it was somewhat underreported, and the

18  difference between then and now is that a lot more work has

19  gone into these cases.  We had three rounds of appeal in the

20  Kansas case.  We did a tremendous amount of work to get these

21  cases ready for mediation.  We did, basically, all the damage

22  discovery.  So that's the difference.

23          Okay.  The MDL expenses of $8.6 million as of March

24  of 2015 include expenses that were paid by assessment to the

25  local counsel and the co-leads and the PSC to pay for things

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

```
 1  like transcripts and filing fees and, you know, all those kinds
 2  of routine litigation expenses and also what we called held
 3  expenses.  Every firm paid its own travel for the depositions
 4  that took place all over the country and so on and so forth.
 5  So, you combine the two, and there's $8.6 million.
 6             So, the $83.15 million here represents the MDL
 7  lodestar through August of 2016 and the expenses as of -- I
 8  don't know -- last week.
 9             From the remanded cases -- so, that's what's on the
10  table here.
11             From the remanded cases -- and there were -- is this
12  the wrong chart?  No, it's not.
13             The remanded cases in Colorado, Illinois, Kentucky,
14  Nevada, Massachusetts, Connecticut, Vermont, Kentucky, New
15  Hampshire, Florida -- did I miss any?  You get the picture --
16  Michigan, Virginia, a little collection -- we can go back and
17  look at the remand orders -- the vast majority of those,
18  actually all of those cases, have now settled.  Although, I am
19  the lucky bearer of the one up on appeal.
20             From those cases, to date, we have collected back to
21  the MDL $10.145 million.  That's cash in the bank.  That's what
22  we have in the bank.
23             I heard Mr. Kohn say, "I don't know.  $20 million.
24  Maybe they did recover it."
25             We did not recover it.  We have been entirely
```

1   transparent and truthful with this Court in every filing.

2   That's what's in the bank.  That's what we have collected.

3           There is a possibility that, if the California

4   judgment is affirmed on appeal -- which, you know, I'm going to

5   assume it will be.  But, you know, need I say the word

6   "Brexit"?  Who knows, right -- there will be another

7   $16 million returned to the MDL litigation fund from the

8   California fee representing the unenhanced lodestar for the MDL

9   work, per Judge Chen's analysis, of $10.2 million, plus a

10  multiplier.

11          We also expect that there will be another half a

12  million dollars returned to the MDL from the Arkansas case,

13  which final approval has been granted orally, but there's no

14  written order, but we're expecting -- there is now an order as

15  of -- things change so fast.  Okay.  So another half a million

16  dollars is coming.

17          If you add all of that together and you take account

18  of the uncertain California piece, there will be

19  $26.645 million coming back to the MDL from the remanded cases,

20  representing the work done in the MDL, as represented to every

21  one of those courts, for distribution to all the lawyers who

22  did the work in this case, in these MDL cases, not just these

23  20 cases, all 46 cases, all of them.

24          The fee that we have requested at 30 percent in 19

25  and 33 percent in the last of the cases in front of you now

1    comes to $73.366 million and a half -- $73.366 million.

2          If you subtract the $26 million, if you go to the

3    second to the last line, from the 73.366, that leaves us an

4    unaccounted for MDL lodestar fee of $56.5 million, and a fee

5    award of 73.366 would generate a multiplier of 1.3.  That is a

6    very modest multiplier in contingent fee litigation on the

7    lodestar fee.

8          If California goes south and we never recover

9    anything from that case, a $73.366 million fee award in the

10   remaining cases, taking account of the $10 million and the half

11   a million dollars that's going to come from Arkansas, will

12   generate a lodestar multiplier of zero.  It will be dead on to

13   our lodestar.

14          **THE COURT:**  Wouldn't that be a multiplier of 1?

15          **MS. ROSS:**  That's the multiplier of 1, yeah.  Okay.

16   Not a multiplier of zero, a multiplier of 1.  In other words, 1

17   equals 1.

18          **THE COURT:**  I've never had anyone ask for a zero

19   before.

20          **MS. ROSS:**  Yeah.  No, not a zero multiplier.

21          We have fully accounted for the fees sought in the

22   remanded cases relating to the MDL work.  All of this is in our

23   declarations, and I thought it would be helpful to provide the

24   Court with a more explicit showing of what the math shows.

25          There's no double recovery being sought here.  What

```
 1   we are asking for in the petition in the New Jersey case and in

 2   all of the other cases, essentially, Your Honor, after 12 plus

 3   years of time, for which some of us have been paid nothing --

 4   that would be me -- we're asking to be paid for our time with a

 5   very modest multiplier on lodestar, in recognition of the high

 6   risk, the delay in payment, the preclusion of other work, the

 7   excellence of the result.  That we were able to settle all of

 8   these cases for such stunning amounts of money, given all the

 9   risks in these cases, is undeniable.  It's indisputable, from

10   our point of view.

11          Okay.  I know this has been a long hearing so I'm

12   going to look at my notes.  I really don't want to try the

13   Court's patience because so much of this is in our papers.

14          THE COURT:  I'll tell you what.  We've been at it for

15   a little over two hours.  I always promise the jurors they

16   won't have to sit here for more than two hours, so why don't we

17   take a 10-minute break, let you look over your notes --

18          MS. ROSS:  Yeah, and then we'll speed to the end.

19          THE COURT:  -- and then we'll hear from the class

20   reps to close us up.

21          MS. ROSS:  Thank you, Your Honor.

22          LAW CLERK:  All rise.

23          (All comply; short recess taken.)

24          THE COURT:  You may be seated.

25          (All comply.)
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

1          **THE COURT:**  And, Ms. Ross, I believe that the podium

2   was with you when we broke.

3          **MS. ROSS:**  Okay.  I just have a few more brief

4   comments.

5          I should never say that, right?  It will be like 45

6   minutes, and you'll be saying to yourself, "Brief.  What's that

7   definition of brief in California?"

8          Okay.  I just have a couple more things I want to

9   say.

10          Returning to the question of whether the settlement

11   is fair and adequate and appropriately resolves particularly

12   the Consumer Fraud Act claim, there are two points I would like

13   to make.

14          The first is that -- three points.

15          The first is that --

16          **THE COURT:**  Very lawyer like.

17          **MS. ROSS:**  Very lawyer like, looking at my fingers.

18          Every argument that Ms. Bouckenooghe --

19          Bouckenooghe?

20          **MS. BOUCKENOOGHE:**  Bouckenooghe.

21          **MS. ROSS:**  Bouckenooghe.  Sorry.

22          Dutch, right?

23          **MS. BOUCKENOOGHE:**  Belgian.

24          **MS. ROSS:**  Belgian, okay.

25          Every argument that Ms. Bouckenooghe made in her oral

1    presentation, every one of them is responded to in our final

2    approval brief so I'm not going to try the Court's patience by

3    saying the same things we've said in writing.

4            But I would like to point out, first, there is a body

5    of case law we do discuss in our final approval brief

6    responding to the first iteration of the objections that says:

7    Settlements of claims where treble damages are available are

8    appropriately valued by reference to the single damages that

9    could be recovered because, otherwise, settlement evaluation,

10   including the treble damage piece, would really interfere with

11   many, many settlements, in antitrust cases in consumer fraud

12   cases, and so on and so forth.

13           There's a really nice discussion in a decades-old

14   opinion from the Second Circuit called **City of Detroit versus**

15   **Grinnell** which is talked about in our papers.

16           There's a 2011 Third Circuit opinion called **Sullivan**,

17   also talked about in our papers.

18           And there's a Ninth Circuit case called **Rodriguez**

19   **vest West Publishing**, all of which explain -- lay out the

20   reason why it's not only appropriate, it's preferred to value a

21   claim like this Consumer Fraud Act claim by reference to the

22   single damages, which really reflect the harm to the Plaintiffs

23   as the best measure of settlement, instead of the punishment

24   factor that a successful Plaintiff could get at trial.

25           And that's what we did here, and that's what we've

1  asked the Court to do, in terms of measuring the settlement in

2  this New Jersey case at $25.5 million against the net expected

3  value if no settlement were reached.

4        So, I think it's really -- you know, it's just not

5  correct to say that we undervalued the claim because we didn't

6  take the $32 million or $46 million, multiply it by three, and

7  then discount for risk.

8        Had we done so, we would have been asking the

9  Defendant, as a condition of settlement, to concede to

10  liability, which no defendant will ever do, so that was the

11  first thing I wanted to say.

12        The second point I want to make is that

13  Ms. Bouckenooghe spent some time talking about fee shifting and

14  why the settlement was undervalued because we didn't factor in

15  the value of a possible fee shift.

16        And fee shifting, you know, comes into play if you

17  win the case.  Fee shifting does not come into play if you

18  settle a case.  There's no basis for fee shifting in a

19  settlement.

20        And, you know, we went over this ground, actually,

21  with this Court when we filed our motion for a common benefit

22  set aside, and the Court denied that motion, in part, because

23  we were talking about mixing fee shifting and common benefit

24  recoveries.

25        There's no basis for fee shifting if there's no

1    liability found and no judgment, and that's why we didn't

2    consider the value of fee shifting in terms of the settlement.

3            And last but not least, I want to circle back around

4    to the attorney-fee argument.

5            The chart that we put together for the Court was for

6    the purpose of showing, you know, very concretely -- refuting

7    the claim that we're attempting to double recover.  But we

8    don't want to lose the very important point that fees in this

9    Circuit and in each one of these cases are appropriately

10   awarded as a percentage of the fund and that the lodestar is

11   not really a relevant consideration and that a lodestar

12   crosscheck is not mandatory or required.  And, most certainly,

13   lodestar is not the cap on a common fund fee recovery.  That's

14   just not the law.  If it were, nobody would have a contingent

15   fee practice.  I certainly wouldn't.

16           And so, with that, we would ask the Court to approve

17   the settlement and approve the fee award and overrule all of

18   the objections.

19           **THE COURT:**  Thank you, Ms. Ross.

20           Mr. Kohn.

21           **MS. ROSS:**  I believe Mr. Marchetti wanted to say

22   something.

23           **THE COURT:**  Oh, I'm sorry.

24           Mr. Marchetti.

25           **MR. MARCHETTI:**  Thank you, Your Honor.

```
1              Anthony Marchetti, Jr., of the Marchetti Law Firm.

2              This is my first time in 12 years to have the

3    opportunity to speak to the Court, and I didn't want to let it

4    pass by without taking advantage of that chance.

5              As the Court may be aware, I've bean in counsel, both

6    in New Jersey and in other states that are both still within

7    the MDL, as well as many that have been remanded.

8              I just wanted to just make sure that it was clear, on

9    the record, a couple basic points.

10             First of all, I do believe and recommend that the

11   settlement is reasonable and should be accepted.  I believe it

12   basically takes the risks and the benefits, the pros and the

13   cons, as has been discussed today.

14             And I may disagree with Mr. Norris, I may disagree

15   with Ms. Ross about the strength of the consumer fraud claim.

16   However, when you put all of them together, the settlement, as

17   a whole, is fair.

18             And when you look at the numbers, the difference

19   between the proposed resolution that's for Your Honor to

20   determine and what's requested is really a small amount.  It's

21   almost -- I believe the math works out to maybe $12 per week,

22   per driver, a very, very small amount.

23             And the settlement does, in fact, address the issues

24   of risk, both the risk of things like the FAAAA, which, of

25   course, we may disagree with FedEx, but we don't know what's
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**      213

```
 1   going to happen down the road on the Costello versus BeavEx
 2   case and also the risk of the other defenses raised and have
 3   been discussed ad nauseam in the briefing and for the past two
 4   days.
 5           And the last point that I wanted to raise is that
 6   that the settlement does provide a level of certainty and
 7   finality with regard to the class as a whole, as well as the
 8   named Plaintiffs, and that is the case will be resolved,
 9   payment will happen sometime in the, perhaps, foreseeable
10   future, as opposed to the path that the case may take if the
11   settlement is not approved.
12           I was lucky enough to be counsel or brought in as
13   counsel after several years of the remand in Florida where the
14   case had proceeded for a period of time before Mr. Stack asked
15   Mr. Houston and I to come in and assist him.  And then, after
16   we stepped into the case, we were involved in the case for
17   another two-and-a-half or three years before the case was
18   resolved.  And the point being that the cases, even if
19   successful on appeal, if the cases are not resolved, the cases
20   could last three, four, five, six more years going forward.
21           And, as was discussed, as was discussed yesterday, as
22   was discussed today, it's in the interest -- we believe or I
23   believe -- in the interest of the class to actually have
24   payment happen now, as opposed to rolling the dice on what
25   might happen down the road through several different courts,
```

1    for, essentially, $12 per week.

2          Thank you.

3          **THE COURT:**  Thank you, Mr. Marchetti.

4          **MR. HARWOOD:**  Your Honor, before we give Mr. Kohn the

5    last word, I just wanted to respond.

6          **THE COURT:**  You folks had two argue the first time

7    around, Mr. Kohn.

8          **MR. KOHN:**  That's three now, Your Honor.  They all

9    offer the same opinion.

10         **MR. HARWOOD:**  I just wanted to respond to one of

11   Your Honor's questions about the exact language that the

12   objectors employed about settling for $30 million.  It appears

13   in the declaration of Michael Tofaute dated February 3, and in

14   Paragraph 13, it says:  I joined in Mr. McMahon's statement to

15   Ms. Ross that we would not settle this case below $30 million.

16         And two paragraphs later, in Paragraph 15, the last

17   sentence says:  However, she -- Ms. Ross -- already knew that

18   we would not agree to a settlement under $30 million.

19         So, I think someone making a sober evaluation of the

20   risks involved would not walk away from $25.5 million sitting

21   on the table, you know, down an uncertain path into the future.

22   It seems like a reasonable thing to accept.

23         Thank you, Your Honor.

24         **THE COURT:**  Thank you.

25         Mr. Kohn.

1      **MR. KOHN:**  Your Honor, I was going to be briefer, but

2  I wasn't expecting Mr. Marchetti to get up and speak.

3      I find it somewhat interesting, considering he's

4  taken his name off of co-lead counsel's briefs in response to

5  anything that we filed in this case, including the preliminary

6  approval brief, and, yet, has come here with no papers and

7  offered up his opinions, so let me just address a couple of

8  those things.

9      I think that Mr. Marchetti being the only New Jersey

10  counsel at that mediation and the one who's most familiar with

11  the consumer fraud claim, surprising that his opinions weren't

12  given great weight by the rest of co-lead counsel that day

13  because I believe, if asked, he would think that the New Jersey

14  Consumer Fraud Act claim had at least a 20 percent chance of

15  success, which is kind of what we've been arguing in our papers

16  on the fairness.

17      So counsel at the mediation was negotiating from a

18  weak position.  They didn't realize that they had a $10 million

19  hammer to wield to try to drive up the number.  They ignored

20  that, gave it zero, ignored the attorneys' fee shift, gave it

21  zero, and negotiated from a weaker position.

22      So when they say, "We fought hard with FedEx," that's

23  fine, but you forgot half the bullets.

24      That claim is worth at least an additional

25  10 million, which who knows how much that would have resulted

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS

```
 1   in, had it been used properly.  Had it been used to negotiate
 2   the settlement here, we believe the settlement would have
 3   increased, so the way it is now is unreasonable.
 4          That $10 million claim, which one of the red flags
 5   Your Honor pointed out in your opinion on the proffer, means
 6   that this is unreasonable, means that this isn't fair.  That
 7   claim was given zero for no reason.
 8          We haven't seen any mediation briefs.  We haven't
 9   been given the matrix that we've asked for on how they plugged
10   in play.  From our clients, we've been told that number
11   percentages were put in and values were spit out.  If we had a
12   look at that and Your Honor saw fit, then maybe that will
13   change our opinion or maybe it will support our position.
14   We've been fought every step of the way to get that.
15          The fee shifting that Ms. Ross mentioned, that you
16   don't talk about that as part of settlement, again,
17   Mr. Marchetti being the New Jersey attorney at that mediation
18   knows, when you're dealing with consumer fraud claims and
19   you're negotiating a class action settlement, as we all have
20   done in the past, having fee shifting as part of that is an
21   extraordinary, again, hammer to wield to get extra money,
22   either for the class or in terms of actually discussing, look,
23   we'll settle the class here and we'll fee shift.
24          As we've set forth in our papers, Your Honor, that
25   was proposed by FedEx and ignored and shot down by co-lead
```

1    counsel.  Yet, when we come to the Court now, this settlement,

2    at least, where the negotiation was at that time -- and,

3    obviously, it wasn't final.  It could have gone up or down --

4    would have resulted in a million more to the class than what

5    they got at 25-and-a-half million.  That shows the

6    extraordinary value that fee shifting has.  They would have

7    gotten more money, with a lesser number, than what co-lead

8    counsel got them after the protracted and long negotiation.

9    They didn't realize the strength of that.

10            As Mr. Harwood pointed out, I think he read -- he did

11    read the declarations of our clients correctly.  At the time,

12    at that mediation, they said they wouldn't settle for less than

13    30.  That doesn't mean they would settle for 30.  They wouldn't

14    settle for less.  That sure as heck doesn't mean he would

15    settle for 30.  That's how that's represented.  Your Honor can

16    read the papers and draw your own conclusions from that, but I

17    think it's clear that they wouldn't have, and they walked out

18    because of that.

19            Let's go back, just real quick.  I'll touch on the

20    attorneys' fees, Your Honor, and, then, hopefully, we can all

21    go have some lunch.

22            So, as it relates to the attorneys' fees, class

23    counsel has said, basically, any mechanism in which the Court

24    should view their fees that would result in less is wrong.

25            Apparently, according to them, the Seventh Circuit

```
 1   allows for bloated and excessive fee awards.  That's not the

 2   case.  No court allows for that.  Every court looks at

 3   excessive fees.

 4        We think the template set forth by Judge Chen

 5   provides good guidance to this Court on how these fees should

 6   be looked at in this case.

 7        And, yet, I'll take Ms. Ross's piece of paper that

 8   she gave us.  She said:  It only gives you a 1.3.  Look, it all

 9   works out.  The math works out perfectly.

10        She asked for a 30 percent multiplier on her

11   expenses.  I'm sorry.  You don't get a multiplier on your

12   expenses.  That's how she did the math.

13        You take that math out, you're down to 46 million in

14   fees that are left over.  With a 1.3 multiplier, that's 59.8,

15   not 73.

16        So I ask, Your Honor, when you're looking at the

17   reasonableness of these fees -- and, again, Ms. Ross says:

18   Lodestars don't matter.  I don't know why they're raising it.

19   They're wrong.

20        They raised it first.  It was in their motion for

21   fees in September of 2016, long before Your Honor ever got to

22   see our papers from us or know of us.  They raised it then.

23   We've just tried to keep them in check.

24        So, if they raised the lodestar, it's worth looking.

25   They felt it sufficient and important to bring it to the
```

 1   Court's attention back in September before any objections.  Now

 2   that there are objections to that, suddenly:  Don't look at our

 3   lodestar anymore, Your Honor.  Let's do some creative math.

 4   Let's count expenses as our lodestar figure and then multiply

 5   them.

 6            Again, multipliers is to fees.  And if we give them

 7   the credit -- and I don't know how we're at 16 million now.  In

 8   California, we were at 20 in their papers.  But I'll take 16

 9   for what it is.

10            Again, the Arkansas fee, 500,000.  First time I've

11   heard of that one today.

12            Your Honor, these fees are unchecked.  They've not

13   been accounted for.  They're going to result in a windfall

14   recovery in this case.  So whether Your Honor applies it to

15   just New Jersey or whether you apply it globally, how

16   Your Honor sees fit and what guidance Your Honor gives the

17   Court, at least as it relates to New Jersey, some reduction of

18   fees is appropriate in this circumstance.

19            We've given Your Honor our calculations, from 1.7 or

20   $1.9 million fee to the New Jersey class for that case for the

21   work done, all the way to what we think is 6.6 million, which,

22   I think, is beyond fair and reasonable, but, under that

23   sliding-scale approach, that's what the Court suggests.

24            The sliding-scale approach, again, as counsel says,

25   is not mandatory.  Right, it's not, but the Court should apply

1    it.

2              Their response to that:  It's not mandatory so we

3    shouldn't do it.  That's not the law.

4              And when we look at what we talked about with the

5    20 million or 16 million from California, you heard from

6    Ms. Ross:  I don't know if I'm going to get it so let's not

7    talk about it.  Let's not count it.  If it's on appeal, it will

8    be a long time so we shouldn't consider it.

9              Your Honor, that's not the way the law works to

10   protect the class reps.

11             Ms. Ross talked about making sure that the class gets

12   every dollar that they should.  They were happy with

13   16.4 percent in California for virtually the same amount of

14   work that was done in this case.  16.4 percent sounds like a

15   wonderful number here, and I assume they would be happy with it

16   here, as well.

17             And just before I finish, Your Honor, you know

18   Your Honor commented on Ms. Ross' outburst, for lack of a

19   better word, before, and I thought it was done then.

20             Ms. Ross, when she got up here, also continued to

21   criticize me and my colleagues, trying to mimmick my voice.

22   I'm not going to respond to it, but I just think, Your Honor,

23   that that is uncalled for.

24             **THE COURT:**  Thank you, sir.

25             To those of you who I have been working with on this

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS

```
 1   case only for the last few months, thank you for your
 2   presentation.
 3           For those of you who have been here for 12 years or
 4   even the session before the Denver session when this MDL was
 5   created, it's been good working with you folks.
 6           I imagine everything I do from here on out will
 7   likely be in writing, whatever it is I do, and, perhaps, more
 8   in writing, depending on what the Court of Appeals does,
 9   depending on what I do.
10           Ms. Ross.
11           MS. ROSS:  Yes.
12           I just -- you know, I neglected to say two things not
13   related --
14           THE COURT:  We've got to stop at some point.
15           MS. ROSS:  Okay.  But this is not related to New
16   Jersey.  It's a matter of housekeeping.
17           THE COURT:  Oh, housekeeping?
18           MS. ROSS:  Yeah.
19           THE COURT:  Okay.
20           MS. ROSS:  No, we're done.  I know better.
21           We wanted to jointly alert the Court that, as you've
22   heard a couple of times, we are this close (indicating) to
23   resolving the class ERISA claim.
24           THE COURT:  The ERISA claim.
25           MS. ROSS:  And that claim was asserted in the Kansas
```

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**

```
 1   complaint, and it was dismissed without prejudice.

 2           So, we are expecting to file something with the Court

 3   within the next two weeks to let you know that we have, in

 4   fact, finalized a settlement, a tentative class settlement, and

 5   that we'll be asking the Court to issue a Rule 54(b) judgment

 6   in the Kansas case so that we can amend that complaint,

 7   reassert the claim, and then proceed with settlement.

 8           THE COURT:  Okay.

 9           MS. ROSS:  So, I just wanted to let you know that.

10           And the second thing I was asked to let the Court

11   know is that there are proposed -- there's a whole batch of

12   proposed final judgments that we have collectively put together

13   that we will supply to the Court.

14           THE COURT:  Okay.  Thank you.

15           MS. ROSS:  Okay.  Thank you.

16           THE COURT:  And I assume you're not proposing that I

17   slow down on these settlements because of the ERISA case?

18           MR. HARWOOD:  Please, don't slow down.

19           MS. ROSS:  No, not at all, Your Honor.

20           THE COURT:  I didn't think so.

21           MR. KOHN:  Your Honor, real quick.

22           You asked for me to give the **Alexander** opinion.

23           THE COURT:  Yeah.

24           MR. KOHN:  I just want to make sure that Ms. Ross

25   knows, because I don't want to be accused of anything, that
```

 1    there's highlighting in here, but that's the way it came off

 2    ECF.

 3              **THE COURT:**  That's okay.

 4              **(Attorney Kohn not near microphone;**

 5              **Court reporter unable to hear.)**

 6              **MR. KOHN:**  -- so I just wanted Your Honor to know

 7    it's not our highlighting.

 8              **THE COURT:**  Okay.  I appreciate it.  Thank you.

 9              **MS. ROSS:**  It was filed under seal, and then it was

10    unsealed, and that's why the highlighting.

11              **MR. KOHN:**  I just wanted to make the Court aware.

12              **THE COURT:**  No, that's fine.  I appreciate it.

13              **MR. MILCOFF:**  Your Honor, one final thing.  If we

14    could have a quick sidebar about an issue that Mr. Kohn just

15    raised in his remarks, and then I think we're done.

16              **THE COURT:**  I guess I'm confused.  Let me hear what

17    you have to say and then decide whether it should be a sidebar.

18              I assume you want sidebar because --

19              **MR. MILCOFF:**  Of confidentiality, Your Honor.

20              **THE COURT:**  Okay.

21              **MR. NORRIS:**  Is Mr. Kohn welcome?

22              **MS. ROSS:**  Oh, wait.

23              Us, too?

24              **(Simultaneous speaking.)**

25              **COURT REPORTER:**  I'm sorry.  I need to know who's

 1    speaking and I need to be able to hear you.

 2            **MS. ROSS:**  May I join you or no?

 3            **MR. MILCOFF:**  Joseph Milcoff, for FedEx.

 4            We have a confidentiality issue, due to the

 5    negotiations that were done before the mediator, that we would

 6    like to address with the Judge at sidebar, with only people who

 7    are a party to that confidentiality agreement so that the Judge

 8    may deal with it as he sees fit.

 9            **THE COURT:**  All right.  If it's anything that

10    wouldn't be confidential, I'll certainly let you know what was

11    said, Mr. Kohn.

12            **MR. KOHN:**  Okay.

13            **(Sidebar conference commenced.)**

14            **THE COURT:**  You need to talk into this, and you need

15    to identify yourself.

16            **MR. MILCOFF:**  Your Honor, Joseph Milcoff, for FedEx.

17            During Mr. Kohn's remarks, what was represented to

18    the Court is that FedEx made a request that a fee shift be

19    considered as part of settlement discussions.

20            To my knowledge, to my colleagues' knowledge, no such

21    proposal was ever made and believe that's a misrepresentation

22    to the Court.

23            **THE COURT:**  Okay.  I think that was included in his

24    earlier papers, rather than here for the first time, so I'm

25    going to let him know what your concern was.

**CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS**   Page 225

```
 1              MR. MILCOFF:  We didn't want to breach the

 2   confidentiality.

 3              MS. ROSS:  Right.

 4              THE COURT:  No, I understand.  Yeah, I appreciate it.

 5              MS. ROSS:  Right, and we conquer.  We all recall

 6   what, actually, was said, and we have not responded because we

 7   are holding fast to the mediation (inaudible) and don't want to

 8   breach it.

 9              THE COURT:  All right.  Thank you.

10              Mr. Kohn, come on up.

11              Counsel, let me ask you to stay here so you can be

12   here (inaudible) --

13              COURT REPORTER:  Judge, I can't hear you.

14              THE COURT:  Since confidentiality is involved, I

15   don't want to tell just everybody that's here.

16              You had made reference -- and I know it's in your

17   papers, which is why I don't think you need to make another

18   response -- about the offer to negotiate a settlement with the

19   fees separate.

20              And the position, I'm told -- and they had to do it

21   privately because it was all covered by the confidentiality

22   agreement -- neither side remembers that.

23              Again, I'm not deciding anything today, but I did

24   want to let you know what it was I was told.  And since it was

25   in your papers, it didn't seem --
```

CERTIFIED EXCERPT TRANSCRIPT OF PROCEEDINGS

```
 1              MR. KOHN:  Your Honor, we put forth factually what

 2   our clients believe was said and done, and Your Honor can

 3   determine.

 4              THE COURT:  Okay.  Thank you.

 5              MR. KOHN:  Yep.

 6              (Sidebar concluded.)

 7              THE COURT:  Last call?

 8              MS. ROSS:  Thank you, Your Honor.

 9              THE COURT:  Thank you, folks.

10              LAW CLERK:  All rise.

11              (All comply; proceedings concluded.)

12                          ***

13                       CERTIFICATE

14      I, DEBRA J. BONK, certify that the foregoing is a

15   correct transcript from the record of proceedings in the

16   above-entitled matter.

17      DATED THIS 7TH DAY OF JULY, 2017.

18                       S/S DEBRA J. BONK

19                       DEBRA J. BONK
                         FEDERAL CERTIFIED REALTIME REPORTER
20

21

22

23

24

25
```